IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY ROBERTS,                              No.  CIV S-93-0254 GEB DAD DP

      Petitioner,

  v.                                       ORDER RE FURTHER DISCOVERY

S.W. ORNOSKI, Acting Warden
of the California State
Prison at San Quentin,
                                            **DEATH PENALTY CASE**
      Respondent.
_____/

      On September 29, 2005, the court issued an order addressing petitioner's motion for discovery and amended supplementary motion for discovery.  Petitioner's motion was granted in part and denied in part.  (See Order filed September 29, 2005 at 85-86.)  The court ordered respondent to produce certain discovery within thirty days. (Id.)  However, in his discovery request 85 petitioner sought "[a]n accurate and complete transcript of the 8/25/80 interview of Marcus Richardson which was seen by Judge Taft and by Petitioner Roberts during the state court evidentiary hearing."  (Pet.'s Mot. for

1

Discovery at 24.)  By "accurate and complete" petitioner means a transcript reflecting a statement by Richardson fully exonerating petitioner of any involvement in the killing that resulted in the imposition of the death penalty. Without objection by respondent, petitioner's request for a limited evidentiary hearing with respect to discovery request 85 was granted. (Id. at 75.)  Both parties filed pre-hearing statements.

The limited evidentiary hearing was conducted before the undersigned in February of 2006.  Robert Bloom and Claudia J. Robinson appeared on behalf of petitioner.  Deputy Attorney General Glenn R. Pruden appeared on behalf of respondent.  That hearing spanned two days and included the testimony of nine witnesses.[1]  The matter was fully presented and argued at the hearing.  Nonetheless, at the request of petitioner's counsel, the parties were given an opportunity to file post-hearing briefs.  In addition, on February 17, 2006, petitioner filed an additional discovery motion asking that he be administered a court-ordered polygraph examination on the subject of his testimony at the evidentiary hearing.

Below, the court will address each of the pending discovery matters, taking up first petitioner's discovery request 85 which was the subject of the limited evidentiary hearing.

/////

---

[1] The following witnesses testified at the hearing: The Honorable Franklin R. Taft, both of petitioner's counsel (Claudia Robinson and Robert Bloom), petitioner Larry Roberts, Deputy Attorney General Susan Lee, former Deputy Attorney General Karl Mayer and former correctional officers Thomas Hartman and Robert Horton.

I.   <u>Discovery Request 85 - The August 25, 1980 Interview of Witness</u>
     <u>Marcus Richardson</u>

     A.   <u>Introduction</u>

          Petitioner has long-claimed that in the underlying state
court criminal proceedings the prosecution adulterated tape
recordings and prepared and produced false transcripts of witness
interviews.  In particular, petitioner has argued that there is a
transcript of an interview of witness Marcus Richardson in which
Richardson exonerates petitioner by stating that petitioner was not
even present at the scene of the assault on Charles Gardner.
Petitioner claims that both he and the judge assigned by the
California Supreme Court to preside over the evidentiary hearing in
his state court habeas action, retired Superior Court Judge Franklin
Taft, finally saw this version of the transcript during the course of
those collateral proceedings but that it was then suppressed by
respondent's counsel once again.  In this regard, petitioner's
counsel claims that at the state court hearing Judge Taft paraphrased
the transcript in which Richardson exonerated petitioner.
Specifically, petitioner points to the following statements made by
Judge Taft during an <u>in</u> <u>camera</u> conference with respondent's counsel
(Deputy Attorney Generals Lee and Mayer) at which time witness
interviews were addressed:

          THE COURT: The problem I have, I think it's
          principally with Exhibits 1 and 1A.  I don't know
          whether you've had a chance to look at it or not.

          MS. LEE: Um-hum.

/////

THE COURT: But it's – that's been called
inculpatory. Now, this is the person, I don't
know whether you recall, but Marcus Richardson
was the person who was supposedly with Cade, that
Cade mentioned.

MS. LEE: Yes.

THE COURT: And Cade drew the map of the place
where everybody was.

MS. LEE: Yes.

THE COURT: Right after Cade testified, then this
witness, I mean, was interviewed.
     He draws also a map very similar, but puts
everybody in different locations. **He impeaches
Cade's testimony pretty well, and he exonerates
Roberts, so I don't see how it's inculpatory.**

* * *

THE COURT: Well, I can figure out pretty well
what he's talking about. Essentially he says
that he's with Menefield just like Menefield, not
Menefield, hell, with Cade, just like Cade said.

MS. LEE: Yes.

THE COURT: That they talk about going against the
wall, that they then move down the hallway from
where it was, then there's typical, "You mean,
right here where I think it's him in that
regard?" And they're drawing that and put that
on the diagram there, **then he said there were two
people involved; that he knows, knows Roberts,
that Roberts was not one of the people involved,
that it was Menefield, and who dropped the knife,
picked it up again, ran up the stairs with
Gardner, chasing him, and he completely leaves
Roberts out although he says he knows, doesn't
know him personally but he knows him by sight and
who he is, and it seems to me that that's not
only contradicting Cade which sort of opens the
door on the Supreme Court question: Did Cade
actually see what he said he saw, but also it
raises a Brady issue that I just don't feel
comfortable closing my eyes to it if it is a
Brady issue.**

/////

1  (Reporter's Transcript (RT) at 2151, 2153-54; Limited Evidentiary

2  Hearing (LEH) at 325-26, Ex. P at 2151, 2153-54)(emphasis added).[2]

3       Through his discovery motion, petitioner seeks an order

4  requiring that an accurate tape recording and transcript of that

5  interview (i.e. one reflecting statements by Richardson exonerating

6  petitioner) be produced since it would be highly relevant to

7  petitioner's claim of prosecutorial misconduct in both the trial

8  court and habeas proceedings.[3]

9       Respondent's counsel has consistently represented that

10  petitioner and his counsel have received a copy of the only

11  transcript that exists of the August 25, 1980 Richardson interview.

