IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY ROBERTS,

   Petitioner,     No. CIV S-93-0254 GEB DAD

 vs.         DEATH PENALTY CASE

WARDEN, San Quentin State
   Prison,

   Respondent.   AMENDED ORDER[1]

_____/

   Petitioner's motion for an evidentiary hearing and to expand the record came on

for hearing before the court on September 21, 2011.  Assistant Federal Defender Allison Claire

and Attorney Robert Bloom appeared for petitioner.  Deputy Attorney Generals Glenn Pruden

and Bruce Ortega appeared for respondent.  For the reasons set forth below, after considering the

briefs and the arguments of counsel, and good cause appearing, the court grants petitioner's

motion to expand the record and grants in part petitioner's motion for an evidentiary hearing.

---

[1]  The court amends its June 1, 2012 order (Dkt. No. 424) in order to correct a non-substantive error appearing on pages 54-56 of the original order.  (See pp. 55-57, infra.)  In addition, this amended order incorporates amendments the court made on November 14, 2012 (see Dkt. No. 460 at 8) to the original June 2012 order.  Those changes involve the allegations in petitioner's claim 1 regarding prosecution witness William Acker.  (Compare Dkt. 424 at 32-33, 35 with pp. 32-34, 36, infra; and compare Dkt. No. 424 at 127 with pp. 128-129, infra.)

I. <u>Background</u>

    A. <u>Facts Presented at Trial</u>[2]

       1. <u>Guilt Phase</u>

         Early on the morning of August 17, 1980, Charles Gardner, an inmate at the California Medical Facility, Vacaville, walked down a first-floor corridor as his fellow inmates lounged against the walls on both sides.  He emerged with 11 stab wounds that would shortly prove to be fatal.  Nevertheless, he was able to grab a knife that an assailant had left on the floor.  In pursuit of [inmate] Menefield, Gardner ran or staggered some distance up a flight of stairs to the second floor, where he plunged the knife into the chest of a prison guard, Officer Patch.  Patch died within the hour at the prison clinic, Gardner shortly afterward.

         Two issues dominated the trial: the identity of Gardner's murderer or murderers, and Gardner's mental state when he attacked Patch.

         The prosecution sought to prove defendant killed Gardner.  It offered evidence to support two scenarios, both based on a theory that Gardner was killed in a gang dispute.  One possibility was that defendant and Menefield planned to kill Gardner as part of a conflict among members of the Black Guerrilla Family (BGF), a prison gang.  Gardner was the protégé of Ruben Williams, the Vacaville BGF leader, with whom defendant disagreed over gang tactics.  However, there was evidence that cast doubt on this possibility: defendant may have obtained the prison-made knife with which he stabbed Gardner from Williams himself.  The other possibility was that defendant stabbed Gardner because he had called him a "punk nigger" in the prison yard and thereby showed disrespect to a fellow BGF member.  "Punk" is prison jargon for a passive homosexual.  There was testimony that the term is a serious insult to many inmates, and was intolerable to defendant.

         Inmates testified they saw defendant stab Gardner repeatedly and saw Menefield restrain Gardner when he tried to escape.  After the incident, witness Cade was sent to maximum security for fighting with another inmate and spoke with defendant, who was being held there as a suspect.  Cade testified defendant told him that he had done the deed.  Cade further testified that defendant said Gardner wanted to withdraw from the BGF and had threatened another inmate, and that Williams had ordered a "move on him" if Gardner posed a threat to the inmate.  According to

---

    [2] This recitation of the facts is taken from the the California Supreme Court's opinion reversing in part and affirming in part petitioner's judgment of conviction on appeal.  <u>People v. Roberts</u>, 2 Cal. 4th 271, 294-97 (1992).

Cade, defendant also said that after he attacked Gardner defendant ran to the third floor.  Another inmate testified that he heard Menefield and defendant argue about the assault after it took place. According to that inmate, defendant asked, "Why didn't you pick up the knife?"  Menefield assertedly replied, "Because I was running right behind you up the stairs."  Inmate Long testified that he saw defendant stab Gardner and then run up to the third floor.

In response, defendant introduced evidence that the prosecution's key witnesses-inmates Long, Hayes, Cade, and Rooks-had won benefits from the state that gave them a motive to lie.  Defendant also contended that witnesses had been housed together and had had a chance to reconcile their testimony.

Defendant did not testify at the guilt phase.  He sought to prove that he was on the third floor when Gardner was stabbed. There was evidence that he had been seen at that location just after an alarm had sounded as a result of the attack and that it was impossible for him to have made his way there from the first floor in time.  For its part, the prosecution introduced evidence that an agile person could run from the first floor to certain key locations in seconds and walk briskly to defendant's cell in less than one minute, and that defendant could have done so unseen.

Defendant also sought to prove that the stabbing of Gardner was not the proximate cause of his death: there was evidence that Gardner was relatively well physically on arrival at the prison clinic and died as a result of incompetent medical care.

As for Patch's killing, there was evidence that Gardner, though failing rapidly, pursued Menefield up the stairs to the second floor.  Prison guards hearing the commotion rushed toward the two, seizing Menefield and, in the case of Patch, trying to secure Gardner.  Gardner then stabbed Patch.

The prosecution presented expert testimony to support its theory that Gardner fell rapidly into shock from loss of blood after his stabbing and became an unconscious agent of defendant. Prison workers described Gardner as a well-behaved inmate with no innate desire to attack a guard.  Defendant introduced evidence that Gardner intended to stab Patch to exact revenge on his keepers, whom he hated, and that when he attacked Patch he was physically capable of thinking for himself and merely took advantage of the opportunity presented by having a knife in hand.

2.  Penalty Phase

In aggravation, the People introduced evidence of prior violent criminal activity and a prior felony conviction.  In 1970, on his 17th birthday, defendant shot and killed a high school security guard, Obidee Cowart, and was convicted of first degree murder.

There was also evidence of continuing BGF membership found in defendant's cell at Soledad Prison, including a note addressed to defendant in Menefield's handwriting saying that a possible witness to Gardner's stabbing would have to be killed. Further, defendant had stabbed three inmates besides Gardner and had been caught with the paraphernalia of violence in prison.

Defendant testified at the penalty phase. In mitigation, he presented evidence bearing on background and character. He grew up virtually without social and emotional support. He was the eldest of five siblings, each of whom had a different father. His mother, an abusive alcoholic, was 15 when she gave birth to him; she never lived with defendant's father. When she drank she would neglect the children; she and the man she lived with for 13 years would burn and stab each other in front of them. Defendant would steal food for his siblings when his mother's welfare money went to buy alcohol. Defendant grew up in a dreary section of the Watts neighborhood in Los Angeles; when he was 12, his family moved to a notoriously dangerous housing project.

Defendant testified that he had not intended to kill Cowart but had acted instinctively in self-defense after the latter had pulled a gun on him. He also stated that he fell out with the BGF over its practice of assaulting people who disobeyed its rules or policies. For that reason, he said, the gang tried twice to have him killed. He learned that an inmate named Lynch had ordered a BGF attack on him, and stabbed him in revenge. He wanted to escape the BGF but had to maintain an appearance of continued adherence lest he be killed for trying to quit. He could not completely disassociate himself from the BGF until he was sent to Tehachapi Correctional Institution, a transfer he earned by good behavior. He testified that he had earned a high school equivalency degree and had taken college correspondence courses.

B. Procedural Background

In 1983, a jury found petitioner guilty of all charges: the first degree murders of Charles Gardner and Officer Patch; conspiracy to commit murder; assault by a life prisoner resulting in death; and possession of a weapon by an inmate. (RT 7922-30.[3]) The jury also found true special circumstance allegations that petitioner had previously been convicted of first degree murder, that he had committed multiple murders, and that he had lain in wait to kill Mr. Gardner. (Id.) He was sentenced to death for the murder of Mr. Gardner, and to life

_____

[3] The state trial transcript and clerk's transcript were lodged in this court on July 21, 1995. See Dkt. No. 118. They are identified herein as "RT" and "CT," respectively.

imprisonment without possibility of parole for Officer Patch's killing.  (RT 10,233-36.)  His co-defendant, Archie Menefield, was found guilty in a joint trial of similar charges stemming from the same incident, and was sentenced to life imprisonment without possibility of parole.  (RT 7922-30; 10,236-37.)

In 1992, the California Supreme Court reversed the convictions as to Officer Patch and set aside the multiple murder special circumstance.  The California Supreme Court affirmed in all other respects.  People v. Roberts, 2 Cal. 4th 271 (1992).

In 1995, petitioner filed his first federal habeas petition in this court.  (Dkt. No. 86.)  In 1998, after a determination that the petition included unexhausted claims, petitioner filed a fully exhausted petition and the case was stayed while he litigated his unexhausted claims in the California Supreme Court.  (Dkt. Nos. 202, 203, 205.)  In August of 1999, the California Supreme Court issued an order to show cause in the state habeas proceeding.  The state Supreme Court ordered respondent to address: (1) whether the prosecutor knowingly offered perjured testimony; and (2) whether trial counsel was ineffective for failing to impeach prosecution witnesses with evidence from a corrections officer that the east grille gate to the third floor at CMF-Vacaville was not locked at all times.  (Dkt. No. 412-1, ex. A.)  Thereafter, in March of 2000, the California Supreme Court ordered a reference hearing on the following issues:

> 1.  What, if any, testimony did the prosecutor at petitioner's trial induce, or attempt to induce, from inmate witnesses?  And if any, from which inmates?  Did the inmate witnesses discuss their testimony among themselves before trial?  Did the inmate witnesses' trial testimony vary from what they actually saw or heard?  And specifically in addition (but without necessarily limiting the findings of fact to answering the following questions):

> a.  Did Raybon Long hear petitioner discuss Gardner's stabbing before it occurred?  Did Long see petitioner stab Gardner?  Did Long see petitioner run to the third floor after stabbing Gardner?

> b.  Did Richard Yacotis hear petitioner discussing the stabbing afterward?  What is the truth of the claims made in Yacotis's purported August 12, 1982, letter to defense counsel?

1         c. Did the trial testimony of Ryland T. Cade, Robert Hayes, or David Calvin, Jr., vary from what they actually saw or heard?

2

3         d. Did Leslie H. Rooks see petitioner carrying a knife just before the stabbing?  After the stabbing, when and where did Rooks first see petitioner?

4

5         e. Were attempts made to persuade George Frederick Payne to testify falsely at trial?

6

7        2. What evidence was available to defense counsel that the east grille gate on the third floor at the California Medical Facility, Vacaville, was locked or open at the time of the stabbing?  What additional evidence, if any, would further investigation have produced on this point?  What circumstances would have weighed against investigating the existence of or presenting any such evidence?  What evidence rebutting any such evidence would have been available to the prosecution following its own investigation?  Was the east grille gate open or locked at the time of the stabbing?  If it was locked, could petitioner nonetheless have gone up the stairs and to his cell immediately after the stabbing?

8

9

10

11

12

13  (Id.)

14        From May 26, 2000 to January 18, 2001, Solano County Superior Court Judge

15  Taft held an evidentiary hearing.[4]  The California Supreme Court later summarized the evidence

16  presented at the reference hearing before Judge Taft as follows:

17        Long, who testified at trial that he saw petitioner stab Gardner, but later recanted that testimony, and then recanted his recantation, was called as petitioner's witness but stated that, affected by the illicit use of drugs, he remembered little of what had happened 20 years before.  On the advice of his counsel, he invoked the privilege against self-incrimination and did not testify.

18

19

20

21        Cade reaffirmed his trial testimony that he saw petitioner stab Gardner.  He acknowledged that he, Long and Hayes had discussed the case before trial when they were incarcerated in the same unit, but denied they had "compared stories."  Rather, Cade stated they all were nervous and reluctant to testify and just gave each other "moral support."

22

23

24

25     [4] The transcript of the reference hearing was lodged in this court on September 30, 2003 as Exhibits 38-71 to the Answer.  (See Dkt. No. 263.)  Citations herein to the reference hearing transcript are identified as "RH RT."

26

Yacotis, who testified at trial that, after the crimes, he heard petitioner discuss the killings with Menefield, but later recanted that testimony, stood by his recantation, testifying that Long and the other inmate witnesses conspired to win benefits for themselves in exchange for false testimony at petitioner's trial and reasserting that the prosecutor and his investigators had exhorted him to testify falsely at trial. Yacotis stated that the conversation he described at trial between petitioner and Menefield in the segregation unit in 1980, in which one asked the other, "Why didn't you pick up the knife?" never occurred. Yacotis reiterated that petitioner and Menefield were not housed near each other in the segregation wing.

Ruben Lavert Howard, an inmate at the Chino state prison, testified at the reference hearing that he had heard Long, Rooks, and Calvin discuss petitioner's case. Regarding the stabbings, "one of them said that Larry didn't do it, but he was in the hallway and another guy said something about, 'I'm going to try to get a date out of it,'" meaning a parole date. "They . . . said that Larry was in the hallway and that he didn't have nothing to do with the actual . . . crime . . . ."

Howard testified that Rooks, Calvin, and Long all said petitioner did not commit the crime and was being framed. Long later repeated that assertion. Howard further testified that he alerted his or petitioner's family to the conspirators' plans and asked them to tell the defense lawyers, but nothing happened as a result of whatever efforts, if any, they undertook.

Arthur Givens (spelled "Gibens" at trial) testified that at Chino, Long told him some people were trying to align their story about the Gardner stabbing to win release from prison, and he was scared the jury would find out they were lying.

Calvin reaffirmed his trial testimony that he saw Menefield and another unidentified prisoner, but not petitioner, stab Gardner. He also testified that after the incident, he was in a segregation wing cell adjoining petitioner's cell for six months, and petitioner never discussed the incident there. Calvin testified that he was doing "short time" at the time of the stabbings-he was due for parole in one and one-half years-so the investigators had little to offer him as an inducement in exchange for his testimony.

As regards prosecutorial misconduct, Payne testified that Horton told him that it would be worthwhile monetarily if he would testify petitioner ran to the third floor. Similarly, Kirk offered Payne money to testify that he saw petitioner and Menefield running up the stairs and down the hall. Payne refused. Payne further testified that the third floor grille gate was "mostly locked," but added that he "rarely went up to the third floor." On cross-examination, Payne stated that Kirk may not have explicitly

7

1    offered him money for his testimony, but offered him some type of
2    assistance or benefit in exchange for his testimony.

3    In re Roberts, 29 Cal. 4th 726, 738-39 (2003).

4    On May 23, 2001, Judge Taft issued written findings following the reference

5    hearing.[5]  Therein Judge Taft found:  (1) Leslie Rooks and David Calvin did not "fabricate" "any

6    identifiable portion of their [trial] testimony;" (2) while Raybon Long invoked the Fifth

7    Amendment and did not testify, his "trial testimony should not be treated as believable;" (3)

8    Richard Yacotis's testimony at the reference hearing that he lied at trial was believable; (4)

9    Ryland Cade's "trial testimony was not truthful and varied from what he actually heard and saw;"

10   (5) "[p]etitioner presented nothing that would indicate that [Robert] Hayes' trial testimony was

11   false;" (6) Mr. Calvin's trial testimony did not vary from what he saw or heard; (7) Mr. Rooks'

12   trial testimony was "credible;" and (8) George Payne lied at the reference hearing when he

13   testified that he was induced to testify falsely.  With respect to the ineffective assistance of

14   counsel claim regarding the east grille gate, Judge Taft found that defense counsel "did not

15   overlook any potential evidence that would have tended to show that the grille gate was locked at

16   the time of the stabbings" and that "the third floor east grille gate was in fact open at the time of

17   the stabbings."  Finally, Judge Taft found that prosecutors had not induced the inmate witnesses

18   to testify falsely.

19   In its subsequent decision denying petitioner's habeas corpus petition, the

20   California Supreme Court disagreed with Judge Taft's findings regarding the trial testimony of

21   inmates Long and Cade.  In re Roberts, 29 Cal. 4th 726, 742-44 (2003).  The California Supreme

22   Court also found the recantation of Richard Yacotis insufficiently material to warrant habeas

23   relief.  Id. at 743.  Justice Kennard and Chief Justice George dissented from the decision.  They

24   would have accepted the referee's findings and granted habeas relief because "[w]ithout the false

25

26   [5]  Judge Taft's findings were lodged here on September 30, 2003 as Exhibit 74 to the
     Answer.  (See Dkt. No. 263.)

1  testimony, there is a reasonable probability the jury would not have convicted petitioner of

2  Gardner's killing." Id. at 747.

3          On July 15, 2003, petitioner filed a second amended federal habeas petition with

4  this court. (Dkt. No. 248.) Petitioner filed the present motion for an evidentiary hearing and to

5  expand the record in December of 2010. (Dkt. No. 369.)[6] Petitioner filed numerous exhibits in

6  support of his motion. (Dkt. Nos. 370-393.) In addition, petitioner submitted some exhibits

7  from the reference hearing under seal along with some new exhibits and moved for an order that

8  they all remain under seal.[7] (Dkt. No. 394.) Respondent opposed the motion for an evidentiary

9  hearing. (Dkt. No. 412.) On August 30, petitioner filed a reply. (Dkt. No. 418.)

10  II.  Legal Standards

11          Because petitioner's original federal habeas petition was filed in 1995, it is

12  governed by the law in existence before passage of the 1996 Anti-terrorism and Effective Death

13  Penalty Act ("AEDPA"), which changed standards and procedures for considering cases under

14  28 U.S.C. § 2254.[8] See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997); Smith v. Mahoney, 611

15  F.3d 978, 995 (9th Cir. 2010).

16          A.  Standards Governing Motion for an Evidentiary Hearing

17          A federal court is required to hold an evidentiary hearing where petitioner presents

18  a colorable claim for relief and one of following standards is met:

19
20          [6] In 2006, during the course of litigating petitioner's discovery motion, the undersigned
       held a limited evidentiary hearing regarding petitioner's request than an accurate and complete
21      transcript of an August 25, 1980 interview of inmate Marcus Richardson be produced in
       connection with these proceedings. (Dkt. Nos. 326 & 327.) Petitioner argued that both Judge
22      Taft and petitioner himself had seen such a transcript at the reference hearing. (Id.) This court
       found that petitioner had not proven the existence of a different version of Richardson's
23      interview statement that allegedly exculpated petitioner. (Dkt. No. 328.) Accordingly, that
       aspect of petitioner's discovery motion was denied. (Id.)

24          [7] This court ruled on a portion of petitioner's motion to seal in a March 28, 2012 order.
       (Dkt. No. 421.)
25
26          [8] Accordingly, all citations to the federal habeas statute, 28 U.S.C. § 2240, et seq., and
       rules refer to the 1995, pre-AEDPA, version of the statute, available on Westlaw.

We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

Townsend v. Sain, 372 U.S. 293, 313 (1963).[9]  See also Siripongs v. Calderon, 35 F.3d 1308, 1314 (9th Cir. 1994).

To show a "colorable claim," petitioner is "'required to allege specific facts which, if true, would entitle him to relief.'"  Earp v. Ornoski, 431 F.3d 1158, 1167 n. 4 (9th Cir. 2005) (quoting Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir.1998)).  Petitioner need not prove his claim in order to be entitled to an evidentiary hearing.  Rather, alleging a "colorable" claim is a "low bar."  Id. at 1170.  Thus, in Earp, the Ninth Circuit held the petitioner had made out several "colorable claims" because if his alleged facts proved true, "he may well have" successful constitutional claims.  Id. at 1171.

Even where an evidentiary hearing is not mandatory, this court has discretion to hold one.  Townsend, 372 U.S. at 318; Hillery v. Pulley, 533 F. Supp. 1189, 1204 (E.D. Cal.

---

[9]  In Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992) the Supreme Court overruled one specific portion of the decision in Townsend.  In Keeney the high court held that a petitioner who fails to develop a material fact in a state court hearing must show either (a) cause for failing to do so and prejudice resulting therefrom, or (b) that failure to hold a hearing will result in a fundamental miscarriage of justice.  Keeney did not address the other Townsend factors.  Nor did it affect the district court's discretion to hold an evidentiary hearing.  See Keeney, 504 U.S. at 23 (O'Connor, J., dissenting) ("[D]istrict courts . . . still possess the discretion, which has not been removed by today's opinion, to hold hearings even where they are not mandatory."); see also Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993).  Respondent argues that Keeney should control this court's ability to accept any new evidence.  However, during the hearing on petitioner's motion, respondent's counsel conceded that Keeney is limited to Townsend's factor five in this circuit.  See Kemp v. Ryan, 638 F.3d 1245, 1258 (9th Cir. 2011); Rhoades v. Henry, 638 F.3d 1027, 1041 & n. 13 (9th Cir. 2011); Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005); Seidel v. Merkle, 146 F.3d 750, 754 (9th Cir. 1998) ("Contrary to what the State argues here, Tamayo-Reyes did not effect Townsend's holding with respect to the district court's broad authority to consider any evidence relevant to a federal habeas petitioner's claim.").

1   1982) ("even where not otherwise mandated, the federal court has the discretion to hold an

2   evidentiary hearing particularly where material issues of fact are in dispute").  "Factors relevant

3   to the District Court's discretionary determination include the existence of a factual dispute, the

4   strength of the proffered evidence, the thoroughness of prior proceedings, and the nature of the

5   state court determination." Pagan, 984 F.2d at 64 (citations omitted).  Moreover, "[t]he

6   attachment of the presumption of correctness to a particular finding of fact does not deprive the

7   federal district court of the discretion to hold an evidentiary hearing." Knaubert v. Goldsmith,

8   791 F.2d 722, 727 n. 3 (9th Cir. 1986) (emphasis in original). See also Richmond v. Ricketts,

9   774 F.2d 957, 962 (9th Cir. 1985); Pagan, 984 F.2d at 64.  The fact that the state court held a

10  hearing also does not deprive the federal court of the discretion to hold an evidentiary hearing on

11  the same claim. See Guidry v. Dretke, 397 F.3d 306, 323-24 (5th Cir. 2005).

12          B.  Standards Governing Motion to Expand the Record

13          Contrary to the argument advanced by respondent here, prior to the AEDPA,

14  expansion of the record was not controlled by the same standards governing the holding of an

15  evidentiary hearing.  Rather, Habeas Rule 7 permitted expansion of the record with relevant

16  materials.  In this regard, it is well-established that a "judge can direct expansion of the record to

17  include any appropriate materials that 'enable the judge to dispose of some habeas petitions not

18  dismissed on the pleadings, without the time and expense required for an evidentiary hearing.'"

19  Blackledge v. Allison, 431 U.S. 63, 82 (1977).  The standard is simply whether the materials

20  sought to be added to the record are "relevant to the determination of the merits of the petition."

21  Rule 7, Rules Governing § 2254 Cases; see also Vasquez v. Hillery, 474 U.S. 254, 258 (1986);

22  McDougall v. Dixon, 921 F.2d 518, 532 (4th Cir. 1990).

23  III.  Exhaustion

24          Respondent alleges that much of the new evidence presented by petitioner for the

25  first time in this federal habeas proceeding renders his claims unexhausted.  Respondent also

26  complains that petitioner has "sandbagged" the state by waiting until he arrived in federal court

11

1    to present his evidence in support of his claims to relief.  This "sandbagging" argument ignores

2    the long-recognized difficulties habeas petitioners in California face in proving their claims in

3    state court.  State habeas petitioners often receive very limited investigative funding from the

4    state court.  See R. Sanger, Comparison of the Illinois Commission Report on Capital

5    Punishment with the Capital Punishment System in California, 44 Santa Clara L. Rev. 101, 140-

6    41 & App. (2003) ("[T]he California Supreme Court limits funds available to the defense on

7    direct appeal and habeas corpus proceedings.  The funds available are not sufficient for

8    expensive procedures or complex cases.") (footnote omitted).   Further, prior to 2003, and at the

9    time petitioner's state habeas petition was pending, a state habeas petitioner did not have access

10   to discovery unless the court issued an order to show cause.  People v. Gonzalez, 51 Cal. 3d

11   1179, 1258 (1990) (a habeas petition which does not state a prima facie case for relief "must be

12   summarily denied, and it creates no cause or proceeding which would confer discovery

13   jurisdiction."); People v. Ainsworth, 217 Cal. App. 3d 247 (1990).  In this case, the California

14   Supreme Court issued an order to show cause on only a limited number of petitioner's many

15   claims.  (Dkt. No. 412-1, Ex. A.)  Moreover, petitioner was provided access to some of this

16   evidence only after numerous attempts to obtain it from prosecutors and respondent's counsel.  In

17   any event, respondent's "sandbagging" argument is not relevant to this court's reasons, set forth

18   below, for granting portions of petitioner's motions for an evidentiary hearing and to expand the

19   record.  Respondent's concern in this regard was addressed by the United States Supreme Court

20   in Keeney and, as discussed above, this court is not bound by the Keeney cause and prejudice test

21   unless it is considering granting an evidentiary hearing under Townsend's fifth factor.  See Jones

22   v. Wood, 114 F.3d 1002, 1012 (9th Cir. 1997).

23           Here, respondent's exhaustion arguments are not supported by the applicable

24   standards for determining whether claims are exhausted.  State courts must be given the first

25   opportunity to consider and address a state prisoner's habeas corpus claims.  See Rhines v.

26   Weber, 544 U.S. 269, 273-74 (2005) (citing Rose v. Lundy, 455 U.S. 509, 518-19 (1982)); Scott

1  v. Schriro, 567 F.3d 573, 583 (9th Cir. 2009) ("All exhaustion requires is that the state courts

2  have the opportunity to remedy an error, not that they actually took advantage of the

3  opportunity."); King v. Ryan, 564 F.3d 1133 (9th Cir. 2009) ("Habeas petitioners have long been

4  required to adjudicate their claims in state court - that is, 'exhaust' them - before seeking relief in

5  federal court."); Farmer v. Baldwin, 497 F.3d 1050, 1053 (9th Cir. 2007) ("This so-called

6  'exhaustion requirement' is intended to afford 'the state courts a meaningful opportunity to

7  consider allegations of legal error' before a federal habeas court may review a prisoner's

8  claims.") (quoting Vasquez v. Hillery, 474 U.S. 254, 257 (1986)).  In general, a federal court will

9  not grant a state prisoner's application for a writ of habeas corpus unless "the applicant has

10  exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1).  A state will

11  not be deemed to have waived exhaustion unless the state, through counsel, expressly waives the

12  requirement.  28 U.S.C. § 2254(b)(3).

13         A petitioner satisfies the exhaustion requirement by fairly presenting to the

14  highest state court all federal claims before presenting the claims to the federal court.  See

15  Baldwin v. Reese, 541 U.S. 27, 29 (2004); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v.

16  Connor, 404 U.S. 270, 276 (1971); Wooten v. Kirkland, 540 F.3d 1019, 1025 (9th Cir. 2008).  A

17  federal claim is fairly presented if the petitioner has described the operative facts and the federal

18  legal theory upon which his claim is based.  See Wooten, 540 F.3d at 1025 ("Fair presentation

19  requires that a state's highest court has 'a fair opportunity to consider . . . and to correct [the]

20  asserted constitutional defect.'"); Lounsbury v. Thompson, 374 F.3d 785, 787 (9th Cir. 2004)

21  (same) (quoting Picard, 404 U.S. at 276)); Weaver v. Thompson, 197 F.3d 359, 364 (9th Cir.

22  1999).  This requires petitioner to have "characterized the claims he raised in state proceedings

23  specifically as federal claims."  Castillo v. McFadden, 399 F.3d 993, 999 (9th Cir. 2005)

24  (emphasis in original) (internal citation omitted).  "In short, the petitioner must have either

25  referenced specific provisions of the federal constitution or cited to federal or state cases

26  involving the legal standard for a federal constitutional violation.  Mere 'general appeals to broad

constitutional principles, such as due process, equal protection, and the right to a fair trial,' do not establish exhaustion." Id. (quoting Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999)). Thus, a claim is unexhausted where the petitioner did not fairly present the factual or legal basis for the claim to the state court. See Picard v. Connor, 404 U.S. at 275. "[I]t is not enough . . . that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982). As a rule, the "mere similarity of claims is insufficient to exhaust." Duncan, 513 U.S. at 365-66.

On the other hand, "new factual allegations do not ordinarily render a claim unexhausted." Beatty v. Stewart, 303 F.3d 975, 989 (9th Cir. 2002). A claim is unexhausted only if new factual allegations "fundamentally alter the legal claim already considered by the state courts." Vasquez v. Hillery, 474 U.S. 254, 260 (1986). See also Beatty, 303 F.3d at 989-90; Weaver, 197 F.3d at 364. It is not necessary that "every piece of evidence" supporting federal claims have been presented to the state court. Chacon v. Wood, 36 F.3d 1459, 1469 n.9 (9th Cir. 1994) (emphasis in original). See also Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008). Rather, the introduction of new evidence affects the fair presentation requirement only when it "substantially improves the evidentiary basis" for petitioner's claims. Aiken v. Spalding, 841 F.2d 881, 883 (9th Cir. 1988). New factual allegations that are merely cumulative of those presented to the state court do not transform the claim and thus do not require exhaustion. Hillery v. Pulley, 533 F. Supp. 1189, 1200-02 (E.D. Cal. 1982), aff'd, 733 F.2d 644 (9th Cir. 1984), aff'd, 474 U.S. 254 (1986). See also Weaver, 197 F.3d at 364 (acknowledging that although the "precise factual predicate" for a claim had changed after the evidentiary hearing in federal court, the claim remained rooted in the same incident and was therefore exhausted).

Thus, exhaustion does not require that every piece of evidence supporting the federal claim be presented to the highest state court. Davis, 511 F.3d at 1009. Rather, "to exhaust the factual basis of the claim, the petitioner must only provide the state court with the operative facts, that is, all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies." Id. (internal quotation marks omitted). Accordingly, "fair

14

1   presentation" requires only that claims be alleged with as much particularity as is practicable

2   under the circumstances.  See Kim v. Villalobos, 799 F.2d 1317, 1320 (9th Cir. 1986).

3            As noted, it appears that respondent misconstrues the purpose of the exhaustion

4   requirement as explained under the above authorities.  The state court must merely have been

5   given a fair opportunity to rule on petitioner's claims.  That does not mean the claim presented to

6   the state court must in every respect be the same as the claim presented in federal court.  Correll

7   v. Stewart, 137 F.3d 1404, 1414 (9th Cir. 1998) ("'claim exhaustion' does not equate to

8   'evidence exhaustion'").  Were that the case, many aspects of federal habeas law would be null.

9   The pre-AEDPA statute and rules clearly contemplated the possibility of new factual

10  development in federal court.  See 28 U.S.C. § 2254(e) (evidentiary hearings); Rule 6, Rules

11  Governing § 2254 Cases (discovery).  Further, this court recognizes that requiring a petitioner to

12  present every factual basis for his claim in state court ignores the reality that state court

13  procedures often do not permit full fact-finding.  If the petitioner presented the legal basis for the

14  claim but was unable to make a substantial factual showing because state court procedures did

15  not permit such fact-finding, then the state court has had a sufficient opportunity to rule on the

16  merits of the claim and the exhaustion requirement is satisfied.  See Weaver, 197 F.3d at 364-65;

17  Miller, 677 F.2d at 1084 n.9.

18           In any event, respondent has not shown petitioner's new evidence fundamentally

19  alters the claims that he presented to the state courts.  Accordingly, the undersigned rejects the

20  argument that any of petitioner's claims for federal habeas relief are unexhausted.

21  IV.  Motion for an Evidentiary Hearing

22           Petitioner seeks an evidentiary hearing on claims 1, 7, 15 ,16, 29, 30, 42, and 43

23  of his second amended petition.  This court will exercise its discretion to grant a hearing on all or

24  portions of each of these claims.  Petitioner has shown aspects of each of these claims are

25  colorable, involve disputed material issues of fact, and were not satisfactorily resolved by the

26  state court.

A.  Prosecutorial Misconduct and False Testimony - Claim 1

Petitioner alleges pervasive prosecutorial misconduct violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  He argues that the prosecution committed multiple acts of misconduct by, among other things: (a) suppressing exculpatory evidence, including witnesses' complete rap sheets, witnesses' prior statements,  consideration given for witnesses' testimony, and the mental health history of inmate witness Cade; (b) suborning perjury; and (c) presenting evidence prosecutors knew or should have known was false.  In addition, petitioner alleges that his conviction was obtained based on false testimony in violation of his right to due process.[10]

As described above, the California Supreme Court ordered a reference hearing on two aspects of this claim, that the prosecutor knowingly presented false evidence and that petitioner's conviction was based on false testimony.  The California Supreme Court agreed with its appointed referee that the prosecutor did not knowingly present false evidence.  In re Roberts, 29 Cal. 4th at 740-41.  However, a majority of the court refused to adopt the referee's findings regarding the lack of truthfulness of the trial testimony given by inmate witnesses Long and Cade.  Id. at 742-44.  Justice Kennard and Chief Justice George dissented on this issue, indicating that they would have adopted the referee's findings and granted petitioner habeas relief because his conviction was obtained based on false testimony.  Id. at 747.

Respondent makes much of the presumption of correctness due state court findings of fact under 28 U.S.C. § 2254(d).  However, as noted above, the federal court is not bound by the presumption of correctness when determining, in its discretion, that an evidentiary hearing is warranted in this pre-AEDPA case.  Knaubert, 791 F.2d at 727 n. 3.  For several reasons, application of the presumption of correctness is not warranted at this point in these

---

[10]  The California Supreme Court noted that petitioner did not raise this claim until after the reference hearing.  Nonetheless, the court ruled on the merits of the claim.  29 Cal. 4th at 741. Respondent has not shown any reason why this court may not do so as well.

1    federal habeas proceedings.  First, there was disagreement even among the justices of the

2    California Supreme Court regarding the witnesses' credibility.  As noted, the five-judge majority

3    disagreed with many of the referee's important findings in this regard.  The two dissenting

4    justices agreed with the referee's determination and considered his findings sufficient to warrant

5    the granting of state habeas relief.  Second, respondent's counsel's failure to provide petitioner's

6    counsel with discovery in time for preparation for, or presentation at, the state reference hearing

7    renders application of the presumption of correctness not only inappropriate but inequitable.

8          Respondent also complains that the federal court should not re-hear evidence

9    already presented and ruled on by the state courts.  However, it is important to note that at this

10   stage of these proceedings the only question is whether petitioner's claims merit evidentiary

11   development in federal court.  This court is not yet determining what evidence will be presented.

12   Nor is this court suggesting that granting an evidentiary hearing on a given claim grants

13   petitioner license to re-present at the evidentiary hearing all of the evidence he has already

14   presented to the state courts.

15         Below, the court turns back to petitioner's claim 1 and his motion for an

16   evidentiary hearing, addressing each aspect of that claim below.