12  (Resp. to Mot. for Discovery at 19; Resp. to Supp. Mot. for Discovery

13  at 24.)  Indeed, counsel has represented that with respect to all

14  requested transcripts and recordings, petitioner has been provided

15  with complete and accurate versions.  Finally, counsel for respondent

16  suggested that any remaining questions as to whether another

17  Richardson interview transcript ever existed, could be addressed by a

18  limited evidentiary hearing.

19       Given the seriousness of the allegation and the likelihood

20

21       [2] Earlier, on November 29, 2006, in open court with all counsel
in attendance, Judge Taft had stated: " I received some interviews

22  yesterday and I've read the interviews.  I think there is some - -
quite a bit of exculpatory statements in the interview, so I'm going

23  to turn them over, which creates another problem.  The interview was
done by Mr. Horton and Mr. Hartman."  (RT at 1196; LEH, Ex. N at

24  1196).  Thereafter, scheduling matters were discussed by the court
and counsel.  (Id. at 1197.)

25       [3] Petitioner has also asserted that parts of tape recorded

26  witness interviews have never been produced and has suggested that
parts of recordings were destroyed in the process of copying them.

that absent a final resolution by this court the issue would continue
to be the source of contention, a limited evidentiary hearing was
granted.  That evidentiary hearing was specifically limited to the
question of whether another version (i.e. one containing exculpatory
statements attributed to Richardson as alleged by petitioner) of the
Richardson interview transcript did exist and, if so, what became of
it.  Below, the court will summarize the evidence presented at the
hearing.

    B.  <u>The Limited Evidentiary Hearing</u>

        Retired Superior Court Judge Franklin Taft was appointed by
the California Supreme Court in 2000 to serve as the referee at an
evidentiary hearing in petitioner's state habeas proceeding.  At some
point in those state habeas proceedings, Deputy Attorney General
Susan Lee delivered transcripts of witness interviews to Judge Taft's
chambers for his review.  (Transcript of Limited Evidentiary Hearing
held February 7-8, 2006 (hereinafter Tr. LEH) at 6.)  Judge Taft
acknowledged at the evidentiary hearing before this court that at the
state court hearing he stated that he had reviewed an interview
transcript that had "quite a bit of exculpatory statements" but he
now has no specific recollection of the nature of that exculpatory
information. (Tr. LEH at 8, 43-44.)  Moreover, Judge Taft had no
recollection of the content of the interview of witness Richardson.[4]

_____

    [4] Judge Taft also explained that because the inmate witnesses
were referred to in the transcripts by number rather than by name and
because he did not have a conversion chart, at the time of the state
court hearing he was confused regarding the identity of the inmate
being interviewed in any particular transcript. (Tr. LEH at 45.)

(Tr. LEH at 11.)   He did recall bringing Deputy Attorney General Lee
and Mayer into chambers to tell them he intended to order the
previously undisclosed interview transcripts turned over to
petitioner's counsel because he believed they contained <u>Brady</u>
material.  (<u>Id</u>. at 33-35.)   Judge Taft also had a vague recollection
that he returned all of the interview transcripts submitted for his
review to Deputy Attorney General Lee and that she gave them to
counsel for petitioner.  (<u>Id</u>.)   Beyond that, Judge Taft had no
recollection of the date or manner in which those interview
transcripts were provided to petitioner's counsel at the state habeas
hearing.

Although acknowledging his statement at the December 18,
2000, hearing regarding the nature of the exculpatory witness
interview he had reviewed, Judge Taft testified that he had been
provided more than one interview shortly before the start of a court
session[5] and had merely "flash read" them.  (<u>Id</u>. at 19-20, 32.)   He
also testified that he was under time pressure during the hearing
because he was simultaneously serving as the civil law and motion
judge in his court.  (<u>Id</u>. at 45.)   He had no recollection of any
specific document to which he may have been alluding in his comments
set forth above.  (<u>Id</u>.)   Judge Taft testified that it was possible
that he had misread an interview, resulting in the comments that form
the basis of petitioner's claim that a second Richardson interview

_____

[5] Although this was Judge Taft's current recollection, it
appears from the transcripts that he in fact likely received the <u>in</u>
<u>camera</u> submission on or about November 28, 2000, the day before his
initial comments regarding the interview transcripts. (<u>Id</u>. at 25-26.)

transcript has been suppressed.  (Id. at 32, 45.)  He also explained

that in making the comments in question, he was not entering an

evidentiary finding as to what any inmate witness had said in their

interviews but rather was merely explaining why he was ordering the

interview transcripts turned over to petitioner's counsel.  (Id. at

20.)  Judge Taft further explained that the matter did not seem

significant at the time of the state court hearing and that he

believed if there was an issue presented by the contents of the

interviews, it would have been raised at that time by the parties who

would spend more time reviewing the transcripts than he had.  (Id. at

20, 22-23, 60-61.)