17              1. Suppression of Evidence

18         To establish a due process violation based on the prosecution's suppression of

19   evidence, a petitioner must show the evidence was "material either to guilt or punishment,

20   irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83,

21   87 (1963).  See also Youngblood v. West Virginia, 547 U.S. 867, 869 (2006) ("A Brady violation

22   occurs when the government fails to disclose evidence materially favorable to the accused").  The

23   "central premise" of the Brady decision is that "even though an individual prosecutor may win a

24   conviction, society as a whole loses when that conviction is wrong."  Gonzalez v. Wong, 667

25   F.3d 965, 981 (9th Cir. 2011).  The duty to disclose favorable evidence is applicable even though

26   there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and

encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985); Gonzalez, 667 F.3d at 981.  "There are three essential components to a Brady claim: (1) 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'that evidence must have been suppressed by the State,' and (3) 'prejudice must have ensued.'"  Jackson v. Brown, 513 F.3d 1057, 1071 (9th Cir. 2008) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).  See also Skinner v. Switzer, ___U.S. ___, 131 S. Ct. 1289, 1300 (2011); Banks v. Dretke, 540 U.S. 668, 691 (2004); Maxwell v. Roe, 628 F.3d 486, 509 (9th Cir. 2010).  Evidence relevant to witness credibility falls within the Brady rule where "the 'reliability of a given witness may well be determinative of guilt or innocence.'"  Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).  See also United States v. Price, 566 F.3d 900, 907 (9th Cir. 2009) ("[E]vidence that would impeach a central prosecution witness is indisputably favorable to the accused."); Killian v. Poole, 282 F.3d 1204, 1210 (9th Cir. 2002) (habeas relief granted where undisclosed letters would have been valuable to the defense in impeaching "make-or-break" witness' credibility before the jury); Singh v. Prunty, 142 F.3d 1157, 1161-63 (9th Cir. 1998) (petitioner was entitled to habeas relief where the prosecution suppressed evidence of agreement to provide benefits to a key witness in exchange for his testimony, and a reasonable probability existed that had evidence been disclosed, one or more members of jury would have viewed the witness's testimony differently); United States v. Brumel-Alvarez, 991 F.2d 1452, 1461 (9th Cir. 1992) (Information that is required to be disclosed under Brady "includes "material . . . that bears on the credibility of a significant witness in the case.") (quoting United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988)).  The fact that the defense introduced substantial evidence at trial to impeach a witness's credibility does not foreclose the consideration of other avenues of impeachment.  "[W]ithheld impeachment evidence does not become immaterial merely because there is some other impeachment of the witness at trial."  Gonzalez, 667 F.3d at 984.

/////

1  Information of "new avenues of impeachment" could lead a fact finder to question the credibility

2  of a witness who has been impeached by other evidence.[11]  Id. at 984-85.

3          The standard for determining prejudice under Brady is whether there is a

4  "reasonable probability" that the result of trial would have been different had the evidence been

5  disclosed to the defense.  Strickler, 527 U.S. at 289.   "The question is not whether petitioner

6  would more likely than not have received a different verdict with the evidence, but whether "in

7  its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

8  confidence."  Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434  (1995)).  See also Hein v.

9  Sullivan, 601 F.3d 897, 906 (9th Cir. 2010); Silva v. Brown, 416 F.3d 980, 986 (9th Cir. 2005)

10  ("a Brady violation is established where there 'the favorable evidence could reasonably be taken

11  to put the whole case in such a different light as to undermine confidence in the verdict'").

12  Prejudice is measured by looking at the withheld evidence as a whole, "in the context of the

13  entire record."  Maxwell v. Roe, 628 F.3d 486, 512 (9th Cir. 2010) (quoting United States v.

14  Agurs, 427 U.S. 97, 112 (1976)), cert. denied, ___U.S.___, 132 S. Ct. 611 (2012).  "The

15  cumulative effect of all undisclosed evidence may violate due process and warrant habeas relief."

16  Id.  See also Barker v. Fleming, 423 F.3d 1085, 1094 (9th Cir. 2005).  Once the materiality of the

17  suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514

18  U.S. at 435-36; Silva, 416 F.3d at 986.

19          Petitioner argues the prosecution suppressed the following evidence: (1)

20  information that witness Ryland Cade suffered from severe and long-term mental illness, and

21  other matters related to Cade's credibility; (2) the prior convictions and prior informant activity

22

23          [11]  The California Supreme Court held that petitioner's new impeachment evidence was
not material because the inmate witnesses had been "thoroughly impeached" at petitioner's trial.
2 Cal. 4th at 308.  The court did not recognize that different, undisclosed avenues of
24  impeachment might have allowed the jury to consider different bases for determining a witness's
credibility.  For example, evidence of a witness's history as an informant might cause the jury to
25  doubt the witness's motivations for testifying, while evidence of the witness's mental illness
might cause the jury to doubt the witness's ability to perceive and recollect events accurately.
26  See Gonzalez, 667 F.3d at 984-85.

of witnesses Robert Hayes, Leslie Rooks, and William Acker, as well as the benefits received by

each for testifying; (3) information about victim Charles Gardner's mental state and violent

character; (4) a statement by inmate witness Alexander Vichi that Mr. Menefield and someone

other than petitioner were the actual assailants; and (5) a statement by another inmate witness,

possibly Marcus Richardson, that also identified someone other than petitioner as the second

assailant of Gardner.

a.  Evidence re Ryland Cade

i.  Background

At trial, Ryland Cade testified to the following.  The morning of the crime, he saw

that petitioner had a prison knife, with something white wrapped around the handle, tucked into

his waistband inside his unfastened jacket.  (RT 2912:11 - 2913:14; 2995:5-6.)  As Mr. Cade

walked downstairs to the first floor, he encountered Raybon Long on the stairs..[12]  (RT 2901:1,

2902:27 - 2903:1.)  Mr. Long warned him someone was about to be assaulted.  (RT 2903:3-23.)

Mr. Cade saw petitioner stab Charles Gardner.  (RT 2917:1-7, 2919:9 - 2920:21.)  He saw Archie

Menefield grab Mr. Gardner by his clothes and pull him down.  (RT 2921:16 - 2923:9.)  Mr.

Cade testified he saw petitioner drop the knife and run up the stairs, followed by Menefield.  (RT

2923:23 - 2924:24.)

Mr. Cade also testified at trial that he later got into a fight and was placed in "the

hole," a segregated unit, in a cell near petitioner's cell.[13]  (RT 2943:24 - 2945:6.)  While there,

petitioner told him that he had killed victim Gardner and then ran to the third floor.  (RT

---

[12]  In Cade's trial testimony as well as that of the other inmate witnesses, many inmates
were referred to by their nicknames.  In this regard, petitioner's nickname was "Zoom."  Archie
Menefield was "Racehorse."  Charles Gardner was "Little Charles."  Ryland Cade was "Terry."
David Calvin was "Lucky."  Raybon Long was "Butch."  Leslie Rooks was "Rider."  Robert
Hayes was "Roberta."  Ruben Williams was "Big Rube."  (E.g., RT 1996; 2032:13-14, 20-21;
2580 - 2583; 2892:15-19; 2892:27 - 2893:3; 3039:27; 6501- 6502.)

[13]  On cross-examination at trial, defense counsel pointed out that Mr. Cade had
previously told prosecutor Kirk that he "[p]icked a fight personally to go into the hole because I
know [I] would be on the same row with these guys."  (RT 3082:15-25.)

2945:27-28, 3008:18-26.)  Cade testified that he did not discuss the case with other inmate

witnesses when he was housed at Chino before petitioner's trial.  (RT 2953:18 - 2954:27.)  Mr.

Cade was housed at the Contra Costa County Jail with David Calvin, Raybon Long, and Robert

Hayes during petitioner's trial.  (RT 3036:7-15.)  He testified he also did not discuss his

testimony with the other inmate witnesses at that time either.  (RT 3036:16-20.)

Cade testified at trial that he asked prosecutor Charles Kirk and Department of

Justice Investigator Norman Gard about an early parole date.  (RT 3033:16-28.)  He testified that

he was told they "couldn't" do that.  (RT 3034:3-5.)  Cade denied that prosecutor Kirk helped

make arrangements so that he could be married while in prison.  (RT 3035:13-28.)  Cade testified

that, with regard to his federal imprisonment, the only thing Mr. Kirk had done for him was write

a letter on his behalf to the federal authorities.  (RT 3115:15 - 3116:1.)   This letter was admitted

at trial as Exhibit 46.  (RT 3115, 4032.)

Defense counsel questioned Mr. Cade about his inconsistent prior statements he

had made in three interviews with correctional officers and the prosecutor and during his

testimony at petitioner's preliminary hearing.  (See, e.g., RT 3006-3008(re Aug. 25, 1980

interview with Officers Horton and Hartman); 3009 (re prelim. hrg. testimony); 3015-3017 (re

Apr. 16, 1981 interview with prosecutor Kirk); 3053-3054 (re Sept. 5, 1980 interview with

Horton and Hartman); 3072-3077 (re all three interviews and prelim hrg. testimony).)

At the reference hearing ordered by the California Supreme Court, Mr. Cade

testified he was incarcerated in 1980 after being convicted of two murders.  (RH RT 804-805.)

Cade testified that he did in fact talk with inmates Calvin, Long, Hayes and Rooks about the case

when they were all housed in the Contra Costa County Jail.  (RH RT 1123:1 - 1124:1.)  Cade

asserted his Fifth Amendment privilege and refused to answer questions about whether he had

been truthful in his trial testimony about the presence of Raybon Long at the crime scene.  (RH

RT 1127:2-22.)  Cade also refused to answer questions about the crime.  (RH RT 1165-1170.)

However, Cade later testified that he saw petitioner and then Archie Menefield run up the stairs.

1   (RH RT 1223:10-26, 1224:10-18.)  He also testified he did not remember seeing anyone else on

2   the stairway.  (RH RT 1223:25-27.[14])  Cade testified later that he believed Long was near the

3   mail room when Charles Gardner was attacked.  (RH RT 1247:16-18.)  Cade admitted that he

4   had testified for the prosecution in a prior case.  (RH RT 1179:1-8.)  Cade recalled asking

5   prosecutor Kirk for an early release.  (RH RT 1183:18 - 1184:7.)

6          Mr. Cade also testified at the reference hearing that he has been under the care of

7   a psychiatrist since 1976.  (RH RT 1227:18-20.)  At one point, he was sent to a mental hospital to

8   be evaluated for competency to stand trial.  (RH RT 805:15-20.)  He took medication on and off

9   when he was at CMF.  (RH RT 1227:21-22.)  When he was not taking his prescribed medication,

10  he sometimes heard voices.  (RH RT 1227:28 - 1228:1, 24.)  In the April 16, 1981 interview with

11  prosecutor Kirk, Cade stated, "All my life I've been on medicine and I woke up.  I've been off

12  medication for two weeks, and I feel like a brand new man, like I've been reborn in a lot of ways

13  because it made me feel good that I don't take medicine.  It should make me a normal person

14  again."  (RH RT 1238:18-25.)

15         Mr. Cade eventually testified at the reference hearing that he saw petitioner stab

16  Charles Gardner.  (RH RT 1313:26 - 1314:1.)

17         Petitioner argues that prosecutor Kirk suppressed and failed to provide to the

18  defense substantial information regarding Mr. Cade's mental illness, prescribed medications,

19  criminal history, and the benefits he received for testifying at petitioner's trial.

20                          ii.  Suppression of Mental Health Evidence

21         At the time of petitioner's trial, mental health evidence regarding a witness,

22  particularly evidence of severe mental illness such as psychoses, may have been admissible to

23  impeach the witness.  See People v. Reber, 177 Cal. App. 3d 523, 530 (1986) ("Certain types of

24  mental disorders are highly probative on the issue of a witness' credibility.  For example, the

25  ─────────────────

26      [14]  This statement is consistent with Cade's preliminary hearing testimony.  (Preliminary
    Hearing Transcript ("PX RT"), lodged here on July 21, 1995, at 396:22-25; see Dkt. No. 118.)

veracity of one afflicted with a psychosis such as paranoid schizophrenia may be impaired by distortions in his ability to perceive and recall events; a schizophrenic who suffers delusions and hallucinations may have difficulty distinguishing fact from fantasy.")  Mental health evidence is the sort of potentially impeaching evidence that a prosecutor is required to provide the defense under Brady.  See Gonzalez, 667 F.3d at 983 ("Courts have long recognized the impeachment value of evidence that a government witness has a severe illness, such as schizophrenia, that dramatically impaired [his] ability to perceive and tell the truth."); see also  Wilson v. Beard, 589 F.3d 651, 665 (3rd Cir. 2009); East v. Johnson, 123 F.3d 235, 238 (5th Cir. 1997); cf., Benn v. Lambert, 283 F.3d 1040, 1056 (9th Cir. 2002) (Brady requires evidence of a witness's drug use should have been revealed to defense because it was relevant to impeach the witness's "ability to recollect or perceive the events.").  Even though a witness may be impeached at trial with evidence of his criminal record and history as an informant, new evidence of the same witness's mental illness would not be cumulative and could cause the fact finder to question the witness's "competency to perceive and tell the truth."  Gonzalez, 667 F.3d at 984.

Petitioner argues the following evidence from Mr. Cade's CDC file regarding Cade's mental health was not provided to the defense until the reference hearing: (1) a summary of the probation officer's report regarding Cade's Los Angeles County murder case which describes the court's finding of his mental incompetence; (2) a CMF psychiatric intake report dated February 2, 1978 indicating Cade had received psychiatric treatment in Louisiana, had a history of alcohol abuse, had suffered a severe head injury at age 16, and has received a diagnosis of "organic brain syndrome;" (3) a CDC intake report dated January 31, 1978 reflecting that Cade had a history of blackouts, and alcohol and drug abuse; (4) a psychiatric evaluation dated March 27, 1979 which listed Cade's diagnosis as "schizo-affective schizophrenia," listed abuse Cade had inflicted upon himself and concluded that "psychotic content persists;" (5) a March 8, 1978 report of a transfer from Chino to CMF because Cade was psychotic; (6) an April 1, 1980 psychiatric evaluation which gave a diagnosis of "borderline personality disorder;" (7) a

1  November 13, 1980 report indicating that Cade had a "psychotic history" and was supposed to be

2  taking the anti-psychotic drug Navane; (8) a document dated February 7, 1978, which indicated

3  Cade was then taking the anti-psychotic drug Stelazine; (9) an parole document from April of

4  1978 stating that Cade had a "serious mental disorder;" and (10) a January 1978 pre-sentence

5  report which stated that Cade used cocaine daily, suffered from blackouts and had been in a

6  mental hospital in Louisiana;   (Reference Hearing Exhibit ("RH Ex.") GGG, filed under seal per

7  March 28, 2012 order.[15])

8          In addition, petitioner presents the reports of two psychiatrists who found Mr.

9  Cade incompetent to stand trial in 1977 and the Los Angeles County Superior Court opinion

10  finding Cade incompetent.  (Exs. 2 and 3 to State Pet., lodged here in Ex. 27 to Answer; see Dkt.

11  No. 263.)

12          One of the most obvious, and damning, indications that prosecutor Kirk knew of

13  Mr. Cade's mental illness and purposefully kept it from the defense, is Cade's rap sheet.

14  Information on the copy of that rap sheet produced to the defense by the prosecution was

15  redacted.  (Dkt. No. 391-4, RH Ex. II.)  Petitioner has submitted to this court an unredacted

16  version of what appears to be the identical rap sheet.  (Ex. 203 to Mtn. for Evi. Hrg., filed under

17  seal per March 28, 2012 order, at p. AGO-5708, .)  Petitioner states he obtained a copy of the

18  unredacted version through federal discovery of prosecutor Kirk's case file.  (Dkt. No. 369 at

19  63:17-20 & n. 86.)  A comparison of the two shows that someone redacted the word "INSANE" /

20  next to an entry regarding Cade's Los Angeles murder case.[16]  In addition, Cade's location in a

21

22          [15]  While Ex. GGG is filed under seal to protect some privileged information, the details
    listed here appear in petitioner's publicly-filed Second Amended Petition, Dkt. No. 248, at 70-72.
23  Throughout this order, the court similarly has described only that information from sealed
    documents which has already been made public in other filings.

24

25          [16]  The rap sheet disclosed pre-trial reflects the notation "Penal Code § 1370," which
    involves mental incompetence.  This citation would not have raised the same red flag for the
    defense as an "INSANE" notation.  Even if reference to § 1370 should have caused counsel to
26  investigate Cade's mental health, such evidence would support petitioner's ineffective assistance

1    prison mental health hospital, was also redacted, as was Cade's murder conviction itself.  Other

2    direct indications that prosecutor Kirk knew about Cade's mental health history include Cade's

3    statement to Kirk that "All my life I've been on medication. . . ."  (Ex. 203 to Mtn. for Evi. Hrg.,

4    filed under seal per March 28, 2012 order, at p. AGO-5691.)

5           Prosecutor Kirk testified at the reference hearing that he revealed the rap sheets to

6    the trial judge in camera.  (RH RT 1675:12-18.)  According to Mr. Kirk, the trial judge instructed

7    him regarding what information from Cade's rap sheets needed to be disclosed to the defense

8    "and I did that."  (RH RT 1675:28 - 1676:1.)  Kirk further testified that Cade's mental problems

9    "had nothing to do with credibility" and that the prosecution was not required to produce to the

10   defense all felony records of all prosecution witnesses.[17]  (RH RT 1676:19 - 1677:2, 1679:8-9.)

11   It should be noted that there is no record before this court corroborating Kirk's claim that the trial

12   court directed him to suppress certain information about the witnesses' criminal records.

13          Petitioner's mental health expert, Dr. Tucker, testified at the reference hearing that

14   the medical records showed Mr. Cade was supposed to be taking the psychiatric drug Navane at

15   the time of the crime.  (RH RT 2629:1-7.)  According to petitioner, the prosecution witnesses'

16   medications list provided to the defense before trial did not list Navane as one of Cade's

17   prescribed medications.  Dr. Tucker testified that Navane controls hallucinations and delusions

18   and reduces thought disorders.  (RH RT 2629-31.)  From his review of the records, Dr. Tucker

19   concluded that Cade suffers from a "severe psychotic disorder."  (RH RT 2631:22-24.)  Dr.

20   Tucker testified that while he could not be certain due to the passage of time, he felt it was likely

21   Cade's mental illness impaired his perception of events at the time of the crime for which

22

---

23   of counsel claim.  The referee found that the "INSANE" notation was redacted from the version
     of the rap sheet provided to the defense before trial.  (Ex. 74 to Answer, at 7; see Dkt. No. 263.)
24

25        [17]  As stated previously, the question under Brady is whether the prosecutor knew or
     should have known he was required to disclose certain information.  Therefore, whether or not
     Kirk was mistaken regarding his legal obligations under Brady and Giglio to disclose
26   impeachment information is not determinative of the issue.

1   petitioner was convicted.  (RH RT 2636:3-16; RH Ex. FFF, submitted for filing under seal,[18] at

2   5.)

3              The referee, Judge Taft, refused to make a finding regarding Cade's mental state

4   at the time of the crime or the time of petitioner's trial.  (Ex. 74 to Answer at 8; see Dkt. No.

5   263.)  However, the referee did review Dr. Tucker's opinions and found that Cade's testimony at

6   the reference hearing was "evasive and often at variance with prior testimony."  (Id.)  The referee

7   also noted that the California Supreme Court had already found that Cade's trial testimony had

8   been thoroughly impeached.  (Id.)  Based on these considerations, the referee found that Cade's

9   trial testimony was untruthful.  (Id.)  The majority of the California Supreme Court rejected the

10  referee's finding in this regard because "it was not based upon new evidence that had not been

11  presented to the jury, but upon Cade's demeanor while testifying at the reference hearing and

12  essentially repeating his trial testimony."  29 Cal. 4th at 744.  In fact, however, it does not appear

13  that Judge Taft so limited the bases for his finding that Cade's trial testimony was untruthful.

14  While Judge Taft declined to make a specific finding regarding Cade's mental state, it appears

15  that he nonetheless considered the mental state evidence in determining that Cade had not been

16  truthful at trial.  Moreover, the evidence presented at the reference hearing, along with new

17  evidence presented to this court, raises a significant question regarding the reliability of Cade's

18  testimony at petitioner's trial.  Further, that evidence raises serious questions about what

19  prosecutor Kirk knew or should have known about the reliability of Cade's testimony which he

20  presented at petitioner's trial.

21  /////

22  /////

23

24         [18]  In a March 28, 2012 order, this court granted a portion of petitioner's request to seal
    exhibits.  (Dkt. No. 421.)  The court also deferred ruling on some of petitioner's requests in order
25  to permit the parties to meet and confer after issuance of the present order.  (See id.)  Exhibit
    FFF, and other exhibits referred to herein as "submitted for filing under seal," are the exhibits for
26  which the court has deferred ruling on the sealing request.

iii.  Suppression of Other Information re Cade

Petitioner also argues the prosecution suppressed both evidence of Cade's criminal history and of benefits Cade requested and received.  Both of these categories of information fall well within the ambit of Brady.  See Jackson v. Brown, 513 F.3d 1057, 1070-71 (9th Cir. 2008) (benefits provided to witness constitute Brady material); Benn, 283 F.3d at 1048-49 (same as to witness's prior informant activity and lies to law enforcement); Carriger v. Stewart, 132 F.3d 463, 479-82 (9th Cir. 1997) (en banc) (witness's criminal record, history of false statements to law enforcement and history of blaming others for his misdeeds found to constitute Brady material); United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986) ("facts which imply an agreement" must be disclosed to the defense); In re Pratt, 69 Cal. App. 4th 1294, 1310-11 (1999) (same as to witness's prior informant activity).

Petitioner argues the prosecution suppressed the following non-mental health related evidence reflected in Cade's criminal history: (1) a July 1980 report in Cade's CDC file from the United States Attorney for the District of South Carolina containing information that Cade had assisted the prosecution of a case there but had been untruthful; (2) documents regarding a 1975 stabbing incident in Louisiana; (3) a pre-sentence report from Cade's Los Angeles case in which, among other things, Cade is described as "untruthful" and "unreliable;" and (4) Cade's Los Angeles and South Carolina murder convictions.  (Exs. 203 at p. AGO-5708 and 204 at C0066, filed under seal per March 28, 2012 order; Ex. 205 (L.A. case), submitted for filing under seal; Dkt. No. 372-1, Ex. 206 (S. C. case); RH Ex. GGG, filed under seal per March 28, 2012 order, at 173, 11, 137, 44-46, 73.)  As described above, the prosecution redacted Cade's 1979 Los Angeles County murder conviction from the rap sheet produced to the defense.  In addition, Cade's January 1980 murder conviction in federal court in South Carolina was not disclosed to petitioner's defense.  In fact, a prosecution filing at trial specifically represented that Cade had "NO CONVICTIONS AVAILABLE FOR IMPEACHMENT."  (Dkt. No. 392-1, RH Ex. KK.)  Yet, petitioner has presented proof to this court of both of Cade's felony convictions.

27

1  (Ex. 205 to Mtn. for Evi. Hrg., submitted for filing under seal;  Dkt. No. 372-1, Ex. 206 to Mtn.

2  for Evi. Hrg., at 7-8.)  Petitioner asserts that both of these convictions would have been

3  admissible to impeach Cade's credibility under California Penal Code § 788.  The California

4  Supreme Court has held that the prosecution witnesses' prior felonies should have been revealed

5  to the defense in this case.  Roberts, 2 Cal. 4th at 308.

6           Petitioner also claims the prosecution suppressed the following evidence

7  regarding benefits possibly conferred on Cade in exchange for testifying at petitioner's trial: (1) a

8  September 23, 1981 letter from Cade to Department of Justice Investigator Norman Gard asking

9  that prosecutor Kirk write "the letter" to the federal parole board to help Cade "get out"[19]; (2)

10  notes regarding "marriage forms for Cade" (Dkt. No. 372-2, Ex. 208 to Mtn. for Evi. Hrg.); (3)

11  Cade's September 30, 1981 letter to Gard asking for help in obtaining his girlfriend's release

12  from custody (Dkt. No. 372-3, Ex. 209 to Mtn. for Evi. Hrg.); (4) Cade's February 18, 1982 letter

13  to prosecutor Kirk asking if he had "checked on the camps" and asking Kirk to thank Officer

14  Hartman "for the gifts" (id.); (5) Cade's March 9, 1982 letter to DOJ investigator Gard asking for

15  money (id.); (6) Cade's August 18, 1982 letter to Gard which Cade signed "Your Slave" (id.);

16  and (7) information that prosecutors arranged for Cade to have a tattoo removed while

17  ////

18  ////

19  ////

20  ////

21  ////

22  ////

23  ////

24

25  [19]  Petitioner has not cited the location of this letter in the record and the court has been
    unable to find it.  Whether or not this letter exists does not change this court's conclusion that an
    evidentiary hearing is necessary with respect to the Brady issues involving information relevant
26  to Mr. Cade.

1    incarcerated.[20] (Ex. 207, filed under seal per March 28, 2012 order; Ex. 104, submitted for filing

2    under seal; Dkt. No. 248 at 77-78, 172-173).

3            Finally, petitioner argues that prosecutors in his case suppressed the statements of

4    two different inmates to the effect that Cade was not even at the scene of the incident.  (Dkt. Nos.

5    371-4 and 371-5, Exs. 201 and 202 to Mtn. for Evi. Hrg.)

6                                    b.  Suppression of Other Evidence

7            Petitioner also alleges prosecutors failed to turn over information which would

8    have impeached the credibility of three other prosecution witnesses.  In addition, he argues the

9    prosecution suppressed evidence of victim Gardner's mental state and violent character, and

10   evidence that inmate Alexander Vichi had identified someone besides petitioner as the other

11   assailant.[21]

12                                       i.  Robert Hayes

13           Robert Hayes was one of the three inmate witnesses who testified at trial that he

14   saw petitioner stab Gardner.  (RT 2270:13-18.)  Mr. Hayes testified for the prosecution as

15   follows.  Early on the morning of the crime, Mr. Hayes was working at his job as a clerk in the

16   prison medical clinic.  (RT 2228:17-18, 2233:6 - 2234:3.)  Petitioner came by the clinic.  (RT

17   2234:12-20.)  Petitioner asked Hayes if alcohol could remove fingerprints and blood.  (RT

18

19       [20]  Cade testified in November of 1982.  (RT 2890, et seq.)  Apparently a defense
     investigator learned of the tattoo removal in January 1983, which resulted in a January 26, 1983
20   in camera hearing where the incident was discussed.  (Ex. 207, filed under seal per March 28,
     2012 order; Ex. 104, submitted for filing under seal.)   The defense then sought to have the tattoo
21   specialist, Lyle Tuttle, testify at petitioner's trial.  Roberts, 2 Cal. 4th at 301.  The trial court
     granted the prosecution's motion to quash the subpoena issued to Tuttle.  Id.  On appeal, the
22   California Supreme Court held the trial court erred under state law in quashing the subpoena but
     that the error was harmless because "Cade was impeached thoroughly by other means."  Id. at
23   302.  In a related analysis, the court held that evidence of the tattoo removal was not material and
     therefore its suppression did not violate petitioner's due process rights.  Id. at 303.

24       [21]  Petitioner also alleges that the prosecution suppressed evidence that another inmate,
     possibly Marcus Richardson, identified the second assailant as someone other than petitioner.
25   However, as discussed above, this court held an evidentiary hearing on that issue and determined
     that the existence of a transcript reflecting such a statement by Richardson has not been
26   established.

1  2245:14 - 2246:4.)  Hayes testified he saw petitioner attempting to wrap a prison-made knife

2  with an ace bandage.  (RT 2292:7 - 2293:20.)  Petitioner then asked for some paper tape.  (RT

3  2246:11-21.)  Paper tape is white.  (RT 2294:25-26.)  Petitioner went into a back room where the

4  paper tape is kept and Hayes saw him wrapping tape around the knife.  (RT 2248:14 - 2250:5.)

5  When Hayes questioned petitioner about the knife, petitioner told him he could not let Gardner

6  get away with disrespecting him.  (RT 2251:10-14.)  Hayes testified he looked into the hallway

7  from the window of the clinic and saw petitioner stab Charles Gardner.  (RT 2270:5 - 2272:7.)

8  Hayes did not discuss the case with other inmate witnesses when he was housed at Chino or at

9  the Contra Costa County Jail before trial.  (RT 2299:22 - 2300:9.)

10          Mr. Hayes died before the reference hearing.  (Ex. 74 to Answer at 8; see Dkt. No.

11  263.)  Petitioner claims the prosecution suppressed evidence of Hayes' prior conviction by giving

12  the defense the date of that conviction as January 1981, rather than the correct date of January

13  1982.  The prosecution did not provide the defense with all of Hayes' prior convictions.

14  Reference Hearing Exhibit MM is the prosecution's list of Hayes' prior felony convictions which

15  was provided to the defense at trial.  (Dkt. No. 392-3.)  That list omits a felony forgery

16  conviction which Hayes suffered in Mississippi.  (Dkt. No. 373-5 and 374-1, Exs. 216 and 217 to

17  Mtn. for Evi. Hrg.)  It also omits a series of burglaries of which Hayes was convicted that were

18  committed when he was released shortly after Gardner's killing.[22]  (Dkt. Nos. 373-5 and 374-3,

19  Exs. 216 and 219 to Mtn. for Evi. Hrg.)  In addition, near the end of the reference hearing

20  petitioner was for the first time provided with two letters Hayes wrote to prosecutors.  The first,

21  dated January 27, 1982, is directed to Department of Justice Investigator Norman Gard.  (Dkt.

22  /////

23  /////

24  ───────────────────

25  [22] Mr. Hayes guilty pleas to these burglaries would appear to have been particularly
relevant to Hayes' credibility because they involved his false representation to elderly victims
that he was a Social Services or Social Security employee.  (Dkt. No. 374-3, Ex. 219 to Mtn. for

26  Evi. Hrg.)

1   No. 374-4, Ex. 220 to Mtn. for Evi. Hrg.[23])  Therein, in Hayes indicates he had prior

2   conversations with Agent Gard in which they discussed Hayes' then upcoming sentence and

3   arrangements that had been made to house him at Chino.  (Id.)  In addition, the letter reflects that

4   Hayes was acting as an informant with respect to a number of prisoners.  (Id.)  The second letter,

5   dated September 24, 1982, is addressed to prosecutor Kirk.  (Id.)  Therein, Hayes refers to a

6   meeting with Kirk in which they discussed witness protection programs.  (Id.)  Hayes also

7   mentions in the second letter that Kirk said he would write a letter to the Board of Prison Terms

8   on Hayes' behalf.  (Id.)  Both of these letters, and the meetings of Hayes with prosecutor Kirk

9   and Agent Gard, were not revealed to the defense.

10                          ii.  Leslie Rooks

11           Leslie Rooks testified at petitioner's trial as follows.  On the morning of the

12   stabbing he saw petitioner with a knife.  (RT 2040:11-12, 2042:6-7, 2064:7 - 2065:3.)  Mr.

13   Rooks saw petitioner on the third floor immediately after the alarm sounded.  (RT 2043:5-27.)

14   Petitioner was dressed in his underwear.  (Id.)  When Rooks had seen him earlier, petitioner had

15   been wearing a jacket and pants.  (RT 2043:28 - 2044:11.)  In connection with his cooperation

16   with authorities Rooks had received a letter from prosecutor Kirk to his parole authorities, thirty

17   dollars in his inmate trust account, placement in protective custody, and help in transferring to a

18   facility of his choice consistent with his security considerations.  (RT 2054:8-21.)

19           In 1995, Mr. Rooks signed a declaration stating that he did not see petitioner with

20   a knife that morning and that petitioner was with him on the third floor at the time the alarm

21   sounded.  (Ex. 27 to State Pet., lodged here in Ex. 28 to Answer; see Dkt. No. 263.)  Petitioner

22   asserts that Rooks "reaffirmed" these two statements in his testimony at the reference hearing.

23   (Dkt. No. 248 at 178:9-14.)  However, petitioner does not provide citations to the reference

24   hearing transcript to support this assertion.  The court did locate Mr. Rooks' reference hearing

25   _____

26       [23]  Both letters also appear in Exhibit 222, Dkt. No. 375-1.

1   testimony in which he stated that he remembered petitioner was with him on the third floor when

2   the alarm went off.  (RH RT 101:1-9.)  In the Answer, respondent points to Rooks' testimony at

3   the reference hearing that he saw petitioner with a knife on the morning before the stabbing and

4   that he testified truthfully at trial.  (RH RT 107:2-13, 324:27-28.)  The referee found that Rooks'

5   trial testimony was credible.  (Ex. 74 to Answer, at 9; see Dkt. No. 263.)

6          Petitioner states that the prosecution failed to turn over Mr. Rooks' rap sheet,

7   which would have shown that his commitment offense of murder was extremely brutal.  (Dkt.

8   No. 248 at 152 n. 119.)  In addition, prosecutors failed to reveal that Rooks had previously served

9   as an informant.  (Dkt. No. 204, Ex. 14 to First Am. Pet.; Ex. 226, filed under seal per March 28,

10  2012 order, at p. RK931.)  Petitioner argues prosecutors failed to disclose monetary benefits

11  given to Rooks.  (RH Ex. Z, lodged here as Ex. 97 to Answer, see Dkt. No. 273; Dkt. No. 393-1,

12  RH Ex. WW.[24])  In Exhibits 226, 228, and 229 to his motion, petitioner presents evidence of

13  prosecutor Kirk's efforts over the years to assist Mr. Rooks in obtaining parole.  (Dkt. No. 375-5,

14  Ex. 229; Ex. 226, filed under seal per March 28, 2012 order; Ex. 228, submitted for filing under

15  seal.)[25]

16                  iii.  William Acker

17         William Acker testified at the penalty phase of petitioner's trial that petitioner

18  stabbed him in 1973.  (RT 9424:3-8.)  Acker's testimony was supported by the testimony of

19  correctional officers who reported at the time of the incident that petitioner likely was the

20  perpetrator of that stabbing.  (RT 9441 - 9459.)  Petitioner claims the prosecution failed to turn

21

22         [24]  Petitioner also cites RH Ex. B.  (Dkt. No. 369 at 71:16.)  However, the court is unable
    to locate that exhibit in either party's submissions.

23

24         [25]  Petitioner also argues prosecutors should have disclosed information regarding Rooks'
    pro per habeas petitions in which he complained he was being denied psychiatric services.  (Dkt.
    Nos. 375-2, 375-3, and 375-4; Exs. 223, 224, and 225 to Mtn. for Evi. Hrg.)  However, Rooks
25  merely made unsupported allegations in those petitions that he was being denied treatment for
    emotional and mental issues.  Such allegations hardly rises to the level of material facts relevant
26  to an assessment of Rooks' credibility.

over Mr. Acker's rap sheet and failed to notify the defense of Acker's prior informant activity. (Dkt. No. 248 at 152:3-4; Dkt. No. 369 at 18:11-12.)  Petitioner presents information about Acker's two guilty pleas in cases in which he testified against his wife.  (Dkt. No. 376-4, Ex. 235 to Mtn. for Evi. Hrg.; Ex. 234, submitted for filing under seal.)  Petitioner also presents evidence of Acker's involvement as an informant in the death penalty case of Jesse Gonzalez.  (Dkt. Nos. 376-5 and 377-1, Exs. 236 and 237 to Mtn. for Evi. Hrg.)  Acker testified at Gonzalez's trial in 1980 that he had served as an informant in other cases as well.  (Ex. 236 at 13-15, 61-63.)