            At the time of the hearing before this court there was

doubt in Judge Taft's mind whether his comments on December 18, 2000

even referred to a Richardson interview transcript.  (Id. at 29.)

However, Judge Taft did have a recollection of petitioner's counsel

making a "big production" out of wanting all the interview-related

documents at the state court hearing and, after receiving them, not

following up with any questions to the witnesses about the contents

of those interviews. (Id. at 41, 60.)  Moreover, Judge Taft believed

that he would have had any interview transcripts that he believed

petitioner's counsel may not have previously received, marked as

exhibits to ensure that they had been produced.  (Id. at 48.)

However, in the end and although he continues to express the belief

that perhaps he had confused different interviews with one another,

Judge Taft had no cogent explanation as to what he was referring to

in his comments regarding the existence of exculpatory evidence on

1   December 18, 2000.  (<u>Id</u>. at 53-58.)

2          Claudia Robinson, one of petitioner's attorneys both before

3   this court and in the state court habeas proceedings, testified next.

4   Attorney Robinson testified that she was at counsel table with

5   petitioner when, after his <u>in camera</u> review, Judge Taft directed the

6   clerk to provide petitioner's counsel with copies of at least two,

7   and perhaps more, inmate witness interviews just before a recess was

8   taken.  (<u>Id</u>. at 67.)  According to attorney Robinson, petitioner's

9   other counsel, Robert Bloom, was out of the courtroom at this time.

10  (<u>Id</u>. at 68.) It was attorney Robinson's recollection that while

11  petitioner was looking at one of the documents just delivered to

12  them, one of the deputy attorney generals asked for the documents

13  back and that Robinson gathered them and returned them to Deputy

14  Attorney Generals Lee and Mayer who looked at them and then returned

15  only one to her.  (<u>Id</u>. at 67.)  Robinson recounted that she did not

16  question the deputy attorney generals why only one document was

17  returned, although she remembered feeling uncomfortable about it and

18  ultimately expressed her concern to Mr. Bloom.  (<u>Id</u>. at 78-80.)

19         Attorney Robinson could not describe the documents that

20  were the subject of this exchange other than to state that they were

21  type-written, but she believed from the context of the production

22  that one of them was the interview of Marcus Robinson. (<u>Id</u>. at 69-

23  70.)  She had no recollection whatsoever of whether petitioner said

24  anything to her about these documents or what he had seen in them,

25  nor of whether she had seen petitioner say anything to Mr. Bloom when

26  he returned to the courtroom (<u>Id</u>. at 73-74, 76.)

1    Petitioner Larry Roberts testified at the hearing before

2   this court to a similar version of events.  He recalled that during a

3   recess in the state habeas hearing sometime after an _in camera_

4   session[6], while attorney Bloom was out of the courtroom, Judge Taft's

5   clerk delivered two documents to counsel table and indicated that the

6   judge had sent the documents out for them. (_Id._ at 83, 92.)

7   Petitioner reviewed one of the documents which was Richardson's

8   statement that he and his counsel had seen before. (_Id._ at 83-84.)[7]

9   According to petitioner, the second document was another Richardson

10  statement that began the same as the first but after a few pages

11  included a statement by Richardson that he had witnessed the stabbing

12  by two assailants, one of whom was Menefield and the other one of

13  which was definitely not Roberts. (_Id._ at 84.)  Petitioner testified

14  that he was in "total shock" upon reading this never-before-seen

15  statement exonerating him and leaned back in his chair. (_Id._)

16    According to petitioner, it was then that Deputy Attorney

17  General Lee stated that the two documents were the same except for

18  the diagram and that Judge Taft meant for respondent's counsel to

19  have only one of them and that Lee retrieved the documents from

20

21    [6]  Petitioner had no specific recollection of when during the
     proceedings this event occurred, though he believed it was toward the
22   end of the hearing. (_Id._ at 92-94.)  However, a declaration executed
     by petitioner in 2001 suggests that at that time petitioner took the
23   position that he viewed the documents containing  the exculpatory
     statement approximately a week before the _in camera_ hearing before
24   Judge Taft. (_Id._ at 106.)

25    [7]  Petitioner could not recall whether Richardson was referred
     to by name, number or in some other fashion in the documents he saw
26   that day. (_Id._ at 91.)

attorney Robinson and the paralegal seated at counsel table.  (Id.)
Petitioner testified that upon attorney Bloom's return to the
courtroom he asked Bloom if he had seen the Richardson statement but
that Bloom was rushing to prepare for upcoming witnesses.  (Id. at
84, 95-98.)  Petitioner felt no need to discuss the matter further
that day because he was confident that both his counsel and Judge
Taft had seen the Richardson statement which exonerated him.  (Id. at
84.)  A few days later when he brought the subject up with Bloom
during a prison visit, petitioner described himself as devastated
when his attorney said that no such statement by Richardson existed
and questioned whether he had ever actually seen such a document.
(Id. at 86-87.)