On December 7, 2011, petitioner filed a Notice of Supplemental Authority regarding Acker.  (Dkt. No. 420.)  Therein petitioner cites the recent Ninth Circuit decision in Mr. Gonzalez's capital habeas case.  Gonzalez v. Wong, 667 F.3d 965 (9th Cir. 2011).  Mr. Acker was the primary prosecution witness against Gonzalez at both the guilt and penalty phases of that case.  The Ninth Circuit held that the prosecution suppressed evidence of Acker's mental illness (schizophrenia) and history of lying and manipulating.  Id. at 981.  Even though the Gonzalez defense had introduced evidence of Acker's murder conviction and history of acting as an informant at trial, the Ninth Circuit found the new evidence of his mental illness was a sufficient basis on which to conclude that petitioner Gonzalez had made a colorable showing that he could succeed on his Brady claim.  Id. at 981-86.

While the court recognizes that the evidence set out above would have been important to impeach William Acker, petitioner has not shown that the impeaching evidence regarding Acker was material.[26]  The jury was instructed to consider unadjudicated criminal conduct only if it unanimously found that conduct to be true beyond a reasonable doubt.  (See RT 10,208:20 - 10,211:4.)  The instructions also directed the jury to record its findings regarding each instance of unadjudicated criminal conduct on the verdict form provided. (RT 10,209:3-5.) The jury did not mark the allegations regarding the alleged attack on Acker as having been found

---

[26]  The court adds this paragraph to the present amended order to include the rulings made on November 14, 2012.  (Dkt. No. 460.)  See n. 1, supra.

to be true. (CT 1794.)[27]  Of course, a jury is presumed to follow the instructions they are given. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Petitioner has not made any showing to overcome that presumption. (See Dkt. No. 455 at 2-4.)  Because the evidence shows the jury did not consider Mr. Acker's testimony in rendering its penalty phase verdict, any evidence that may have impeached Mr. Acker is not material.  There is no "reasonable probability" that had the jury heard the evidence impeaching witness Acker, the result of the penalty phase of his trial would have been different.[28]

### iv.  Charles Gardner

At trial, the prosecution's theory was that Charles Gardner was ambushed by petitioner and Archie Menefield.  According to petitioner, one defense theory was that the fight was spontaneous.[29]  Petitioner argues evidence relating to the victim's violent and volatile nature

---

[27]  For each of the three instances of unadjudicated criminal conduct considered by the jury, it was directed to find each "true" or "not true" by crossing out the inapplicable words. (CT 1794.) The jury crossed out "not true" with respect to the allegations that petitioner possessed a piece of metal in his cell. (Id.) The jury crossed out no words with respect to the allegations of an assault on Jimmy Fuzzell and an assault on William Acker. Based on the jury's clear indication that it found the metal possession allegation true, the most reasonable interpretation of the jury's failure to mark the other two allegations as true or not true indicates that it did not unanimously find them to be true. Petitioner does not contest this interpretation of the jury's verdict form.

[28]  The court long ago came to the same conclusion.  (Dkt. No. 123 at 2-3.)

[29]  Respondent argues that the issue of Gardner's propensity for violence is no longer important because it related only to the state's argument at trial regarding the cause of Officer Patch's death. The prosecution had attempted to paint a picture of Gardner as an inmate who was trying to reform and had avoided violence while at CMF.  Prosecutors argued the reason Gardner stabbed Patch was because he had lost so much blood and was in shock.  Thus, according to respondent, since the California Supreme Court reversed petitioner's conviction for Patch's killing, whether or not Gardner had a history of violence is not relevant to any claims that could now prejudice petitioner.  Petitioner counter by arguing that the evidence had other relevance at his trial.  According to petitioner, it is possible that Gardner's propensity for violence, or lack thereof, could have been considered by the jury with respect to issues other than the question of hypovolemic shock.  At the penalty phase, that evidence could have been relevant as a mitigating factor under California Penal Code § 190.3(e).  Respondent has not shown the jury was told it could use the evidence in question only to determine whether or not Gardner was in hypovolemic shock when he stabbed Patch.  Accordingly, for purposes of this motion, the court will accept petitioner's description of the potential relevance of this evidence at trial.

34

1  would therefore have been relevant at the guilt phase of his trial.  In addition, petitioner claims

2  the information would have been admissible at the penalty phase of his trial under California

3  Penal Code § 190.3(e) ("Whether or not the victim was a participant in the defendant's homicidal

4  conduct or consented to the homicidal act.").  (Dkt. No. 369 at 19 n. 22.)

5       Petitioner alleges the prosecution withheld documents showing Mr. Gardner

6  conspired to stab an inmate named Harmon in 1979 and was placed in segregation as a result.

7  (Dkt. No. 248 at 110:24 - 111:7.)  Exhibit 19 to the First Amended Petition is a letter from

8  inmate Wilbert Cross to an associate superintendent at CMF in which he appeals his and Charles

9  Gardner's placement in isolation pending an investigation into a stabbing.  (Dkt. No. 204.)

10  Exhibit 20 is a report by Lt. Hartman which states that both Cross and Gardner were released

11  from administrative segregation even though officers believed they were probably involved in the

12  stabbing of Harmon "in a conspiratorial status."  (Id.)  That report recommended that the appeal

13  letter be placed in the CDC files of both inmates.  Petitioner argues that the trial testimony of

14  Officer Tipton that Gardner had no CDC form 115 disciplinary reports after January 1977 was

15  therefore false or, at the very least, misleading.[30]  (RT 1792:7-13.)

16                    v.  Alexander Vichi

17       In 1995, inmate Alexander Vichi signed a declaration stating that he saw two

18  inmates hitting another inmate on the morning of the stabbing.  He saw the thinner assailant, who

19  had "unusual ears," drop a knife and run up the stairs.  He saw this man brought to the first floor

20  in handcuffs right after the assault.  He recalled the second assailant was wearing a Muslim type

21  cap.  Mr. Vichi stated that he was questioned by officers after the incident and identified the two

22  men from photographs.  (Ex. 41 to State Pet., lodged here in Ex. 28 to Answer.)

23  /////

---

24

25  [30]  At one point in the petition, petitioner mischaracterizes Tipton's testimony, stating that Tipton testified that Gardner "had no incidents of violence for the three years prior to his death."  (Dkt. No. 248 at 111:20-21.)  However, Tipton's testimony specifically referred only to disciplinary write-ups.  (RT 1788 - 1794.)

26

1    At the reference hearing, Mr. Vichi testified similarly.  (RH RT 1372-74.)

2    Petitioner does not explain, however, why he believes Vichi's reference hearing testimony

3    reflects that he identified Archie Menefield and someone other than petitioner as the assailants.

4    Vichi testified at that hearing that no one in the courtroom looked familiar to him.  (RH RT

5    1374:15-22.)  However, he also indicated he might not remember what the assailants looked like.

6    In this regard, Vichi stated simply, "Twenty years is a long time."  (RH RT 1374:18.)

7    c.  <u>Conclusion re Suppression of Evidence Claim</u>

8    Petitioner has proffered sufficient evidence to support a colorable claim that the

9    prosecution suppressed material evidence regarding the credibility of witnesses Ryland Cade,

10    Robert Hayes, and Leslie Rooks.  However, petitioner has not made a colorable showing that the

11    prosecution suppressed material evidence regarding the credibility of witness William Acker.

12    Petitioner has also presented sufficient evidence that prosecutors suppressed evidence that

13    Charles Gardner was involved in a prison stabbing.  While Gardner was not convicted of that

14    stabbing, information that officers suspected he was involved in the stabbing arguably could have

15    been introduced to counter the prosecution's evidence that Gardner had been non-violent in the

16    three years before his death.  However, given the paucity of evidence presented, the court finds

17    petitioner has not made a colorable argument that the prosecution suppressed any evidence

18    regarding Alexander Vichi.[31]

19    2.  <u>Presentation of False Testimony</u>

20    Petitioner claims prosecutor Charles Kirk presented at trial the false testimony of

21    Ryland Cade, Raybon Long, Leslie Rooks, Richard Yacotis, and Robert Hayes.  That testimony

22    was significant.  Long, Cade and Hayes were the only three witnesses to testify they saw

23

24    [31]  It is possible that somewhere in petitioner's 425-page second amended petition or his 149-page motion for an evidentiary hearing, there is additional support for his argument regarding Vichi.  However, the section of the motion dedicated to suppression of evidence related to Vichi (Dkt. No. 369 at 19:5-7) references only page 179 of the petition.  That page simply states petitioner's conclusion that Vichi did not identify petitioner as one of the perpetrators.  (Dkt. No. 248 at 179:4-16.)

petitioner stab Gardner.  Yacotis testified that petitioner made incriminating statements after the killings.  Rooks testified he saw petitioner with a knife shortly before the stabbing.

A violation of a defendant's constitutional rights occurs if the government knowingly uses false evidence in obtaining a conviction.  Giglio v. United States, 405 U.S. 150, 153-54 (1971); Napue, 360 U.S. at 269; see also United States v. Agurs, 427 U.S. 97, 103 (1976) ("'[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair."); Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids a conviction where the false evidence is 'known to be such by representatives of the State.'") (quoting Napue, 360 U.S. at 269)  It is clearly established that "a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict."  United States v. Bagley, 473 U.S. 667,  680 n.9 (1985).  See also Maxwell v. Rose, 628 F.3d 486, 506 (9th Cir. 2010); Killian v. Poole, 282 F.3d 1204, 1209-10 (9th Cir. 2002) (habeas relief was to be granted where "there is a reasonable probability that, without all the perjury, the result of the proceeding would have been different.")  Due process is violated in such circumstances regardless of whether the false testimony was obtained through the active conduct of the prosecutor, Hysler v. Florida, 315 U.S. 411 (1942); Mooney v. Holohan, 294 U.S. 1033 (1935), or was unsolicited.  Napue, 360 U.S. at 269 ("[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears").  This rule applies even where the false testimony goes only to the credibility of the witness.  Napue, 360 U.S. at 269; Mancuso v Olivarez, 292 F. 3d 939, 957 (9th Cir. 2002).

"To establish a Napue claim, a petitioner must show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material.'"  Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (quoting United States v. Zuno–Arce, 339 F.3d 886, 889 (9th Cir.2003)), cert. denied, ___U.S.___, 132 S. Ct. 159 (2011).  See also United States v. Polizzi,

1   801 F.2d 1543, 1549-50 (9th Cir. 1986); United States v. Juno-Arce, 339 F.3d 886, 889 (9th Cir.

2   2003).  False evidence is material "if there is any reasonable likelihood that the false [evidence]

3   could have affected the judgment of the jury." Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir.

4   2010) (quoting Bagley, 473 U.S. at 678).  Mere speculation regarding these factors is insufficient

5   to meet petitioner's burden.  United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

6           The California Supreme Court ruled on petitioner's claim that his conviction was

7   based on false testimony.  In its analysis, the court referred only to the statutory right under

8   California law to habeas relief based on the introduction of "'[f]alse evidence that is substantially

9   material or probative on the issue of guilt or punishment.'" Id. at 741-42 (quoting Cal. Penal

10  Code § 1473).  Of course, petitioner's claim here must rest on the federal constitution, not state

11  law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (federal writ not available for state law

12  error).  Respondent argues there is no entitlement to federal habeas relief based on the use of

13  false testimony absent prosecutorial misconduct.  While the cases cited by respondent may

14  suggest as much, they do not specifically so hold.  See Murtishaw v. Woodford, 255 F.3d 926,

15  959 (9th Cir. 2001) (finding petitioner not entitled to habeas relief while noting that petitioner

16  had presented no evidence that the prosecution knew the challenged testimony was false);

17  Carothers v. Rhay, 594 F.2d 225, 229 (9th Cir. 1979); Pavao v. Cardwell, 583 F.2d 1075, 1077

18  (9th Cir. 1978).  Petitioner, in turn, cites several Ninth Circuit decisions which support his

19  argument that a conviction resting on false testimony, without any evidence of prosecutorial

20  misconduct in presenting the testimony, may still result in a violation of due process.  See

21  Maxwell v. Roe, 628 F.3d 486, 499-500 (9th Cir. 2010) ("[A] defendant's due process rights

22  were violated . . . when it was revealed that false evidence brought about a defendant's

23  conviction."), cert. denied, ___U.S.___, 132 S. Ct. 611 (2012); Killian v. Poole, 282 F.3d 1204,

24  1208 (9th Cir. 2002) ("we assume without deciding that the prosecutor neither knew nor should

25  have known of Masse's perjury about his deal.  Thus our analysis of the perjury presented at

26  Killian's trial must determine whether 'there is a reasonable probability that [without all the

1  perjury] the result of the proceeding would have been different.'"); Hall v. Director of

2  Corrections, 343 F.3d 976, 981-82 (9th Cir. 2003).  This legal issue need not be resolved at this

3  point of these proceedings.   For purposes of the pending motion, this court finds petitioner has

4  made a sufficient showing that a conviction based on false testimony states a federal claim.

5                              a.  Ryland Cade

6            The referee found that Ryland Cade's trial testimony was false.  (Ex. 74 to

7  Answer at 7-8, see Dkt. No. 263.)  However, the referee declined to find that Mr. Cade's false

8  testimony was "knowingly induced by Kirk or the investigators."  As petitioner points out, the

9  referee did not make a finding regarding whether prosecutors should have known that the

10  challenged testimony was false.  Petitioner claims prosecutor Kirk knew or should have known

11  Cade's testimony was false because he knew that Cade was so mentally ill that his version of the

12  events was unreliable.  Petitioner also argues that Cade was subjected to suggestive interviewing

13  techniques, that members the prosecution team coached his story, and that he was purposely

14  housed at Chino and then the Contra Costa County Jail with the other testifying inmates so they

15  could coordinate their trial testimony.  Petitioner's showing regarding the falsity of Cade's

16  testimony and regarding the mental health evidence prosecutor Kirk knew of and suppressed is

17  described above.

18            According to petitioner, during Mr. Cade's August 25, 1980 interview with

19  officers after the stabbing, he was "coerced and led" into changing his original story that he had

20  not witnessed the stabbing.  (Dkt. No. 248 at 135:4-8; Dkt. No. 204, Ex. 8 to First Am. Pet., at

21  pp. 11404-11426 (interview transcript).)  Officers Horton and Hartman also threatened Cade.

22  (Dkt. No. 248 at 135:8-9.)  In addition, the officers showed Cade a diagram which placed him at

23  a certain location.  (Dkt. No. 204, Ex. 8 to First Am. Pet., at 11403.)  They apparently told Cade

24  that Archie Menefield had placed Cade there.  (Dkt. No. 248 at 135:19-20.)  The prosecution did

25  not reveal the use of the diagram to the defense until after Cade had testified at trial.  (RT

26  6540:16-18.)  According to petitioner, that discussion between officers and Cade also does not

1    appear in the transcript of Cade's August 25, 1980 interview.

2              In addition, petitioner claims that during the April 1981 interview of Mr. Cade by

3    prosecutor Kirk and Agent Gard, Cade was coached to change his position about where Charles

4    Gardner was stabbed.  (Dkt. No. 248 at 136:17-20; Dkt. No. 204, Ex. 10 to First Am Pet., at

5    11444-11529.)[32]  Petitioner alleges that interview transcript reflects that prosecutor Kirk gave

6    Cade information to help him "remember" the stabbing.  (Dkt. No. 248 at 136:20-22.)

7                              b.  Raybon Long

8                                 i.  Background

9              Raybon Long was one of only three witnesses to testify at trial that he saw

10   petitioner stab Charles Gardner.   He testified that on the day before the stabbing, he heard

11   petitioner arguing with BGF leader Ruben Williams.  (RT 2592:2-3, 2594:4-13.)  Mr. Long also

12   heard petitioner tell victim Gardner that if he took sides with Williams, he would die with him.

13   (RT 2595:28 - 2596:9, 2598:17 - 2599:1.)  On the day of the stabbing, Long saw petitioner wake

14   Archie Menefield, give him a knife, and tell him Williams was on the first floor.  (RT 2601:7-22,

15   2628:25 - 2629:13, 2655:6-15, 2783:15-26.)  He also overheard petitioner ask a group of inmates

16   whether one of them would be willing to pick up the knives after the stabbing.  (RT 2602:1-28.)

17   Long testified he saw petitioner stab Gardner with a knife with "a white handle on it like hospital

18   kind of tape."  (RT 2616:23 - 2619:2.)  He saw Menefield hold Gardner down during the

19   stabbing.  (RT 2621:4-28.)  Long did not see Menefield with a knife during the stabbing.  (RT

20   2622:5-10.)  He saw petitioner drop the knife and, followed by Menefield, run up to the third

21   floor.  (RT 2622:16 - 2623:11.)  He saw Menefield on the second floor throw a "white-handled

22   knife" out of a window.  (RT 2628:9 - 2629:23, 2782:27 - 2783:19.)  He saw Gardner pick up the

23   knife petitioner dropped and run up the stairs.  (RT 2631:12 - 2632:2.)

24   /////

25   _____

26   [32]  The court notes that petitioner does not pinpoint where in this transcript the alleged coaching took place.

Mr. Long testified that he was housed at Chino along with witnesses Calvin, Hayes, Cade, and Rooks after the stabbing.  (RT 2718:15-18.)  He also testified that "we never discussed the case amongst one another."  (RT 2718:20, 2846:3-4.)

During cross-examination, and to some extent on re-direct examination at petitioner's trial, Mr. Long admitted lying during the preliminary hearing and during interviews conducted by the prosecutors.[33]   (RT 2641:12-19, 2674:16 - 2675:13, 2677:22 - 2678:3, 2682:4-25, 2725:2-24, 2772:2 - 2777:22,  2834:11-18.)  In particular, he admitted lying about his BGF membership and testified that he never told interviewers, until shortly before he appeared as a witness at trial, that he had seen Archie Menefield with a knife and had seen Menefield grab Charles Gardner.  (RT 2643:16 - 2644:20, 2778:1-6, 2848:5-28.)

At trial, Mr. Long testified that in exchange for his testimony, he had received placement in protective custody, the opportunity to choose his placement "subject to his custodial status," a letter from prosecutor Kirk to his custodian regarding Long's cooperation,[34] thirty or forty dollars to compensate for lost work, and, as described by prosecutor Kirk, "the possibility that we might at some time look at . . . reduction [of] sentence."  (RT 2647:14 - 2649:26.)  Long denied ever telling anyone that he testified in order to get early release.  (RT 2719:1-3.)  He also denied that he knew he would be placed in a witness protection program and denied telling anyone he was going to have dental work done.  (RT 2719:4 - 2720:3.)

---

[33]   The prosecution introduced transcripts or summaries of six interviews it conducted with Long.  Those transcripts were used at various times by both the prosecution and defense in examining Long at trial.  According to the exhibit index in volume 1 of the Record of Transcript, the interviews were identified as exhibits 38 through 38E.  (1 RT xxxiv.)  "Interview D" is identified as a summary of a March 12, 1981 interview, for which there was no transcript.  (RT 2821-22.)  Petitioner included the transcripts or summaries of four interviews as Exhibits 4-7 to his First Amended Petition.  (Dkt. No. 204.)

[34]   In his motion, petitioner indicates this information is new.  He submits prosecutor Kirk's letter to the Chino warden as Exhibit 214 to his motion (Dkt. No. 373-4).  However, petitioner does not establish what information contained in that letter was not available to defense counsel at trial.  In fact, at trial prosecutor Kirk showed Long People's Exhibit 37, which he identified as the letter to the warden he wrote for Long.  (RT 2648:12-14.)  Kirk stated on the record at that time that he had given copies to defense counsel.  (RT 2648:7-8, 18-22.)

1    In 1995, Mr. Long signed a declaration in which he stated: (1) he saw who

2    assaulted Gardner but did "not wish to state who was involved in the incident because I am

3    concerned that there will be retaliation against me;" (2) Cade and Hayes could not have seen the

4    assault; (3) after the assault, prison investigators threatened him if he did not cooperate with

5    them; (4) his testimony that petitioner killed Gardner was false; and (5) prosecutors encouraged

6    him and the others housed at Chino before trial to "get the story straight." (Dkt. No. 249, Ex. A1

7    to Second Am. Pet.)

8    However, in 1999, Mr. Long signed a second declaration in which he refuted

9    important parts of his 1995 declaration.  (Dkt. No. 249, Ex. A5 to Second Am. Pet.)  In his 1999

10   declaration Long recanted his 1995 statement that the prosecution team coerced him to lie at

11   petitioner's trial.  He concluded: "What I said during the course of my testimony during the trial

12   was the truth.  Larry Roberts stabbed Charles Gardner."  (Id.)

13   At the reference hearing, Long stated as follows:

14           Now, just to save a whole lot of people a lot of time, in order for
         me to stand up or sit here and deny or confirm what is said over here and –
15       or deny what's confirmed or said over there would mean beyond a shadow
         of a doubt that I am perjuring myself, regardless at the bottom of each one
16       of those statements it said at the bottom that I signed this under the penalty
         of perjury.
17
             So considering the two statements, I have already perjured
18       myself, so to keep myself from being perjured any further, look, as
         everybody knows, this happened a number of years ago, right?
19
             What's today's date?
20
         THE COURT:  October 6th, 2000.
21
         THE WITNESS:  There you go.  That's twenty years, four months
22       and five, six days, something up in there.  It's a long time ago.  My
         memory is not as good as it once was, okay?  When I told the
23       defense one thing and then told the District Attorney and them
         another, that's what I thought at the time, okay?
24
             Half the stuff that went on at that time, I don't even
25       remember half of it now, so if anybody tries to stand up and ask me
         anything about what's going on or what happened in the past, I'm
26       telling you, half of it I won't even remember.

42

1          Since I've been on the streets, I've used and experimented with a number of drugs.  Half of it I won't remember what I said then.  We have to let it go then.  I can't change my past, can't change what was said, good or bad, but I can't perjure myself any further; and asked any questions, that's what I would be doing.

2

3

4          To deny what I told you is the truth or admit what I told you is the truth is perjury.  Same thing over there; so if anybody can tell me how I cannot keep from doing that in this courtroom, I'm with it.

5

6   MR. BLOOM: Finished?

7   THE WITNESS: Sure.

8   THE COURT: Well I've read Mr. Long's declarations and they do seem to be in conflict.

9

       Let me ask you this, Mr. Long: Do you want to talk to an attorney?

10

11   THE WITNESS: If I have to make any further statements in this courtroom, I definitely do.

12   THE COURT: All right.  I guess the next question that we have is whether the People want to grant Mr. Long immunity.

13

       (Ms. Lee confers with colleague)

14

15   MS. LEE: We're not in a position to grant any immunity without knowing what the testimony will be, and we believe Mr. Long should consult an attorney.

16

17   (RH RT at 38:16 - 40:8.)

18          The court then stated that he would appoint the public defender to represent Mr.

19   Long.  (RH RT at 40:9-11.)  Later that day, Long's appointed attorney informed the court that

20   Long wished to assert his Fifth Amendment privilege against self-incrimination.  (RH RT at

21   45:8-11.)  The prosecutor refused to grant Long immunity.  (RH RT at 9-20.)  Long did not

22   testify any further at the reference hearing.

23          ii.  Evidence showing Prosecutor Kirk knew Raybon Long lied

24          Petitioner presents the following new evidence (evidence that was not available to

25   the defense at trial) of benefits received by Mr. Long in connection with his trial testimony:

26   /////

1        (1) In 1984, he received $432 to relocate from San Diego to Las Vegas.

2  (Dkt. No. 373-2, Ex. 212 to Mtn. for Evi. Hrg.)

3        (2) A 1982 note indicates Long was to be transferred to CIM-E (Chino)

4  after he testified.  (Dkt. No. 373-3, Ex. 214 to Mtn. for Evi. Hrg.)

5        (3) In 1983, Long was transferred to the Sierra Conservation Center.  (Id.;

6  Ex. 213, filed under seal per March 28, 2012 order.)

7        (4) On April 24, 1981, prior to trial, prosecutor Kirk wrote a CDC official

8  asking that Long be transferred to a CDC camp near San Diego.  (Dkt. No. 373-4, Ex. 215 to

9  Mtn. for Evi. Hrg.; Dkt. No. 392-5 (redacted version of letter introduced at reference hearing as

10  Ex. VV).)

11        (5) On June 30, 1983, shortly after the conclusion of the penalty phase,

12  Kirk wrote the superintendent of the Sierra Conservation Center asking that Long be considered

13  for sentence reduction based on his cooperation in this case.  (Dkt. No. 373-4, Ex. 215 to Mtn.

14  for Evi. Hrg.)

15        (6) Long's statements to a prison psychiatrist.  (Ex. 213, filed under seal

16  per March 28, 2012 order.)

17        (7) Richard Yacotis testified at the reference hearing that Long told him

18  years later that he had received dental care, cash, and assistance for his sister as the result of his

19  testimony in petitioner's case.  (RH RT at 735.)

20        (8) In his 1995 declaration, Long stated that he was given "preferential

21  treatment" at the prisons and at the Contra Costa County jail during trial, had spending money

22  after he testified at petitioner's preliminary hearing, received contact visits while he was held at

23  the county jail, was promised early release on parole, and received $400 after he was paroled.

24  (Dkt. No. 249, Ex. A1 to Second Am. Pet., ¶¶ 33-35.)

25        Petitioner also sets out the following evidence in support of his argument that Mr.

26  Long's testimony was coached:

1       (1) A series of interviews conducted by officers and the prosecution reflects

2   that Long's testimony was coached.  (Dkt. No. 248 at 35-36; see fn. 28, supra.)

3       (2) Long declared that officers coached him.  (Dkt. No. 249, Ex. A-1 to

4   Second Am. Pet., ¶¶ 20, 21, 23, 24.)

5       (3) Long declared that officers interviewed him on August 19, 1980 and

6   threatened him if he did not cooperate.  (Dkt. No. 248 at 132-133; Dkt. No. 249, Ex. A-1 to

7   Second Am. Pet., ¶¶ 17-19.)  That interview apparently was not tape-recorded.  (Dkt. No. 248 at

8   35:6-13.)

9       (4) Richard Yacotis testified that he overheard Long conspire with others to

10  testify falsely against petitioner.  (Ex. 30 to State Pet., lodged here in Ex. 28 to Answer; RH RT

11  734:8 - 735:4.)

12      (5) Prosecutor Kirk had Long housed at Chino and then at the Contra Costa

13  County Jail with the other testifying inmates so they could coordinate their testimony.

14      The referee found Long's trial testimony "should not be treated as believable."

15  (Ex. 74 to Answer at 5, see Dkt. No. 263.)  The California Supreme Court held that the referee's

16  finding in this regard was based, in part, on inducements provided to Long of which the jurors at

17  petitioner's trial were aware.  Roberts, 29 Cal. 4th at 743.  Petitioner has now presented new

18  evidence that Long's trial testimony regarding the benefits he received in exchange for his

19  testimony was likely not entirely truthful.  That new evidence presented by petitioner raises

20  questions about what Long expected to receive as a result of agreeing to testify.  Given the

21  existence of factual disputes which were not resolved satisfactorily at the state court reference

22  hearing, this court finds taking evidence regarding the truthfulness of Long's trial testimony

23  appropriate.[35]

24  _____

25      [35] The parties dispute the effect of Long's invocation of his Fifth Amendment privilege at
    the reference hearing and argue about the propriety of the conduct of respondent's counsel and

26  that of the referee in response to that invocation.  This court need not resolve those issues to

c. Leslie Rooks

As described above, Leslie Rooks testified at trial that he saw petitioner with a knife before the stabbing.  In a 1995 declaration, Rooks recanted that testimony.  However, at the reference hearing, Rooks again testified as he did at trial.[36]  The referee found Rooks' trial testimony to be credible.  (Ex. 74 to Answer, see Dkt. No. 263.)

Petitioner argues that prosecutor Kirk should have known Mr. Rooks lied in his trial testimony because, as described above, Rooks was a known informant and because Rooks had asked for benefits in exchange for his testimony.  In addition, petitioner alleges that Rooks was purposely housed at Chino and then the Contra Costa County Jail with the other testifying inmates so they could coordinate their testimony.

d. Richard Yacotis

Richard Yacotis was scheduled to testify for the defense at trial.  (RT 6516:24 - 6517:6.)  Yacotis signed a statement, dated August 12, 1982, in which he said that he overheard inmates Long and David Calvin discuss both "lying for their freedom" in a murder trial and sending "some other inmates to the gas chamber."  (Ex. 29 to State Pet., lodged here as Ex. 28 to Answer, see Dkt. No. 263.)  On the day he was brought to court to testify, Mr. Yacotis met with prosecutors.  (RT 6517:4-6.)  Afterwards, he refused to testify for the defense and instead testified for the prosecution in rebuttal.  In that testimony Yacotis stated that after the crime, he overheard petitioner ask Archie Menefield why he didn't pick up the knife.  (RT 6501:9-20.)  Menefield replied that he couldn't because he was running up the stairs after petitioner.  (RT 6501:21-22.)

---

determine that factual disputes exist regarding the truthfulness of Long's trial testimony regarding both petitioner's crime of conviction and the benefits Long received in exchange for his testimony.  There is a sufficient possibility that resolution of those factual disputes in petitioner's favor will result in a finding that he is entitled to relief with respect to claim 1. Therefore, petitioner has made a colorable showing regarding this aspect of claim 1.

[36] Petitioner states, without citation to the record, that Rooks testified at the reference hearing that petitioner was with him on the third floor "at the time of the incident."  (Dkt. No. 248 at 178:9-14.)

1    Menefield also told petitioner "'If push comes to shove, I will take the rap.'" (RT 6501:23-26.)

2    Yacotis was housed at Chino with the other inmate witnesses before petitioner's trial.  (RT

3    6519:2-15.)  He overheard some of the other inmates talk about the case.  (RT 6520:4 - 6521:5.)

4    Yacotis testified that prosecutor Kirk did not promise him anything for testifying.  (RT 6629:17-

5    19.)  Mr. Yacotis also testified at trial that he did not read the August 12, 1982 letter before he

6    signed it.  (RT 6604:21 - 6605:3.)  However, he affirmed that he overheard inmates Long and

7    Calvin talk about getting their stories straight and sending other inmates to the gas chamber.  (RT

8    6522:9-12, 6602:11 - 6603:1, 6622:1-12.)  He denied most of the remaining content of the August

9    12 letter bearing his signature.  (RT 6622:16-21.)

10          In a 1995 declaration, Mr. Yacotis stated that he did not testify truthfully at

11   petitioner's trial.  He stated therein that Mr. Long told him about benefits Long would receive

12   from testifying regarding the 1980 incident at CMF.  (Ex. 30 to State Pet., lodged here as Ex. 28

13   to Answer, ¶ 5.)  Specifically, Long told him he would be released and would get $2,000, a new

14   identity, and dental work.  (Id.)  Mr. Calvin told Yacotis he was receiving the same benefits as

15   Long in exchange for his testimony and that Long had not witnessed the stabbing.  (Id. ¶ 6.)

16   Yacotis said he heard Long and Calvin discussing getting their stories straight.  (Id. ¶ 7.)  He

17   stated he told an inmate named Ruben Howard what he had overheard.  (Id. ¶ 10.)  Howard was a

18   close friend or relative of petitioner's.  (Id.)  Howard typed up Yacotis' August 12, 1982

19   statement.  (Id.)  Yacotis read and signed it.  (Id.)  His trial testimony that he could not read or

20   write was not true.  (Id. ¶ 11.)  Yacotis stated that prosecutor Kirk pressured him to change his

21   story.  (Id. ¶ 16.)  Yacotis declared that he gave false testimony at petitioner's trial and that in fact

22   he had never overheard petitioner talk about the crime.  (Id. ¶¶ 21, 27-29.)  Yacotis stated that he

23   saw Long after trial and Long told him prosecutors had given him new teeth, had moved his sister

24   and had cut his time in prison.  (Id. ¶ 31.)

25          At the reference hearing, Mr. Yacotis stood by his 1995 declaration.  (RH RT

26   733:1-2.)  The referee found Yacotis's testimony at the reference hearing to be believable.  (Ex.

74 to Answer, at 6.)  Judge Taft found Yacotis did not overhear the conversation between

petitioner and Menefield to which he had testified at trial.  (Id.)  The referee found true "the

claims made in the August 12, 1982 letter."  (Id.)

         Petitioner's claim that prosecutor Kirk presented Yacotis's false testimony at trial

is based on Yacotis's August 12, 1982 letter, 1995 declaration, reference hearing testimony, and

the referee's finding that Yacotis testified credibly at the reference hearing.  Nonetheless, the

California Supreme Court held that since Yacotis was not an eyewitness to the crime, his

recantation "does not undermine our confidence in the judgment of conviction."  29 Cal. 4th at

743.

### e.  Robert Hayes

         Robert Hayes' trial testimony that he saw petitioner stab Charles Gardner is

described above.  Mr. Hayes died before the reference hearing.  The referee noted that David

Calvin testified that Hayes was housed at Chino with other witnesses and "was overheard

discussing the expected testimony and the possible rewards."  (Ex. 74 to Answer at 8, see Dkt.

No. 263.)  The referee concluded, however, that: "Petitioner presented nothing that would indicate

that Hayes' trial testimony was false."  (Id.)

         Petitioner argues prosecutor Kirk knew Mr. Hayes' testimony was false because

the prosecution "made offers of substantial benefits to Hayes."  (Dkt. No. 248 at 80:2-3.)  It

appears that none of these benefits were revealed at trial.  Exhibit 221 to the Motion for an

Evidentiary Hearing contains letters from Hayes to Agent Gard and Department of Justice

Investigator William Bennett which were produced in discovery in connection with this federal

habeas action.  In a March 24, 1983 letter to Bennett, Hayes lists the items he would like Bennett

to send him in a birthday package.  (Dkt. No. 374-5 at 11-13.)  In an April 24, 1983 letter, Hayes

asks Gard about the status of an apparent promise to move him to a new prison.  (Dkt. No. 374-5

at 7.)  In a June 29, 1983 letter  Hayes inquires about the status of a letter of recommendation to

the Departmental Review Board that his sentence be reduced by twelve months.  (Id. at 2-3.)

1     Exhibit 222 contains documents produced during the state habeas proceedings.[37]

2  (Dkt. No. 375-1.)  It contains a July 5, 1983 letter from Mr. Hayes to prosecutor Kirk in which

3  Hayes recounts a conversation he had with investigator Bennett.  (Id. at 7.)  Hayes says he was

4  told that "the final stage of the Roberts/Menefield case would end on May 12, 1983, with the

5  formal sentencing," that letters of recommendation for those still in custody would then be sent,

6  and that the Department of Corrections would probably act on the recommendation "in about

7  three weeks."  (Id.)  Hayes complains in this letter that it had then been over six weeks without

8  response from the Department of Corrections.  (Id.)  He also complains about his inability to earn

9  work-time credits while in protective custody.  (Id. at 8.)  In an August 9, 1983 letter prosecutor

10  Kirk told Hayes that he has sent a letter of recommendation for a one-year sentence reduction to

11  the prison superintendent and that he would look into the loss of work-time credits.  (Id. at 10.)

12     It does not appear that Hayes ever testified at trial regarding any of the benefits he

13  received in exchange for his testimony.  The fact that the defense was not provided discovery with

14  respect to the evidence of benefits to Hayes is strong support for petitioner's Brady claim, as

15  discussed above.  If the defense if fact knew about those benefits but failed to make use of that

16  discovery, it would support petitioner's ineffective assistance of trial counsel claims discussed

17  below.  (Dkt. No. 248 at 211:16-19.)