        Finally, petitioner's attorney Robert Bloom testified that
the handwriting on the Marcus Richardson interview report that was
offered into evidence at the state court habeas hearing, which does
not contain the alleged exculpatory statement at issue, belonged to
attorney Bloom and was used because he had his copy handy.  (Id. at
111.)  Bloom also testified that, contrary to Judge Taft's
speculation, the judge's remarks about exculpatory information in the
interview reports could not have referred to inmate Vichi because no
report of an interview with Vichi ever existed.  (Id. at 111-12.)
Attorney Bloom testified that both by letter and motion he had
attempted to raise the issue of this allegedly missing exculpatory
statement in 2001 without success.  (Id. at 112-114.)  Finally, Bloom
testified that petitioner's testimony that he made a comment to Bloom
in court about the statement containing important information was

1   accurate and that he remembered petitioner saying something to that

2   effect.  (<u>Id</u>. at 116.)   To the best of his recollection and based

3   upon his review of transcripts of the state habeas proceedings, Bloom

4   believed petitioner made this comment to him on December 6, 2000 and

5   then called him the next day from prison to discuss the exculpatory

6   information further.  (<u>Id</u>. at 118-19.)   Although Richardson did not

7   testify in the state habeas proceedings until January 11, 2001,

8   attorney Bloom explained he did not question Richardson about any

9   exculpatory statements because he did not have a copy of the

10  transcript reflecting the exculpatory statement and had not reviewed

11  Judge Taft's reported comments regarding exculpatory information.

12  (<u>Id</u>. at 119-22.)

13      Next, California Department of Correction Sergeant Greg

14  Demars was called by respondent and testified that he was assigned to

15  the Investigative Services Unit which dealt with investigations of

16  prison incidents.  (<u>Id</u>. at 136-37.)   In late 2000 or early 2001 he

17  was contacted by Deputy Attorney General Susan Lee to make copies of

18  all reports, tapes and other evidence the CDC had with respect to the

19  investigation of the killings of inmate Gardner and correctional

20  officer Patch.  (<u>Id</u>. at 125.)   In carrying out that directive,

21  evidence officer Barbara Evans made a copy of the taped interview of

22  Marcus Richardson conducted August 25, 1980.  (<u>Id</u>. at 127.)   There

23  was an original tape and three tape copies of that interview in the

24  boxes of evidence and the CDC officers, pursuant to instructions,

25  made copies of all originals and all copies that were in their files.

26  (<u>Id</u>. at 127-28, 140-43.)   While copying one of the copies of the

Richardson interview, the tape broke inside the recorder.  (Id. at

128.)  However, the original tape and two of the three copies

remained undamaged and were forwarded to Ms. Lee as requested.  (Id.

at 129.)  After consulting with Ms. Lee, Demars kept all the

fragments of the copy which broke.  Demars also described precautions

that were taken to ensure that the copies of recordings that were

made would be complete and accurate.  (Id. at 131-32.)  He indicated

that due to varying tape lengths, in May of 2001 they had to re-copy

some of the tapes using a manual recorder instead of a high speed

dubbing machine after Ms. Lee pointed out that some copies she

received were incomplete, with the tape running out before the end of

an interview.  (Id. at 152.)

Deputy Attorney General Karl Mayer testified that he

retired from the Attorney General's Office after 35 years of service

in September of 2000 but continued working part-time through August

2002.  (Id. at 164.)  In October of 2000 he attended one of the

hearings in petitioner's state habeas proceedings and was invited to

assist in those proceedings by Ms. Lee and Deputy Attorney General

Bass.  (Id. at 164-65.)  From that point forward he assumed duties

assisting Deputy Attorney General Lee and replaced Mr. Bass.  (Id. at

165, 169.)  Mayer recalled attending, along with Ms. Lee, an in

camera conference with Judge Taft regarding the transcript of the

Richardson interview.  (Id. at 166.)  However, he had no recollection

of Judge Taft commenting on exculpatory information contained in that

interview, nor would he have responded to any such comments if they

were made since he was unaware of the record and had not been

13

1  involved in the preparation of the case.  (Id. at 166-67, 170-71,

2  173-74.)   However, when confronted with the transcript of those in

3  camera proceedings, Mr. Mayer conceded that he actively participated

4  in the conference and displayed familiarity with the facts of the

5  case.  (Id. at 176-77.)   Mr. Mayer also agreed that after reviewing

6  the Richardson interview transcript provided by respondent in

7  preparation for this hearing, he saw nothing in that transcript that

8  would support Judge Taft's comments regarding exculpatory

9  information.  (Id. at 179.)   Finally, Mayer had no specific

10  recollection of handing petitioner's counsel any transcripts nor was

11  he aware of Ms. Lee destroying or hiding any transcripts from the

12  defense.  (Id. at 168.)   Mayer stated that he did not raise an

13  objection in response to Judge Taft's remarks regarding exculpatory

14  information in the Richardson interview transcript and he did not

15  recall whether Ms. Lee did or not.  (Id. at 186.)   He also did not

16  recall discussing the matter either with Ms. Lee or the trial

17  prosecutor Charles Kirk, with whom he met after Judge Taft's

18  comments.  (Id. at 187.)   He had no explanation to offer as to why he

19  remained silent after Judge Taft described an undisclosed and

20  exculpatory statement by Richardson of which he was unaware.  (Id. at

21  195-209.)   Mayer did acknowledge that if exculpatory information had

22  not been turned over to the defense at trial, it would be a Brady

23  violation.  (Id.)   Throughout his testimony Mayer asserted that he

24  was merely the second chair, had little to do with the substance of

25  the case and therefore could shed no light on the issue now before

26  this court other than to say he personally was unaware of any

14

1  undisclosed Richardson interview.