18     f.  Testimony re Charles Gardner

19     Finally, petitioner argues that the prosecution knew or should have known that the

20  evidence it presented indicating that Charles Gardner had no record of violence was false.  In this

21  regard, Officer Tipton testified that he had reviewed Mr. Gardner's CDC file and it showed no

22  disciplinary write-ups since January 1977.  (RT 1788:12-24.)  Gardner's prison counselor, James

23  Donovan, testified at trial that he had reviewed Gardner's CDC file and it showed no disciplinary

24  problems at CMF.  (RT 3824:7-8.)  However, Donovan also testified that he recalled "someone

25

26     [37]  According to petitioner, legible copies of many of these documents were not produced
to the defense until after the close of evidence.

49

pointed out he [Gardner] had been locked up for investigation" around July or August of 1979. (RT 3838:2-9.) Petitioner presents evidence that in 1979 Gardner was placed in administrative segregation and investigated by prison officials for a stabbing at CMF. (Exs. 19 and 20 to First. Am. Pet., Dkt. No. 204.) However, that evidence also shows that while correctional officers believed Gardner was involved in the stabbing, they were unable to substantiate that belief and Gardner was released from segregation. (Ex. 20.) Accordingly, it cannot be said prosecutor Kirk knew Gardner had been violent and knew or should have known Donovan's testimony was false.

g. Conclusion re Presentation of False Testimony

Petitioner has made a colorable showing that the prosecution knew, or should have known, that material evidence it presented at trial was false. The history of witnesses Cade, Long, Rooks, Yacotis, and Hayes of mental illness and/or prior informant activity, and the obvious coercive effect of benefits conferred on those witnesses, the interview techniques employed, and giving the witnesses the opportunity to coordinate their testimony combine to make out a substantial claim of a violation of petitioner's rights under Napue.

3. Additional Prosecutorial Misconduct

Petitioner seeks an evidentiary hearing with respect to several additional grounds upon which his prosecutorial misconduct claim rests. Petitioner argues investigators focused on him early on in their investigation and then proceeded to develop evidence against him, without considering other possible suspects. He claims prosecutor Kirk deliberately delayed investigating petitioner's alibi. Petitioner claims Mr. Kirk did not follow up with witnesses who could have confirmed petitioner's story that he was on the third floor when the stabbing took place. (Dkt. No. 248 at 137:17-25.) According to petitioner, Kirk also delayed charging petitioner so he did not have access to counsel and the prosecution had exclusive access to all potential witnesses. (Id. at 139:9-20, 206-08.) In addition, according to petitioner, Mr. Kirk interfered with the defense's ability to investigate the case by delaying the disclosure of evidence. (Id. at 140-153.)

////

50

1          With respect to most of this claim, petitioner does not demonstrate how he was

2   prejudiced by any alleged intentional delay on prosecutor Kirk's part.  Petitioner admits his

3   attorney was able to locate four alibi witnesses, all of whom testified at trial.  (Dkt. No. 248 at 207

4   n.162.)  He also has failed to make any showing that there were other witnesses who would have

5   supported his alibi nor has he established what testimony such witnesses would have provided.

6   Petitioner has not made a colorable showing of success on his argument that prosecutor Kirk

7   intentionally failed to investigate petitioner's alibi or delayed in charging petitioner to petitioner's

8   detriment.  Accordingly, the evidentiary hearing ordered below on claim 1 will not include the

9   development of evidence on this aspect of that claim.

10          However, petitioner has made a showing of prejudice regarding the delayed

11   discovery of documents that could have been used, among other things, to impeach the

12   prosecution's trial witnesses (Dkt. No. 248 at 135-36, 140-153), to show someone other than

13   petitioner was the assailant (id. at 142:11-19), and to impeach testimony that victim Gardner had a

14   trouble-free history at CMF (id. at 145:19 - 146:2).[38]

15                4.  Conclusion re Claim 1

16          The following factors are relevant to considering whether or not the court should

17   exercise the discretion to hold an evidentiary hearing: "the existence of a factual dispute, the

18   strength of the proffered evidence, the thoroughness of prior proceedings, and the nature of the

19   state court determination."  Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993).  See also Silva v.

20   Woodford, 279 F.3d 825, 853-54 (9th Cir. 2002); Jones v. Woods, 114 F.3d 1002, 1010 (9th Cir.

21   1997).  Petitioner has shown numerous factual disputes relevant to the resolution of claim 1.  The

22   primary dispute is, of course, whether or not the inmate witnesses testified truthfully at

23   petitioner's trial regarding the crime and the benefits they received for testifying for the

24   prosecution.  Clearly, the parties dispute the veracity of much of the inmate witness testimony.  In

25

26          [38]  In fact, during trial the defense sought a mistrial due to the state's failure to disclose
    evidence.  (RT 3342:10 - 3354.)

1  addition, they dispute the prosecution's role in inducing that testimony, and prosecutor Kirk's

2  knowledge of its veracity or knowledge of information that should have led him to question its

3  veracity.  Finally, there are numerous disputes regarding the disclosure of evidence to the defense

4  prior to petitioner's trial.

5          Petitioner presents substantial evidence in support of this claim.  He has made a

6  colorable showing that he can succeed on his allegations in claim 1 that the prosecution

7  suppressed material evidence and knew or should have known it was presenting false testimony at

8  trial.  The materiality standard is whether, considering all of the errors for which petitioner has

9  made a colorable showing, there is a reasonable probability the result of the proceedings would

10 have been different absent these instances of misconduct.  Strickler v. Greene, 527 U.S. 263, 289

11 (1999).  This court notes that no physical evidence linked petitioner directly to the crime.  In

12 particular, petitioner has pointed out that investigating officers found no blood on petitioner's

13 clothing or shoes.  (Dkt. No. 248 at 24:27 - 25:13.)  Petitioner also states that three witnesses

14 testified they saw petitioner on the third floor at or before the time the alarm went off.[39]  Officers

15 and an inmate located on the third floor or near the stairs did not see petitioner run up the stairs

16 shortly before the alarm went off.[40]  (Dkt. No. 248 at 21:10-24.)

17

18      [39]  Defenses witnesses Richard Caton, Benito Morales, and James Lindsey so testified at
    trial.  However, their testimony did not necessarily establish petitioner did not commit the crime.
19  Caton testified the alarm woke him up and then he saw petitioner.  (RT 5918:7.)  He also
    testified the alarm rang for five to seven minutes.  (RT 5920:12-20.)  Morales testified he saw
20  petitioner just before the alarm went off.  (RT 5942:6-9.)  Lindsey testified he saw petitioner
    walking away from the stairway on the third floor four or five minutes before the alarm went off.
21  (RT 6816:4 - 6817:7.)  While this testimony may show petitioner was on the third floor shortly
    before the alarm sounded, it does not conclusively establish an alibi for petitioner.  The
22  prosecution presented evidence at trial that it could have taken less than one minute to run from
    the first floor to petitioner's cell on the third floor.  29 Cal. 4th at 745.

23

24      [40]  Officer Rudolph testified he did not see petitioner come up the stairs and through the
    grille gate within five minutes before the alarm went off.  (RT 3263:26-28.)  He testified on re-
25  direct that he did not see every inmate coming through the grille gate at that time.  (RT 3277:4-
    6.)  Officer DuQuesnay's testimony was less direct.  First, contrary to petitioner's assertion,
26  DuQuesnay testified that he did not know petitioner.  (RT 3244:5-10.)  Second, he simply
    testified that he saw no inmates running down the hallway within the ten or twenty minutes

1    The final questions in considering whether to hold an evidentiary hearing involve

2    the nature of the state court proceedings.  Besides arguing the merits of each claim, respondent's

3    primary, and in some instances only other, opposition to the motion for an evidentiary hearing is

4    the contention that the state court held a sufficient hearing.  (E.g., Dkt. No. 412 at 8:11-16, 9:7-

5    13.)  However, for a number of reasons, it is difficult to find the fact-finding in the state court

6    proceedings, and the conclusions rendered therefrom, dispositive.  First, the reference hearing did

7    not address petitioner's arguments that evidence was suppressed and that the prosecutor should

8    have known some of the testimony it presented at trial was false.  Second, despite the length of the

9    reference hearing, the referee issued extremely limited findings, which were not supported by

10   specific references to the record.  Third, based on some statements that do not appear to be

11   supported by the record and/or the applicable law, the California Supreme Court majority opinion

12   rejected the specific finding of the appointed referee that inmate witnesses Cade, Yacotis, and

13   Long had testified falsely at petitioner's trial.[41]  Further, the two dissenting justices would have

14   adopted the referee's findings and granted petitioner habeas relief.  Finally, and contrary to

15   respondent's assertions, petitioner seeks to present evidence now that was not available to him at

16   the time of the reference hearing, primarily because the prosecution failed to disclose it, in some

17   /////

18   /////

19

20   before the alarm went off.  (RT 3250:22-28.)  Officer Stall testified he did not see petitioner or
     any other inmate running down the hall before the alarm went off.  (RT 1969:17-27.)

21

22   [41]  For example, the California Supreme Court majority stated that the referee based his
     adverse finding regarding Cade's credibility on no new evidence.  29 Cal. 4th at 744.  However,
23   the referee heard extensive evidence, which was not introduced at trial, regarding Cade's mental
     illness.  While the referee specifically declined to make a finding regarding Cade's mental state,
24   he noted that mental state evidence and then concluded that Cade's trial testimony was not
     truthful.  (Ex. 74 to Answer at 7-8.)  In another example, the California Supreme Court found
25   Yacotis's recantation was of no import because he had not been an eye witness to the crime.  29
     Cal. 4th at 743.  However, it appears that the California Supreme Court majority considered that
26   recantation only in isolation.  As addressed above, determining whether prejudice ensues from
     prosecutorial misconduct requires consideration of the cumulative effect of all errors.

1  instances despite repeated requests by petitioner's counsel for that evidence.[42]

2        For the reasons set out above, the court grants petitioner's request for an

3  evidentiary hearing on claim 1 in all respects except regarding the allegations that (1) prosecutors

4  suppressed evidence regarding Alexander Vichi, and (2) prosecutors committed misconduct by

5  delaying the investigation of petitioner's alibi and charging him.

6        B.  Ineffective Assistance of Counsel During Jury Selection and at the Guilt Phase -
         Claims 7 & 15

7

8        Petitioner's trial attorney Richard Urquhart had never tried a homicide case when

9  he was appointed in June 1981 to represent petitioner.  (Ex. 101, submitted for filing under seal.)

10  Mr. Urquhart worked on the case for over a year before he hired attorney George Cotsirilos,

11  shortly before trial was scheduled to begin, in order to assist him with penalty phase preparation.

12  (Ex. 102, submitted for filing under seal.)  According to petitioner, attorney Urquhart's

13  inexperience caused him to perform unreasonably during jury selection by failing to challenge the

14  venire as being insufficiently representative of the community, failing to probe jurors' potential

15  racial biases, failing to question jurors regarding exposure to pre-trial publicity, failing to exercise

16  peremptory challenges on those grounds, and failing to explore jurors' attitudes about the death

17  penalty.  In addition, petitioner seeks an evidentiary hearing on his claims that Mr. Urquhart acted

18

19        [42]  As discussed above, the two letters from Hayes to prosecutors were not disclosed to
    the defense until after the close of evidence.  (Dkt. No. 369 at 38:20 - 39:5.)  When petitioner
20  attempted to bring this evidence to the attention of the referee, Judge Taft refused to hear it.
    (Pet'r's Mtn. for Disclosure (before the California Supreme Court), Ex. 78 to Answer.)
21  Prosecutors also failed to produce legible copies of four letters written by Cade to prosecutors.
    (Dkt. No. 369 at 40:3-22.)  Cade's mental health records were not provided to petitioner's expert
22  until after Cade had been excused as a witness.  (Id. at 40:24 - 42:3.)  Marcus Richardson's
    statement to prosecutors in December 2000, was not revealed to petitioner until after Kirk's
23  reference hearing testimony about the handling of inmate witnesses.  (Id. at 42:5 - 43:5.)  The
    court also notes that petitioner again raises the issue of the "missing" exculpatory statement by
24  Marcus Richardson.  This court has already conducted an evidentiary hearing on this issue and
    concluded that petitioner has not shown such a statement ever existed.  (Mar. 31, 2007 Order,
25  Dkt. No. 328, at 24-25.)  Accordingly, this court will not rely on this fact in support of
    petitioner's contention that the referee failed to preserve evidence and ensure a complete record.
26  (Dkt. No. 369 at 44-46.)

1  unreasonably at the guilt phase by failing to show that the east grille gate on the third floor was

2  kept locked, failing to uncover the impeachment evidence identified by petitioner in his claim 1,

3  and failing to introduce the testimony of a prison expert who could have explained that petitioner

4  was no longer a BGF gang member, that small benefits conferred by authorities may be

5  considered of great significance by jailhouse informants, and that petitioner was scheduled to be

6  released on parole shortly and therefore had incentive to behave well.

7         1.  Legal Standards

8              To establish a colorable claim of ineffective assistance of counsel a petitioner must

9  first show that, considering all the circumstances, counsel's performance fell below an objective

10  standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  After a

11  petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable

12  professional judgment, the court must determine whether, in light of all the circumstances, the

13  identified acts or omissions were outside the wide range of professionally competent assistance.

14  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

15  he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice

16  is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

17  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

18  probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

19  at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000); United States v. Murray, 751

20  F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-18 (9th Cir.

21  1984).

22         2.  Ineffective Assistance during Jury Selection - Claim 15

23                  a.  Failure to Challenge Representativeness of Jury Venire

24              Petitioner's first claims attorney Urquhart should have challenged the

25  representativeness of the jury.  Applicable to this, and to the other claims of ineffective assistance

26  of counsel, petitioner seeks to present testimony from defense team members that trial counsel's

1    actions were based on inexperience, not strategy.  (Exs. 101, 102, and 104 (Decs. of Urquhart,

2    Cotsirilos, and defense investigator Danny Clark), submitted for filing under seal.)  Petitioner

3    does not describe any other evidence he would present in support of this claim.  However,

4    petitioner must not only show counsel acted unreasonably, he must show prejudice as well.  He

5    must show that, had counsel challenged the jury's composition, there is a reasonable probability

6    he would have been successful.

7           Petitioner does little to make this showing of prejudice.  "'[T]he selection of a petit

8    jury from a representative cross section of the community is an essential component of the Sixth

9    Amendment right to a jury trial.'"  United States v. Mitchell, 502 F.3d 931, 949-50 (9th Cir. 2007)

10   (quoting Taylor v. Louisiana, 419 U.S. 522, 528 (1975)).  "To establish a prima facie violation of

11   the fair-cross-section requirement," petitioner must show: "(1) a group qualifying as 'distinctive'

12   (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the

13   jury-selection process accounts for the underrepresentation."  Berghuis v. Smith, ___ U.S. ___,

14   130 S. Ct. 1382, 1392 (2010) (citing Duren v. Missouri, 439 U.S. 357, 364 (1979)).  See also

15   Mitchell, 502 F.3d at 949.  In his petition, petitioner simply states that "the percentage of African-

16   American venire persons appearing on the several jury panels summoned by the trial court during

17   Petitioner's jury selection was significantly below the percentage of this group comprising the

18   population of African-American citizens residing in Solano County in 1982."  (Dkt. No. 248 at

19   250:3-6.)  In his motion for an evidentiary hearing before this court, petitioner makes no proffer

20   of the evidence he would present in support these allegations at the requested evidentiary hearing.

21   Nor does petitioner proffer any evidence to show a "systematic exclusion" of African-Americans

22   from the jury pool at his trial.  See Taylor v. Louisiana, 419 U.S. 522, 531 (1975).  Whether or

23   not Mr. Urquhart acted reasonably in failing to challenge the representativeness of the jury venire,

24   petitioner has not made a colorable showing that there is a reasonable probability that such a

25   challenge would have been successful.  Therefore, the court will not hear evidence on this aspect

26   of petitioner's claim 15.

b. Failure to Question Jurors re Racial Bias

Petitioner next argues that Mr. Urquhart unreasonably failed to question jurors regarding their possible racial biases. Only two of the twelve jurors at petitioner's trial were African-American. (Dkt. No. 248 at 245:9-10.) Petitioner was an African-American prisoner and, the prosecution repeatedly stressed at trial, a member of the Black Guerilla Family prison gang. He was charged with murdering not only another black inmate, but a white correctional officer. These were obvious reasons for the defense to be concerned about racial bias in this case. According to petitioner, Mr. Urquhart asked no questions of the prospective jurors to explore their possible racial bias. In his declaration, Mr. Urquhart concedes that he was aware that aspects of the case "could play into the racial fears of white jurors." (Ex. 101, submitted for filing under seal.) Mr. Urquhart also admits he made no attempt to question prospective jurors regarding possible racial bias. (Id.)

"The right to a jury free of biased persons is of constitutional magnitude." Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992) (citing Smith v. Phillips, 455 U.S. 209 (1982)). Petitioner's evidence of juror bias is the declaration of juror Conklin that some of the jurors made racially inappropriate comments and that she felt some were biased against the defendants. (Dkt. No. 370-2, Ex. 105 to Mtn. for Evi. Hrg., ¶ 7.) When considering the possibility of prejudice to petitioner from juror bias, the court must also look to the cumulative effect of all errors. Respondent argues that since this claim is based on prejudice resulting from the interracial crime and the conviction for the murder of Officer Patch was overturned, petitioner's claim in this regard is moot. Petitioner does not limit his claim to the interracial murder, although that is obviously a focus of it. He also argues racial prejudice based not merely on his race but on his membership in a black prison gang. Further, racial bias, even if it was directed only towards the murder of the white officer, could well have infected the penalty phase decision making according to petitioner.

/////

Petitioner has made out a colorable claim that attorney Urquhart acted unreasonably and that there is a reasonable probability petitioner was prejudiced thereby at the penalty phase.  In Turner v. Murray, 476 U.S. 28 (1986), the Supreme Court held that, upon a request from defense counsel, a trial judge in an interracial murder case was obligated to voir dire the jury about racial prejudice because in "a capital sentencing proceeding . . . the jury is called upon to make a 'highly subjective, unique, individualized judgment.'"  476 U.S. at 33-34 (quoting Caldwell v. Mississippi, 472 U.S. 320, 340 n.7 (1985)).  The Court in Turner overturned the petitioner's death sentence based on what it found to be inadequate defense voir dire.  The Turner case creates a sufficiently colorable obligation, for purposes of determining whether an evidentiary hearing is appropriate, on the part of a reasonable attorney in Mr. Urquhart's shoes to question the prospective jury about racial prejudice.[43]  With respect to prejudice, the Court in Turner stressed that racial bias may be difficult to detect in the highly discretionary penalty phase decision-making process:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected.  On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law.  Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance.  More subtle, less consciously held racial attitudes could also influence a juror's decision in this case.  Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

Id. at 35.  Further, given the other colorable claims of error during the penalty phase of

---

[43]  Respondent relies in part upon the Supreme Court's decision in Ristaino v. Ross, 424 U.S. 589 (1976) in which the court noted that the fact a crime involves interracial violence does not alone require a trial judge to question the prospective jurors about racial prejudice.  In so arguing, respondent is conflating two different standards - the due process right to an impartial jury and the Sixth Amendment right to a reasonably competent attorney.  The fact that due process may not require voir dire on racial prejudice in the prosecution of an interracial crime does not necessarily mean a reasonable attorney would have failed to conduct such questioning.

1   petitioner's trial, described below, and given his showing that some trial jurors made racially-

2   biased comments, petitioner has made a colorable allegation of prejudice at the penalty phase.

3   The court is less certain about petitioner's showing of any effect of the alleged error at the guilt

4   phase.  However, given his many other, and substantial, claims of guilt phase error and given the

5   fact that any evidence on this issue with respect to the guilt phase would be applicable to the

6   jury's later penalty phase decision, the court will also consider the guilt phase effect of  the

7   evidence in connection with petitioner's allegations.

8           Subject to further briefing regarding limits on the evidence this court may consider

9   with respect to racial bias, petitioner's request for an evidentiary hearing on his claim that attorney

10  Urquhart inadequately questioned the prospective jurors about race is granted.[44]

11                  c.  Failure to Question Jurors re Pretrial Publicity

12          Petitioner next claims that attorney Urquhart unreasonably failed to question

13  prospective jurors about their exposure to pretrial publicity.  The Sixth Amendment "guarantees to

14  the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366

15  U.S. 717, 722 (1961).  See also Green v. White, 232 F.3d 671, 676 (9th Cir. 2000).  If prejudicial

16  pretrial publicity makes it impossible to obtain an impartial jury, then the trial judge must grant

17  the defendant's motion for a change of venue.  Daniels v. Woodford, 428 F.3d 1181, 1210 (9th

18  Cir. 2005); Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997); Harris v. Pulley, 885 F.2d

19  1354, 1361 (9th Cir. 1988).  However, jurors are not required to be totally ignorant of the facts

20  and issues involved in a case.  Irvin, 366 U.S. at 722; see also Murphy v. Florida, 421 U.S. 794,

21  800 (1975); United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  It is sufficient if the

22  jurors can lay aside their impressions or opinions and render a verdict based on the evidence

23

24  [44]  Respondent attempts to cast petitioner's argument as requiring a rule that counsel in an
    interracial murder case is per se ineffective for failing to question the jurors about race.
    Therefore, according to respondent, petitioner seeks a new rule contrary to Teague v. Lane.  (Dkt.
25  No. 412 at 41-42.)  It does not appear to the court that petitioner is arguing a per se right to relief
    or that he is seeking a new rule.  In any event, any Teague challenge, assuming it was preserved
26  in the answer, can be raised when the merits are addressed later in this case.

1   presented in court.  Holt v. United States, 218 U.S. 245 (1910); United States v. Dischner, 974

2   F.2d 1502, 1525 (9th Cir. 1992) (issue is whether jurors could impartially judge the defendant, not

3   whether they remembered the case), overruled on other grounds by United States v. Morales, 108

4   F.3d 1031, 1035 n. 1 (9th Cir. 1997).  Thus, pretrial publicity is so prejudicial that it requires a

5   change of venue where "the community where the trial was held was saturated with prejudicial

6   and inflammatory media publicity about the crime" or "voir dire reveals that the jury pool harbors

7   'actual partiality or hostility [against the defendant] that [cannot] be laid aside." Hayes v. Ayers,

8   632 F.3d 500, 508 (9th Cir. 2011) (quoting Harris, 885 F.2d at 1361, 1363).

9           Petitioner does not describe what that pretrial publicity was or how it may have

10   prejudiced jurors against him.  Rather, he states only that pretrial publicity described him as "an

11   African-American implicated in the death of a white correctional officer."  (Dkt. No. 248 at

12   247:5-6.)  Petitioner does proffer six newspaper articles.  (Dkt. No. 376-3, Ex. 233.)  Most of

13   those articles appear to have been published during the course of trial and are thus irrelevant to a

14   showing that attorney Urquhart should have questioned prospective jurors during voir dire about

15   their exposure to pre-trial publicity.  Without a more detailed and persuasive proffer regarding the

16   nature of any pre-trial publicity, petitioner has not made a colorable claim that his counsel acted

17   unreasonably or to petitioner's prejudice by failing to question the prospective jurors about their

18   exposure to pretrial publicity regarding this case.

19                   d.  Failure to Inquire about Jurors' Attitudes about the Death Penalty

20           Petitioner final argument in support of his claim 15 is that attorney Urquhart failed

21   to inquire adequately into prospective jurors' attitudes regarding the death penalty.[45]  While

22   attorney Urquhart's questioning of prospective jurors is apparent from the record, petitioner

23   _____

24       [45]  In the petition, this argument is cast somewhat differently.  There, petitioner alleges
     that his counsel "failed to make appropriate challenges relating to jurors' views regarding the
     death penalty."  (Dkt. No. 248 at 209:25.)  Regardless of whether petitioner's claim is that his

25   attorney failed to "question" or failed to "challenge" prospective jurors, he has provided no
     factual or legal support with respect to such a claim and therefore has not established a colorable

26   claim to federal habeas relief on this ground.

1   contends that an evidentiary hearing is necessary to establish that his attorney's actions in this

2   regard were not part of a reasonable defense strategy.  However, this question goes only to the

3   reasonableness of counsel's performance.  The second question under <u>Strickland</u> is whether

4   petitioner was prejudiced by his counsel's performance.  Petitioner makes no showing in his

5   motion for an evidentiary hearing or in his petition to support a colorable claim that had attorney

6   Urquhart properly questioned prospective jurors regarding their views of the death penalty, there

7   is a reasonable probability the result of the proceedings would have been different.

8                    e.  <u>Conclusion re Claim 15</u>

9        The court finds the only colorable aspect of petitioner's claim 15 is his contention

10   that he received ineffective assistance of counsel due to attorney Urquhart's failure to question

11   prospective jurors during voir dire regarding racial bias.  Accordingly, the court will hear evidence

12   on this issue.

13            3.  <u>Ineffective Assistance during the Guilt Phase - Claim 7</u>

14              a.  <u>Presentation of Evidence re East Grille Gate</u>

15        Several inmates testified at trial that they saw petitioner run from the first floor to

16   the third floor through the east grille gate.  Petitioner's trial counsel attempted to raise some

17   question about whether that gate was locked.  Petitioner now argues that his counsel should have

18   questioned Officer DuQuesnay about a statement he made to defense investigator Danny Clark

19   that the gate in question was always kept locked.  (Clark Decl., Exs. 6 and 6a to State Pet., lodged

20   here as Ex. 27 to Answer.)  He also argues that his trial counsel should have presented evidence

21   that prison rules required the grille gate be kept locked or manned at all times.  (June 1980 CMF

22   Post Order, RH Ex. 9, lodged here as Ex. 99 to Answer; <u>see</u> Dkt. No. 273.)

23        In connection with this issue, the California Supreme Court ordered the appointed

24   referee to make findings on the following questions:

25            What evidence was available to defense counsel that the east grille
            gate on the third floor at the California Medical Facility, Vacaville,
26            was locked or open at the time of the stabbing?  What additional

1    evidence, if any, would further investigation have produced on this
     point?  What circumstances would have weighed against
2    investigating the existence of or presenting any such evidence?
     What evidence rebutting any such evidence would have been
3    available to the prosecution following its own investigation?  Was
     the east grille gate open or locked at the time of the stabbing?  If it
4    was locked, could petitioner nonetheless have gone up the stairs and
     to his cell immediately after the stabbing?

5

6    (Dkt. No. 412-1, Ex. A.)

7           The referee made the following findings:

8           The evidence in these hearings was undisputed, and the
     Referee finds, that the procedure for the operation of the third floor
9    east grille gate called for the gate to be locked, or monitored by an
     officer, at all times.  The evidence was also undisputed that, before
10   the murders, the policy was honored more often in the breach than
     in the observance.  In other words, the east grille gates, including
11   the third floor east grille gate, were often left open and unattended,
     especially when the institution was running programs such as meals,
12   yard release, and Sunday morning church services.

13          The evidence at the Reference hearing was that, after
     Gardner and Patch were killed, the procedure was changed to
14   require an officer to be posted at each gate, and to monitor all
     movement through the gate.

15
            There was no substantial evidence to show that Roberts
16   might have taken a different route to the third floor after the
     stabbings.  There was another grille gate at the other end of the
17   corridor which could have been used to gain access to the third
     floor.  However, this grille gate was so far distant from the stabbing
18   that it would not have played a role in anyone's theory of the case.

19          It is clear from this evidence that further investigation on
     this point would only have disclosed more evidence that (1)
20   enforcement of the third floor east grille gate procedure was notably
     lax at the time of the stabbing; (2) CMF administrators attributed
21   the circumstances leading up to the stabbings in part to lax security
     procedures and thereafter took measures to tighten up the
22   procedures; and (3) it was possible that the second perpetrator could
     pass through the gate unnoticed immediately after the stabbings.

23
            Your Referee finds that defense counsel did not overlook
24   any potential evidence that would have tended to show that the
     grille gate was locked at the time of the stabbings.  The Referee
25   further finds that the third floor east grille gate was in fact open at
     the time of the stabbings.

26   /////

1   (Ex. 74 to Answer at 11-12, <u>see</u> Dkt. No. 263.)

2       The California Supreme Court held:

3           Petitioner claims that he received ineffective assistance of counsel because his trial counsel, Richard C. Urquhart, failed to

4 impeach Officer Peter DuQuesnay with DuQuesnay's earlier statement, made to a defense investigator, that the third floor east

5 grille gate was kept locked.

6           Gardner was stabbed on the first floor.  As noted above, petitioner sought to prove he was on the third floor when Gardner

7 was stabbed and introduced alibi evidence at trial that he was seen on the third floor shortly after the stabbing.  The prosecution

8 introduced evidence that petitioner could have run from the first floor to his cell on the third in less than one minute.  In order to do

9 so, however, petitioner would have had to pass through the third floor east grille gate.  Petitioner asserted it would not have been

10 possible for him to pass through the gate because it was locked.

11           DuQuesnay, a correctional officer on the date of the killings, testified for the prosecution at trial that when the alarm sounded he

12 locked up the prisoners in his charge, which took some time, headed for the third floor east grille gate, and found it locked.  He could not

13 remember whether that gate was unlocked when the alarm sounded. He recalled that Officer Rudolph was in charge of the third floor

14 east grille gate.

15           Rudolph testified that he was going back and forth from the corridor leading to the third floor east grille gate to another wing of

16 the prison on the morning of the stabbings.  He was standing in the corridor when the alarm sounded, but he could not remember how

17 long he had been there.  Nor did he remember whether he locked the gate before running to the second floor in response to the alarm.

18 Rudolph further testified that, prior to the stabbings, the gate was not always monitored and usually was unlocked.

19

20           In his petition for writ of habeas corpus, petitioner alleged that on July 9, 1982, four months before DuQuesnay testified at

21 trial, Danny Clark, a defense investigator, interviewed DuQuesnay and typed a report saying DuQuesnay told him "the grill gate at the

22 top of the stairs was kept closed and locked . . . .  He states that the procedure was for the officer to unlock the gate if anyone came up

23 and then to relock it.  If the officer happened to be back inside one of the wings at the time someone came to the gate they would just

24 have to wait to be let on the . . . third floor corridor."

25           Urquhart declared that he was unaware of the contents of Clark's interview of DuQuesnay at the time DuQuesnay testified at

26 trial.  Urquhart stated: "I would definitely have cross-examined DuQuesnay using this prior statement to Clark had I been aware of

the statement.  The locked condition of the East gate was the most important fact in the entire case."

On February 16, 1996, petitioner's counsel, Robert Bloom, and an investigator, Robert Buechler, visited DuQuesnay, by then a lieutenant in the corrections corps, at the California Training Facility at Soledad.  DuQuesnay agreed to talk with them, and Bloom showed DuQuesnay Clark's July 9, 1982, report.  Bloom declared:  "Lt. DuQuesnay took a few minutes to read the Clark report, and then spontaneously said that the report was accurate . . . . [I]t also accurately reflected his independent recollection of the events that took place the day Officer Patch and inmate Gardner were killed.  He specifically remembered that the East Gate on the third floor of Vacaville prison was kept locked at all times and that a person without a key . . . would have to wait for an officer with a key to unlock the gate in order to pass through that gate."

DuQuesnay testified at the reference hearing and stated he did not recall much about his conversation with Bloom. DuQuesnay testified that although the procedure was to keep the east grille gate locked, that policy was often honored in the breach - the gate would be left open and unmonitored, against the rules. Inmate witness David Calvin, Jr., testified to the same effect. So did Donald Maurice Glenn, who was a correctional sergeant at the California Medical Facility at Vacaville at the time of the incident, and Gloria Manuel, a retired correctional lieutenant at the time of the reference hearing, who was stationed at Vacaville in 1980. Even Clark, petitioner's pretrial investigator and a lawyer in the Contra Costa County Public Defender's Office at the time of the reference hearing, agreed on cross-examination that DuQuesnay was commenting only on procedure, not whether the third floor grille gate actually was locked when Gardner was killed.  The referee so found:  "the east grille gates, including the third floor east grille gate, were often left open and unattended, especially when the institution was running programs such as meals, yard release, and Sunday morning church services."  The killings occurred on a Sunday morning.  "The Referee further finds that the third floor east grille gate was in fact open at the time of the stabbings."

As concerns the question of ineffective assistance of counsel, the referee found:  "It is clear from this evidence that further investigation . . . would only have disclosed more evidence that (1) enforcement of the third floor east grille gate procedure was notably lax at the time of the stabbing; (2) [California Medical facility, Vacaville] administrators attributed the circumstances leading up to the stabbings in part to lax security procedures and thereafter took measures to tighten up the procedures; and (3) it was possible that the second perpetrator could pass through that gate unnoticed immediately after the stabbings."  Petitioner excepted to portions of this finding.

/////

1          Substantial evidence supports the referee's findings, and we
          adopt them. There is no reasonable probability that the outcome
2         would have differed, with regard either to guilt or to penalty, had
          petitioner's counsel discovered Clark's report and cross-examined
3         DuQuesnay further.  There was no ineffective assistance of counsel.

4    Roberts, 29 Cal. 4th at 745-47.

5          As petitioner points out, neither the reference order, the referee's findings, nor the

6    California Supreme Court's decision addresses directly the question of the reasonableness of

7    defense counsel's failure to bring to the jury's attention Officer DuQuesnay's statement and

8    prison rules.  However, it is clear that both the referee and California Supreme Court found no

9    prejudice as the result of any failure on the part of defense counsel to challenge DuQuesnay with

10   his statement to Clark or to present evidence of the Post Order.  There was significant evidence

11   introduced at petitioner's trial and at the reference hearing that the east grille gate was often left

12   open, even though prison procedures required it be locked.  Petitioner simply chooses to ignore

13   the following evidence:[46] (1) DuQuesnay testified at trial that Officer Rudolph was in charge of

14   the east grille gate; (2) Rudolph testified at trial that "the gate was not always monitored and

15   usually was unlocked;" (3) both DuQuesnay and Rudolph testified at trial that prison procedures

16   required the gate to be locked; and (4) Clark testified at the reference hearing that when he

17   interviewed DuQuesnay, he understood that DuQuesnay's statements about the east grille gate

18   being locked referred to prison procedures.  Petitioner has not made a colorable showing that there

19   is a reasonable probability the result of the guilt phase would have been different had Urquhart

20   brought DuQuesnay's statement and the post order to the jury's attention.  An evidentiary hearing

21   is therefore denied on this aspect of claim 7.

22   /////

23

24        [46] These facts are described by the California Supreme Court in the passage cited above.
     Neither respondent nor petitioner provided citations to the trial or reference hearing transcript to
25   support them.  However, since petitioner does not challenge the California Supreme Court's
     description of this testimony, this court assumes, for purposes of this motion, that court's
26   description is accurate.

b.  <u>Failure to Consult with, and Present Testimony of, Expert on Prisons</u>

Petitioner next claims that his trial counsel provided ineffective assistance by failing to introduce the testimony of a prison expert that petitioner was no longer a BGF gang member, that small benefits conferred by authorities may be considered of significant importance by jailhouse informants, and that petitioner was scheduled to be released on parole shortly (and therefore had incentive to behave well).  The theme of the prosecution's case at trial was that petitioner was attempting to wrest control of the BGF from fellow inmate Ruben Williams. According to prosecutors, petitioner decided to kill Charles Gardner because he was a friend of Williams and because Gardner had insulted petitioner the day before the crime.  Testimony regarding the status of petitioner's gang membership would have been important to counter the prosecution's theory of the case.  Further, evidence about petitioner's parole status would also have had relevance to the issue of his motivation, or lack thereof, for attacking Gardner.  Finally, evidence regarding the value of benefits granted by the authorities to informants has obvious relevance to the important trial issue of the inmate witnesses' credibility.