2       The state court record would appear to reflect that Mr.

3  Mayer was much more active and involved in the substance of the state

4  habeas proceedings than he now recalls.  However, Mayer did testify

5  that although he never saw an interview transcript in which

6  Richardson exculpated petitioner, because he was not familiar with

7  the entire file he could not say if such a document existed in the

8  Attorney General's files.  (Id. at 195.)

9       Retired correctional lieutenant Thomas Hartman testified

10  that he was the lead officer at California Medical Facility (CMF)

11  Vacaville, along with Manuel Gloria, Bob Horton and Donald Glenn,

12  assigned to investigate the August 17, 1980, killings of prisoner

13  Charles Gardener and correctional officer Albert Patch.  (Id. at

14  210.)  In interviewing inmates during that investigation lieutenant

15  Hartman teamed up with officer Horton and officers Gloria and Glenn

16  teamed with one another.  (Id. at 212.)  Transcripts of the inmate

17  interviews were made and those transcripts were then checked against

18  the tape recordings by the interviewing officers who also redacted

19  names of inmates and replaced them with numbers.  (Id. at 212-13.)

20  Although he had no recollection of any particular interview, based

21  upon his review of the initials on the tape recording, Hartman

22  testified that he and Horton interviewed inmate Richardson.  (Id. at

23  212.)  Hartman had no recollection of Richardson exonerating Roberts

24  of the Gardner killing.  (Id.)  Hartman also testified that he never

25  altered any of the tape recordings of his inmate interviews in any

26  way.  (Id. at 214.)  Hartman stated that at the request of the

prosecutor, he kept a master list of the inmates who were
interviewed, that each time a given witness was interviewed there was
a separate entry reflecting that interview and the master list
indicated that Marcus Richardson was interviewed by officers on
August 25, 1980.  (Id. at 215-17, 228.)  Hartman agreed that the
master list indicated that Richardson was not interviewed again until
approximately eight months thereafter.  (Id. at 230.)  Hartman noted
that the interviews were over 25 years ago and he could not recall
what any of the inmates said in interviews.  (Id. at 222.)

Robert Horton appeared next and testified that he retired
in 1987 from his position as a correctional officer and that he was
also assigned to the investigation headed by lieutenant Hartman.
(Id. at 234.)  Horton believed that the officers did not record all
of their inmate interviews but those that were tape recorded were
also transcribed.  (Id. at 236.)  Horton participated in the
interview of Marcus Richardson on August 25, 1980 and testified that
he did nothing to alter the tape recording or to avoid recording any
exculpatory information provided during that interview.  (Id. at
237.)  Horton did not recall Richardson exculpating petitioner in his
statement.  (Id.)  Horton agreed that he had expressed surprise
during the interview that Richardson admitted being at the scene
because most of the inmates interviewed denied any knowledge of the
incident and did not want to get involved.  (Id. at 239-40.)  He also
agreed that the recording of the interview with Richardson reflected
that it ended with a statement by lieutenant Hartman that perhaps
Richardson would talk to the officers again the following morning.

16

1   (Id. at 243.)   However, Horton was clear that although he would see

2   Richardson on the main line and greet him, Richardson was not

3   interviewed the morning after nor the days following the August 25

4   interview.   (Id. at 243-45.)

5          Finally, Deputy Attorney General Susan Lee testified that

6   she was the lead attorney for respondent in petitioner's state habeas

7   proceedings.   (Id. at 252.)   As a result she became thoroughly

8   familiar with the case files maintained by the prosecuting trial

9   attorney, the Department of Justice and CMF-Vacaville pertaining to

10  petitioner's prosecution.   (Id. at 253-54.)   Lee testified that

11  several weeks into the state habeas hearing, Judge Taft directed that

12  copies of certain undisclosed substantive inmate interviews be

13  submitted for in camera review and she complied with that order by

14  assembling five documents comprising four interviews involving two

15  inmates and submitting them to the court.   (Id. at 256-57, 265.)   Lee

16  reported that the transcripts presented to Judge Taft for in camera

17  review were the same transcripts now before this court.   (Id. at 260-

18  61, 285; see also LEH Exs. I, J, K, L & M.)   She did not prepare a

19  document or cover letter listing the specific documents that were

20  presented to Judge Taft for his in camera review.   (Id. at 290-91.)

21         Lee's recollection was that it was on November 29, 2000,

22  that at Judge Taft's direction the court clerk delivered to counsel

23  table copies of the interview transcripts that the Judge had ordered

24  disclosed following his in camera review but that it was not until

25  December 6, 2000 that she handed petitioner's counsel an extra copy

26  of a diagram associated with one of the interviews because he did not

17

1   seem to have it.  (Id. at 262-63.)