Petitioner has made a sufficiently colorable showing that his trial counsel should have investigated and presented testimony of a prison expert and, when considered with other errors at trial, had he done so there is a reasonable probability the result of the proceeding would have been different.

c.  <u>Failure to Investigate and Present the Impeachment Evidence set out in Claim 1</u>

Whether due to prosecutorial misconduct in suppressing evidence or due to ineffective assistance of defense counsel in failing to locate it, as described above in the discussion of claim 1, petitioner has made a significant showing that the jury in his case was not made aware of important evidence impeaching the credibility of the inmate witnesses called by the prosecution at trial.  An evidentiary hearing is necessary to determine why that evidence was not presented and just how prejudicial its absence was.

/////

66

C.  Excessive Courtroom Security - Claim 16

Petitioner claims both that the courtroom security during his trial was so excessive that it prejudiced jurors against him and was not justified.  In addition, he argues that he was shackled at trial in violation of his constitutional rights.

1.  Legal Standards

Excessive courtroom security may violate due process where it poses a threat to the "fairness of the fact-finding process" by infringing upon the presumption of innocence.  Holbrook v. Flynn, 475 U.S. 560, 567-68 (1986) (quoting Estelle v. Williams, 425 U.S. 501, 503-04 (1976)).

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."

Id. (quoting Taylor v. Kentucky, 436 U.S. 478, 485(1978)).

The Supreme Court in Holbrook noted that the question to be asked in determining the appropriateness specifically of shackling of a defendant at trial is:  Is it justified by "an essential state interest?"  475 U.S. at 568.  See also Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002) ("[A] defendant has the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest."); Duckett v. Godinez, 67 F.3d 734, 747 (9th Cir. 1995).  However, the Supreme Court declined to apply the standard governing the shackling of a defendant at trial to the presence of security personnel in the courtroom.  Rather than find such security presumptively prejudicial, the Court held that in reviewing the constitutionality of a state court's use of courtroom security the federal habeas court must

////

////

////

67

look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

Holbrook, 475 U.S. at 572.  See also Williams v. Woodford, 384 F.3d 567, 588 (9th Cir. 2004).

### 2.  Background

Prior to trial, prosecutor Kirk filed an ex parte motion for additional courtroom security personnel.  (CT 780-81.)  Kirk requested that plainclothes or uniformed officers be seated in the courtroom, that plainclothes or uniformed officers be placed in the corridor outside the courtroom, and that visitors to the courtroom walk through a metal detector located at the entrance to the corridor, be subject to a search, and have their photograph taken.  (Id.)  The trial judge granted the ex parte motion and ordered that the measures requested be undertaken based on the "good cause" that had been "presented in camera."  (CT 778-79.)  While the request and order appear in the Clerk's Transcript on Appeal, Kirk's declaration in support of those increased security measures was not made available to defense counsel until it was released in this federal habeas proceeding.[47]  In his declaration, Kirk first established that he had been involved in several criminal trials involving BGF members where "rescues" of the defendants or harm to judges or prosecutors was planned and/or carried out.  (Dkt. No. 366 at consecutive pp. 2-3.)  In particular, he noted the attempted rescue of a BGF defendant which resulted in the death of a Marin County Superior Court judge.  (Id. at consec. p. 3.)  Kirk stated that both defendants in the present case were BGF members.[48]  (Id.)  He then stated two reasons for his opinion that "a 'rescue' attempt in

---

[47]  Prosecutor Kirk's declaration is identified as respondent's exhibit 85 to the Answer.  It was originally lodged under seal and later unsealed by order of this court.  (Dkt. No. 365.)  It can be found attached to Respondent's Notice of Fourth Lodging of Exhibits.  (Dkt. No. 366, located on the court's docket between Dkt. Nos. 280 and 281.)

[48]  In his motion for an evidentiary hearing on his claims of ineffective assistance of trial counsel at the guilt and penalty phases of trial, petitioner argues that at the time of the crimes he was no longer a BGF member.  (E.g., Dkt. No. 369 at 82:10-15; 114:6.)  However, petitioner appears to admit his BGF membership in his Second Amended Petition.  (E.g., Dkt. No. 248 at

1  this case is a reasonable possibility." (Id. at consec. p. 4.)  The first reason was information from

2  a "confidential informant" that defendant Menefield told the informant that the BGF "were getting

3  some help from New York and that there would be 'plenty of coverage' for the trial." (Id.)  Mr.

4  Kirk described recent interactions between West Coast BGF leaders, primarily Ernest Graham

5  who he identified as "the current 'street' leader" of the BGF, and East Coast radical groups

6  including the Weathermen and the Black Liberation Army.[49] (Id. at consec. p. 3.)  The second

7  reason was also based on information from a confidential informant.  According to prosecutor

8  Kirk, this informant "reported that defendant Roberts has recently sent all of his personal

9  belongings home." (Id.)

10            On October 4, 1982, during in camera proceedings with the parties, the trial judge

11  noted that while jurors were walking through the metal detector before entering the courtroom, the

12  metal detector was not turned on and jurors were not being searched.  (RT 2:20 - 3:4.)  The parties

13  also discussed the prosecution's decision not to seek the shackling of the defendants in court

14  "unless there is disruptive behavior in the courtroom." (RT 3:6-12.)

15            Another discussion regarding courtroom security procedures occurred during jury

16  voir dire on October 19, 1982.  Defendant Menefield's counsel, Mr. Moe,  reported to the court

17  that a prospective juror had asked not to be required to provide his address to the court.  (RT

18

19  262:9-10.)  In claim 7, ineffective assistance of counsel at the guilt phase, petitioner does not
    argue that his counsel failed to challenge the prosecution's identification of him as a BGF

20  member.  In any event, petitioner does not specifically challenge prosecutor Kirk's identification
    of Menefield and petitioner as BGF members in his declaration in support of enhanced

21  courtroom security.  (Dkt. No. 369 at 99-100.)  In the declarations from attorneys Moe and
    Urquhart stating the grounds upon which they would have challenged Kirk's motion, neither

22  attorney mentioned that petitioner was not a BGF member.  (Dkt. No. 370-1, Ex. 103 to Mtn. for
    Evi. Hrg.; Ex. 101, submitted for filing under seal,  ¶15.)

23

24        [49]  Prosecutor Kirk's identification of Mr. Graham, and possibly the fear of a BGF
    "rescue" attempt during the trial, may have found some support in the appearance of Graham at
    the court.  In this regard, a bailiff had informed the trial judge during the death qualification

25  questioning of prospective jurors that Graham and his wife had asked to watch the proceedings.
    (RT 967:10-17.)  Citing California case law requiring sequestration during death qualification

26  questioning, the trial judge denied the request.  (RT 967:18-22.)

1469:18-23.)  The court assumed the juror was "worried about reprisal."  (RT 1469:28 - 1470:2.)

Mr. Moe agreed that was the juror's likely concern.  (RT 1470:3.)  The trial judge stated that he

would therefore refrain from asking jurors their addresses.  (RT 1470:16-17.)

          Defense counsel Moe, defendant Menefield's attorney, next objected to the number

of uniformed personnel "sitting around the defendants."  (RT 1471:2-5.)  The trial judge simply

noted counsel's objection and continued with the voir dire process.  (RT 1471:6-12.)   However,

that same afternoon, Mr. Kirk requested an in camera hearing to discuss the courtroom security.

(RT 1529:4-11.)  It was determined at that time that four uniformed officers were in the

courtroom.  (RT 1529:12-21.)  Kirk stated that he had spoken with attorney Moe and would

request that the two uniformed officers sitting closest to the defendants and the other sitting near

the jury box be dressed in civilian clothing.  (RT 1529:21 - 1530:10.)  Prosecutor Kirk stated, "I

am more than willing to accommodate the defendants in any kind of reasonable request

concerning the security measures that have been taken in this case."  (RT 1530:10-12.)  Attorney

Moe mentioned a problem at the beginning of trial where the search of the courtroom was

conducted by security personnel in front of jurors.  "In fact, jurors were grabbed and pulled back

out of the courtroom so they could conduct the search, with the door open.  It caused a lot of

buzzing among the jurors . . . ."  (RT 1530:15-23.)  Attorney Moe also pointed out that the

defense attorneys "have no way of knowing the reasons [for the security] for it was all in camera."

(RT 1530:15-16.)  Prosecutor Kirk stated that after he was informed about the issue of jurors

being exposed to the search of the courtroom, he had instructed the security staff only to perform

searches when the courtroom doors were closed.  (RT 1530:24 - 1531:2.)  Moe replied that he had

"no reason to disbelieve that" and he requested that any security "be done [as] unobtrusively as

possible."  (RT 1531:3-5.)

/////

/////

/////

1      According to respondent, the defense raised no other objections to the courtroom

2  security measures employed at trial.[50]  (Dkt. No. 412 at 48:11-12.)  Respondent points out that

3  defense counsel questioned two jurors about whether the security precautions caused them

4  concern.  (RT 1539:4-9; 1593:24-26.)  Both jurors responded that neither the security nor the fact

5  that the defendants were prisoners caused them any concern.  (RT 1539:8-10, 18-21; 1593:20-27.)

6      3.  Petitioner's Claims

7      Petitioner claims the following security measures employed in connection with his

8  trial combined to violate his due process rights.

9          a.  Conspicuous presence of armed security personnel in and around the

10  courtroom, including armed officers on the courthouse roof, which was visible from the street.

11      Petitioner proffers the declarations of defense counsel and investigators that

12  courtroom security was conspicuous and heavy, including armed snipers deployed on the roof of

13  the courthouse.  (Exs. 101 and 104, submitted for filing under seal.)  In addition, petitioner

14  proffers the declarations of jurors Galloway and Blea.  Mr. Galloway describes "various guards

15  from different agencies both inside and outside the courtroom" and characterized the security as

16  "strong."  (Dkt. No. 370-3, Ex. 106 to Mtn. for Evi. Hrg., ¶3.)  Juror Blea characterized the

17  security as "pretty heavy."  (Dkt. No. 370-4, Ex. 107 to Mtn. for Evi. Hrg., ¶4.)  Neither juror

18  described the officers on the roof or the other unusual security measures alleged by petitioner.

19          b.  Metal detector installed at entrance to courtroom.

20      Petitioner again proffers the testimony of defense counsel and investigator.  (Dkt.

21  No. 370-1, Ex. 103 to Mtn. for Evi. Hrg.; Exs. 101 and 104, submitted for filing under seal.)

22

23      [50]  Respondent argues that trial counsel's failure to raise these issues at trial demonstrates
   that the courtroom security measures were not excessive.  (Dkt. No. 412 at 48-49.)  Defense
   counsel's failure to object has no bearing on petitioner's claim of excessive courtroom security

24  here.  The courtroom security employed either violated petitioner's due process rights or it did
   not.  The issue of trial counsel's failure to object could have arguably provided grounds to bar the

25  claim.  However, respondent does not contend that this claim is procedurally barred.
   Accordingly, this court will not consider defense counsel's failure to object to the security

26  measures deployed in determining whether an evidentiary hearing is appropriate.

1  Petitioner also states that "[j]urors were aware of the metal detector."  However, he cites only to

2  the declaration of juror Blea who described a metal detector at the entrance to the courthouse; she

3  did not mention another metal detector at the entrance to the courtroom.  (Dkt. No. 370-4, Ex. 107

4  to Mtn. for Evi. Hrg., ¶4.)  During another in camera hearing, however, the trial judge noted that

5  jurors were walking through a metal detector before entering the courtroom, but observed that the

6  metal detector was not turned on and jurors were not being searched.  (RT 2:20 - 3:4.)

7         c.  Members of the public wishing to enter the courtroom were required to

8  show identification and be photographed.

9         Petitioner proffers only the testimony of defense counsel to prove that this security

10  measure was employed at his trial.  (Dkt. No. 370-1, Ex. 103 to Mtn. for Evi. Hrg.; Ex. 101,

11  submitted for filing under seal.)

12         d.  Defendants were transported to court by a "caravan of armed vehicles"

13  and in heavy restraints; they were shackled and unshackled in view of the courthouse.

14         Again, petitioner's primary proffer in support of this allegation is from defense

15  counsel.  (Dkt. No. 370-1, Ex. 103 to Mtn. for Evi. Hrg.; Ex. 101, submitted for filing under seal.)

16  He also proffers the declaration of juror Conklin who indicated that "there was a point" when

17  jurors saw petitioner shackled.  (Dkt. No. 370-2, Ex. 105 to Mtn. for Evi. Hrg., ¶4.)

18         e.  Prosecutor Kirk carried a gun.

19         Petitioner presents the declarations of Jurors Galloway and Blea in support of his

20  allegation that prosecutor Kirk was armed in the courtroom during the trial.  (Dkt. Nos. 370-3 and

21  370-4, Exs. 106 and 107 to Mtn. for Evi. Hrg.)  Both jurors saw what appeared to be a shoulder

22  holster under Kirk's jacket.  Petitioner also proffers the declaration of attorney Moe that he saw

23  prosecutor Kirk armed with a gun.  (Dkt. No. 370-1, Ex. 103 to Mtn. for Evi. Hrg.)

24         Petitioner argues that the effect of these severe security measures was exacerbated

25  by extensive pre-trial publicity, visible media coverage of the trial, and prosecutor Kirk's repeated

26  /////

references to the BGF.[51]   However, petitioner's only proffer of evidence to support his claims of

"extensive" publicity and "visible" media coverage consists of the several newspaper articles

about the trial referred to above.  (Dkt. No. 376-3, Ex. 233 to Mtn. for Evi. Hrg.)  While a few

jurors stated that other jurors read newspaper accounts and discussed them, they do not specify

what those juror discussions involved.  (Dkt. Nos. 370-2 and 370-4, Exs. 105 and 107 to Mtn. for

Evi. Hrg.)  Without more, petitioner has not made an adequate showing that jurors' awareness of

publicity or media coverage contributed to the prejudicial effect of courtroom related security.

### 4.  Need for Evidentiary Hearing on Claim 16

There are two aspects to petitioner's claim.  Primarily, petitioner challenges the

extent of the security employed at his trial.  In addition, petitioner challenges the justification for

the enhanced security measures.

### a.  Excessive Security

Petitioner is entitled to an evidentiary hearing if he has made a colorable claim that

the security measures employed at his trial violated his due process rights.  Petitioner must show

not just that extreme security measures were in place, but that jurors were aware of those

measures.  Moreover, petitioner's showing on this issue must be put in the context of a trial in

which jurors knew that both defendants and many witnesses were prisoners, knew gang

affiliations played a role, and were aware of recent violence in another trial involving prison gang

members.[52]  The court notes that at oral argument on petitioner's motion for an evidentiary

---

[51]  Petitioner also adds a sixth security measure to his claim - the requirement that the defendants could not attend the jurors' prison tour unless they were shackled.  Petitioner does not seek to present evidence regarding this security measure.  He argues it is relevant in considering the prejudicial impact of all the security measures employed at his trial.  According to petitioner, the defendants absence from the prison viewing would have communicated to the jury that they were extraordinarily dangerous.  This court does not agree.  Petitioner has not established that a reasonable juror would have expected the inmate defendants to accompany them on the prison tour unless they posed an extreme danger.

[52]  In his application for enhanced security, prosecutor Kirk mentioned a Marin County prison gang case involving the attempted "rescue" of a defendant, which resulted in the death of

73

1   hearing, petitioner's counsel stated that the evidence proffered in support of the motion was the

2   only evidence petitioner would intend to present at an evidentiary hearing.  Accordingly, this court

3   looks at the strength of petitioner's legal claims by assuming petitioner can prove his factual

4   allegations through the proffer already before the court.

5          Petitioner has shown one or more jurors saw or knew the following: (i) uniformed

6   officers were in and outside the courtroom; (ii) there was a metal detector at the entrance to the

7   courthouse; (iii) there was also a metal detector at the entrance to the courtroom; (iv) petitioner

8   was shackled at some unspecified point during the trial; and (v) prosecutor Kirk wore shoulder

9   holster.[53]  Petitioner has not presented evidence demonstrating that jurors saw armed officers on

10  the courthouse roof  or a "caravan of armed vehicles" transporting the defendants to court.  He has

11  also not established that the jurors were aware that members of the public entering the courtroom

12  were required to show identification and be photographed.

13         Courts have held that even heavy security is not inherently prejudicial to a

14  defendant and, in many ways, is to be expected in cases such as this one.  For instance, in

15  Holbrook v. Flynn, 475 U.S. 560, 562 (1986), the Supreme Court considered "whether a criminal

16  defendant was denied his constitutional right to a fair trial when, at his trial with five

17  _____

18  a Marin County Superior Court judge.  (Dkt. No. 366 at consec. pp. 2-3.)  Juror Galloway also
    mentioned that Marin County case as a reason why it seemed to make sense that security was
19  heavy in this case.  (Dkt. No. 370-3, Ex. 106 to Mtn. for Evi. Hrg., ¶ 4.)

20         [53]  Respondent argues that petitioner has not adequately supported his claim that
    prosecutor Kirk was armed during the trial.  Respondent notes that only attorney Moe saw
21  Kirk's weapon and that jurors Galloway and Blea only saw him with what appeared to be a
    shoulder holster.  (Dkt. No. 412 at 49:9-17.)  Respondent's argument does not focus on the
22  correct issue.  The question is whether the security in the courtroom perceived by jurors was
    excessive.  If the prosecutor's wearing of a shoulder holster led jurors to reasonably believe that
23  he was carrying a gun for his protection in the courtroom, which indeed seems like a reasonable
    assumption, then that fact must be added to the other aspects of courtroom and courthouse
24  security measures in determining the potential effect on jurors.  Respondent also argues
    petitioner's allegation that prosecutor Kirk was armed is unexhausted.  The allegation that Kirk
25  was armed is just one factual aspect of petitioner's claim of excessive security measures.  It does
    not substantially change petitioner's claim and therefore does not render that claim unexhausted.
26  See Chacon v. Wood, 36 F.3d 1459, 1469 (9th Cir. 1994).

74

codefendants, the customary courtroom security force was supplemented by four uniformed state

troopers sitting in the first row of the spectator's section." The Supreme Court first considered

whether the deployment of security personnel is the sort of "inherently prejudicial practice that,

like shackling, should be permitted only where justified by an essential state interest specific to

each trial." 475 U.S. at 568-69. The Supreme Court explained that,

> [w]hile shackling and prison clothes are unmistakable indications of
> the need to separate a defendant from the community at large, the
> presence of guards at a defendant's trial need not be interpreted as a
> sign that he is particularly dangerous or culpable. Jurors may just as
> easily believe that the officers are there to guard against disruptions
> emanating from outside the courtroom or to ensure that tense
> courtroom exchanges do not erupt into violence. Indeed, it is
> entirely possible that jurors will not infer anything at all from the
> presence of the guards. If they are placed at some distance from the
> accused, security officers may well be perceived more as elements
> of an impressive drama than as reminders of the defendant's special
> status. Our society has become inured to the presence of armed
> guards in most public places; they are doubtless taken for granted so
> long as their numbers or weaponry do not suggest particular official
> concern or alarm.

Id. at 569. The Court concluded that deployment of security must be considered on a case-by-case

basis and then determined that "four officers sitting quietly in the front row of the courtroom's

spectator section" did not create "an unacceptable risk of prejudice" or brand the defendants "with

an unmistakable mark of guilt." Id. at 570-71 (citations omitted). Since the defendant in that case

had not shown actual prejudice, his due process claim was found to have failed. Id. at 572.

Similarly, in Hayes v. Ayers, 632 F.3d 500, 521-22 (9th Cir. 2011), the trial court

had instituted security measures much like those employed in the present case.

> [T]he court permitted screening of everyone who entered the
> courtroom. Security provisions included use of a hand-held metal
> detecting wand, patdown of outer clothing, examination of bags and
> purses for weapons, locking the courtroom door, and posting an
> extra deputy in the courtroom and two additional deputies outside
> the courtroom. Prospective jurors, who only received identification
> badges after they were selected, were screened alongside the general
> public until a jury was picked.

632 F.3d at 521. The Ninth Circuit held that screening those entering the courtroom "'need not be

1   interpreted as a sign that [the defendant] is particularly dangerous or culpable.'" Id. at 522

2   (quoting Holbrook, 475 U.S. at 569).  Rather, the court found that "[i]ndiscriminate screening at

3   the courtroom door permits an even 'wider range of inferences' than strategically placed guards,

4   and it suggests even more strongly that the security is designed 'to guard against disruptions

5   emanating from outside the courtroom.'"  Id.

6           Likewise, in Ainsworth v. Calderon, 138 F.3d 787, 797 (9th Cir.), amended, 152

7   F.3d 1223 (9th Cir. 1998), the court considered whether the presence of four, and sometimes six,

8   uniformed officers in the courtroom violated the petitioner's due process rights.  One officer had

9   been placed behind each of the two defendants and, at least once, two officers sat behind

10  petitioner Ainsworth.  138 F.3d at 797.  In addition, there were two to four additional uniformed

11  officers in the courtroom at trial.  Nonetheless, the court concluded that the ratio of two courtroom

12  guards to each defendant in the courtroom was not inherently prejudicial.  Id.; see also King v.

13  Rowland, 977 F.2d 1354, 1358 (9th Cir. 1992) (ratio of three guards to one defendant not

14  inherently prejudicial); Williams v. Woodford, 384 F.3d 567, 588 (9th Cir. 2004) (one uniformed

15  officer near defendant, three others near jury or spectators not inherently prejudicial).  Further,

16  when six officers were in the courtroom, two were placed at the door which would have indicated

17  to jurors that they were there to "'guard against disruptions emanating from *outside* the

18  courtroom.'"  Id. (quoting Holbrook, 475 U.S. at 572).  See also Jenner v. Class, 79 F.3d 736 (8th

19  Cir. 1996) (requiring spectators to pass through metal detector, excluding spectators when the

20  defendants entered or left the courthouse, closing certain floors of the courthouse, and restricting

21  those who defendant could speak with found not to be inherently prejudicial).

22          Petitioner has cited few cases in support of his argument that the security measures

23  employed at his trial were constitutionally excessive and even those few cases he relies upon do

24  not provide persuasive support for his position.  Rather, the decisions relied upon by petitioner

25  each involved circumstances far more extreme than those presented in this case.  For instance, in

26  Woods v. Dugger, 923 F.2d 1454 (11th Cir. 1991), the Court found that a number of factors

coalesced to create an "unacceptable risk" to the defendants' right to a fair trial in a case involving the murder of a prison guard.  The case had been tried in a small county in which a third of the residents were prisoners and a large number of the county's residents are employed by prisons.  923 F.2d at 1457-58.  Prior to the murder in question, the victim's statement that the prison was "dangerously understaffed" had been reported in the newspaper.  Id. at 1458.  His death "became a focal point for the lobbying efforts" of groups seeking better prison staffing.  Id.  Of the seated jurors at the petitioner's trial, four had either worked in the prisons or had relatives working in them and several other jurors had both heard of the case and had relatives working in the prisons.  Id.  During the trial, about half of those seated in the spectators' gallery were wearing prison guard uniforms.  Id.  The court found that pretrial publicity combined with the imposing presence of so many prison guards created "'an unacceptable risk [of] impermissible factors coming into play.'"  Id. at 1459 (quoting Holbrook, 475 U.S. at 570).

Similarly, in Mata v. Johnson, 99 F.3d 1261, 1271 (5th Cir. 1996), vacated in part and remanded, 105 F.3d 209 (5th Cir. 1997),[54]  the court found that the "totality of the circumstances" surrounding the defendants' trial justified an evidentiary hearing on his claim that excessive security had been employed.  In that case, the petitioner had claimed that

> his trial was tainted to the point of reversible prejudice by the combined effects of excessive pretrial publicity, conspicuous presence of heavily armed security personnel in and around the courtroom, installation of surveillance cameras and metal detectors for the duration of the trial, and the intimidating presence of 30-40 uniformed prison guards as spectators in the courtroom throughout his trial.

99 F.3d at 1271.  Again, the circumstances described in Mata are a far cry from the security measures allegedly employed in petitioner's case.

---

[54]  As petitioner points out, the Fifth Circuit in Mata originally noted the presence of the petitioner's fair trial claim but determined it was procedurally barred.  99 F.3d at 1271.  On rehearing, the court determined the procedural bar did not apply to the fair trial claim, vacated that portion of its prior opinion, and remanded to the district court "with instructions to conduct a full evidentiary hearing on Mata's fair trial claim."  105 F.3d at 210.

1          As part of his excessive security claim, petitioner argues that the jurors at his trial

2  saw him shackled.  As noted above, the standard for evaluating a shackling claim is higher than

3  that for evaluating a claim of excessive court security generally.  "[A] defendant has the right to

4  be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an

5  essential state interest."  Ghent, 279 F.3d at 1132.  The only factual support for this aspect of his

6  claim 16 offered by petitioner is the declaration of Juror Conklin in which she states:  "I also

7  remember there was a point when the jurors were able to view the defendants in shackles."  (Dkt.

8  No. 370-2, Ex. 105 to Mtn. for Evi. Hrg., ¶4.)  Petitioner does not allege where, when, or for how

9  long jurors saw him shackled.  Without more detail about what the jurors saw, petitioner has not

10  presented a colorable claim that the state lacked a reason to shackle the defendants at that time or

11  that the trial jurors were in any way prejudiced by seeing the defendants in shackles.  See Rhoden

12  v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999) ("A jury's brief or inadvertent glimpse of a

13  defendant in physical restraints outside of the courtroom has not warranted habeas relief.")

14  (Citations omitted).   Here, the jurors at petitioner's trial were aware that the defendants were

15  prisoners.  It would hardly have been surprising for them to see those prisoners being taken to and

16  from court in shackles.  See United States v. Halliburton, 870 F.2d 557, 561 (9th Cir. 1989);

17  Wright v. Texas, 533 F.2d 185, 188 (5th Cir.1976); United States v. Leach, 429 F.2d 956, 962

18  (8th Cir. 1970).

19          Petitioner also cites the decision in Parrish v. Small, 315 F.3d 1131 (9th Cir. 2003)

20  for the proposition that should even one juror have seen a defendant shackled, an evidentiary

21  hearing is necessary.  The decision in Parrish is distinguishable from this case on a number of

22  grounds.  First, and most importantly, the state court in Parrish had already had found that the trial

23  judge did not have sufficient justification to require the shackling of the defendant. 315 F.3d at

24  1133.  Since it was established that the defendant had been "'"unconstitutionally shackled,"'" the

25  only issue in Parrish was "'whether the defendant was  prejudiced.'"  Id. (quoting Dyas v. Poole,

26  309 F.3d 586, 588 (9th Cir. 2002)).  Here, as discussed above, petitioner has made no showing

1    that any use of shackling at his trial was inappropriate.  Second, the juror in Parrish saw the

2    defendant shackled in court.  Id.  In the present case, petitioner has not established where any

3    jurors may have seen him shackled.  Therefore, the decision in Parrish does not require this court

4    to hear evidence on petitioner's shackling claim.  Absent a more specific proffer of evidence,

5    petitioner has not adequately supported this aspect of his claim.  To the extent petitioner raises the

6    shackling in support of his claim of excessive security at his trial, for the reasons stated above,

7    this court finds petitioner has also not made a sufficient showing that the shackling of the

8    defendants would have contributed to any overall prejudice flowing from the security measures

9    employed at trial.

10           Petitioner has shown that jurors were aware of a limited number of security

11   measures employed during his trial.  However, even if the jurors were aware of all the security

12   measures petitioner describes, most of those measure would not necessarily have indicated to

13   jurors that petitioner was dangerous nor would they have branded him "with an unmistakable

14   mark of guilt."  Holbrook, 475 U.S. at 571.  See also United States v. Darden, 70 F.3d 1507, 1533

15   (8th Cir. 1995) (large number of security personnel in courtroom, spectators required to pass

16   through  two magnetometers, defense attorneys' belongings inspected within view of the jury, jury

17   assembled in a secret location and transported to court under heavy security, and snipers on roof

18   of courthouse, all determined not to be inherently prejudicial).  Rather, the measures employed

19   may just as reasonably indicated to jurors that others involved in or viewing the trial may have

20   been cause for any security concerns.  See Morgan v. Aispuro, 946 F.2d 1462, 1465 (9th Cir.

21   1991) (moving trial to courtroom in which spectator area was separated from courtroom by a glass

22   partition not inherently prejudicial;  "there was no reason for the jury to infer that [petitioner]

23   specifically was the reason for the security measures.")  In a trial such as this one involving prison

24   inmate defendants, inmate witnesses, and gang involvement, even if petitioner could prove that all

25   his factual allegations regarding the security measures employed at his trial were true, he has not

26   shown that those measures were inherently prejudicial in violation of his constitutional rights.

The next question is whether petitioner has made a colorable showing that he suffered actual prejudice as a result of the security measures employed at his trial.  Few courts have addressed such issues.  As an initial matter, this court must determine what evidence may appropriately be considered in determining actual prejudice.  Federal Rule of Evidence 606 describes the circumstances under which juror testimony or evidence of a juror's statement may be considered when a verdict is challenged.[55]  That rule states as follows:

> (1) **Prohibited Testimony or Other Evidence**. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> (2) **Exceptions**. A juror may testify about whether:

> (A) extraneous prejudicial information was improperly brought to the jury's attention;

> (B) an outside influence was improperly brought to bear on any juror; or

> (C) a mistake was made in entering the verdict on the verdict form.

The Ninth Circuit has held that Rule 606 permits jurors to testify as to how extraneous information made them feel, but not as to how such information affected their votes as to what the verdict should be.

> [A] court can and should consider the "effect of extraneous information or improper contacts on a juror's state of mind," a juror's "general fear and anxiety following" such an incident, and any other thoughts a juror might have about the contacts or conduct at issue.  Id. In this regard, a juror's testimony concerning his fear that individuals would retaliate against him if he voted to acquit (or convict) would be admissible, although his statement that he

---

[55] The Federal Rules of Evidence apply to these habeas proceedings.  "In the following proceedings these rules apply to the extent that matters of evidence are not provided for in the statutes which govern procedure therein . . . habeas corpus under sections 2241 - 2254 of title 28, United States Code . . . ."  Fed. R. Evid. 1101(e).

1      actually cast his vote one way or the other because of that fear
2  would not.  Further, evidence regarding any influence that such
   improper conduct or contacts had on the jurors' abilities to fairly
3  and impartially receive the evidence, listen to the testimony
   presented, and the judge's instructions is also admissible.  Finally,
4  the court may consider the likely consequence of actions that might
   cause jurors to feel intimidated regardless of whether the jurors
5  admit such an effect.  Thus, objective and subjective factors may
   both be considered.

6  United States v. Rutherford, 371 F.3d 634, 644-45 (9th Cir. 2004) (footnote omitted; internal

7  citations omitted).

8         In Hayes, discussed above, the court looked to jurors responses to questions posed

9  during voir dire to determine whether the defendant may have suffered actual prejudice from the

10  security measures employed at trial.  632 F.3d at 522.  In the present case, respondent argues that

11  petitioner's counsel asked only two jurors whether the security employed at trial gave them cause

12  for concern.  Both jurors responded that it did not.  (RT 1539:4-10; 1593:20-27.)

13         Petitioner points to the declaration of Juror Galloway that indicates he was

14  concerned about his safety during trial and "may have kept a shotgun near my bed for safety

15  reasons during trial."  (Dkt. No. 370-3, Ex. 106 to Mtn. for Evi. Hrg., ¶ 3.)  Juror Galloway

16  appeared to be influenced by the amount of security employed during petitioner's trial and by the

17  then-fairly recent Marin County prison gang trial in which a judge had been killed.  (Id.)  While

18  Juror Galloway does not state that the security employed caused him to be concerned about

19  petitioner in particular, his declaration is significant in that it suggests that at the very least he was

20  concerned for his own safety.  Given the lack of cited legal authority for measuring

21  constitutionally significant prejudice, the court finds petitioner has made a minimally colorable

22  showing of actual prejudice.  However, the parties are advised that prior to the evidentiary

23  hearing, the court will require further briefing on the issue of the admissibility of juror testimony

24  as well as the standard governing a claim that petitioner suffered actual prejudice as a result of the

25  security measures employed at his trial.

26  /////

1      b. Justification for Enhanced Security

2          i. Exhaustion

3          As an initial matter, respondent argues this aspect of petitioner's claim 16 was not

4  raised in his petition before this court and is not exhausted.  The court finds that petitioner did

5  raise this claim in his federal petition.  Specifically, in his Second Amended Petition, petitioner

6  described his claim 16 as follows:  "Petitioner claims that excessive and unnecessary security

7  measures created a prejudicial atmosphere in the courtroom . . . ."  (Dkt. No. 248 at 254:16.)  This

8  allegation is sufficient to put respondent on notice that petitioner was challenging the reasons, or

9  "necessity," for the security measures employed at his trial.

10         For two reasons, the court also declines to find petitioner's claim in this regard to

11  be unexhausted.  First, petitioner's arguments regarding the justification for the enhanced security

12  measures employed at his trial are based on prosecutor Kirk's own declaration, which petitioner's

13  counsel was only able to obtain through discovery in this federal habeas proceeding.  Respondent

14  complains that petitioner did not seek Kirk's declaration earlier.  However, respondent ignores the

15  fact that petitioner could not have done so.  Under governing state law at the time, petitioner had

16  no right to discovery in his state habeas proceeding until an order to show cause issued.  People v.

17  Gonzalez, 51 Cal. 3d 1179, 1258 (1990) (A habeas petition that does not state a prima facie case

18  for relief "must be summarily denied, and it creates no cause or proceeding which would confer

19  discovery jurisdiction."), superseded by statute as stated in In re Steele, 32 Cal. 4th 682, 690

20  (2004) (Gonzalez superseded by statute effective Jan. 1, 2003).  While the California Supreme

21  Court did issue  an order to show cause in petitioner's case, it was limited to two issues, neither of

22  which involved the security measures employed at trial.  (Dkt. No. 412-1 at consec. p. 4.)

23         As discussed in detail above, a petitioner satisfies the exhaustion requirement by

24  providing the highest state court with an opportunity to rule on the merits of his claim.  Baldwin,

25  541 U.S. at 29; Duncan, 513 U.S. at 365; Wooten, 540 F.3d at 1025; Batchelor v. Cupp, 693 F.2d

26  859, 862 (9th Cir. 1982).  If a petitioner presented the state court with the legal basis for the claim

82

1    but was unable to make a substantial factual showing because state court procedures did not

2    permit fact-finding, then the state court has had a sufficient opportunity to rule on the merits of the

3    claim and the exhaustion requirement is satisfied.  See Weaver v. Thompson, 197 F.3d 359, 364-

4    65 (9th Cir. 1999); Miller v. Estelle, 677 F.2d 1080, 1084 n.9 (5th Cir. 1982).  Because the

5    exhaustion doctrine requires the state court have a "fair opportunity" to consider a petitioner's

6    claims, and because the California Supreme Court chose not to permit fact-finding with respect to

7    petitioner's claim that the jurors at his trial were exposed to excessive security measures, the

8    exhaustion requirement has been satisfied.  The second reason this court declines to find these

9    claims unexhausted is that it is unnecessary to address the question because, for the reasons set

10   forth below, this court finds petitioner has not stated a colorable challenge to the basis provided

11   by prosecutor Kirk for his motion seeking that enhanced security measures be employed at trial.