2            Consistent with attorney Robinson's testimony, Lee recalled

3   approaching petitioner's counsel table after the clerk delivered the

4   documents following the court's in camera review.  (Id. at 265.)  She

5   did so because she was shocked by the Judge's comment on November 29,

6   2000 about there being "quite a bit of exculpatory materials," was

7   confused because she had not been given copies of five documents

8   which was the number she submitted for in camera review and wanted to

9   see if petitioner's counsel had been given any document that she did

10  not have or was unaware of since she thought she had reviewed all the

11  materials and did not regard anything in them as exculpatory of

12  petitioner.  (Id. at 265, 287, 293-98.)  However, Lee denied taking

13  any of the documents away from petitioner's counsel.  (Id. at 273-

14  74.)

15           Lee also recalled the in camera hearing she attended with

16  Mr. Mayer in Judge Taft's chambers on December 18, 2000.  (Id. at

17  266.)  It was her recollection that Judge Taft had called them into

18  chambers during the testimony of the trial prosecutor, Deputy

19  Attorney General Charles Kirk, because Judge Taft believed that there

20  may have been a failure to disclose a Richardson interview to the

21  defense that was a possible Brady violation, that he intended to

22  question Kirk about the matter if petitioner's counsel failed to and

23  he wished Kirk to be notified so that he could refresh his

24  recollection on the matter before responding to questioning.  (Id.)

25  Lee understood Judge Taft to be referring to the Richardson interview

26  of August 25, 1980 that is before this court.  (Id. at 266.)  She

18

was dismayed by Judge Taft's statement, quoted above, that Richardson exculpated Roberts by saying he was not even present at the scene of the killings because she felt Judge Taft was confused and was misreading the interview but that he had already ruled by ordering the interview transcript disclosed to petitioner's counsel. (Id. at 267.)  Lee had filed a written request for clarification of that order but it had not been ruled upon.  (Id. at 268.)  She was also concerned that the proceedings were being conducted outside the presence of petitioner's counsel and she did not want to appear to be attempting to be "sweeping under the rug" something the judge viewed as a possible Brady violation.  (Id. at 268.)  For all these reasons, and because the interview transcript was already disclosed to the defense and would speak for itself as to its contents, she did not argue with Judge Taft about what she believed to be his erroneous reading of the Richardson interview transcript.  (Id. at 269, 298, 318.)  She then discussed the matter with the trial prosecutor and reviewed the prosecution discovery records and assured herself that the transcript of the August 25, 1980 interview of Richardson had, in fact, been disclosed to the defense prior to trial.  (Id. at 270.)  Lee denied that the trial prosecutor was annoyed with her for disclosing to Judge Taft a previously undisclosed statement by Richardson exculpating petitioner.  (Id. at 270.)  Rather, in her testimony Lee was adamant that she has never seen or been aware of a transcript of the August 25, 1980 interview or any other statement in which Richardson exculpated petitioner.  (Id. at 273, 320, 330.)

Once Judge Taft indicated that Richardson would be called

1  to testify at the state court evidentiary hearing, Lee directed an

2  investigator to interview him and turned a copy of that interview

3  over to petitioner's counsel.  (Id. at 274-78.)  Richardson did

4  subsequently testify at the state habeas hearing and, according to

5  Lee, did not in any way exculpate petitioner.  (Id. at 280.)

6  Finally, Lee denied ever hiding or destroying a statement by

7  Richardson exculpating petitioner.  (Id. at 281.)  Lee's only

8  explanation for Judge Taft's comments describing an alleged

9  exculpatory statement from Richardson was that the judge seemed at

10  times during the state habeas hearing to be temporarily confused and

11  to describe things rather loosely.  (Id. at 286, 322.)  When pressed

12  by this court for a cogent explanation, Lee went so far as to suggest

13  that Judge Taft appeared to be unprepared and inattentive during the

14  state habeas hearing and that as a result he had "conflated" the

15  statements and testimony of various witnesses to the point of

16  becoming utterly confused and mistaken in his characterization of

17  this particular statement.  (Id. at 324-330.)

18      C.  Analysis

19      This issue is before the court in the context of

20  petitioner's motion for discovery.  As the court has previously

21  stated, the parties in a habeas proceeding are not entitled to

22  discovery as a matter of course.  Bracy v. Gramley, 520 U.S. 899, 904

23  (1997); Bittaker v. Woodford, 331 F.3d 715, 728 (9th Cir.), cert.

24  denied, 540 U.S. 1013 (2003).  Rather, "[a] party shall be entitled

25  to invoke the processes of discovery available under the Federal

26  Rules of Civil Procedure if, and to the extent that, the judge in the

1   exercise of his [or her] discretion and for good cause shown grants

2   leave to do so, but not otherwise."  Rule 6(a), Rules Governing §

3   2254 Cases.  See also Bracy, 520 U.S. at 904.  Good cause is shown

4   "where specific allegations before the court show reason to believe

5   that the petitioner may, if the facts are fully developed, be able to

6   demonstrate that he is . . . entitled to relief."  Bracy, 520 U.S. at

7   908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)).  See

8   also Pham v. Terhune, 400 F.3d 740, 743 (9th Cir. 2004).  In order to

9   obtain discovery a petitioner need not demonstrate that he will

10  prevail on the claim underlying the discovery request.  See Bracy,

11  520 U.S. at 909 ("It may well be, as the Court of Appeals predicted,

12  that petitioner will be unable to obtain evidence sufficient to

13  support a finding of actual judicial bias in the trial of his case,

14  but we hold that he has made a sufficient showing . . . to establish

15  'good cause' for discovery."); Pham, 400 F.3d at 743.  Thus, it has

16  been "held that a district court abused its discretion in not

17  ordering Rule 6(a) discovery when the discovery was 'essential' for

18  the habeas petitioner to 'develop fully' his underlying claim.  Id.