12                                  ii.  Justification for Security

13                    Petitioner states there is "reason to believe that prosecutor Kirk exaggerated or

14   fabricated his 'factual basis' for the motion [for enhanced security]."  (Dkt. No. 369 at 99:14-16.)

15   In this regard, petitioner proffers declarations from trial counsel challenging Kirk's two grounds

16   for his motion.  With respect to Kirk's statement that Menefield told an informant that the BGF

17   would be getting help from New York to cover the trial, attorney Moe states: "If I had known of

18   this allegation at the time, I would have investigated and challenged it.  I think it is highly unlikely

19   that my client could have made such a statement, because he was in no position to have access to

20   that kind of intelligence."  (Dkt. No. 370-1, Ex. 103 to Mtn. for Evi. Hrg.)  With respect to Kirk's

21   statement that petitioner had recently sent home his personal property, attorney Urquhart states

22   that had he known prosecutor Kirk was making this argument, he could have explained that

23   petitioner likely sent home his property because he was expecting to soon be released on parole.

24   (Ex. 101, submitted for filing under seal, ¶15.)  However, attorney Urquhart indicated in his

25   declaration that he did not know whether petitioner had sent property home but was simply

26   surmising that petitioner would have had a good reason to do so.  (Id.)

1        Neither of petitioner's challenges to the Kirk declaration in support of his motion

2   for enhanced security is specific or certain.  Both attorneys Moe and Urquhart merely hazard

3   guesses as to possible challenges to Kirk's bases for the motion.  Further, petitioner's challenge to

4   Kirk's statement regarding petitioner sending property home does not appear valid.  Petitioner

5   does not show either that he did not send property home or that he sent property home before he

6   was charged with the murders in question.  After petitioner was so charged, any expectation of

7   being released on parole soon would obviously have been unfounded.  Prosecutor Kirk's

8   declaration in support of the security measures is dated September 30, 1982.  (Dkt. No. 366 at

9   consec. p. 5.)  It states that petitioner "recently" sent property home.  Petitioner was charged with

10  the murders back in June of 1981.  (Dkt. No. 248 at 139:21.)  After that date, petitioner had no

11  reasonable expectation that he would be paroled any time soon.  Any argument along those lines

12  in 1982 would not have convinced the trial judge that petitioner had a legitimate alternative reason

13  for sending home his belongings.  Petitioner has not proffered a sufficient challenge to Kirk's

14  declaration in support of the enhanced security measures.  Petitioner has not made a colorable

15  showing that he could succeed on a challenge to the justification for those security measures.

16  Petitioner's request to question Kirk about his declaration at an evidentiary hearing before this

17  court is therefore denied.

18        D.  Removal of Juror During Deliberations - Claim 29

19        Petitioner argues the trial court's removal of a juror during deliberations violated

20  his rights to due process and an impartial jury.

21        1.  Background Facts

22        On the morning of the fourth day of deliberations, prosecutor Kirk reported that

23  "we have had Juror Conklin contacted and she has been ill."  (RT 7902:5-6.)  Mr. Kirk stated that

24  both he and the trial judge had talked with the juror in question, she "is in bed at the present time

25  under a doctor's care.  She does have an elevated blood pressure.  She has indicated that it's a

26  result of both her illness and she says the pressure of what she is doing right now."  (RT 7902:9-

13.)  The record reflect that the juror asked to be allowed to remain at home and felt that she might be able to come back on Thursday.  (RT 7902:18-20.)  Kirk expressed his concern about a "three-day hiatus" which the granting of the juror's request would necessitate.  (RT 7902:24-28.)  He represented that the bailiff had informed him that "the jury would like to continue their deliberations, would like an alternate appointed."  (RT 7903:1-2.)  Kirk then requested that juror Conklin be replaced with an alternate juror.  Both defense attorneys asked for time to speak to their clients regarding the matter.  (RT 7903:17 - 7904:11.)  Prosecutor Kirk next suggested convening the jury, telling them Ms. Conklin was ill and might not be back until late in the week, telling them that if an alternate was appointed they would be required to start deliberations over again, sending the jury back to consider what to do, and having the jury advise the court how it wished to proceed.  (RT 7905:2-9.)  Attorney Urquhart stated he did not have a problem with this approach, but noted that he did not "want the jury to think they are controlling whether an alternate is picked or not."  (RT 7905:12-15.)  The court agreed to prosecutor Kirk's proposed procedure in addressing the issue.  (RT 7905:16.)  Attorney Moe stated he had no objection to it. (RT 7905:19.)  The court then presented the circumstances to the jury and asked "what would you prefer to do?"  (RT 7906:17-28.)   Shortly thereafter,[56] the jury foreman informed the court that the jurors "have decided it would be better if an alternate was called in."  (RT 7907:6-7.)

It was at this point that attorney Urquhart raised an issue with the trial judge about notes received from the jury the previous Friday.  Apparently the trial judge had been out of town the prior court day, a Friday, and Superior Court Judge Ely was substituting for him during jury deliberations.  (RT 7908:16-17; 7910:6.)  On that Friday morning, the jury had sent out several

/////

/////

---

[56]  The court reporter noted in the transcript that at this point in the proceedings the judge and all counsel left the courtroom "momentarily" while the jury discussed whether to request the seating of an alternate juror.  (RT 7907:3-4.)

questions.[57]  (RT 7908:14-19.)  One of the questions was "whether, after having signed and dated the verdict form, a person could change their [sic] mind."  (RT 7908:17-19.)  Shortly after this jury question was submitted to the court, another question was posed by the jury asking: "whether the person had to support any doubts they had in front of the rest of the panel."  (RT 7908:21-23.)  Judge Ely advised the jury in response to their questions, "'Until the formal verdict is returned, you can change your mind.'"  (RT 7910:6-7.)

When Mr. Kirk questioned the relevance of Mr. Urquhart's observation about the jury notes received the previous Friday, attorney Urquhart stated:  "If this is, perhaps, the one juror who had some reservations, or had some doubt in the case, perhaps the jury's only[58] decision is influenced by that as well.  I think the Court can consider that in making its decision to seat an alternate."  (RT 7909:1-5.)  Attorney Urquhart suggested that the court should consider that Juror Conklin may have been the one juror with a question in her mind about what the verdict should be in weighing the expressed desire of the other jurors to replace Juror Conklin with an alternate.  (RT 7911:1-5.)  Attorney Urquhart then posed a formal objection to the seating of an alternate juror.  (RT 7912:23 - 7913:12.)  Without commenting on attorney Urquhart's objection and argument in support thereof, the trial court informed the jury that an alternate would be seated in place of juror to Conklin.  (RT 7915:17-19.)  The court stated it was seating the alternate because of juror Conklin's illness and the preference of the rest of the jurors to proceed with their deliberations with an alternate.  (RT 7917:8-22.)

Petitioner's motion for a new trial included an argument that Juror Conklin was erroneously excused.  (CT 1811-13.)  Petitioner included a declaration from Juror Conklin that

---

[57]  Petitioner seeks to expand the record before this court with the two jury notes.  (Dkt. No. 418 at 36 n. 30.)  Those notes are attached to petitioner's reply brief.  (Dkt. No. 418-1.)  According to petitioner, these jury notes were also exhibits to the deposition of Jury Foreperson Charles Edwards.  (Dkt. No. 418 at 8-9.)  However, it does not appear that the notes are part of the state trial court record.

[58]  The word "only" in this sentence appears to be a typographical error.

1   stated she was in fact the juror who had wished to change her mind after signing the verdict form.

2   (CT 1806.)  Juror Conklin also stated that she had insisted that the jury ask the trial judge whether

3   she could do so.  (Id.)  When she spoke to the trial judge on Monday February 28, the day she was

4   ill, she told the judge she "would be available for deliberations on Thursday."  (CT 1807.)  The

5   trial court granted the prosecutor's motion to strike juror Conklin's declaration (CT 1815, 1819-

6   25) and denied petitioner's motion for a new trial without comment.  (CT 1815.)

7              2.  Proffered Evidence

8              In addition to Juror Conklin's May 1983 declaration, petitioner has presented a

9   second declaration from juror Conklin as well as declarations from two other trial jurors, both of

10  whom support juror Conklin's version of the events and indicate that the jury voted to replace

11  juror Conklin because she was a holdout for acquittal.  (Dkt. Nos. 370-2, 370-3, and 370-5, Exs.

12  105, 106, and 108 to Mtn. for Evi. Hrg.)  The jury foreman, juror Edwards, recalled that there was

13  one juror who

14              was insistent in her beliefs, refused to stand up for justice, and
              would not be swayed by our reasonable arguments.  I recognized
15              this as a big problem and was very concerned that if this juror
              remained in deliberations, we would wind up with a hung jury.  I
16              didn't want that.  I believe in the process and I wanted it to work
              correctly.  So as the foreman, I took control of the situation and
17              alerted the female bailiff.  I pointed out the female juror to the
              female bailiff and told her that juror refused to believe any of the
18              prosecution witnesses and that we were going to have to get rid of
              her to avoid a hung jury.  The bailiff said she would relay this
19              information to the judge.

20  (Dkt. No. 370-5, ¶ 6.)  Jury foreman Edwards also recalled that when the juror in question took ill,

21  the judge brought the jury into the courtroom "and asked the jury what we wanted to do about that

22  holdout female juror."  (Id. ¶ 7.)  Jury foreman Edwards stated that this juror's illness, and the

23  delay in the proceedings caused by that illness, "had nothing to do with my belief that she should

24  be removed from the jury."  (Id.)  In his declaration juror Galloway stated in no uncertain terms

25  that "[w]e would not have come to a unanimous decision had this woman stayed on as a juror."

26  (Dkt. No. 370-3, ¶ 7.)  He also indicated that the jury's decision to have the juror in question

1   excused, "was not a difficult decision."  (Id.)  Juror Conklin stated that the other jurors "wanted

2   me to agree with them and be done with it.  But I was not going to change my mind to guilty no

3   matter what." (Dkt. No. 370-2, ¶ 8.)

4                    3.  Legal Standards

5           It is clear that a trial judge may not dismiss a juror because that juror is a "holdout"

6   who disagrees with his or her follow jurors as to what their verdict should be.

7                    Removal of a holdout juror is the ultimate form of coercion.
                     Thus, " 'a court may not dismiss a juror during deliberations if the
8                    request for discharge stems from doubts the juror harbors about the
                     sufficiency of the government's evidence.' " "The reason for this
9                    prohibition is clear:  'To remove a juror because he is unpersuaded
                     by the Government's case is to deny the defendant his right to a
10                   unanimous verdict.' "  As the D.C. Circuit observed:

11                   If a court could discharge a juror on the basis of such a
                     request, then the right to a unanimous verdict would be
12                   illusory.  A discharge of this kind would enable the
                     government to obtain a conviction even though a member of
13                   the jury that began deliberations thought that the government
                     had failed to prove its case.  Such a result is unacceptable
14                   under the Constitution.

15  Sanders v. Lamarque, 357 F.3d 943, 944-45 (9th Cir. 2004) (quoting United States v. Brown, 823

16  F.2d 591, 596 (D.C. Cir. 1987)) (other internal citations omitted).  It is less clear what is

17  constitutionally required in a situation like the present one, where there was some reason to

18  suspect that the juror in question was a holdout but there was also an arguably legitimate

19  alternative reason to dismiss that juror and replace her with an alternate.  California law may well

20  require an appropriate inquiry before dismissing a juror and seating an alternate.  See Cal. Penal

21  Code § 1089.  Federal courts to address such issues have concluded that a trial judge who has

22  reason to suspect that a jury is seeking to have a holdout juror dismissed, should conduct an

23  inquiry to satisfy that a defendant's rights to an impartial jury under the Sixth Amendment is

24  protected.

25          The Eleventh Circuit's decision in Green v. Zant, 715 F.2d 551 (11th Cir. 1983) is

26  instructive on this issue.  There, the state trial court failed to conduct an inquiry prior to

dismissing a juror. The federal appellate court considered the trial court's dismissal of a juror

during deliberations under the following circumstances:

> Approximately three hours after they began their sentencing deliberations, the jury returned to the courtroom and the foreperson asked the judge "can a sentence be given, 'life in prison without parole?' " The court responded that it could not answer the question. After another brief question and answer, the jury began to withdraw to resume its deliberations.
>
> At this point, one of the jurors, Dorothy Mae Ponder Todd, fell to the floor in the hallway outside the courtroom and in an audible voice repeatedly cried "I can't do it."

715 F.2d at 554. The trial judge then brought the foreperson back to the courtroom and asked her

whether juror Todd "is in your opinion incapable of continuing deliberation in this case because of

the fact that she is physically and emotionally unable to continue and participate in the

deliberation of this Jury." Id. The foreperson responded that she believed Juror Todd was

incapable of continuing and confirmed that Todd had asked to be excused. Id.. The trial court

then excused juror Todd. In connection with state habeas proceedings, however, the petitioner

submitted an affidavit from Todd stating that she had been one of two holdout jurors and that she

had in fact felt capable of continuing with her jury service at petitioner's trial. Id. at 555.

On federal habeas, the petitioner argued "the trial court erred by not questioning

juror Todd or further investigating her illness." Id. The Eleventh Circuit held:

> Green has stated a colorable claim of constitutional magnitude. Under the peculiar facts of this capital case, Green's "valued right to have his trial completed by a particular tribunal," and his sixth amendment right to a fair, impartial and representative jury may well have required that the trial court investigate the need to discharge juror Todd.

Id. (internal citations omitted). The federal appellate court noted that where a juror's disability is

not entirely clear, "some hearing or inquiry into the situation is appropriate to the proper exercise

/////

/////

89

of judicial discretion." Id. at 556.[59]  The court then discussed the precise issue presented in this case:

> Our difficulty is that to date no court has made findings of historical fact necessary to resolve Green's constitutional claim. Findings of specific historical facts are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).  Such facts include "a recital of external events and the credibility of their narrators . . . ." Specifically, we do not know whether juror Todd was so ill that she was unable to continue deliberations.  If she was so incapacitated and if a hearing would have revealed that fact to the trial court, then Green cannot complain that he was prejudiced by the court's failure to hold a hearing. At the other extreme, if a hearing would have revealed that Ms. Todd was clearly able to continue as a juror, then failure to hold the hearing raises the possibility of potentially fatal prejudice.

Id. at 556-57 (internal citations omitted).  The Eleventh Circuit concluded under such circumstances that while the "primary responsibility for fact-finding resides with the state court," when the state court has failed to develop the "facts necessary to support a constitutional claim," "a federal evidentiary hearing is necessary." Id. at 557.  Accordingly, the Eleventh Circuit remanded the case to the district court with instruction to conduct an evidentiary hearing and make appropriate findings of fact. Id. at 559.  This court finds that the decision in Green supports the conclusion that an evidentiary hearing is necessary in this case with respect to petitioner's claim 29.

A recent decision from this circuit provides additional support for petitioner's argument that he has presented a colorable claim for relief in this regard.  In Williams v. Cavazos,

/////

---

[59]  The court recognizes that the Eleventh Circuit in Green relied in part upon the Sixth Amendment but primarily found the petitioner's claim reflected due process concerns regarding the dismissal of a juror who did not support imposition of the death penalty.  715 F.2d at 556 (relying on the holding in Witherspoon v. Illinois, 391 U.S. 510 (1968) that "a juror's decision that death is not appropriate under the facts of a given case is not constitutionally sufficient to permit her discharge from the jury.").  However, the decision in Green is important not because it found that the petitioner had stated a colorable claim, but because it concluded that fact-finding regarding the holdout juror's dismissal from the jury was appropriate.  Therefore, the legal basis for the petitioner's claim presented in Green is not particularly relevant to this court's analysis regarding whether an evidentiary hearing on the issue presented here is appropriate.

646 F.3d 626 (9th Cir. 2011), cert. granted, ___U.S.___, 132 S. Ct. 1088 (2012),[60] the federal

habeas court considered a state trial judge's dismissal of a juror who was known to be the lone

holdout.  After being notified by the jury foreperson that one juror had "expressed an intention to

disregard the law," the trial judge and counsel questioned each of the twelve jurors about their

deliberations and about the particular juror's, Juror No. 6, willingness to follow the law as given.

646 F.3d at 633-34.  The trial judge dismissed the juror as a "biased juror" because:

> "his mind is bent . . . against the prosecution," as evidenced by his
> statements concerning the government's burden of proof, his
> disagreement with the felony-murder rule, and his "dishonest[y]" in
> recounting whether anyone had discussed the severity of the charge
> or juror nullification.  The court then concluded that Juror No. 6
> "was lying in court" and "has no business being a juror in this
> matter," and so dismissed him.

Id. at 634.  An alternate replaced Juror No. 6 and the following day the jury returned a guilty

verdict.  Id. at 634-35.  The Ninth Circuit in Williams first noted the "clear" Sixth Amendment

requirement that a trial judge may not "discharge a juror on account of his views of the merits of

the case."  Id. at 642-43.  The court then discussed the importance of the jury as "the only actor

permitted to determine guilt."  Id. at 643.  The Ninth Circuit noted that "'a judge may not direct a

verdict of guilty no matter how conclusive the evidence.'"  Id. (quoting United Bhd. of Carpenters

& Joiners of Am. v. United States, 330 U.S. 395, 408 (1947)).  The court observed:

> It would similarly vitiate the "essential" role of a jury to act as a
> "safeguard" against both the power of the state and the court for a
> judge to selectively dismiss jurors based on the views of the merits
> of the case they express during deliberations.  Such dismissals are
> thus prohibited as well, because a court cannot "do indirectly that
> which it has no power to do directly."

Id. (internal citations omitted).  The court in Williams also recognized the tension between

---

[60]  This court notes that the Supreme Court granted certiorari in Williams only on the
following question: "Whether a habeas petitioner's claim has been 'adjudicated on the merits' for
purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained decision but
did not expressly acknowledge a federal-law basis for the claim."  2011 WL 4874095 (Pet. for
Cert.).

investigating allegations of jury misconduct and maintaining the secrecy of juror deliberations.  Id. Finally, the court concluded by stating this rule:

> [I]n deciding whether to discharge a juror mid-deliberation, the critical Sixth Amendment questions are whether, after an appropriately limited inquiry, it can be said that there is no reasonable possibility that the juror's discharge stems from his views of the merits, and whether the grounds on which the trial court relied are valid and constitutional.  If the answer to either question is no, the removal of the juror violates the Sixth Amendment.

Id. at 644.

The Ninth Circuit in Williams also examined situations such as the one posed here - where there are two potential, and possibly intertwined, reasons for a juror's dismissal.  Among those situations discussed by the court in Williams was that presented in Perez v. Marshall, 119 F.3d 1422, 1423 (9th Cir. 1997).  In Perez the state trial judge had dismissed a lone holdout juror on the grounds that "she was emotionally incapable of continuing to participate in the jury-deliberation process."  (Id.)  After holding a hearing pursuant to California Penal Code § 1089, the trial judge determined that the holdout juror was "unwilling and unable to remain on the jury." 119 F.3d at 1423.  The Ninth Circuit held that the trial judge did not violate the defendant's rights by excusing the holdout juror under these circumstances.  In so holding, the court relied upon the trial judge's "lengthy interview" with the holdout juror.  Id. at 1426.  After considering cases in which jurors were properly replaced due to physical or mental health problems, the court

> recognize[d] that [the holdout juror's] emotional condition is different from a hearing impairment, a mental illness, or a poor physical health condition in that it could be related to her viewpoint on the merits of the Government's case.  In other words, [the juror's] infirmity as a juror could have been triggered or exacerbated by her disagreement with the other jurors as to Perez's guilt.  Nevertheless, the trial judge properly removed [the juror] from the jury because [the juror's] emotional instability prevented her from continuing to perform the essential functions of a juror in the same way that a hearing impairment, a mental illness, or a poor health condition would have.

Id. at 1427.  In Perez the Ninth Circuit considered that the trial judge was "forced to act, not

92

because of [the juror's] status as a holdout juror, but because of [the juror's] emotional inability to continue performing the essential function of a juror-deliberation." Id.  The court stressed that the trial judge "took great pains to preserve the originally empaneled jury." Id.  It was noted that the trial judge interviewed the juror "at length and offered alternatives to ease the stress of deliberations;" and "encouraged her to continue deliberating and steadfastly to maintain her position if she believed she was correct." Id. at 1427-28.  In Perez the Ninth Circuit also observed that the reconstituted jury was unable to reach a verdict on several counts, serving as an indication that the removal of the holdout juror did not have a coercive effect on the jury.[61]  Id. at 1428.  The court in Williams stressed that the record was clear in Perez that the trial judge had been forced to act not because the juror in question was a holdout, but because she was emotionally unable to continue.  646 F.3d at 644-45.

The court in Williams also relied on the decision in United States v. Symington, 195 F.3d 1080, 1083 (9th Cir.1999) in reaching its conclusion that constitutional error had occurred.  In Symington, jurors complained about a holdout juror, juror Cotey, who "was unable to maintain focus on the topics of discussion and she refused to discuss her views with the other jurors." 195 F.3d at 1083.  After questioning the jurors individually, the trial judge dismissed juror Cotey on the ground that she was "'either unwilling or unable to deliberate with her colleagues.'" Id. at 1084.  The Ninth Circuit noted that "there may have been some reason to doubt [the juror]'s abilities as a juror," but "there was also considerable evidence to suggest that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case." Id. at 1088.  The court found the juror's dismissal violated the Sixth Amendment.  In doing so, the court employed the same legal standard employed by the court in Williams - a court may not dismiss a juror "if the record discloses any

---

[61]  It should be noted that the court's review of the trial court findings in Perez was limited by the AEDPA, which required that "special deference" be accorded those findings.  119 F.3d at 1426.  As noted at the outset, AEDPA is inapplicable in the present case.

reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case." Id. at 1087. It is instructive that the Ninth Circuit in Symington focused on the jury's request for dismissal of the juror in question, not merely on the trial court's decision to dismiss that juror:

> It is undisputed that if this is true - if the other jurors did seek to remove Cotey because they disagreed with her views on the merits - then dismissal of Cotey was improper. "[W]hen a request for dismissal stems from the juror's view of the sufficiency of the evidence . . ., a judge may not discharge the juror: the judge must
>
> either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement."

Id. at 1085-86 (quoting Brown, 823 F.2d at 596).

The Ninth Circuit in the Williams case concluded that under this standard, the trial judge's dismissal of Juror No. 6 violated the defendant's Sixth Amendment rights. 646 F.3d at 646. In an alternative ruling, the court found the trial judge's findings regarding Juror No. 6 were not supported by the record and therefore the decision to replace Juror No. 6 was unsupported by good cause as required by the Sixth Amendment. Id. at 647-52. This court finds particularly instructive that the Ninth Circuit in Williams found two, independent grounds for its holding that the trial judge improperly dismissed Juror No. 6: (1) there was a reasonable possibility the juror's dismissal stemmed from her views on the merits of the case; and (2) the trial judge's stated reasons for dismissing the juror were not supported by the state court record. The court held that either basis alone was grounds for the granting of federal habeas relief. Id. at 647.

The U.S. Court of Appeals for the D.C. Circuit has similarly held that a court may not dismiss a juror if there is a "possibility" the juror's holdout status underlies the request for dismissal. United States v. Brown, 823 F.2d 591, 594 (D.C. Cir. 1987). In Brown jurors sent out a note to the trial judge indicating that they had reached an impasse after five weeks of deliberations. After the trial judge instructed the jury to continue deliberating, one juror asked to be excused. Id. In response to questioning by the trial judge, the juror stated that he "disagreed"

1    with the RICO law and did not feel that he could follow the law due to "the way it's written and

2    the way the evidence has been presented."   Id.   In this context, the D.C. Circuit stated that

3    although "the problem that the reasons underlying a request for a dismissal will often be unclear,"

4    "a court may not delve deeply into a juror's motivations because it may not intrude on the secrecy

5    of the jury's deliberations."   Id. at 596.   The court concluded that "if the record discloses any

6    possibility that the request to discharge stems from the juror's view of the sufficiency of the

7    government's evidence, the court must deny the request."   Id.   The court in Brown found that the

8    record before it indicated "a substantial possibility" that the juror's request stemmed from his

9    view of the inadequacy of the government's evidence.   Id.   Accordingly, the court held the

10   dismissal of the juror violated the defendants' Sixth Amendment rights.   Id. at 597.

11          Recently, a district court relied on the Ninth Circuit's decision in Williams to find

12   that a juror's dismissal violated the federal habeas petitioner's Sixth Amendment rights.   In Bell v.

13   Uribe, No. EDCV 08-1913 JST SS, 2011 WL 4481485 (Report and Recommendation, C.D. Cal.

14   Aug. 8, 2011), adopted, 2011 WL 4481394 (C.D. Cal. Sept. 24, 2011), jurors asked to talk with

15   the trial judge during deliberations.   In response, the trial court conducted a hearing at which other

16   jurors complained that Juror No. 7, a mental health worker, was injecting her opinions about the

17   defendants' mental health into the deliberations and was essentially "acting as an expert."   2011

18   WL 4481485 at *12-14, *19-20.   In addition, it became clear during this exchange that Juror No.

19   7 was the lone holdout juror.   Id. at 16.   Eventually, after numerous discussions with jurors and

20   counsel, the trial judge found Juror No. 7 "was attempting to persuade this jury based upon her

21   training and experience and information that she had collected outside of court."   Id. at *21.   The

22   trial judge excused Juror No. 7.   Id.   Faced with this record the district court in Bell determined

23   that there "is a reasonable possibility that the removal of Juror No. 7 stemmed from her view of

24   the evidence."   Id. at *24.   The federal habeas court recognized that the state trial court may have

25   had cause to remove the juror because she "acted as an expert" but concluded that the trial court

26   "'was not justified in acting upon that cause because there was a 'reasonable possibility' that the

1   request for removal was directly connected to [Juror No. 7's] views on the merits.'" Id. (quoting

2   Williams, 646 F.3d at 647).  The district court concluded that based upon the record before it,

3   "there is strong evidence that Juror No. 7's removal was motivated by the trial court's desire to

4   have a unanimous verdict" and thus, that decision to replace the juror violated the Sixth

5   Amendment.  Id. at *27.  The court then determined that the error was not harmless, a fairly easy

6   determination the court noted, when a holdout juror has been removed.  Id. at *28.  Accordingly,

7   the court granted petitioner Bell's federal habeas petition.  Id.

8          Respondent relies on the decision in Peek v. Kemp, 784 F.2d 1479 (11th Cir. 1986)

9   (en banc) in arguing that the trial court's inquiry in the present case provided a sufficient basis for

10   excusing the juror and replacing her with an alternate.  In Peek, the trial court had dismissed an ill

11   juror during deliberations based solely on a conversation with the jury foreperson.  784 F.2d at

12   1482.  The foreperson informed the trial judge that the juror in question "is definitely extremely

13   nervous and almost at the breaking point."  Id.  The Eleventh Circuit pointed out that

14   "[s]ubsequent fact-finding revealed that at the time of his dismissal, [the juror] was the lone

15   holdout as to guilt.  This was unknown to the court and both attorneys at the time."  Id.  The court

16   found that because "the record supports a finding that [the juror] was too ill to continue in the

17   deliberations at the time he was dismissed, we find that no constitutional error resulted from the

18   state trial judge's failure to question [the] juror . . . personally prior to dismissing him."  Id. at

19   1484.

20          4.  Analysis

21          It is well established that a trial court must have good cause to dismiss a sitting

22   juror.  There is no question that illness alone may constitute such good cause.  However, as

23   pointed out by the Ninth Circuit in Williams, and as emphasized in the decisions in Symington,

24   Perez, and Brown, if there is a reasonable possibility the dismissal was based in part on the juror's

25   holdout status, dismissal of the juror violates the Sixth Amendment.  The initial question for this

26   court then, is whether the information available to the trial judge was sufficient to require him to

investigate further whether juror Conklin was the holdout juror.  This court finds it was.

The trial judge knew the following: (1) one juror had changed his or her mind about a verdict on the third day of deliberations; (2) this appeared to cause dissension among the jurors because they next asked whether the juror who had done so had to "support any doubts" he or she had "in front of the rest of the jury;" (3) the following court day, the court was informed that a juror was ill, in part because of the stress of the case; (4) before being asked, the jurors who were present requested that the court replace the ill juror with an alternate; and (5) when told that they would be required to start deliberations anew with an alternate if the absent juror was replaced, the jurors who were present quickly voted to replace the juror in question.  Once he had been informed of the possibility of a holdout, the trial judge could easily have questioned the jurors who were present, and, if necessary, conducted a telephone conference with juror Conklin. This inquiry was particularly necessary in this case because the trial judge had given the jurors who were present a significant say in the decision whether or not to replace juror Conklin.  In fact, allowing the other jurors to vote on the matter strongly indicates that the trial judge did not find juror Conklin's illness alone to constitute a sufficient reason to dismiss her from the jury. Moreover, the trial judge did not appear to believe that the proceedings would be significantly delayed by waiting for juror Conklin to return to deliberations.  In fact, the trial judge and trial counsel recognized that deliberations would not necessarily proceed more quickly if an alternate replaced juror Conklin because in that instance the jury would be required to start their deliberations anew.  (RT 7904:19 - 7905:1; 7906:17-27.)  There was no indication that juror Conklin was suffering from an illness that would prevent her from returning to deliberate with the jury within the next few days.  In fact, the trial judge had actually informed the jurors who were present that juror Conklin would return for deliberations on Thursday "come hell or high water." (RT 7906:23-25.)

In light of this record, the court concludes that petitioner has made a colorable Sixth Amendment claim that the trial court erred in dismissing juror Conklin without conducting

97

1  an appropriate inquiry.[62]  The next question is whether an evidentiary hearing in this federal

2  habeas proceeding is necessary to resolve any disputed factual issues.  Petitioner seeks to present

3  the following evidence at such a hearing: (1) the testimony of juror Conklin that she was the

4  holdout juror; (2) the testimony of other jurors that they voted to replace juror Conklin because

5  she was a holdout; and (3) testimony to show that prosecutor Kirk knew the other jurors wished to

6  remove juror Conklin due to her status as a holdout before she called in ill.[63]  An additional

7  potential factual issue is the question of what precisely the trial judge knew about juror Conklin's

8  illness.  As noted, the trial judge did not hold an on-the-record inquiry into juror Conklin's illness.

9  However, he, prosecutor Kirk, and possibly attorney Urquhart apparently spoke to her on the

10  telephone.[64]  (RT 7902:7-9; 7904:1-2.)  Whatever transpired in those conversations could be

11

12  _____

   [62]  Respondent argues, and the California Supreme Court held, that illness constitutes
   good cause for the removal of a juror.  2 Cal. 4th at 323-25.  However, the California Supreme
13  Court's decision on appeal addressed this question only under state law.  Id.  Petitioner also
   raised this claim, including the federal constitutional challenge aspect thereof, in his state habeas
14  petition.  (State Pet., lodged herein as Ex. 25 to Answer, at 261-64.)  The California Supreme
   Court denied habeas relief without comment.  29 Cal. 4th at 747.

15
   [63]  Respondent argues that petitioner may not pursue this allegation of prosecutorial
16  misconduct because it was raised neither in state court nor in his second amended federal
   petition.  (Dkt. No. 412 at 65 & n. 34.)  Petitioner concedes that he did not raise this issue
17  previously but asserts he is not raising a separate unexhausted prosecutorial misconduct claim.
   (Dkt. No. 418 at 34-35.)  Rather, he states that he seeks to present evidence that prosecutor Kirk
18  knew the wishes of the jurors who were present as part of his proof that they sought to replace
   juror Conklin.  The record before this court reflects that prior to taking the jury's vote on how to
19  proceed, the trial court was informed by prosecutor Kirk that the other jurors wished to proceed
   without juror Conklin.  (RT 7903:1-2.)  Petitioner appears to also want to demonstrate that the
20  other jurors had requested juror Conklin's dismissal prior to her illness.  In his declaration, jury
   foreman Edwards stated that during deliberations he told the female bailiff that one female juror
21  "refused to believe any of the prosecution witnesses and that we were going to have to get rid of
   her to avoid a hung jury."  (Dkt. No. 370-5, Ex. 108 to Mtn. for Evi. Hrg., at ¶ 6.)  According to
22  foreman Edwards, the bailiff told him she would relay that information to the judge.  (Id.)

23  [64]  It is not clear that attorney Urquhart spoke to juror Conklin.  At the hearing before she
   was excused and replaced, Urquhart stated, "My feeling is, from the impression I got on the
24  phone, Mrs. Conklin still wishes to deliberate."  (RT 7903:28 - 7904:2.)  However, in the
   opposition to petitioner's motion for a new trial, prosecutor Kirk described what transpired as
25  follows: "[A]fter the question of illness arose, all three counsel were called into the judge's
   chambers where, in the presence of the judge and of each other, first Judge Randall then Mr. Kirk
26  talked to Mrs. Conklin over the telephone -- a procedure followed because she was ill in bed and

1   relevant to assessing the trial judge's ultimate decision to excuse juror Conklin during

2   deliberations.

3          The question of what factual issues are before the court is bound up in how the

4   constitutional issue is framed.  Petitioner argues he should be permitted to show that the other

5   jurors voted to replace juror Conklin because she was the holdout.  However, petitioner does not

6   place that issue in the analytical framework of his claim.  Most courts have examined the actions

7   of a trial court in such situations based on what the trial court knew in determining whether or not

8   a petitioner's Sixth Amendment rights have been violated.  For example, in Peek, the Eleventh

9   Circuit found it important that neither counsel nor the trial court was aware that the ill juror was

10  also a holdout.  784 F.2d at 1482.   It appears, however, that petitioner's evidence would be

11  relevant if this court is required to conduct a prejudice inquiry.[65]

12         Here, after considering the above authorities, this court finds that an evidentiary

13  hearing is necessary to resolve the following factual issues raised by petitioner's claim 29: (1)

14  what evidence was available to the trial judge regarding juror Conklin's illness and her holdout

15  status; (2) whether juror Conklin was the juror who wished to change her vote as mentioned in the

16  jurors' note sent to the trial judge; and (3) whether juror Conklin's view of the evidence caused

17  ────────────────

18  unable to be present.  Judge Randall offered all counsel the opportunity to talk with Mrs.
    Conklin, but both Mr. Urquhart and Mr. Moe declined the offer.  No one contested the fact that
    she was in fact ill."  (CT 1836-37.)  Prosecutor Kirk then argued that this telephone call was a
19  sufficient "hearing" upon which to find good cause to discharge juror Conklin.  (CT 1837-39.)