19  (quoting Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir. 1997)).  See

20  also McDaniel v U.S. District Court (Jones), 127 F.3d 886, 888 (9th

21  Cir. 1997) (finding that the district court "acted well within its

22  discretion in ordering discovery" where the petitioner's claims did

23  "not appear purely speculative or without any basis in the record.").

24  Finally, federal courts have "the power to 'fashion appropriate modes

25  of procedure,' including discovery, to dispose of habeas petitions

26  'as law and justice require[.]'"  Bracy, 520 U.S. at 904 (citations

21

1  omitted) (quoting Harris, 394 U.S. at 299-300).  See also Bittaker,

2  331 F.3d at 728.

3       Here, however, the issue is unique.  Petitioner's counsel

4  has sought discovery of a witness statement which allegedly

5  exculpates petitioner of the offense for which he was convicted and

6  sentenced to death.  Respondent has long contended that no such

7  statement ever existed.  It cannot be said that the claims stemming

8  from petitioner's insistence that such a statement exists and was

9  suppressed first by the trial prosecutor and later by respondent's

10 counsel in state habeas proceedings, are purely speculative or

11 without any basis in the record.  Rather, Judge Taft's comments on

12 the record at the state court hearing describing an exculpatory

13 statement certainly provide some basis for petitioner's claim.[8]  On

14 the other hand, this court cannot order the production of a statement

15 that has never existed.

16      Through discovery ordered by this court and by way of the

17 limited evidentiary hearing, petitioner's counsel has been given

18 every opportunity to develop fully his underlying claim in this

19 regard.  In order to obtain an order requiring respondent's counsel

20 to produce such a statement, petitioner must convince this court that

21 such a recorded statement existed at some time.  He has failed to do

22 so.

23      As noted at the hearing, the most persuasive evidence

24 petitioner is able to point to are the statements made by Judge Taft

25

26      [8]  Petitioner's own testimony provides some arguable basis for
    the claim as well.

at the state habeas proceedings.  As this court has acknowledged,
Judge Taft's comments are most remarkable because of the detail in
which they describe a witness statement exonerating petitioner.  See
supra at 4.  Judge Taft testified before this court that something he
saw, or believed he saw, caused him to make those comments.  However,
Judge Taft did not come before this court and testify that he
recalled reviewing a report of interview in which a witness
exculpated petitioner.  Rather, he testified that he had merely
"flash read" several interview reports, did so under time pressure,
was confused by the manner in which the reports referred to various
prisoners and conceded that he may have misread the reports and thus
mischaracterized them in his comments.[9]  This court has carefully
considered the testimony and feels compelled to accept Judge Taft's
explanation that he may have simply, and unfortunately, made the
comments in question based upon a hurried misreading of interview
reports.

The other evidence relied upon by petitioner does not
significantly add to his showing.  Petitioner himself has testified
that he briefly read a witness interview that exonerated him.

---

[9]   Judge Taft also explained that the matter did not seem
significant at the time of his comments and that he believed if there
was an issue presented by the contents of the interviews, it would be
raised by the parties in the state habeas proceedings. This aspect of
Judge Taft's testimony is consistent with Deputy Attorney General
Lee's testimony that during the state habeas hearing she found Judge
Taft to be prone to describe things loosely.  For, if Judge Taft
truly believed at the time that a witness statement completely
exonerating petitioner had been suppressed by the prosecution for
years, he would have certainly considered it to be an extremely
significant matter.

23

However, petitioner is challenging his capital conviction in these proceedings.  He obviously has much to gain in making this claim.  Indeed, given the critical nature of the matter, petitioner could not be blamed for now believing he saw such a statement even if none existed.  Attorney Robinson's testimony, describing the handling of materials at counsel table after Judge Taft's in camera review, attempted to cast the events in a sinister light but in reality adds little to the showing.  Attorney Robinson never saw a witness interview containing any exculpatory information.  Finally, petitioner failed to make any showing whatsoever substantiating his repeated claim that respondent's counsel had tampered with tape recordings of witness interviews.

Balanced against this weak showing by petitioner, respondent has presented the testimony of the investigating correctional officers and Deputy Attorney General Lee, who represented respondent at the state habeas hearing.  Those witnesses testified that they have never seen nor been made aware of any interview of inmate Richardson in which the witness exonerated petitioner.[10]  The testimony of these witnesses on this point was credible and was not impeached.  Finally, it is undisputed that in his testimony at the state habeas hearing, Richardson did not exculpate petitioner.

Based upon the evidence presented, the court is not

_____

[10] The correctional officers' testimony also rejected any notion, as later suggested by petitioner, that Richardson was interviewed shortly after August 25, 1980, and may have made a statement exculpating petitioner at that time.