20         [65] It is worth noting that courts have not been entirely clear on the question of whether
    prejudice flowing from any constitutional error must be assessed in this context.  Some courts
21  have found a traditional prejudice inquiry appropriate.  See Peek, 784 F.2d 1479 (where the trial
    court did not hold a hearing, the reviewing court determines whether the petitioner was
22  prejudiced by a juror's dismissal by examining whether the juror was in fact too ill to continue);
    Green, 715 F.2d at 556-57 (the court found to require an evidentiary hearing to consider whether
23  the petitioner prejudiced by removal of juror).  At least one court has engaged in a harmless error
    analysis after determining that the trial judge's removal of the lone holdout juror violated the
24  Sixth Amendment.  Bell, 2011 WL 4481485, at *27.  Finally, some courts have simply found that
    the trial courts' dismissal of a juror violated the Sixth Amendment and not addressed either
25  prejudice or harmless error.  See Williams, 646 F.3d at 644-47; Symington, 195 F.3d at 1085-88.
    It is possible that the reason prejudice or harmless error is not addressed in these cases is because
26  dismissal of a juror who is holding out for acquittal obviously prejudices a criminal defendant.

other jurors to vote to replace her on the jury.  Having established these factual issues to be

resolved, the next question is what evidence this court may consider in resolving them.

### 5. Admissible Evidence

Respondent argues that Federal Rule of Evidence 606 bars this court's

consideration of juror testimony regarding their deliberations.  Again, Rule 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror
> may not testify about any statement made or incident that occurred
> during the jury's deliberations; the effect of anything on that juror's
>
> or another juror's vote; or any juror's mental processes concerning
> the verdict or indictment.

However, Rule 606(b) contains several limited exceptions.  "Jurors may testify regarding

extraneous prejudicial information or improper outside influences. They may not be questioned

about the deliberative process or subjective effects of extraneous information, nor can such

information be considered by the trial or appellate courts."  United States v. Bagnariol, 665 F.2d

877, 884-85 (9th Cir. 1981).

Respondent cites a number of cases in which courts have held that Rule 606(b)

prevented consideration of a juror's post-verdict declaration that her guilty vote was coerced.  See

United States v. Briggs, 291 F.3d 958, 963-64 (7th Cir. 2002) (the court will not hear "intrajury

influences on the verdict" when considering a motion for a new trial); United States v. Brito, 136

F.3d 397, 414 (5th Cir. 1998) (a juror's testimony that her verdict was coerced by other jurors is

inadmissible in connection with a motion for new trial); United States v. Casamayor, 837 F.2d

1509, 1515 (11th Cir. 1988) (alleged harassment of one juror by another juror was not competent

evidence to impeach a verdict upon motion for new trial).  In addition, Rule 606(b) is often cited

to limit the court's consideration of evidence underlying claims of juror misconduct.  See, e.g.,

Fields v. Brown, 503 F.3d 755, 778 (9th Cir. 2007) (court may not consider juror testimony

"about the subjective effect of evidence on the particular juror or about the deliberative process").

/////

1       The common law also prohibits the court from delving into the details of the jury's

2   deliberations.  In Brown, discussed above, the D.C. Circuit noted "the problem that the reasons

3   underlying a request for a dismissal will often be unclear."  823 F.2d at 596.  The court also

4   warned:  "[A] court may not delve deeply into a juror's motivations because it may not intrude on

5   the secrecy of the jury's deliberations."  Id.  The Ninth Circuit in Williams similarly cautioned

6   that a court must make "an appropriately limited inquiry" while warning that "no one, including

7   the judge, is even supposed to be aware of the views of individual jurors during deliberations,

8   because a jury's independence is best guaranteed by secret deliberations, such that jurors may

9   'return a verdict freely according to their conscience' and their 'conduct in the jury room [may be]

10  untrammeled by the fear of embarrassing publicity.'"  646 F.3d at 643-44 (quoting Clark v. United

11  States, 289 U.S. 1, 16 (1933)).

12      Petitioner argues that Rule 606 is not a bar to consideration of the evidence he

13  seeks to present because he is not offering this evidence to challenge the jury's deliberations, but

14  to challenge the trial court's decision to remove juror Conklin.  Petitioner also argues that to the

15  extent the evidence he wishes to introduce involves the jury's deliberative process, it was not the

16  process that resulted in the verdict against him in any event since once juror Conklin was

17  replaced, the jury was required to start its deliberations over.

18      Both of petitioner's arguments are unsupported by case law.  In United States v.

19  Decoud, 456 F.3d 996, 1016 (9th Cir. 2006), the Ninth Circuit considered the district court's

20  dismissal of Juror No. 8, the only African American juror, during deliberations on the fate of

21  African American defendants.  During the first day of deliberations, Juror No. 8 had sent two

22  notes to the trial judge seeking clarification of the court's instructions.  456 F.3d at 1003.  Shortly

23  thereafter, Juror No. 8 sent a third note asking to speak to the trial judge privately.  Id.  The trial

24  judge and trial counsel then questioned Juror No. 8.  She informed them that her religious values

25  prevented her from "judg[ing] another person."  Id.  After trial, the defense moved for an

26  evidentiary hearing and a new trial based on the declaration of a witness who said she had

encountered Juror No. 8 after trial.  Id. at 1005.  Juror No. 8 told the witness that her real reason

for asking to be excused from the jury was because she was a holdout for acquittal and was being

subjected to "severe pressure from some of the other jurors."  Id. at 1006 n. 3.  Juror No. 8 also

indicated racial reasons may have played a part in the other jurors' interactions with her.  Id.  On

appeal, the defendants argued the district court erred in refusing to grant the evidentiary hearing to

investigate the allegations that racial bias may have played a role in the jury's deliberations.

Among other things, the Ninth Circuit stated that Rule 606 "clearly bars consideration of the

declaration's allegation that the juror said she was subjected to pressure by other jurors for being a

'holdout for acquittal.'"  Id. at 1019 n. 11 (citations omitted).

   The decision in Decoud is at odds with petitioner's argument that Rule 606 would

not apply because he is challenging a juror's dismissal, rather than the jury's verdict.  In Decoud

the court held that Rule 606(b) barred consideration of juror testimony regarding the removal of a

juror.  Further, practically speaking, petitioner's argument is based upon a distinction without a

difference.  Every habeas claim involves an allegation of a constitutional violation, which, if

successful, would result in relief from a verdict.  Ultimately, each such claim is part of "an inquiry

into the validity of a verdict" under Rule 606(b).  The decision in Decoud also counsels against

petitioner's argument that the verdict this court is reviewing is that of the reconstituted jury and,

therefore, this court is not bound by Rule 606(b) in considering what took place in the jury room

prior to juror Conklin's dismissal.  Decoud is the only case cited by either party that involved a

post-verdict challenge to the dismissal of a juror during deliberations.  Both the district court and

the Ninth Circuit in Decoud considered themselves bound by Rule 606(b)'s limitations on the

consideration of juror testimony, despite the fact the final verdict was entered by a reconstituted

jury.[66]  In fact, the court in Decoud indicated that its holding was based on reasoning completely at

---

[66]  Petitioner also argues this court is not bound by the decision in Decoud because the
parties in that case did not raise this issue and therefore the court did not consider it.  However,
petitioner cites no competing authority.  Given the Ninth Circuit's decision in Decoud, which is

1    odds with petitioner's argument here.  The court found that because the replaced juror "did not

2    participate in the verdict" was actually part of the reason the court would not pierce the "sanctity

3    of the jurors' deliberations."  Id. at 1019.

4              The court's application of Rule 606(b) in Decoud is also reasonable.  A primary

5    reason courts and Congress have limited investigation into jury deliberations is to protect the

6    deliberative process generally.  "'Freedom of debate might be stifled and independence of thought

7    checked if jurors were made to feel that their arguments and ballots were to be freely published to

8    the world.'"  Symington, 195 F.3d at 1086 (quoting Clark v. United States, 289 U.S. 1, 13 (1933)).

9    See also United States v. Villar, 586 F.3d 76, 87 (1st Cir. 2009) (" [T]he need to protect a frank

10   and candid jury deliberation process is a strong policy consideration.")

11             Petitioner also attempts to distinguish Decoud on another ground.  He argues that

12   the court's statement in a footnote, that Rule 606 clearly barred consideration of a declaration

13   alleging that the excused juror had reported that she was subjected to pressure by other jurors for

14   holding out for acquittal was dicta and was made in reliance upon inapposite authority.  However,

15   this argument ignores the fact that the court in Decoud determined it also could not consider the

16   evidence of racial tension between jurors.  456 F.3d at 1019.  Again, the court in Decoud was

17   considering a challenge to a verdict that was rendered by a reconstituted jury, and the court

18   applied Rule 606(b) to bar consideration of evidence about what took place in the jury

19   deliberation room before a juror was dismissed.  Petitioner has given this court no basis

20   upon which to stray from the analysis undertaken by the Ninth Circuit in Decoud.[67]

21

22   binding upon this court, and given the underpinnings of the prohibition upon investigation into a
     jury's deliberations, this court finds petitioner's argument in this regard unpersuasive.

23

24        [67]  Petitioner also argues that habeas and appellate courts have been willing to consider
     "pre-verdict juror testimony after a verdict has been reached."  (Dkt. No. 418 at 32 n. 27.)
     However, the cases relied upon by petitioner are not applicable here.  In none of the habeas cases

25   cited by petitioner did a federal habeas court take evidence.  See Williams, 646 F.3d at 635;
     Sanders, 357 F.3d at 947-48.  Rather, the federal appellate court in each case considered only the

26   facts developed before the state court prior to entry of the verdict.  In the federal criminal cases

Despite this conclusion, the court recognizes that this case presents a unique situation.  As discussed above, the only case which appears to address the issue in a similar context is that of the Eleventh Circuit in Green.  There, the court recognized the "difficulty" in considering a constitutional claim where "no court has made findings of  historical fact necessary to resolve Green's constitutional claim." 715 F.2d at 556.  Accordingly, in Green the court ordered an evidentiary hearing to determine whether the petitioner suffered prejudice as a result of the trial court's failure to conduct a proper inquiry before dismissing the juror in question.  Id. at 556-57.  The court did not address Federal Rule of Evidence 606(b).[68]  However, the court did make clear that while the "primary responsibility for fact-finding resides with the state court,"

---

cited by petitioner, district courts questioned jurors during deliberations, pre-verdict.  See Symington, 195 F.3d at 1083-84; United States v. Thomas, 116 F.3d 606, 611-12 (2nd Cir. 1997); United States v. Brown, 823 F.2d 591 (D.C. Cir. 1987).  Rule 606(b) would not have applied in those federal prosecutions because they did not involve an "inquiry into the validity of a verdict."  Petitioner has not shown that his federal habeas challenge to his state court conviction and sentence on this ground involves anything other than an "inquiry into the validity of a verdict."  Petitioner advances a final argument that even if Rule 606(b) applies, this court has discretion to override it.  (Dkt. No. 418 at 34.)  In so arguing, petitioner relies solely upon the decision in United States v. Villar, 586 F.3d 76, 87 (1st Cir. 2009).  There, the district court held Rule 606 precluded the court from engaging in post-verdict inquiry into jurors' possible ethnic bias.  Villar, 586 F.3d at 78.  The First Circuit held that while Rule 606(b) precluded the inquiry, it was permissible in a "rare and grave" case such as where a claim of ethnic bias during jury deliberations implicated the "defendant's right to due process and an impartial jury."  586 F.3d at 87.  The court noted the difficulty in obtaining this sort of information in any other way and remanded to the district court to consider whether to exercise its discretion to hear juror testimony on the issue.  Id. at 87-88.  Since this court finds it may conduct limited fact-finding with respect to the issue raised by petitioner, it need not consider whether the decision in Villar provides support to override Rule 606(b) in this case.

   [68]  Upon remand, the district court conducted an evidentiary hearing.  Green v. Zant, 738 F.2d 1529, 1532 (11th Cir. 1984) ("Green II").  Much of the testimony at that evidentiary hearing appears to have involved what took place when juror Todd fainted outside the courtroom and issues surrounding juror Todd's health.  738 F.2d at 1532-33.  These issues did not involve jury deliberations.  The district court was not required to consider delving into the jury's deliberations because it found that juror Todd did not audibly cry "I can't do it!"  Id. at 1533.  Therefore, the trial judge had no reason to think juror Todd might be a holdout juror and was found not to have erred in failing to question her further.  Once it was established that juror Todd had been quite ill, the district court found, and the federal appellate court agreed, that the trial court had legitimate reasons to dismiss her from the jury without further inquiry.  These holdings do not alter the Eleventh Circuit's apparent willingness to consider juror Todd's holdout status as integral of the petitioner's claim in that case.

1  when the state courts have failed to develop the "facts necessary to support a constitutional

2  claim," "a federal evidentiary hearing is necessary." Id. at 557.

3        The only other case supporting such a post-verdict inquiry is Peek.  There, the state

4  habeas court held a hearing at which it was revealed that the excused juror was the lone holdout,

5  and also that his "emotional and physical state" "impaired his voting and participating in

6  deliberations." 784 F.2d at 1483.  Obviously, because this was state court fact-finding,

7  Federal Rule of Evidence 606(b) did not apply.  However, the case does stand as an example of a

8  federal habeas court's willingness to consider post-verdict juror testimony under certain

9  circumstances.  Specifically, the court in Peek relied upon such testimony in holding that:

10      the record supports a finding that [the excused juror] was too ill to
    continue in the deliberations at the time he was dismissed, we find

11      that no constitutional error resulted from the state trial judge's
    failure to question [the excused juror] personally prior to dismissing

12      him.

13  Id. at 1484.  Essentially, the federal habeas court in Peek applied a traditional prejudice standard

14  by reasoning that even if the trial judge had conducted a proper inquiry at the time, the result

15  would have been the same.

16        Upon consideration of all the authorities discussed above, the court finds it

17  necessary to conduct a limited inquiry into juror Conklin's illness, which would not be barred by

18  Rule 606(b), as well as into the decision by the other jurors to request and vote to have juror

19  Conklin dismissed from the jury.  The court will require the parties to brief the appropriate scope

20  of the inquiry with a caution to petitioner's counsel that the court intends to hear very limited

21  testimony touching upon the jurors' deliberations.  Rather, the focus of the limited evidentiary

22  being granted on this issue must be on juror Conklin's illness and on the basis for the vote by

23  other  jurors to have her dismissed from the jury and replaced with an alternate.   Without this

24  limited evidence, it is not possible for this federal habeas court to conduct an analysis of the

25  prejudice, if any, petitioner suffered when the trial judge failed to conduct an inquiry prior to the

26  removal of juror Conklin.

1      E.  Jury Misconduct and Bias - Claim 30

2              Petitioner has also made numerous allegations of juror misconduct.  First, he

3      argues the jurors were biased by the security measures, media presence, and inflammatory

4      argument by the prosecution regarding the BGF, all of which, he claims, amounted to extrinsic

5      evidence that petitioner was dangerous.  Second, he argues that some jurors exhibited racial bias.

6      Third, he claims jurors were affected by the emotional presence at trial of Officer Patch's widow

7      and daughter.  Fourth, petitioner claims the jurors engaged in the following acts of misconduct

8      during their deliberations: improper contact with an alternate; discussion of evidence prior to

9      deliberations; discussion of sentencing issues during guilt phase deliberations; discussion of

10     evidence that jurors had been instructed by the court to disregard, such as petitioner's failure to

11     testify on his own behalf; and discussion of extrinsic evidence of petitioner's prior murder

12     conviction.  Finally, petitioner argues that some jurors intimidated other jurors into accepting a

13     guilt verdict.

14             While respondent challenges each individual allegation and the support therefor,

15     petitioner correctly argues in his briefs that he need not, at this point, proffer every possible item

16     of evidence in support of his claim.  The question is whether his jury misconduct claim is

17     colorable and whether he has shown there are material factual issues that should be resolved by

18     way of evidentiary hearing.  That said, at oral argument, when asked whether petitioner had any

19     additional evidence in order to demonstrate that he could prove this claim, petitioner's counsel

20     indicated that they had no additional support beside what was set forth in the papers.  Petitioner's

21     proffer on this claim consists of the declarations of Jurors Blea, Conklin, Galloway and Edwards

22     and a collection of newspaper articles.  (Dkt. Nos. 370-4, 370-2, 370-3, 370-5, and 376-3; Exs.

23     107, 105, 106, 108 and 233 to Mtn. for Evi. Hrg.)

24             1.  Legal Standards

25             The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

26     fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).

See also Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  See also United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  Jurors are objectionable if they have formed such deep and strong impressions that they will not listen to testimony with an open mind.  Irvin, 366 U.S. at 722 n.3.  A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced.  Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.), amended, 315 F.3d 1062 (9th Cir.  2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).  Where a juror's actions or misconduct create "destructive uncertainties" about the indifference of a juror, bias should be presumed.  Green, 232 F.3d at 677.

A defendant in a criminal case is also entitled to a jury that reaches a verdict on the basis of evidence produced at trial.  Turner v. Louisiana, 379 U.S. 466 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court.").  The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363, 364-65 (1966).

However, not every incident of juror misconduct requires a new trial.  United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  Rather, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."  Id.  On collateral review, trial errors, such as extraneous information that was considered by the jury, "are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict."  Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997)), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  See also Estrada, 512 F.3d at 1235;

1   Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007); Fields v. Brown, 431 F.3d 1186, 1209

2   n.16 (9th Cir. 2005) (noting that Brecht provides the standard of review for harmless error in cases

3   involving unconstitutional juror misconduct); Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.

4   1993) (a habeas petitioner must show that the alleged error "'had substantial and injurious effect

5   or influence in determining the jury's verdict.'")

6           As described above, Federal Rule of Evidence 606(b) limits the court's

7   consideration of juror testimony.  Here, a threshold question is the extent to which the court can

8   consider the jurors' comments regarding their deliberations in addressing petitioner's jury

9   misconduct claim.  See United States v. Maree, 934 F.2d 196, 201 (9th Cir. 1991), abrogated on

10  other grounds in United States v. Adams, 432 F.3d 1092 (9th Cir. 2006).  As discussed in

11  Sassounian v. Roe, 230 F.3d 1097 (9th Cir. 2000), juror testimony may be considered to

12  demonstrate that extraneous evidence or information was introduced during the jury's

13  deliberation, but not, for instance to show the subjective impact of that extraneous information:

14          A long line of precedent distinguishes between juror testimony
            about the consideration of extrinsic evidence, which may be
15          considered by a reviewing court, and juror testimony about the
            subjective effect of evidence on the particular juror, which may not.
16          . . . Therefore, although we may consider testimony concerning
            whether the improper evidence was considered, we may not
17          consider the jurors' testimony about the subjective impact of the
            improperly admitted evidence.

18

19  Id. at 1108-09.  See also Jeffries, 5 F.3d at 1190.  However, it is "proper to consider the timing of

20  shifts in jury votes relative to the introduction of extrinsic evidence."  Fields v. Brown, 503 F.3d

21  755, 798 (9th Cir. 2007).

22          Evidence concerning the mental processes by which a juror arrived at his/her

23  verdict is inadmissible to test the validity of that verdict.  See Tanner v. United States, 483 U.S.

24  107, 117, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of

25  jury deliberations from intrusive inquiry.").  This rule is intended to protect the jury's deliberative

26  process by preventing challenges to a verdict based on arguments, statements, discussions, mental

and emotional reactions, votes, or methods used in reaching a verdict.  Fed. R. Evid. 606 Advisory

Committee's Notes; In re U.S. Financial Securities Litigation, 609 F.2d 411, 430 n. 68 (9th Cir.

1979).

### 2.  Extrinsic Evidence of Petitioner's Dangerousness

Above, the court has already determined that it will hear any admissible evidence

regarding the actual effect that security measures had on the jurors at petitioner's trial.  That

evidence would also be relevant to petitioner's jury misconduct claim as well.  Petitioner has

made no showing, however, in support of his bare allegation that media presence at his trial had

any effect on jurors.  Accordingly, the court will not permit an evidentiary hearing on that issue.

With respect to petitioner's allegation that the prosecution's arguments about BGF involvement in

the crimes constituted extrinsic evidence of petitioner's dangerousness, the basis for any such

argument is available in the trial transcript and petitioner has not established the existence of a

factual dispute regarding any aspect of this claim.  Accordingly, no further evidence will be

permitted in support of petitioner's jury misconduct claim based upon the alleged effect of media

presence.

### 3.  Racial Bias

As discussed above in connection with petitioner's claim 15, this court will hear

admissible evidence regarding racial bias jurors may have exhibited towards petitioner.  That

evidence is equally applicable to this claim of jury misconduct.

### 4.  Presence of the Victim's Family

Petitioner argues that the jurors at his trial noted and discussed the emotional

responses exhibited by Officer Patch's widow and daughter while they were seated in the

courtroom.  However, petitioner makes no legal or factual showing to establish a colorable claim

to federal habeas relief in this regard.  He simply argues that "if" he can show a juror had contact

with a member of Officer Patch's family or "if" he can show a juror's sympathy for the family

biased him against petitioner, he should succeed on this claim.  However, petitioner has proffered

no evidence establishing either possibility.  Juror Conklin simply stated in her declaration that

some jurors were "affected" by the displays of emotion.  (Dkt. No. 370-2, Ex. 105 to Mtn. for Evi.

Hrg., ¶ 3.)  Petitioner has presented no colorable basis for this aspect of his claim 30.

### 5.  Contact with Alternate

Petitioner claims one of the alternate jurors had improper contacts during trial with

jurors who did deliberate on the verdict and that the alternate in question was racially biased.

(Dkt. No. 369 at 109:1-5.)  However, petitioner points to no evidence supporting this bare claim.

(Dkt. No. 369 at 110-113.)  Without some reason to believe that petitioner has a factual basis for

this claim, the court cannot find that he has made a colorable claim of inappropriate conduct

involving an alternate juror.

### 6.  Discussion of Improper Information before and during Deliberations

Juror Conklin states that jurors learned of petitioner's prior murder conviction and

discussed it.  (Dkt. No. 370-2, Ex. 105 to Mtn. for Evi. Hrg.,  ¶ 2.)  This is petitioner's only

supported allegation that jurors discussed evidence or information that was not admitted at his

trial.  While juror Conklin does not state when jurors learned of and discussed petitioner's prior

murder conviction, because it is possible it occurred during the guilt phase of the trial and because

it is a serious claim of jury misconduct, the court will take testimony regarding the jurors'

exposure to this extraneous information.  However, petitioner points to no support for his

allegations that jurors also discussed his failure to testify on his own behalf at trial or that they

improperly considered evidence introduced solely against defendant Menefield in reaching their

verdict as to petitioner.  Therefore, the court will not hear evidence in support of those aspects of

petitioner's jury misconduct claim.

### 7.  Juror Intimidation

Petitioner's only support for his claim of jury intimidation are declarations of

jurors describing the atmosphere in the jury room and the aggressive stance taken by some jurors

during deliberations.  (Dkt. No. 370-4, Ex. 107 to Mtn. for Evi. Hrg., at ¶ 5-6.)  As discussed

above, this is the sort of testimony that courts have consistently held to be inadmissible under

Federal Rule of Evidence 606(b).  See Estrada v. Scribner, 512 F.3d 1227, 1237 (9th Cir. 2008)

(evidence that jurors felt pressured to vote for second degree murder was inadmissable under Rule

606(b)); United States v. Briggs, 291 F.3d 958, 963-64 (7th Cir. 2002) (courts will not hear

"intrajury influences on the verdict" when considering a motion for a new trial).  Accordingly,

petitioner's request for an evidentiary hearing on this aspect of his claim 30 is denied.

     F.  Ineffective Assistance of Counsel at the Penalty Phase - Claims 42 & 43

     Finally, petitioner argues that he is entitled to an evidentiary hearing on his claims

that his defense counsel provided constitutionally ineffective representation at the penalty phase of

his trial.  In this regard, petitioner claims that his counsel failed to develop and present available

mitigating evidence regarding his family background, traumatic childhood, exposure to

community violence, poverty, substance abuse, and mental health issues.  Specifically, petitioner

contends that his counsel failed to consult a social historian and present expert testimony to help

the jury understand the impact and significance of petitioner's background in relation to his prior

acts of violence.  Petitioner further argues that his counsel failed to challenge the introduction into

evidence of his acts of prior violence in aggravation and that defense counsel actually presented

and argued prejudicial information to the jury during the penalty phase.  Finally, petitioner argues

that his counsel failed to introduce available evidence to show that victim Charles Gardner had a

propensity for violence and "was a participant in the defendant's homicidal conduct," a mitigating

factor under California law.

     1.  Background

     As noted above, less than a month before petitioner's trial commenced attorney

Urquhart hired a second attorney, George Cotsirilos, to help prepare for the penalty phase of

petitioner's trial.  While attorney Cotsirilos conducted investigation, the final decisions and the

litigation of the penalty phase were left to attorney Urquhart.  In fact, attorney Cotsirilos was not

even in the courtroom during the penalty phase of petitioner's trial.

a.  Penalty Phase Prosecution Case

At the penalty phase, the state introduced evidence of petitioner's commitment offense and of several events that took place while he was in prison.[69]  Petitioner was convicted in 1970 for the first degree murder of Obidee Cowart, a high school security guard.  People v. Roberts, 2 Cal. 4th 271, 296 (1992).  Petitioner was seventeen years old at the time of that crime. Id.  At the penalty phase in this case, the prosecution presented the testimony of a number of witnesses from petitioner's 1970 murder trial.  First, prosecutor Kirk read the testimony of Mr. Cowart's wife, Mary Cowart, from petitioner's 1970 trial.  (RT 9131:28 - 9135:14.)  Burl Lundy, Mr. Cowart's supervisor, testified that he was called to the school after the shooting and he spoke to Mr. Cowart.  (RT 9137:1-2, 9139:12-23.)  According to Mr. Lundy, Mr. Cowart described the "two young boys" who had shot him.  (RT 9139:25-28.)  Homicide detective Keith Ross testified that the morning after the shooting, Mr. Cowart identified petitioner as the shooter.  (RT 9159.)  There was substantial testimony presented during the penalty phase of petitioner's trial about the extent of Mr. Cowart's injuries and his suffering in the twelve days that he survived after the shooting.  (E.g., RT 9110-9116, 9134:6-7, 9139:16 - 9140:25, 9146:27-28, 9154:19 - 9155:1.)

The prosecution next presented at the penalty phase evidence of a number of infractions and assaults petitioner had perpetrated while in prison.  DVI Correctional Officer Clifford Brothers testified that he found petitioner in possession of a sharp instrument in April 1971.  (RT 9163-95.)  The jury heard evidence that petitioner was subsequently convicted of possession of a sharp instrument while a prisoner.  (RT 9215.)  Correctional Sergeant Terry Rosario testified that in June 1975 he observed petitioner and another inmate striking an inmate Lynch with pieces of metal.  (RT 9222.)  Dr. Joseph Jarrett, who was a DVI physician, testified that he treated inmate Lynch in June 1975 for multiple stab wounds to the face, anterior and

---

[69]  Although the prosecutor mentioned petitioner's possession of weapons in 1975 in his opening statement at the penalty phase, he presented no evidence to support this charge because that evidence was suppressed after the opening statement by the trial judge.  (RT 9235:9-24.)

1    posterior thorax and abdomen.  (RT 9216-18.)

2           Correctional Officer Ralph Duran testified that in February 1976, he found a sharp

3    metal object hidden in petitioner's cell. (RT 9236-38.)  Inmate Leslie Rooks testified that in

4    August 1973 he saw inmate James Fuzzell immediately after Fuzzell had been stabbed (RT 9352-

5    56), and saw petitioner walking away from Fuzzell (RT 9354:28 - 9355:1).  Correctional Officer

6    Robert Bodeau, after having his recollection refreshed by disciplinary reports he had prepared on

7    August 30, 1973, read his report into the record and testified that petitioner was the only black

8    inmate in the area who matched the description of one of the assailants in connection with this

9    incident.  (RT 9375-80.)

10          Inmate William Acker testified that on December 3, 1973, petitioner had stabbed

11   him.  (RT 9427:7-24.)  Acker testified he saw that petitioner had two weapons.  The first was a

12   "poker" made from welding rod.  The second was made from a flat piece of metal. (RT 9432:8-15,

13   9433:5-11.)  Acker testified that he may not have not have identified petitioner at the time due to

14   the "pseudo gangster code" among prisoners.  (RT 9433.)

15                        b.  Penalty Phase Defense Case

16          In his opening statement at the penalty phase of the trial, attorney Urquhart first

17   read a lengthy quote from Mark Twain.  (RT 9513:20 - 9516:26.)  In that statement he

18   summarized Twain's story of God's creation of Earth as follows:

19                   Some will be called good men and some will be called bad
                 men and each will act according to their nature.  But they are not to
20               be blamed because they are acting in accordance with the law of
                 nature, the law of God.
21

22   (RT 9517:1-4.)  Urquhart then identified petitioner as a "bad man."  (RT 9517:7.)  But he told the

23   jury he would show that petitioner's "nature is not that of the bad man."  (RT 9517:12-13.)

24   Attorney Urquhart then outlined the evidence he would present of petitioner's difficult childhood,

25   rejection by his father, the pressures of prison and petitioner's recent attempts to turn his life

26   around.  (RT 9518 - 9523.)

i.  <u>Mitigating Evidence</u>

Defense counsel presented testimony regarding petitioner's background at the penalty phase through three of petitioner's family members: his father's stepfather Charlie Scott, his mother's twin sister Elizabeth Grimmett, and his paternal uncle Homer Roberts, in addition to petitioner's own testimony.   That background was described as follows.  Petitioner was the eldest of five children, each of whom had a different father.  (RT 9529:15-19, 9543:1-6.)  His mother was fifteen years old when he was born.  (RT 9534:3-4.)  She never married or lived with petitioner's father. (RT 9534:9-15.)  Aside from a one-week visit when he was ten or eleven years old, petitioner had no relationship with his father.  (RT 9538:28 - 9539:10, 9556:5 - 9557:10, 9711:24 - 9712:24.)  Petitioner's relatives described him as a quiet, timid, respectful, nervous child.  (RT 9530:1-8, 9540:24-25, 9569:2-6.)

As a child, petitioner lived in the Watts area of Los Angeles, in a neighborhood that his step-grandfather described as "liquor stores, pool halls and parking lots, drinking and fights," (RT 9527:14-19) and his uncle described as inhabited by "[t]he have-nots, the losers, the robbers" (RT 9565:6-17).  When petitioner was about twelve years old, his family moved to the Jordan Down Projects.  (RT 9528:25 - 9529:9, 9538:6-10.)  The Jordan Down Projects housed gangs of ex-felons, and the violence there was described as even worse than in Watts.  (RT 9722:24 - 9723:5, 9538:11-12.)

Petitioner's mother suffered from a drinking problem and grew violent when she was intoxicated.  (RT 9536:4-12, 9564:25 - 9565:2, 9715:7 - 9716:25.)  When his mother had no money, petitioner stole food to feed his brothers and sister.  (RT 9543:7-17.)  Petitioner's mother and the man with whom she lived for thirteen years fought violently - stabbing and burning each other - in front of petitioner and his siblings.  (RT 9536:13 - 9537:24.)  Petitioner's uncle testified that petitioner's home was a terrible place: "It would just be turmoil, all kinds of fights, people drinking all the time . . . .  Even though I lived in the ghetto, I really wasn't used to being in that environment.  It was just blood shed [sic] and everything like that." (RT 9563:10-13.)  At

1   different times while growing up petitioner was asked to leave his mother's house and live with

2   his great- grandmother, his grandmother, and his aunt.  (RT 9725:1-9, 9529:22-28, 9540:7-16,

3   9563:24 - 9564:18.)  Petitioner stayed with his mother out of concern for her and love for his

4   brothers and sister.  (Id.)  Petitioner dropped out of school when he was sixteen because he was

5   not interested in school and so that he could get a job to help his mother, but he could not find

6   work.  (RT 9737:7-21.)  He began to use marijuana and later barbiturates.  (RT 9740:23 -

7   9743:11.)  Petitioner gambled to help out his family, and he also began dealing drugs.  (RT

8   9740:10-22, 9742:10-9743:11.)

9                                ii.  Original Commitment Offense

10                Petitioner testified that he was in debt to his drug supplier shortly before he shot

11   Mr. Cowart.  (RT 9745:2-4.)  He testified that he committed a burglary at that time to attempt to

12   get money to pay back his supplier, who "had a contract out on me again."  (RT 9746:1-11.)  That

13   burglary was not successful.  (RT 9746:12-20.)  On March 22, 1970, his seventeenth birthday, he

14   planned to attempt another burglary.  (RT 9747:1-5.)  He had been taking "red devil" barbiturates

15   and drinking throughout the day.  (RT 9747:6-27.)   He and a friend planned to rob construction

16   equipment from Jordan High School.  (RT 9748:1-11.)  They did not know a security guard would

17   be at the school.  (RT 9751:4-5.)  Petitioner testified that when he saw Mr. Cowart, the security

18   guard, draw his gun, he instinctively fired at him.  (RT 9752:9 - 9753:12.)

19                Petitioner went to his aunt's house that night.  (RT 9544:11-14.)  He appeared

20   nervous and high on drugs.  (RT 9544:15-22.)  Eventually, he told his aunt what had happened.

21   (RT 9544:23-27.)  The next day, after officers had searched petitioner's house and found a

22   shotgun, his aunt, mother, and grandmother took him to a police station.  (RT 9546:21 - 9547:8,

23   9550:20-27.)

24                Petitioner testified at the penalty phase that, based upon the advice of his then-

25   attorney, he agreed to be tried as an adult for the murder of Mr. Cowart and waived a jury trial.

26   (RT 9761:16-24.)  Petitioner told his attorney that the security guard had drawn his revolver

1   before he, petitioner, fired.  (RT 9754:19-26.)  However, according to petitioner, his attorney did

2   not mention that fact at his murder trial.  (Id. )

3                               iii.  Rebuttal to Other Aggravating Evidence

4                Petitioner testified at the penalty phase that he did not stab inmate James Fuzzell.

5   (RT 9789:22-23.)  He stated he was playing chess and that he and about six other inmates who

6   had been in the vicinity were locked up after Fuzzell was stabbed. (RT 9790:1-4.)  Petitioner

7   testified he also did not stab inmate William Acker.  (RT 9790:19-22.)  Petitioner admitted

8   stabbing inmate Lynch.  (RT 9797:13-15.)  Petitioner testified that he had been stabbed; that he

9   understood that inmate Lynch, who was also a BGF member, had ordered the attack; and that he

10  sought revenge.  (RT 9792:13 - 9797:15.)  Petitioner testified "I wanted to kill Lynch at that

11  point."  (RT 9797:13.)  However, petitioner testified at his penalty phase that during his assault on

12  Lynch, Lynch stopped trying to defend himself and "appeared helpless."  (RT 9797:18-26.)

13  According to petitioner, that caused him to stop the attack.  (RT 9797:24 - 9798:2.)  Petitioner

14  testified that if he had not sought revenge on Lynch, he would have been considered weak - "I had

15  to avenge myself or seek protective custody at that point."  (RT 9798:9-19.)  Petitioner admitted

16  pleading guilty to possession of a weapon in connection with that incident.  (RT 9798:20-22.)

17               Petitioner also admitted possessing a sharp instrument in 1971 while imprisoned.

18  He testified that he carried the knife for self protection because sexual taunts and threats had been

19  made against him. (RT 9819:11 - 9820:18.)[70]  Petitioner testified that the piece of unsharpened

20  metal that was found in the toilet in his cell in 1976 had just been passed into his cell for relay to

21  another inmate ten minutes before its discovery by prison officials.  (RT 9799:17 - 9800:4.)