1  persuaded that the exculpatory statement sought by petitioner through

2  his discovery request has ever existed.  Accordingly, petitioner's

3  request 85 for discovery will be denied.

4  II.  <u>Petitioner's Motion to Have A Polygraph Examination Administered</u>

5        Petitioner has also moved the court to authorize the

6  administration of a polygraph examination regarding his testimony at

7  the limited evidentiary hearing.  In short, petitioner seeks the

8  examination to help establish he was being truthful when he testified

9  before this court that during the state habeas hearing he briefly saw

10  a witness interview which exculpated him.  Because the undersigned

11  finds that the results of the desired polygraph examination would not

12  be relevant to the disposition of discovery request 85, petitioner's

13  motion will be denied.

14        "The question of admissibility of unstipulated polygraph

15  evidence has had a long history in this circuit and around the

16  country."  <u>United States v. Benavidez-Benavidez</u>, 217 F.3d 720, 723

17  (9th Cir. 2000).  A discussion of the current state of the law should

18  begin with reference to <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509

19  U.S. 579 (1993), in which the Supreme Court set out a number of

20  factors regarding the admissibility of scientific evidence.  In

21  <u>United States v. Cordoba</u>, 104 F.3d 225, 227-28 (9th Cir. 1997)

22  ("<u>Cordoba I</u>"), the court held that <u>Daubert</u> overruled any per se rule

23  preventing the admission of unstipulated polygraph evidence.

24        Nonetheless, polygraph evidence remains disfavored.  In

25  <u>Cordoba I</u>, the Ninth Circuit expressed no "new enthusiasm for

26  admission of unstipulated polygraph evidence," noting its "grave

25

potential for interfering with the deliberative process." Cordoba I,

104 F.3d at 228. See also United States v. Thomas, 167 F.3d 299, 308

(6th Cir. 1999). Presently, the admission of unstipulated polygraph

evidence is left to the "wide discretion" of the trial court,

consistent with Daubert standards. Benavidez-Benavidez, 217 F.3d at

724. See also United States v. Jordan, 256 F.3d 922, 933 n.7 (9th

Cir. 2001); Cordoba I, 104 F.3d at 228. "[D]istrict courts are free

to reject the admission of polygraph evidence on the basis of any

applicable rule of evidence without analyzing all other potential

bases of exclusion." Benavidez-Benavidez, 217 F.3d at 724 (affirming

exclusion of unstipulated polygraph evidence under Fed. R. Evid.

403). See also United States v. Booth, 309 F.3d 566, 573 (9th Cir.

2002); United States v. Campos, 217 F.3d 707 (9th Cir. 2000)(holding

unstipulated polygraph evidence concerning defendant's mental state

inadmissible under Fed. R. Evid. 704(b) when it involves "ultimate

issue" of mens rea).

          Here, the proposed polygraph evidence would be of

questionable relevance to resolution of the discovery issue before

the court.  Petitioner as the proffering party has made no showing

that such evidence would be based upon sufficient facts or data and

be the product of reliable principles and methods.  See F.R.E. 702.

As alluded to above, polygraph evidence is viewed with great

skepticism and as being of questionable reliability.  See United

States v. Gardiner, 463 F.3d 445, 468 (6th Cir. 2006); Cordoba, 104

F.3d at 228 (noting that the "inherent problematic nature" of

polygraph evidence "remains"); Granite State Ins. Co. v. Smart

1  <u>Modular Tech. Inc.</u>, 76 F.3d 1023, 1031 (9th Cir. 1996).  As the

2  Supreme Court has observed: "[T]here is simply no consensus that

3  polygraph evidence is reliable.  To this day, the scientific

4  community remains extremely polarized about the reliability of

5  polygraph techniques."  <u>United States v. Scheffer</u>, 523 U.S. 303, 309

6  (1998).  These concerns are particularly applicable when such

7  evidence is offered merely to bolster the credibility of a witness.

8  This court has already observed petitioner testify and listened to

9  his testimony.  <u>See</u> F.R.E. 403.  The questions his counsel proposes

10  to polygraph him on, all involve his account of a brief moment over

11  six years ago, about which he testified in detail before this court.

12  As also noted above, it would even be understandable if petitioner

13  now believed he had in fact seen a statement exculpating him even if

14  such a statement never existed.  In any event, there has been no

15  showing that a polygraph exam administered to petitioner would assist

16  the court in ruling on this discovery request.  Finally, there has

17  been no particularized showing as to the reliability of such testing

18  under these circumstances.  <u>See</u> <u>United States v. Gianakos</u>, 415 F.3d

19  912, 925 n.8 (8th Cir.), <u>cert.</u> <u>denied</u> ___U.S.___, 126 S. Ct. 764

20  (2005).

21          Accordingly, petitioner's motion is denied.

22                              CONCLUSION

23          For the reasons set forth above, IT IS HEREBY ORDERED that:

24          1.    Petitioner's discovery request 85 is denied;

25          2.    Petitioner's motion for a polygraph examination is

26                denied; and

27

3.     This case is set for status conference on May 7, 2007
at 10:00 a.m. in Courtroom 27.

DATED: March 30, 2007.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

ddad1/orders.capital/roberts.0254.discoah