22                               iv.  Life in Prison

23               At the penalty phase the defense presented the following additional evidence

24

25       [70]  The correctional officer who had discovered the knife described the sexual pressure at
     DVI and acknowledged the existence of inmate weapons and violence around that time. (RT
26   9168:3 - 9169:6.)

regarding petitioner's life in prison.  After entering the prison system in 1971, petitioner was placed at DVI, which was known at the time as "San Quentin Junior College" and the "Gladiator School."  (RT 9606:3-4, 9769:4.)  Louis Nelson, a former warden of San Quentin who had worked at DVI, testified that there is tremendous pressure on young inmates - particularly those who were small in stature and not physically mature - for sex.  (RT 9598:7-26.)  They were considered "fair game" for homosexual purposes and eventually would be forced into homosexual relations.  (RT 9598:21 - 9599:9.)  Warden Nelson explained that the choices for a small, young inmate were few: he can carry weapon to defend himself or scare potential attackers (RT 9599:12-25); he can seek protection from an older inmate which usually results in a homosexual relationship (id.); or he can turn to the prison staff for protection, which only doubles his problems because by doing so he is labeled by other prisoners as an informer (RT 9600:5-14).

Petitioner testified as follows.  When he arrived at DVI, he was seventeen years old, 5' 7" tall, weighed 120 pounds, had no facial hair, and looked very young.  (RT 9770:17-18.)  Before entering the mainline, petitioner was exposed to sexually suggestive comments.  (RT 9767:22 - 9768:4.)  On his first night on the mainline, about fifty inmates passed by his cell to check him out.  (RT 9770:6-15.)  Petitioner was told to do something "crazy" like stabbing someone to "keep people off you."  (RT 9768:21 - 9769:7.)

Mr. Nelson testified that there was also rampant racial tension and, consequently, a proliferation of gangs within DVI at the time petitioner entered prison.  (RT 9606:5 - 9607:8, 9626:4-25.)  According to Walter Ware, a teacher at DVI, it was difficult for young inmates who lacked family support and visits to resist joining gangs. (RT 9626:20-25.)  Moreover, possession of weapons, which were abundant within the prison, was common for self-protection.  (E.g., RT 9602:28 - 9603:12.)

A number of witnesses testified on behalf of the defense at the penalty phase regarding petitioner's personal growth while he was in prison.  Mr. Ware testified that petitioner was "a good student, always quiet, did his work on time, he came to class on time" and he "was

1    always clean-cut, neat." (RT 9625:16-18, 23.)   Bernard Chechourka, who worked as a

2    correctional counselor at San Quentin, testified that he had supervised petitioner and in 1979

3    prepared a report on petitioner for a parole hearing. (RT 9629:6-11, 15-28.)  He found petitioner's

4    behavior had improved and that he was doing "well." (RT 9631:6 - 9632:8.)  However, on cross-

5    examination, Mr. Chechourka testified that petitioner was in a segregated "management control

6    unit" while at San Quentin and was highly supervised. (RT 9632:12 - 9634:15, 9637:2-23.)

7    Louis Nuernberger, a prison psychiatrist at San Quentin, testified that he evaluated petitioner

8    twice. (RT 9639:13-20, 9640:2-8.)  He found no indication of mental disorders or personality

9    disorders. (RT 9641:7-14.)  He concluded in 1978 that petitioner had "[p]sychiatrically" "shown

10   the capacity for personal growth under extreme prison conditions." (RT 9642:25-27.)  He

11   concluded that petitioner was "psychiatrically ready for parole at this time." (RT 9642:28 -

12   9643:1.)  Several other prison employees testified that petitioner was cooperative and respectful,

13   and that he had obtained his GED during the period of time he was in administrative segregation

14   before trial. (RT 9669 - 9696.)

15          Janice Roberts testified that she met petitioner in March 1981 when she started

16   corresponding with him. (RT 9704:9-19.)  In September 1981, she visited petitioner in prison.

17   (RT 9704:28 - 9705:5.)  She described petitioner as "gentle and sweet, somewhat shy." (RT

18   9705:8-9. They were married in November 1981. (RT 9706:2-3.)

19          In his closing argument at the penalty phase of the trial, attorney Urquhart started

20   by recounting the history of the death penalty. (RT 10,156 - 10,158.)  He next asked the jury to

21   consider that petitioner had killed only Charles Gardner and had no intention of killing Officer

22   Patch. (RT 10,159 - 10,160.)  Urquhart then discussed the aggravating factors.  Regarding the

23   1970 murder of which petitioner had been convicted, attorney Urquhart focused on petitioner's

24   youth and his testimony that he did not plan to kill Obidee Cowart. (RT 10,160 - 10,162.)  With

25   respect to the other evidence introduced in aggravation, attorney Urquhart discussed petitioner's

26   explanations for each of the incidents in question. (RT 10,163 - 10,165.)  Finally, attorney

1   Urquhart addressed petitioner's troubled background, the prosecution's attempts to minimize the

2   severity of those conditions and noted petitioner's good qualities.  (RT 10,162 - 10,163; 10,166 -

3   10,168.)  He concluded by asking the jury to consider whether they were "truly satisfied beyond

4   all doubt that Larry Roberts is guilty?"  (RT 10,168:22-23.)   In his rebuttal argument, attorney

5   Urquhart focused on the jury's obligation to weigh the evidence in aggravation and mitigation,

6   and discussed briefly petitioner's need to protect himself in prison, and the fact petitioner was

7   never convicted of the attacks on Fuzzell and Acker.  (RT 10,194 - 10,197.)

8   　　　　2. Legal Standards

9   　　　　　　As described above, to establish a colorable claim of ineffective assistance of

10  counsel, petitioner must make a showing that counsel's conduct failed to meet an objective

11  standard of reasonableness and that it prejudiced him.  Strickland, 466 U.S. at 687, 691-94;

12  Wiggins, 539 U.S. at 521.  Prejudice is found where "there is a reasonable probability that, but for

13  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

14  694.  A reasonable probability is "a probability sufficient to undermine confidence in the

15  outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa, 224 F.3d at 981.  When considering

16  numerous allegations of ineffective assistance of counsel, the effect of all errors should be

17  considered cumulatively when determining whether the petitioner is prejudiced.  Harris v. Wood,

18  64 F.3d 1432, 1438 (9th Cir. 1995) (considering combined prejudicial effect of trial counsel's

19  errors); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir 1978) (en banc) ("If counsel is charged

20  with multiple errors at trial, absence of prejudice is not established by demonstrating that no

21  single error considered alone significantly impaired the defense prejudice may result from the

22  cumulative impact of multiple deficiencies."); see also Phillips v. Woodford, 267 F.3d 966, 985

23  (9th Cir. 2001) ("We consider the cumulative effect of multiple trial errors in determining whether

24  relief is warranted.")

25  /////

26  /////

1        3.  <u>Failure to Investigate and Present Mitigating Evidence</u>

2            a.  <u>Proffered Evidence</u>

3            In his declaration before this court, attorney Urquhart explains that attorney

4    Cotsirilos took charge of the penalty phase investigation in petitioner's case.  (Ex. 101, submitted

5    for filing under seal, ¶ 24.)  According to Urquhart, Cotsirilos provided him with information but

6    Urquhart had little time to review it because he was already involved in voir dire and the guilt

7    phase of petitioner's trial.  (Id.)  In his declaration attorney Cotsirilos states that attorney Urquhart

8    was the "sole decision-maker" with respect to penalty phase evidence, but nonetheless provided

9    Cotsirilos with "little direction" regarding penalty phase investigation.  (Ex. 102, submitted for

10   filing under seal, ¶ 7.)  Cotsirilos states that there was no coordination of the guilt and penalty

11   phase cases for the defense and that he did not possess the information he should have had relative

12   to the guilt phase of petitioner's trial so as to be able to conduct an informed investigation of the

13   potential penalty phase issues.  (Id. ¶¶ 8, 10.)  Attorney Harold Rosenthal and several investigators

14   along with attorney Cotsirilos compiled all of their penalty phase interviews in writing and then

15   provided them to attorney Urquhart.  (Id. ¶ 14, 15.)  However, Urquhart never even discussed

16   those interview reports with Cotsirilos.  (Id.)  In fact, Cotsirilos played no role in the penalty phase

17   of petitioner's case after delivering the reports to attorney Urquhart.  (Id. ¶ 18.)

18                    i.  <u>Evidence re Failure to Present Expert Testimony</u>

19          Attorney Cotsirilos suggested retaining psychologist Dr. Stephen Raffle.  (Ex. 102,

20   submitted for filing under seal, ¶ 16.)  Dr. Raffle interviewed petitioner several times and prepared

21   a report for the defense.  (Ex. 309, submitted for filing under seal.)  Dr. Craig Haney, petitioner's

22   post-conviction social history expert, opined that Dr. Raffle's report "was well along the way of

23   assembling a very good" synthesizing overview of petitioner's life.  (Dkt. No. 371-2, Ex. 109-B to

24   /////

25   /////

26   /////

Mtn. for Evi. Hrg., ¶ 275.)  Dr. Haney described Dr. Raffle's report as follows:[71]

> Dr. Raffle's report– contained in a 13-page letter– provided a detailed and coherent outline of many of the themes that could have and should have been further developed and ultimately presented in Larry's penalty trial.  Dr. Raffle had spent approximately 12 hours interviewing Larry and he also had spent time interviewing Homer Roberts and Elizabeth Grimmett (the summaries of which interviews he appended to his letter).  The December 27, 1982 report was clearly not a complete analysis of the existing mitigation in the case.  But it was an excellent start upon which Dr. Raffle (or another expert, if there was some reason that Dr. Raffle could not continue) could have built.  Further it provided trial counsel with a clear roadmap for the development of a penalty trial, including the kind of expert testimony (appropriately buttressed by additional work) that would have made an enormous difference in Larry's penalty phase.

> Thus, Dr. Raffle's report described many aspects of Larry's traumatic childhood, noting that his "family life was chaotic to say the least" and that he "had to fend for himself as a very young child."  Raffle identified Larry's sense of helplessness as a child, including the fact that his mother "was often drunk and usually argumentative" and the [sic] she had alcoholic men in the home with whom she fought, and that Larry told him "there was absolutely nothing we could do about it."  He insightfully connected some of these earlier experiences in Larry's life with the difficulties he encountered in prison, noting the "association" between Larry's helplessness in prison and the helplessness he experienced in childhood.

> Dr. Raffle also addressed some of the effects of Larry's many years in prison.  He seemed to understand that at least some of Larry's "problems in the penitentiary" were ones "related to him being ignorant of penitentiary protocol and his fear" and concern that "he was going to be 'turned out' meaning sexually molested by the inmates . . . It was then that he obtained his first knife."  Raffle also seemed to appreciate the nature of the violent prison world Larry confronted and the steps he had to take in order to survive in it noting, for example, that Larry felt compelled to appear "that he was an aggressive person . . . so others would keep their distance."  He also understood that Larry had gone through "an indoctrination" in the BGF, one in which he was taught to see "prison life as a continual armed confrontation" that, along with his severe conditions of confinement, the process had degraded Larry's ability to make independent decisions.

/////

---

[71]  While Dr. Raffle's report is filed under seal.  The following excerpt from Dr. Haney's report appears in the public record.

He also seemed to understand the special significance of Larry's time in punitive segregation, noting on the second page of his report that: "Importantly he was in solitary confinement from 1973 to 1980," and that, at times, Larry "could have nothing except his underwear, pants and other clothes" in his cell. Dr. Raffle provided a vivid description of what life in solitary was like, including:

> [Larry] notes that his early years in prison were particularly violent . . . He characterizes [the people with whom he was housed] as vicious, and that there is no value placed on life. There are violent racial interactions and, in general, the men are cooped up like animals. There is only screaming and yelling between cells. No one ever felt safe in solitary.

Moreover, in the final analysis, Dr. Raffle's conclusions about Larry were extremely mitigating. He viewed Larry as "intrinsically damaged," but certainly not by virtue of his "nature"; instead, he believed that the damage was caused by Larry's risk-factor filled life. As he put it: "[H]aving a father who disavowed parenthood, and a mother who was an abusive, erratic, unpredictable, and unreliable, violent alcoholic. The home life was particularly unstable . . ." Raffle understood the nature of Larry's institutional adjustment in the otherwise threatening and dangerous world of prison, describing him as an "alienated, besieged, isolated man who is ambivalent about both his circumstance and his need to defend himself, from the age of 18 on, and these are very formative years, [where] he has been in state prison." He further characterized Larry's belief that he was living in a "life and death" set of circumstances in prison as a "realistic perception," and concluded that his "unsocial or antisocial ways" developed "in part because of what has been inflicted on him."

In his concluding paragraph, Dr. Raffle provided precisely the kind of mitigating insight and overview that was entirely lacking from the penalty phase evidence and argument that trial counsel eventually presented. Raffle opined that "Roberts was not acting out of 'free will' inasmuch as free will implies an intact person. Rather he was acting out of a very restricted set of options presented to him both by his childhood, his prison experiences, and immediate circumstances . . ." Yet, for reasons that are impossible to me to fathom, Dr. Raffle was never called as a witness. Moreover, virtually none of his insights or analysis made their way into the penalty phase case trial counsel ended up presenting.

(Id. ¶¶ 276-281 (footnotes omitted).)

Attorney Urquhart indicated he did not consider hiring an expert to assist in

developing petitioner's social history. (Ex. 101, submitted for filing under seal, ¶ 25.) Urquhart

did not even recall reviewing Dr. Raffle's report or why he did not call Dr. Raffle to testify at the penalty phase of petitioner's trial.  (Id. ¶ 26.)

ii.  Evidence re the Failure to Present Other Mitigating Evidence

Petitioner proffers the declarations of his trial attorneys to show that their failure to present substantial additional evidence of petitioner's background of abuse and poverty, family history, and substance abuse was not the result of strategic decision-making.  In addition, he proffers evidence that he claims would have established that victim Charles Gardner was violent and had been acting bizarrely in the months prior to his death.  (Dkt. No. 204, Exs. 19 and 20[72] to First. Am. Pet.; Ex. 361, filed under seal per March 28, 2012 order.)

b.  Analysis

The United States Supreme Court has "acknowledged the essential importance of developing the background and character of a defendant in order to make an individualized assessment of the appropriateness of the death penalty."  Ainsworth v. Woodford, 268 F.3d 868, 877 (9th Cir. 2001) (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989)).  At the time of petitioner's trial, a defense attorney's "obligation" to investigate and present at the penalty phase evidence of the background and character of the defendant was "an integral thread in the fabric of constitutionally effective representation."  Id.  See also Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998).  Defense counsel also have a duty to investigate a defendant's mental state "if there is evidence to suggest that the defendant is impaired."  Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003).  Thus, as the Ninth Circuit has explained:

> Because "[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy," Hendricks v. Calderon, 70 F.3d 1032, 1044 (9th Cir.1995) (citing Deutscher v. Whitley, 884 F.2d 1152, 1161 (9th Cir.1989)) (internal quotation marks omitted), "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase," Caro v. Calderon,

---

[72]  These documents were also Exhibits 31 and 32 to the state petition, lodged here in Ex. 28 to the Answer.

165 F.3d 1223, 1227 (9th Cir.1999).  To that end, trial counsel must inquire into a defendant's "social background, . . . family abuse, mental impairment, physical health history, and substance abuse history," *Correll,* 539 F.3d at 943; obtain and examine "mental and physical health records, school records, and criminal records," *id.; see Summerlin,* 427 F.3d at 630; consult with appropriate medical experts, *Mayfield v. Woodford,* 270 F.3d 915, 927–28 (9th Cir.2001) (en banc); and pursue relevant leads, *Lambright v. Schriro,* 490 F.3d 1103, 1117 (9th Cir.2007) (per curiam). Although "we must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight,' " *Mayfield,* 270 F.3d at 927 (quoting *Strickland,* 466 U.S. at 689, 104 S. Ct. 2052), we need not defer to counsel's choices at trial unless "those choices [were] made after counsel . . . conducted reasonable investigations or[made] a reasonable decision that makes particular investigations unnecessary," *Summerlin,* 427 F.3d at 630 (third alteration in original) (internal quotation marks omitted).

Counsel also has an obligation to present and explain to the jury all available mitigating evidence.  *Correll,* 539 F.3d at 946. Evidence about the defendant's background and character is relevant to the jury's determination "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California,* 494 U.S. 370, 382, 110 S. Ct. 1190, 108 L.Ed.2d 316 (1990) (emphasis and internal quotation marks omitted).  In a capital case, such evidence can be the difference between a life sentence and a sentence of death.  *See Mak v. Blodgett,* 970 F.2d 614, 619 (9th Cir.1992) (per curiam) ("[T]he issue for the jury is whether the defendant will live or die. . . . To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase."  (second alteration in original)).

Hamilton v. Ayers, 583 F.3d 1100, 1113-14 (9th Cir. 2009).  See also Silva v. Woodford, 279

F.3d 825, 842 (9th Cir. 2002).

In cases where it is alleged that counsel's actions reflect a tactical judgment to take,

or not to take, a certain course of action, the Supreme Court has likewise explained:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words,

124

1

2

3

4

> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary.  In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to counsel's
> judgments.

5 Wiggins v. Smith, 539 U.S. 510, 521-22 (2003) (quoting Strickland, 466 U.S. at 690-91).  Thus,

6 "judicial deference to counsel is predicated on counsel's performance of sufficient investigation

7 and preparation to make reasonably informed, reasonably sound judgments."  Mayfield v.

8 Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (citing Strickland, 466 U.S. at 691).  Labeling a

9 decision "trial strategy" does not "automatically immunize an attorney's performance" from Sixth

10 Amendment challenge.  United States v. Span, 75 F.3d 1383, 1389 (9th Cir. 1996) (internal

11 quotations omitted).  "Rather certain defense strategies may be so ill-chosen that they may render

12 counsel's overall representation constitutionally defective."  Brodit v. Cambra, 350 F.3d 985,

13 1003 (9th Cir. 2003).  An unreasonable strategy may amount to ineffective assistance if "'some

14 other action would have better protected a defendant and was reasonably foreseeable as such

15 before trial.'"  United States v. Tucker, 716 F.2d 576, 586 (9th Cir. 1983) (quoting Beasley v.

16 United States, 491 F.2d 687, 696 (6th Cir. 1974)).

17        Finally, there is support in the case law for petitioner's argument that his counsel

18 should have put on expert testimony in support of his mitigation case at the penalty phase of his

19 trial.  Thus, in Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003), the court found

20 defense counsel ineffective for failing to consult a doctor who had examined the petitioner in a

21 proceeding with respect to a prior offense.  The court found this failure prejudiced the petitioner

22 because it would have explained the petitioner's mental illness to the jury.  Douglas, 316 F.3d at

23 1090; see also Caro v. Calderon, 165 F.3d 1223, 1227-28 (9th Cir. 1999) (counsel found to be

24 ineffective because an expert was necessary to explain to the jury that petitioner's chemically-

25 induced neurological damage caused his aggressive behavior).

26 /////

1    In addition to his counsel's alleged failure to humanize petitioner for the jury,

2    petitioner claims that his counsel also failed to develop and present evidence that Gardner was a

3    participant in the events that led to his death, a mitigating factor under California Penal Code §

4    190.3(e) & (k).  In support of this aspect of his claim petitioner presents a long list of Gardner's

5    violent activities.  (Dkt. No. 248 at 377-79.)  This constitutes a sufficient showing in support of a

6    colorable claim that a reasonable defense attorney would have attempted to present evidence of

7    some of these activities on the part of the victim under California Penal Code § 190.3(e) at the

8    penalty phase of petitioner's trial.

9    Accordingly, for purposes of the pending motion the court finds that petitioner has

10   made a colorable showing that his trial counsel unreasonably failed to investigate and present

11   mitigating evidence at the penalty phase of his trial.

12   4.  Failure to Challenge Aggravating Evidence

13   a.  Proffered Evidence

14   Petitioner proffers Dr. Craig Haney's declaration to show that his trial counsel

15   could have, and should have, investigated and presented evidence of petitioner's prison

16   adjustment as a "vulnerable teenager" as well as of his relationship with the BGF.  (Dkt. Nos.

17   371-1 and 371-2, Exs. 109-A and 109-B, ¶¶ 88-161, 209-247.)

18   Petitioner also proffers evidence to "counter the aggravating force" of his prior

19   murder conviction.  (Dkt. No. 369 at 133:1-2.)  Petitioner presents evidence of his drug use at the

20   time of the prior murder.  (Dkt. No. 385-2, Ex. 342, ¶ 9; Ex. 307, submitted for filing under seal,

21   at p. 1388 (prison psychiatric report).)  He also presents declarations from several of his family

22   members describing briefly the alleged inadequacies of petitioner's counsel in his 1970 murder

23   case, including counsel's convincing of petitioner to agree to be tried as an adult in that matter and

24   to waive jury trial.  (Dkt. No. 381-2, Ex. 323; Dkt. No. 385-2, Ex. 342.)

25   Petitioner also proffers evidence that could have been used to challenge the

26   prosecution's evidence of his involvement in the 1973 prison stabbing of inmate Fuzzell.  The

126

1    primary prosecution witness regarding that stabbing was Ryder Rooks.  As discussed above with

2    regard to his guilt phase testimony, Rooks' credibility at trial has been called into significant

3    doubt.  Petitioner also proffers evidence showing that inmate William Acker, who provided the

4    prosecution's sole evidence that petitioner stabbed him, suffered memory problems, was suicidal

5    around the time of the assaults, and had a history of providing testimony for the prosecution.

6    (Dkt. No. 376-4, Ex. 235; Dkt. No. 376-5, Ex. 236; Dkt. No. 377-1, Ex. 237; Ex. 234, submitted

7    for filing under seal.)

8                       b.  Analysis

9            Penalty phase defense counsel has an obligation to conduct a reasonable

10    investigation to challenge any aggravating evidence.  Cf. Boyde v. Brown, 404 F.3d 1159, 1179

11    (9th Cir.) (counsel unreasonable for failing to object to inappropriate aggravating evidence), as

12    amended, 421 F.3d 1154 (9th Cir. 2005); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996)

13    (same).

14            Petitioner argues that his counsel failed to adequately challenge his original

15    commitment offense, the 1970 murder conviction.  He argues that the 1970 shooting was

16    unintended, that he acted with diminished capacity due to the effects of drugs, and was motivated

17    to commit the underlying burglary by fear for his life if he could not repay his drug supplier.

18    Petitioner also argues his conviction as an adult as opposed to as a juvenile (he was seventeen at

19    the time of that crime) was the result of ineffective assistance of counsel.  He says counsel at his

20    penalty phase trial in this case should have presented evidence that petitioner felt remorse for his

21    1970 killing of the security guard.  Finally, petitioner argues that his counsel performed

22    deficiently by failing to exclude live testimony regarding the 1970 homicide from the penalty

23    phase of his trial.[73]

24    /////

25    _____

26         [73] It does not appear petitioner intends to present evidence on this issue and that it is
     included here for purposes of arguing prejudice.

1    Petitioner makes a sufficient showing that attorney Urquhart should have known

2    petitioner  was taking drugs at the time of the 1970 killing and should have argued that, given

3    petitioner's non-violent background, that drugs may have contributed to his murder of the security

4    guards.  However, petitioner provides insufficient evidence that attorney Urquhart should have

5    been aware of and argued that petitioner's attorney in his 1970 case "sold petitioner out,"

6    provided "substandard legal representation," or that petitioner was "railroaded by an unscrupulous

7    lawyer." (Dkt. No. 369 at 133:14 & n. 193.)  Petitioner's proffer in this regard consists only of a

8    few observations by his own family members.[74]  Accordingly, petitioner will not be permitted to

9    present evidence in support of this argument at the evidentiary hearing in these federal habeas

10   proceedings.

11   With respect to the evidence of assaults upon other inmates, petitioner appears to

12   seek to present evidence only with respect to his allegations that his counsel failed to impeach the

13   testimony of inmate William Acker, who testified he had been stabbed by petitioner in prison,

14   and of inmate witnesses to the stabbing of inmate James Fuzzell.[75]  While petitioner has provided

15   sufficient evidence of available information to impeach the testimony of Rooks with respect to the

16   stabbing of Fuzzell, he has failed to show prejudice with respect to counsel's failure to impeach

17   witness Acker.  As discussed above in the section on claim 1, the jury did not find the alleged

18   stabbing of Acker to be true.  Because the jury did not, then, consider Acker's testimony in

19   coming to a penalty phase verdict, petitioner has not shown a reasonable probability that but for

20

21        [74]  Petitioner's aunt Ethel Woodward suggests that petitioner's attorney in the 1970 case,
     Earl Broady, wanted petitioner tried as an adult so he could charge petitioner's family more
22   money in connection with his representation.  (Dkt. No. 381-2, Ex. 323, ¶¶ 26-27.)  She also
     claims that attorney Broady admitted to her that he "sold Larry out."  (Id. ¶ 28.)  Petitioner's aunt
23   Shirley Hamilton stated only that Broady told family members that petitioner had a better chance
     of success in adult court.  (Dkt. No. 385-2, Ex. 342, ¶ 10.)  Petitioner does not explain how these
24   statements help demonstrate that he received ineffective assistance of counsel in connection with
     his 1970 murder conviction.

25

26        [75]  The court amends this paragraph to include the rulings made on November 14, 2012.
     (Dkt. No. 460.)  See n. 1, supra.

1  counsel's failure to impeach Acker with this new information, the result of the penalty phase

2  would have been different.  The evidentiary hearing in this habeas action will therefore encompass

3  petitioner's allegations that his counsel unreasonably failed to impeach witness Rooks at the

4  penalty phase of his trial; but it will not include petitioner's similar allegations regarding witness

5  Acker.

6  　　　　5. Prejudice

7  　　　　　　a. Proffered Evidence

8  　　　　　　To establish prejudice with respect to his claim that counsel was ineffective in

9  failing to challenge aggravating evidence at the guilt phase, petitioner relies primarily on the

10  declaration of Dr. Craig Haney and proffers a number of declarations and substantial documentary

11  evidence upon which Dr. Haney relied.  (Dkt. No. 371-2, Ex. 109-B to Mtn. for Evi. Hrg.)  Dr.

12  Haney explains in great detail the background of petitioner and his parents.  He sets out the racist

13  violence, chronic poverty, and mental illness that marked the histories of both petitioner and his

14  parents.  Dr. Haney  focuses on petitioner's own formative years involving "paternal

15  abandonment; family transience and instability; maternal alcoholism and extreme child neglect;

16  chronic, traumatic exposure to domestic violence; and community-level institutional failure."

17  (Dkt. No. 369 at 127:2-5.)  Petitioner also proffers the declarations of a number of his own family

18  members who did not testify at the penalty phase.  Those declarations provide a great deal more

19  background with respect to petitioner's life than was presented at the penalty phase of his trial.

20  (Dkt. No. 379-2, Ex. 317 (father);  Dkt. No. 381-2, Ex. 323 (maternal grandmother); Dkt. No.

21  384-1, Ex. 336 (paternal aunt); Dkt. No. 384-4, Ex. 339 (paternal uncle); Dkt. No. 385-3, Ex. 343

22  (paternal aunt); Dkt. No. 387-4, Ex. 349 (sister); Dkt. No. 385-5, Ex. 349 (sister); Dkt. No. 388-2,

23  Ex. 352 (brother).)  Further, petitioner shows that his aunt, Elizabeth Grimmett, who did testify at

24  trial, could have provided much more evidence in this area than his counsel adduced at trial.  (Dkt.

25  No. 383-1, Ex. 332 .)

26  /////

1    Petitioner relies upon Dr. Haney's declaration to describe his institutional history

2    and to provide some context for the jury to understand his conduct in prison.  (Dkt. Nos. 371-1

3    and 371-2, Exs. 109-A and 109-B,  ¶¶ 91-161, 209-247.)  Dr. Haney also describes petitioner's

4    attempts to distance himself from the BGF.  (Id.  ¶¶ 123-154, 289.)

5    Finally, petitioner proffers evidence to support his claim that attorney Urquhart

6    rendered ineffective assistance in his opening statement and closing argument at the penalty phase

7    of the trial.  Petitioner proffers the opinions of both juror Galloway and Dr. Haney about the

8    prejudicial effect of those ill-chosen arguments.  (Dkt. No. 370-3, Ex. 106; Dkt. No. 371-2, Ex.

9    109-B, ¶¶ 260, 309-313.)

10    b. Analysis

11    In arguing that he was prejudiced by his counsel's ineffective performance

12    petitioner points to an obviously important consideration – the California Supreme Court reversed

13    petitioner's murder conviction for the death of Officer Patch.  People v. Roberts, 2 Cal. 4th 271,

14    321-22 (1992).  Moreover, in considering the effect of removing the Patch murder conviction

15    from the jury's penalty phase consideration and assessing whether petitioner was entitled to a new

16    penalty phase trial as a result, the California Supreme Court conceded that the issue was a "close"

17    one.  Id. at 327.

18    In addition, petitioner has proffered substantial evidence that, had it been

19    introduced and admitted at the penalty phase of his trial, may have made a difference in the jury's

20    decision-making.  Further, he makes numerous other arguments of penalty phase error which,

21    when considered along with his claims of ineffective assistance of counsel, demonstrate a

22    reasonable probability of success in satisfying the prejudice component of the Strickland standard

23    with respect to this claim.

24    6. Conclusion re Claims 42 and 43

25    It is clear that ineffective assistance is provided when counsel fails to conduct

26    reasonable investigations, or fails to reasonably determine that investigations are unnecessary, and

unreasonably fails to present material evidence.  See Hamilton, 583 F.3d at 1113-14; Boyde v.

Brown, 404 F.3d 1159 (9th Cir.), as amended, 421 F.3d 1154 (9th Cir. 2005); Stankewitz v.

Woodford, 365 F.3d 706, 717-19, 725 (9th Cir. 2004); Turner v. Calderon, 281 F.3d 851, 890-95

(9th Cir. 2002); Silva, 279 F.3d at 842; Wallace v. Stewart, 184 F.3d 1112, 1115 (9th Cir. 1999);

Caro, 165 F.3d at 1226; Siripongs v. Calderon, 35 F.3d 1308, 1312-1316 (9th Cir. 1994);

Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992).  Petitioner has established a colorable

claim of ineffective assistance of counsel at the penalty phase of his trial and is entitled to an

evidentiary hearing on his claims 42 and 43 as described above.

            The court also notes that respondent has mounted little opposition to the motion for

evidentiary hearing on this claim.  Petitioner's briefing totals 32 pages of detailed argument and a

substantial proffer of evidence.  Respondent simply states in a two-page response that petitioner

should not be permitted to "sandbag" the state court by waiting until he seeks habeas relief in

federal court to present most of his evidence.  As this court makes clear above, the provision of

adequate investigative funding at the federal level should not, and legally does not, prevent this

court from hearing petitioner's evidence in support of his ineffective assistance of counsel claims.

This is a pre-AEDPA case in which de novo review of the state court ruling is called for.

Respondent's limited opposition is therefore unpersuasive.

V.  Motion to Expand the Record

            Petitioner seeks to expand the record before this court to include two categories of

documents: (1) exhibits from the reference hearing, and (2) the exhibits he submitted in support of

his motion for an evidentiary hearing.  As described above, prior to passage of the AEDPA, the

standard for expanding the record before the federal habeas court was simply whether the

information was relevant to a determination on the petitioner's claims.  See Rule 7, Rules

Governing § 2254 Cases.  Respondent's primary objections to expansion of the record here rely

on post-AEDPA case law and on the decision in Keeney v. Tamayo-Reyes, discussed above.  As

addressed in detail above, that decision is inapposite because it involved only one aspect of the

1  mandatory evidentiary hearing standards.   (See Dkt. No. 412 at 81:11-27.)  Respondent also

2  objects to expanding the record with declarations that are "inadmissible, in whole or in part, under

3  the rules of evidence." (Dkt. No. 412 at 82:1-3.)  However, respondent does not identify which

4  exhibits fall within this category.[76]  Further, the only case respondent cites in support of its

5  objection involved an appellate court's comment that a district court had not erred in denying an

6  evidentiary hearing where petitioner's only evidence was an affidavit that was inadmissible

7  hearsay.  See Beathard v. Johnson, 177 F.3d 340, 348-49 (5th Cir. 1999).  The decision in

8  Beathard does not bar this court from expanding the record with relevant evidence.

9       Inclusion of these exhibits in the record does not mean respondent may not object

10  to their content in briefing or counter them through the submission of other exhibits, nor does it

11  mean the court will consider everything contained in those exhibits as true.  Because this

12  proceeding will be decided by a judge, not a jury, there is little risk that inadmissable evidence

13  will be considered in rendering a decision.  Accordingly, petitioner's motion to expand the record

14  will be granted.

15                                          CONCLUSION

16       For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED

17  as follows:

18       1.  Petitioner's December 15, 2010 Motion for an Evidentiary Hearing (Doc. No.

19  369) is granted in part.  The court will hear evidence on the following claims or portions of

20  claims:

21  /////

22  /////

23  /////

24

25       [76]  Respondent simply makes three broad arguments in opposition to expanding the record
    and lists a number of exhibits that should not be included in any expansion of the record granted
26  by the court.  (Dkt. No. 412 at 82:7-9.)

a.  Claim 1 in all respects except regarding the allegations that (1) prosecutors suppressed evidence related to Alexander Vichi and William Acker,[77] and (2) prosecutors committed misconduct by delaying the investigation of petitioner's alibi and in charging him.

b.  The allegation in claim 15 that counsel was ineffective by failing to question prospective jurors during voir dire regarding racial bias.

c.  The allegations in claim 7 that counsel should have investigated and presented testimony of a prison expert and the impeachment evidence presented in claim 1.

d.  The allegation in claim 16 that petitioner suffered actual prejudice as a result of courtroom security measures employed at trial.

e.  Claim 29.

f.  The allegations in claim 30 that jurors were prejudiced by extrinsic evidence of petitioner's dangerousness, exhibited racial bias, and considered petitioner's prior murder conviction during the guilt phase.

g.  Claims 42 and 43 in all respects except: (1) the allegations that counsel was ineffective in failing to present evidence that petitioner's attorney in his 1970 murder case acted inappropriately or ineffectively, and (2) the allegations that counsel failed to impeach William Acker.[78]

Petitioner's motion for an evidentiary hearing is denied in all other respects.

2.  Petitioner's December 15, 2010 Motion to Expand the Record (Doc. No. 369) is granted.

/////

---

[77]  The court amends this paragraph to include the rulings made on November 14, 2012. (Dkt. No. 460.)   See n. 1, supra.

[78]  The court amends this paragraph to include the rulings made on November 14, 2012. (Dkt. No. 460.)   See n. 1, supra.

1        3.  On July 11, 2013, at 10:00 a.m. in courtroom # 27, the undersigned will hold a

2  status and scheduling conference.  Counsel need not file status conference statements, but should

3  be prepared to discuss at the status conference the preparation necessary for the evidentiary

4  hearing, a schedule for the exchanging of exhibits and witness lists, and proposed methods for the

5  taking of evidence.

6  DATED: January 30, 2013.

7

8  _____

9  DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

10

11  roberts evi hrg.or am

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26