1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    LARRY ROBERTS,                          No.  2:93-cv-00254 DAD-DB

12                  Petitioner,               DEATH PENALTY CASE

13          v.                                ORDER: (1) CONDITIONALLY
                                              GRANTING HABEAS RELIEF ON
14    RON BROOMFIELD, Warden of the           PORTIONS OF PETITIONER'S GUILT
      California State Prison at San Quentin,[1]  PHASE CLAIMS 1 AND 7; (2) ISSUING A
15                                            CERTIFICATE OF APPEALABILTY AS
                  Respondent.                 TO CLAIM 29; (3)  DENYING AS MOOT
16                                            PETITIONER'S MOTION FOR FINAL
                                              JUDGMENT ON CLAIM 1; and (4)
17                                            DIRECTING THE CLERK OF COURT TO
                                              SUBSTITUTE RON BROOMFIELD AS
18                                            RESPONDENT WARDEN AND ENTER
                                              JUDGMENT
19

20

21

22

23

24

25

26

27    ─────────────────────
      [1]  Pursuant to Federal Rule of Civil Procedure 25(d), Ron Bloomfield, Warden of San Quentin
28    State Prison, is substituted as respondent in place of his predecessor wardens.

## Table of Contents

**Section**                                                                                                          **Page**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. Facts Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.  Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        2.  Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**LEGAL STANDARDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**GUILT PHASE CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     Evidentiary Hearing Claims . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.     Claim 1 – Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . 12

        1.     Legal Standards . . . . . . . . . . . . . . . . . . . . . . . 13

            a.  Prosecutorial Misconduct for Withholding Impeachment Evidence . . 13

            b.  Prosecutorial Misconduct for Presentation of False Evidence . . . . . 15

        2.     Prosecutorial Misconduct Involving the Credibility of Witness Cade . . . 16

            a.  Cade's Testimony . . . . . . . . . . . . . . . . . . . . . . . 16

                i.  Trial Testimony . . . . . . . . . . . . . . . . . . . . 16

                ii.  Cade's Reference Hearing Testimony . . . . . . . . . . . 18

            b.  Claim that Prosecution Suppressed Evidence of Cade's Mental Health  20

                i.  Evidence Presented re Cade's Mental Health Problems . . . . 20

                ii.  Discussion . . . . . . . . . . . . . . . . . . . . . . . 22

            c.  Claim that Prosecution Suppressed Evidence of Benefits Requested
              By and Conferred on Cade . . . . . . . . . . . . . . . . . . 26

                i.  Background Facts . . . . . . . . . . . . . . . . . . . . 26

                ii.  Discussion . . . . . . . . . . . . . . . . . . . . . . . 29

            d.  Claim  that Prosecution Suppressed Cade's Prior Crimes . . . . . . . 31

            e.  Claim that Prosecution Suppressed Cade's Informant Activity . . . . . 33

f. Claim that Prosecution Knew Witnesses Coordinated to Give False Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

g. Prejudice from Prosecutorial Misconduct re Cade's Credibility . . . . 36

3. Prosecutorial Misconduct Involving the Testimony of Witness Richard Yacotis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

a. Yacotis's Trial Testimony . . . . . . . . . . . . . . . . . . . . . 41

b. Yacotis's 1995 Declaration . . . . . . . . . . . . . . . . . . . . 42

c. Yacotis's Reference Hearing Testimony . . . . . . . . . . . . . . 43

d. Discussion of Presentation of Yacotis's False Testimony . . . . . . . 44

4. Prosecutorial Misconduct Involving the Credibility of Witness Robert Hayes    46

a. Hayes' Trial Testimony . . . . . . . . . . . . . . . . . . . . . . 46

b. Evidence re Hayes that was not Disclosed to the Defense . . . . . . . 47

c. Discussion of Suppression of Evidence re Hayes . . . . . . . . . . 49

5. Prosecutorial Misconduct Involving the Credibility of Witness Leslie Rooks    50

a. Rooks' Trial Testimony . . . . . . . . . . . . . . . . . . . . . . 50

b. Rooks' 1995 Declaration . . . . . . . . . . . . . . . . . . . . . 51

c. Rooks' Reference Hearing Testimony . . . . . . . . . . . . . . . . 51

d. Discussion of Suppression of Evidence re Rooks . . . . . . . . . . 51

6. Prosecutorial Misconduct Involving the Credibility of Witness Raybon Long    53

a. Long's Trial Testimony . . . . . . . . . . . . . . . . . . . . . . 53

b. Long's 1995 Declaration . . . . . . . . . . . . . . . . . . . . . 55

c. Long's 1999 Declaration . . . . . . . . . . . . . . . . . . . . . 55

d. Long at the Reference Hearing . . . . . . . . . . . . . . . . . . 55

e. Evidence re Long Uncovered after Trial . . . . . . . . . . . . . . 62

f. Discussion of Presentation of Long's False Testimony . . . . . . . . 64

7. Prosecutorial Misconduct Involving Victim Gardner's History of Violence . . 65

B. Claim 7 – Ineffective Assistance of Counsel at the Guilt Phase . . . . . . . . . . . 66

1. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . 66

2. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . 68

a. Deficient Performance . . . . . . . . . . . . . . . . . . . . . . 68

b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

3. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    a. Reasonableness of Counsel's Conduct . . . . . . . . . . . . . . . . . 71

    b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

C. Claim 16 – Prejudicial Courtroom Security . . . . . . . . . . . . . . . . . . 75

    1. Background Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    2. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    3. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

D. Claim 29 – Removal of a Juror During Deliberations . . . . . . . . . . . . . 80

    1. Background Facts from the Trial Record . . . . . . . . . . . . . . . . 80

    2. Post-trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 84

        a. Juror Conklin . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        b. Juror Galloway . . . . . . . . . . . . . . . . . . . . . . . . . 86

        c. Juror Edwards . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    3. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

        a. Standards for Dismissing a Juror . . . . . . . . . . . . . . . . . 89

        b. Standards for Consideration of Juror Testimony . . . . . . . . . . . 92

    4. Discussion of Removal of Juror During Deliberations . . . . . . . . . . 95

II. Non-Evidentiary Hearing Claims re the Guilt Phase . . . . . . . . . . . . . . . 98

A. Claim 1 - Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . 98

B. Claim 2 – Decision to Seek Death Penalty Based on Impermissible Considerations . . 112

C. Claim 3 – California's Death Penalty Statute Fails to Narrow . . . . . . . . . . 113

D. Claim 4 – Sufficiency of the Evid. For Lying in Wait . . . . . . . . . . . . . . 113

    1. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    2. State Court Decision . . . . . . . . . . . . . . . . . . . . . . . . . 114

    3. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

E. Claim 5 – Reliance at the Guilt Phase on Prior Murder Conviction . . . . . . . . 117

F. Claim 6 – Prosec. Misconduct re Delay in Charging . . . . . . . . . . . . . . 119

G. Claim 7 – Ineffective Assistance of Counsel at the Guilt Phase . . . . . . . . . 120

    1. Discussion of Unreasonable Conduct by Attorney Urquhart . . . . . . . . 120

        a. Failure to Cross-examine Inmate Hayes re Benefits . . . . . . . . . 120

       b.  Failure to Cross-examine Inmate Cade re Aug. 25 Interview . . . . . . . .  121

       c.  Failure to Use Statement of Inmate Black . . . . . . . . . . . . . .  122

   2.   Remaining Claims of Ineffective Assistance of Counsel at the Guilt Phase . . . .  123

H.  Claim 8 – Imbalance of Equities between Prosec. And Dfs. . . . . . . . . . . . .  129

I.  Claim 9 – Trial Court Rulings re Discovery and Disclosure . . . . . . . . . . . .  131

J.  Claim 10 – Denial of Change of Venue . . . . . . . . . . . . . . . . . . .  132

   1.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . .  133

   2.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . .  135

K.  Claim 11 – Denial of Marsden Motions . . . . . . . . . . . . . . . . . .  137

   1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . .  137

   2.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . .  139

   3.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . .  141

L.  Claim 12 – Failure to Dismiss Information . . . . . . . . . . . . . . . . .  142

M.  Claim 13 – Multiple Murder Special Circumstance . . . . . . . . . . . . . .  143

N.  Claim 14 – Improper Denial of Continuance. . . . . . . . . . . . . . . . .  143

O.  Claim 15 – Ineffective Assistance of Counsel during Jury Selection . . . . . . . .  144

P.  Claim 16 – Excessive Courtroom Security . . . . . . . . . . . . . . . . .  148

Q.  Claim 17 – Improper Admission of BGF Membership . . . . . . . . . . . . .  148

   1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . .  149

   2.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . .  149

   3.  Discussion of Procedural Bar . . . . . . . . . . . . . . . . . . . . .  151

   4.  Discussion of Denial of Discovery . . . . . . . . . . . . . . . . . . .  153

   5.  Discussion of Admission of BGF Evidence . . . . . . . . . . . . . . . .  154

R.  Claim 18 – Argument and Instruction re Petitioner's Flight from the Scene . . . . .  156

S.  Claim 19 – Rooks' Testimony that Petitioner Ordered him Killed . . . . . . . . . .  158

T.  Claim 20 - Testimony that Petitioner Refused to Provide a Blood Sample . . . . . .  160

U.  Claim 21 – Evidence of Gardner's Good Character . . . . . . . . . . . . . . .  162

V.  Claim 22 – Denial of Motion to Sever and Admission of Menefield's Statements . . .  162

   1.  Severance . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  163

   2.  Confrontation Clause Error . . . . . . . . . . . . . . . . . . . . . .  164

        a.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

        b.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

  W.  Claim 23 – Denial of Right to Confrontation of Inmates Black and Moore . . . . . . 170

  X.  Claim 24 – Admission of Evidence of Timed Running Tests . . . . . . . . . . . . . 171

  Y.  Claim 25 – Admission of Yacotis's Testimony in Rebuttal . . . . . . . . . . . . . 172

  Z.  Claim 26 – Denial of Right to be Present . . . . . . . . . . . . . . . . . . . . . 172

    1.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

    2.  Absence from Jury Viewing of Crime Scenes . . . . . . . . . . . . . . . . . 173

        a.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . 173

        b.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

    3.  Absence from *Ex Parte* and *In Camera* Conferences . . . . . . . . . . . . . . 174

  AA.  Claim 27 - Judicial Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

  BB.  Claim 28 – Failure to Give Jury Instructions . . . . . . . . . . . . . . . . . . 176

    1.  Instruction re Proximate Cause of Gardner's Death . . . . . . . . . . . . . . 176

    2.  Instruction re Witness Credibility . . . . . . . . . . . . . . . . . . . . . . 179

    3.  Instruction re Petitioner's Decision not to Testify . . . . . . . . . . . . . . . 180

  CC.  Claim 30 – Juror Misconduct . . . . . . . . . . . . . . . . . . . . . . . . 181

  DD.  Claim 31 – Failure to Maintain a Complete Trial Record . . . . . . . . . . . . . 182

    1.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

    2.  Responses to Jury Notes . . . . . . . . . . . . . . . . . . . . . . . . . . 183

    3.  Missing Municipal Court Transcripts . . . . . . . . . . . . . . . . . . . . 187

    4.  Deletions in Transcripts of Ex Parte Proceedings . . . . . . . . . . . . . . . 187

III.  Claim 32 - Prejudice from all Guilt Phase Errors . . . . . . . . . . . . . . . . . . . 187

**CERTIFICATE OF APPEALABILITY** . . . . . . . . . . . . . . . . . . . . . . 192

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

**INTRODUCTION**

Petitioner Larry Roberts is a state prisoner under sentence of death.  He seeks relief pursuant to 28 U.S.C. § 2254.  After a lengthy and complex trial, and after evidentiary hearings in both state and federal court, this case is ready for a final decision by this court.[2]  The undersigned has thoroughly reviewed the state and federal court records of all proceedings and the pleadings and briefs in this case.  For the reasons set forth below, this court finds petitioner's Fifth, Sixth, and Fourteenth Amendment rights have been violated by pervasive prosecutorial misconduct and ineffective assistance of counsel and grants his habeas corpus petition with respect to the guilt phase verdict.  Because guilt-phase relief renders petitioner's penalty phase claims moot, the court does not address those claims.  Should a higher court disagree with this court's conclusions in this regard, this court will consider the penalty phase claims at that time.

**BACKGROUND**

I. Factual Background

    A.  Facts Presented at Trial[3]

        1.  Guilt Phase

> Early on the morning of August 17, 1980, Charles Gardner, an inmate at the California Medical Facility, Vacaville, walked down a first-floor corridor as his fellow inmates lounged against the walls on both sides.  He emerged with 11 stab wounds that would shortly prove to be fatal.  Nevertheless, he was able to grab a knife that an assailant had left on the floor.  In pursuit of [inmate] Menefield,

---

[2]  The undersigned apologizes for the excessive delay in the issuance of this order.  While certainly only in small part responsible for the inordinate delay by the undersigned in issuing this order, this court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion.  While that situation was partially addressed by the U.S. Senate's confirmation of district judges for two of this court's vacancies on December 17, 2021 and June 21, 2022, another vacancy on this court with only six authorized district judge positions was created on April 17, 2022.  For over twenty-two months the undersigned was left presiding over approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation resulted in the court not being able to issue orders in submitted civil matters within an acceptable period of time and continues even now as the undersigned works through the predictable backlog.  This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

[3]  This recitation of the facts is taken from the California Supreme Court's opinion reversing in part and affirming in part petitioner's judgment of conviction on appeal.  *People v. Roberts*, 2 Cal. 4th 271, 294-97 (1992).

1

Gardner ran or staggered some distance up a flight of stairs to the second floor, where he plunged the knife into the chest of a prison guard, Officer Patch. Patch died within the hour at the prison clinic, Gardner shortly afterward.

Two issues dominated the trial: the identity of Gardner's murderer or murderers, and Gardner's mental state when he attacked Patch.

The prosecution sought to prove defendant killed Gardner. It offered evidence to support two scenarios, both based on a theory that Gardner was killed in a gang dispute. One possibility was that defendant and Menefield planned to kill Gardner as part of a conflict among members of the Black Guerrilla Family (BGF), a prison gang. Gardner was the protégé of Ruben Williams, the Vacaville BGF leader, with whom defendant disagreed over gang tactics. However, there was evidence that cast doubt on this possibility: defendant may have obtained the prison-made knife with which he stabbed Gardner from Williams himself. The other possibility was that defendant stabbed Gardner because he had called him a "punk nigger" in the prison yard and thereby showed disrespect to a fellow BGF member. "Punk" is prison jargon for a passive homosexual. There was testimony that the term is a serious insult to many inmates, and was intolerable to defendant.

Inmates testified they saw defendant stab Gardner repeatedly and saw Menefield restrain Gardner when he tried to escape. After the incident, witness Cade was sent to maximum security for fighting with another inmate and spoke with defendant, who was being held there as a suspect. Cade testified defendant told him that he had done the deed. Cade further testified that defendant said Gardner wanted to withdraw from the BGF and had threatened another inmate, and that Williams had ordered a "move on him" if Gardner posed a threat to the inmate. According to Cade, defendant also said that after he attacked Gardner defendant ran to the third floor. Another inmate testified that he heard Menefield and defendant argue about the assault after it took place. According to that inmate, defendant asked, "Why didn't you pick up the knife?" Menefield assertedly replied, "Because I was running right behind you up the stairs." Inmate Long testified that he saw defendant stab Gardner and then run up to the third floor.

In response, defendant introduced evidence that the prosecution's key witnesses-inmates Long, Hayes, Cade, and Rooks-had won benefits from the state that gave them a motive to lie. Defendant also contended that witnesses had been housed together and had had a chance to reconcile their testimony.

Defendant did not testify at the guilt phase. He sought to prove that he was on the third floor when Gardner was stabbed. There was evidence that he had been seen at that location just after an alarm had sounded as a result of the attack and that it was impossible for him to have made his way there from the first floor in time. For its part, the prosecution introduced evidence that an agile person could run from the first floor to certain key locations in

seconds and walk briskly to defendant's cell in less than one minute, and that defendant could have done so unseen.

Defendant also sought to prove that the stabbing of Gardner was not the proximate cause of his death: there was evidence that Gardner was relatively well physically on arrival at the prison clinic and died as a result of incompetent medical care.

As for Patch's killing, there was evidence that Gardner, though failing rapidly, pursued Menefield up the stairs to the second floor. Prison guards hearing the commotion rushed toward the two, seizing Menefield and, in the case of Patch, trying to secure Gardner. Gardner then stabbed Patch.

The prosecution presented expert testimony to support its theory that Gardner fell rapidly into shock from loss of blood after his stabbing and became an unconscious agent of defendant. Prison workers described Gardner as a well-behaved inmate with no innate desire to attack a guard. Defendant introduced evidence that Gardner intended to stab Patch to exact revenge on his keepers, whom he hated, and that when he attacked Patch he was physically capable of thinking for himself and merely took advantage of the opportunity presented by having a knife in hand.

2. Penalty Phase

In aggravation, the People introduced evidence of prior violent criminal activity and a prior felony conviction. In 1970, on his 17th birthday, defendant shot and killed a high school security guard, Obidee Cowart, and was convicted of first degree murder. There was also evidence of continuing BGF membership found in defendant's cell at Soledad Prison, including a note addressed to defendant in Menefield's handwriting saying that a possible witness to Gardner's stabbing would have to be killed. Further, defendant had stabbed three inmates besides Gardner and had been caught with the paraphernalia of violence in prison.

Defendant testified at the penalty phase. In mitigation, he presented evidence bearing on background and character. He grew up virtually without social and emotional support. He was the eldest of five siblings, each of whom had a different father. His mother, an abusive alcoholic, was 15 when she gave birth to him; she never lived with defendant's father. When she drank she would neglect the children; she and the man she lived with for 13 years would burn and stab each other in front of them. Defendant would steal food for his siblings when his mother's welfare money went to buy alcohol. Defendant grew up in a dreary section of the Watts neighborhood in Los Angeles; when he was 12, his family moved to a notoriously dangerous housing project.

Defendant testified that he had not intended to kill Cowart but had acted instinctively in self-defense after the latter had pulled a gun on him. He also stated that he fell out with the BGF over its practice of assaulting people who disobeyed its rules or policies. For that reason, he said, the gang tried twice to have him killed. He learned

3

1
2
3
4
5

> that an inmate named Lynch had ordered a BGF attack on him, and stabbed him in revenge.  He wanted to escape the BGF but had to maintain an appearance of continued adherence lest he be killed for trying to quit.  He could not completely disassociate himself from the BGF until he was sent to Tehachapi Correctional Institution, a transfer he earned by good behavior.  He testified that he had earned a high school equivalency degree and had taken college correspondence courses.

6  II.  Procedural Background

7      In 1983, a jury found petitioner guilty of all charges: the first degree murders of Charles

8  Gardner and Officer Patch; conspiracy to commit murder; assault by a life prisoner resulting in

9  death; and possession of a weapon by an inmate. (RT 7922-30.[4])  The jury also found true special

10  circumstance allegations that petitioner had previously been convicted of first degree murder, that

11  he had committed multiple murders, and that he had lain in wait to kill Gardner.  (*Id.*)  He was

12  sentenced to death for the murder of Gardner, and to life imprisonment without possibility of

13  parole for Officer Patch's killing. (RT 10,233-36.)  His codefendant, Archie Menefield, was

14  found guilty in a joint trial of similar charges stemming from the same incident, and was

15  sentenced to life imprisonment without possibility of parole.  (RT 7922-30; 10,236-37.)

16      In 1992, the California Supreme Court reversed petitioner's convictions as to Officer Patch

17  and set aside the multiple murder special circumstance.  The California Supreme Court affirmed

18  in all other respects.  *People v. Roberts*, 2 Cal. 4th 271 (1992).

19      In 1995, petitioner filed his first federal habeas petition in this court.  (ECF No. 86.[5])  In 1998,

20  after a determination that the petition included unexhausted claims, petitioner filed a fully

21  exhausted petition and the case was stayed while he litigated his unexhausted claims in the

22  California Supreme Court.  (*See* ECF Nos. 202, 203, 205.)  In August of 1999, the California

23  Supreme Court issued an order to show cause in the state habeas proceeding.  The state Supreme

24  Court ordered respondent to address:  (1) whether the prosecutor knowingly offered perjured

25

26  [4]  The record of the state trial transcript and of the clerk's transcript were lodged in this court on July 21, 1995.  (*See* ECF No. 118.)  They are identified herein as "RT" and "CT," respectively.

27

28  [5]  "ECF" refers to this court's electronic filing system.  Documents filed in this federal proceeding are identified by their docket numbers within that system.

testimony; and (2) whether trial counsel was ineffective for failing to impeach prosecution witnesses with evidence from a corrections officer that the east grille gate to the third floor at the California Medical Facility ("CMF") at Vacaville was not locked at all times.  (ECF No. 412-1, ex. A.)  Thereafter, in March of 2000, the California Supreme Court ordered a reference hearing on the following issues:

> 1.  What, if any, testimony did the prosecutor at petitioner's trial induce, or attempt to induce, from inmate witnesses?  And if any, from which inmates?  Did the inmate witnesses discuss their testimony among themselves before trial?  Did the inmate witnesses' trial testimony vary from what they actually saw or heard?  And specifically in addition (but without necessarily limiting the findings of fact to answering the following questions):

> > a.  Did Raybon Long hear petitioner discuss Gardner's stabbing before it occurred?  Did Long see petitioner stab Gardner?  Did Long see petitioner run to the third floor after stabbing Gardner?

> > b.  Did Richard Yacotis hear petitioner discussing the stabbing afterward?  What is the truth of the claims made in Yacotis's purported August 12, 1982, letter to defense counsel?

> > c.  Did the trial testimony of Ryland T. Cade, Robert Hayes, or David Calvin, Jr., vary from what they actually saw or heard?

> > d.  Did Leslie H. Rooks see petitioner carrying a knife just before the stabbing?  After the stabbing, when and where did Rooks first see petitioner?

> > e.  Were attempts made to persuade George Frederick Payne to testify falsely at trial?

> 2.  What evidence was available to defense counsel that the east grille gate on the third floor at the California Medical Facility, Vacaville, was locked or open at the time of the stabbing?  What additional evidence, if any, would further investigation have produced on this point?  What circumstances would have weighed against investigating the existence of or presenting any such evidence?  What evidence rebutting any such evidence would have been available to the prosecution following its own investigation?  Was the east grille gate open or locked at the time of the stabbing?  If it was locked, could petitioner nonetheless have gone up the stairs and to his cell immediately after the stabbing?

(*Id.*)

/////

/////

5

From May 26, 2000 to January 18, 2001, Solano County Superior Court Judge Taft held an evidentiary hearing.[6]  The California Supreme Court later summarized the evidence presented at the reference hearing before Judge Taft:

> Long, who testified at trial that he saw petitioner stab Gardner, but later recanted that testimony, and then recanted his recantation, was called as petitioner's witness but stated that, affected by the illicit use of drugs, he remembered little of what had happened 20 years before.  On the advice of his counsel, he invoked the privilege against self-incrimination and did not testify.

> Cade reaffirmed his trial testimony that he saw petitioner stab Gardner.  He acknowledged that he, Long and Hayes had discussed the case before trial when they were incarcerated in the same unit, but denied they had "compared stories."  Rather, Cade stated they all were nervous and reluctant to testify and just gave each other "moral support."

> Yacotis, who testified at trial that, after the crimes, he heard petitioner discuss the killings with Menefield, but later recanted that testimony, stood by his recantation, testifying that Long and the other inmate witnesses conspired to win benefits for themselves in exchange for false testimony at petitioner's trial and reasserting that the prosecutor and his investigators had exhorted him to testify falsely at trial.  Yacotis stated that the conversation he described at trial between petitioner and Menefield in the segregation unit in 1980, in which one asked the other, "Why didn't you pick up the knife?" never occurred.  Yacotis reiterated that petitioner and Menefield were not housed near each other in the segregation wing.

> Ruben Lavert Howard, an inmate at the Chino state prison, testified at the reference hearing that he had heard Long, Rooks, and Calvin discuss petitioner's case.  Regarding the stabbings, "one of them said that Larry didn't do it, but he was in the hallway and another guy said something about, 'I'm going to try to get a date out of it,'" meaning a parole date.  "They . . . said that Larry was in the hallway and that he didn't have nothing to do with the actual . . . crime . . . ."

> Howard testified that Rooks, Calvin, and Long all said petitioner did not commit the crime and was being framed.  Long later repeated that assertion.  Howard further testified that he alerted his or petitioner's family to the conspirators' plans and asked them to tell the defense lawyers, but nothing happened as a result of whatever efforts, if any, they undertook.

---

[6]  The transcript of that reference hearing was lodged in this federal court on September 30, 2003 as Exhibits 38-71 to the Answer. (*See* ECF No. 263.)  Citations herein to the reference hearing transcript are identified as "RH RT."  Reference hearing exhibits are identified herein as "RH Ex."  They were lodged as Exhibits 86-103 of the Answer.

1

2

        Arthur Givens (spelled "Gibens" at trial) testified that at Chino, Long told him some people were trying to align their story about the Gardner stabbing to win release from prison, and he was scared the jury would find out they were lying.

3

4

        Calvin reaffirmed his trial testimony that he saw Menefield and another unidentified prisoner, but not petitioner, stab Gardner. He also testified that after the incident, he was in a segregation wing cell adjoining petitioner's cell for six months, and petitioner never discussed the incident there. Calvin testified that he was doing "short time" at the time of the stabbings-he was due for parole in one and one-half years-so the investigators had little to offer him as an inducement in exchange for his testimony.

5

6

7

8

9

        As regards prosecutorial misconduct, Payne testified that Horton told him that it would be worthwhile monetarily if he would testify petitioner ran to the third floor. Similarly, Kirk offered Payne money to testify that he saw petitioner and Menefield running up the stairs and down the hall. Payne refused. Payne further testified that the third floor grille gate was "mostly locked," but added that he "rarely went up to the third floor." On cross-examination, Payne stated that Kirk may not have explicitly offered him money for his testimony, but offered him some type of assistance or benefit in exchange for his testimony.

10

11

12

13

14

*In re Roberts*, 29 Cal. 4th 726, 738-39 (2003).

15

    On May 23, 2001, Judge Taft issued written findings following the reference hearing.[7]

16

Therein Judge Taft found:  (1) Leslie Rooks and David Calvin did not "fabricate" "any

17

identifiable portion of their [trial] testimony;" (2) while Raybon Long invoked the Fifth

18

Amendment and did not testify, his "trial testimony should not be treated as believable;" (3)

19

Richard Yacotis's testimony at the reference hearing that he lied at trial was believable; (4)

20

Ryland Cade's "trial testimony was not truthful and varied from what he actually heard and saw;"

21

(5) "[p]etitioner presented nothing that would indicate that [Robert] Hayes' trial testimony was

22

false;" (6) Mr. Calvin's trial testimony did not vary from what he saw or heard; (7) Mr. Rooks'

23

trial testimony was "credible;" and (8) George Payne lied at the reference hearing when he

24

testified that he was induced to testify falsely.  With respect to petitioner's ineffective assistance

25

of counsel claim regarding the east grille gate, Judge Taft found that defense counsel "did not

26

overlook any potential evidence that would have tended to show that the grille gate was locked at

27

28

   [7]  Judge Taft's findings were lodged here on September 30, 2003 as Exhibit 74 to the Answer.  (*See* ECF No. 263.)

1    the time of the stabbings" and that "the third floor east grille gate was in fact open at the time of

2    the stabbings." Finally, Judge Taft found that prosecutors had not induced the inmate witnesses to

3    testify falsely.

4        In its subsequent decision denying petitioner's habeas corpus petition, the California Supreme

5    Court majority disagreed with Judge Taft's findings regarding the trial testimony of inmates Long

6    and Cade. *In re Roberts*, 29 Cal. 4th at 742-44. The California Supreme Court also found the

7    recantation of Richard Yacotis insufficiently material to warrant the granting of habeas relief. *Id.*

8    at 743. Justice Kennard and Chief Justice George dissented from the decision. They would have

9    accepted the referee's findings and granted habeas relief because "[w]ithout the false testimony,

10   there is a reasonable probability the jury would not have convicted petitioner of Gardner's

11   killing." *Id.* at 747.

12       On July 15, 2003, petitioner filed a second amended federal habeas petition with this court.

13   (ECF No. 248.) Petitioner filed a motion for an evidentiary hearing and to expand the record in

14   December of 2010.[8] (ECF No. 369.)   On June 1, 2012, the undersigned granted in part and

15   denied in part petitioner's motion. (ECF No. 424.) The court amended that order on January 31,

16   2013. (ECF No. 466.)   The court granted the motion to expand the record and granted an

17   evidentiary hearing on eight of petitioner's claims or portions of claims.[9]

18       In 2014, the court heard some evidentiary hearing testimony in court and other testimony was

19   taken by deposition and considered by the court.[10] The parties then filed memoranda of points

---

20   [8] In 2006, in litigating petitioner's discovery motion, this court held a limited evidentiary hearing
     regarding petitioner's request that an accurate and complete transcript of an August 25, 1980

21   interview of inmate Marcus Richardson be produced in these proceedings. (ECF Nos. 326 &
     327.) Petitioner argued that both Judge Taft and petitioner himself had seen such a transcript at

22   the reference hearing. (*Id.*) This court found that petitioner had not proven the existence of a
     different version of Richardson's interview statement that allegedly exculpated petitioner. (ECF

23   No. 328.) Accordingly, that aspect of petitioner's discovery motion was denied. (*Id.*)

24
     [9] The exhibits to the motion for evidentiary hearing were filed at ECF Nos. 370-393. In addition,

25   some exhibits were filed under seal at ECF Nos. 422 and 423. (*See* ECF No. 421.)

26
     [10] The evidentiary hearing exhibits were made part of the record subject to objections made in the

27   briefing. (*See* ECF No. 506 at 222.) They are referred to herein as "EH Ex." The evidentiary
     hearing transcript is referred to as "EH RT," with its location in the electronic filing system noted.

28

1   and authorities addressing the evidentiary hearing claims.  (ECF Nos. 518, 525, 526.)  With

2   respect to the non-evidentiary hearing claims, the parties filed additional briefs.  (ECF Nos. 527,

3   528.)

4                                    **LEGAL STANDARDS**

5        The petition for writ of habeas corpus in this case was filed before the effective date of the

6   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and thus is not subject to the

7   provisions of that Act.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Webster v. Woodford*, 369

8   F.3d 1062, 1066 (9th Cir. 2004);  *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 n.1 (9th Cir. 2008);

9   *accord Webster v. Chappell*, No. CIV S-93-306 LKK DAD, 2014 WL 2526857 at *7-9 (E.D. Cal.

10  June 4, 2014) *report and recommendation adopted sub nom. Webster v. Warden, San Quentin

11  State Prison*, No. CIV. S-93-0306 LKK DAD, 2014 WL 4211115 (E.D. Cal. Aug. 26, 2014).[11]

12       Under those pre-AEDPA standards, a writ of habeas corpus is available under 28 U.S.C. §

13  2254 only on the basis of some transgression of federal law binding on the state courts.  *Peltier v.

14  Wright*, 15 F.3d 860, 861 (9th Cir. 1994); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

15  1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195,

16  1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of

17  state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that

18  'federal habeas corpus relief does not lie for errors of state law.'") (citation omitted); *Park v.

19  California*, 202 F.3d 1146, 1149 (9th Cir. 2000); *Lincoln v. Sunn*, 807 F.2d 805, 814 (9th Cir.

20  1987); *Givens v. Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986).

21       However, "a claim of error based upon a right not specifically guaranteed by the Constitution

22  may nonetheless form a ground for federal habeas relief where its impact so infects the entire trial

23  that the resulting conviction violates the defendant's right to due process."  *Hines v. Enomoto*,

24  658 F.2d 667, 672 (9th Cir. 1981) (citing *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980)),

25  *abrogated on other grounds by Vansickel v. White*, 166 F.3d 953, 958 (1999); *see also Lisenba v.

26  California*, 314 U.S. 219, 236 (1941); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  In

27  ─────────────────

28  [11]  Unless otherwise noted, all citations herein to 28 U.S.C. § 2254 refer to the 1994 version of the
     statute, which was the version in effect when petitioner filed his first petition here in 1995.

1    order to succeed on such a claim in a federal habeas petition, "the error alleged must have

2    resulted in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962);

3    *see also Henry*, 197 F.3d at 1031; *Crisafi v. Oliver*, 396 F.2d 293, 294-95 (9th Cir. 1968); *Chavez*

4    *v. Dickson*, 280 F.2d 727, 736 (9th Cir. 1960).  Habeas corpus cannot be utilized to try state

5    issues de novo. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972); *see also Brecht v. Abrahamson*,

6    507 U.S. 619, 633 (1993) ("Federal courts are not forums in which to relitigate state trials.")

7         Although less deference to state court factual findings is required under the pre-AEDPA law,

8    state court factual findings are still entitled to a presumption of correctness unless one of eight

9    enumerated exceptions apply.  *See* 28 U.S.C. § 2254(d); *McMurtrey*, 539 F.3d at 1118*; Silva v.*

10   *Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *Bean v. Calderon*, 163 F.3d 1073, 1087 (9th Cir.

11   1998) (on habeas review, the factual findings of the state court are presumed to be correct unless

12   they are "not fairly supported by the record") (quoting 28 U.S.C. § 2254(d)(8) (1996)).  The state

13   courts' application of law to historical facts is reviewed by the federal habeas court *de novo* as are

14   mixed questions of law and fact.  *Thompson v. Keohane*, 516 U.S. 99, 110 (1995) (holding that

15   under pre-AEDPA standards federal courts are not required to defer to state court determinations

16   of mixed questions of law and fact); *Hoyle v. Ada County*, 501 F.3d 1053, 1059 (9th Cir. 2007);

17   *Thompson v. Borg*, 74 F.3d 1571, 1573 (9th Cir. 1996); *Powell v. Gomez*, 33 F.3d 39, 41 (9th Cir.

18   1994).

19        The federal habeas court also "need not defer to state court rulings on questions of law 'since

20   the federal court is not formally reviewing a judgment, but is determining whether the prisoner is

21   "in custody in violation of the Constitution or laws or treaties of the United States." *McMurtrey*,

22   539 F.3d at 1118 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)). The federal habeas

23   court is to "simply resolve the legal issue on the merits, under the ordinary rules." *Id.* (quoting

24   *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (*en banc*)).

25        The habeas petitioner bears the burden of "proving that [his] detention violates the

26   fundamental liberties of the person, safeguarded against state action by the Federal Constitution."

27   *Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled on other grounds by Keeney v. Tamayo-*

28   *Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Shinn v. Ramirez*, 142 S. Ct. 1718

1   (2022); *accord Silva*, 279 F.3d at 835 ("It is the petitioner's burden to prove his custody is in

2   violation of the Constitution, laws or treaties of the United States.") (quoting *Snook v. Wood*, 89

3   F.3d 605, 609 (9th Cir. 1996)).  To prevail, the petitioner must "convince the district court 'by a

4   preponderance of evidence' of the facts underlying the alleged constitutional error."  *McKenzie v.*

5   *McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 469

6   (1938)), *abrogated on other grounds by Sivak v. Hardison*, 658 F.3d 898 (9th Cir 2011); *see also*

7   *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Silva*, 279 F.3d at 835.

8       Federal habeas relief is appropriate "only if the alleged errors 'had substantial and injurious

9   effect or influence in determining the jury's verdict.'"  *Hovey v. Ayers*, 458 F.3d 892, 900 (9th

10   Cir. 2006) (quoting *Brecht*, 507 U.S. at 637).

11       With these standards of review in mind, the undersigned will address each of petitioner's

12   claims for federal habeas relief challenging his guilt-phase verdict.  Because this court finds the

13   granting of relief to be appropriate on petitioner's guilt-phase claims, it need not, at this point,

14   reach petitioner's penalty phase claims.

## GUILT PHASE CLAIMS

16       This court held an evidentiary hearing on eight of petitioner's claims and subclaims.  The

17   parties briefed the evidentiary hearing claims shortly after the conclusion of that hearing.  They

18   were then given the opportunity to supplement the Second Amended Petition and Answer with

19   further briefing on the non-evidentiary hearing claims.  Accordingly, this court examines each set

20   of claims, first the evidentiary hearing claims and then the non-evidentiary hearing claims, in

21   separate sections below.  In the final section of this order, the court addresses the cumulative

22   effect of the guilt-phase errors.

23   I.  Evidentiary Hearing Claims

24       In January 2014, the court held an evidentiary hearing, at which trial prosecutor Charles R.B.

25   Kirk and petitioner's trial defense attorneys Richard Urquhart and George Cotsirilos testified.

26   (ECF Nos. 505, 506, and 507.)  In addition, the testimony of the following witnesses was taken

27   by deposition:  Charles Edwards, Edwina Conklin, Mark Galloway, Ronald Moe, Thomas

28   Hartman, Robert Horton, Dr. Craig Haney, and James Esten.  (*See* ECF No. 511.)  The following

claims are those evidentiary hearing claims of error affecting the guilt phase of petitioner's trial:

- Claim 1 – Prosecutorial misconduct for suppressing exculpatory evidence, suborning perjury, and presenting evidence the prosecutor knew or should have known was false. Petitioner also alleged in claim 1 that his conviction was based on false testimony in violation of his due process rights. The court granted an evidentiary hearing on all aspects of claim 1 except the allegations that (a) prosecutors suppressed evidence related to Alexander Vichi and William Acker, and (b) prosecutors committed misconduct by delaying the investigation of petitioner's alibi and in charging him.

- Claim 7 – The allegations that defense counsel should have investigated and presented the testimony of a prison expert and the impeachment evidence presented in claim 1.

- Claim 15 –The allegation that defense counsel was ineffective by failing to question prospective jurors during voir dire regarding racial bias.

- Claim 16 - The allegation that petitioner suffered actual prejudice as a result of courtroom security measures employed at his trial.

- Claim 29 – Challenging the trial court's removal of a juror during deliberations.

- Claim 30 - The allegations that jurors were prejudiced by extrinsic evidence of petitioner's dangerousness, exhibited racial bias, and considered petitioner's prior murder conviction during the guilt phase.

(ECF No. 466 at 133.)

In his briefing on the evidentiary hearing claims, petitioner states that because he "did not develop any evidence supporting" claims 15 and 30, he would discuss those claims in the separate briefing addressing his non-evidentiary hearing claims. (ECF No. 518 at 1 n.3.) This court will follow that organization and discusses claims 15 and 30 in the section of this order below in addressing the non-evidentiary hearing claims affecting the guilt phase.

### A. Claim 1 – Prosecutorial Misconduct

Petitioner alleges that pervasive prosecutorial misconduct in connection with his guilt phase trial violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. He argues that the prosecution committed multiple acts of misconduct by, among other things: (a)

suppressing exculpatory evidence, including witnesses' complete rap sheets, witnesses' prior statements, consideration given for witnesses' testimony, and the mental health history of inmate witness Cade; (b) suborning perjury; and (c) presenting evidence prosecutors knew or should have known was false. In addition, petitioner alleges that his conviction was obtained based on false testimony in violation of his right to due process.[12]

As described above, the California Supreme Court ordered a reference hearing on two aspects of this claim, that the prosecutor knowingly presented false evidence and that petitioner's conviction was based on false testimony. The California Supreme Court agreed with its appointed referee that the prosecutor did not knowingly present false evidence. *In re Roberts*, 29 Cal. 4th at 740-41. However, a majority of the court refused to adopt the referee's findings regarding the lack of truthfulness of the trial testimony given by inmate witnesses Long and Cade. *Id.* at 742-44. Justice Kennard and Chief Justice George dissented on this issue, indicating that they would have adopted the referee's findings and granted petitioner habeas relief because his conviction was obtained based on false testimony. *Id.* at 747.

### 1. Legal Standards

#### a. Prosecutorial Misconduct for Withholding Impeachment Evidence

The U.S. Court of Appeals for the Ninth Circuit has re-stated the legal standards to be applied in assessing a claim of prosecutorial misconduct based upon the alleged withholding of impeachment evidence under the "landmark case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) as follows:

> Prosecutors are constitutionally obligated to disclose "evidence favorable to an accused . . . [that] is material either to guilt or to punishment." This prosecutorial duty is grounded in the Fourteenth Amendment, which instructs that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The purpose of *Brady* is to ensure that

---

[12] Respondent commences his post-evidentiary hearing briefing expressing concerns about the "general disparagement" of and "*ad hominem* attacks" on prosecutor Charles Kirk that respondent feels petitioner has made in his filings and that trial counsel Moe and Urquhart made in their testimony. (ECF No. 525 at 5-9.) Respondent moves to strike a number of these statements from the record. The court does not find a need to strike these statements because they are obviously subjective and are not considered as evidence of misconduct on prosecutor Kirk's part by this court.

> "criminal trials are fair," *Brady*, 373 U.S. at 87, and "that a miscarriage of justice does not occur," *United States v. Bagley*, 473 U.S. 667, 675 (1985). Placing the burden on prosecutors to disclose information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). The prosecution is trusted to turn over evidence to the defense because its interest "is not that it shall win a case, but that justice shall be done." *Id.*

*Amado v. Gonzalez*, 758 F.3d 1119, 1133-34 (9th Cir. 2014) (some citations omitted). Evidence "favorable to an accused" is not limited to exculpatory evidence. It includes "all material impeachment evidence." *Id.* at 1134 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972) and *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

A *Brady* violation has three elements: (1) the evidence was favorable to the defendant as exculpatory or impeachment evidence; (2) the state suppressed the evidence; and (3) prejudice resulted from the failure to disclose that evidence. *Guerrero v. Biter*, 762 F. App'x 370, 372 (9th Cir. 2019)[13] (citing *United States v. Wilkes*, 662 F.3d 524, 535 (9th Cir. 2011)).

The standard for materiality under *Brady* is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, *quoted in Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Essentially, this is a prejudice analysis. *See United States v. Price*, 566 F.3d 900, 911 n.12 (9th Cir. 2009) (The "terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases."). The Supreme Court in *Kyles* further explained the materiality standard by focusing on four aspects of it. First, the Supreme Court looked to the term "reasonable probability:"

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Second, the Court stressed that the materiality test is "not one of sufficiency of the evidence." *Id.* at 435. Rather, the test is whether "the

---

[13]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

1  favorable evidence could reasonably be taken to put the whole case in such a different light as to

2  undermine confidence in the verdict." *Id.*  Third, the materiality inquiry subsumes any harmless

3  error analysis:  if error is found, "it cannot subsequently be found harmless under *Brecht*." *Id.*

4  Finally, the Court stressed that materiality requires considering the cumulative effect of all

5  suppressed evidence. *Id.* at 436-37. *See also Wearry v. Cain*, 577 U.S. 385, 394 (2016) (citing

6  *Kyles*, 514 U.S. at 441).  The Court explained that to do so, a court must first "evaluate the

7  tendency and force of the undisclosed evidence item by item" because "there is no other way."

8  *Kyles*, 514 U.S. at 436 n.10.  A court may then evaluate the cumulative effect of all undisclosed

9  evidence on the verdict. *Id.*

10  The Supreme Court has thereafter stressed that suppressed "[e]vidence qualifies as  material

11  when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'"

12  *Wearry*, 577 U.S. at 392  (quoting *Giglio*, 405 U.S. at 154).  This means a petitioner need "show

13  only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.*  The Court

14  noted that, under this standard, it is possible that the new evidence "may not have affected the

15  jury's verdict." *Id.* n.6.

16  The duty to disclose favorable, material evidence "extends to information that is not in the

17  possession of the individual prosecutor trying the case" but is known by "others acting on the

18  government's behalf." *Amado*, 758 F.3d at 1134 (citing *Kyles*, 514 U.S. at 441-42).  Indeed, the

19  Supreme Court in *Kyles* held that a prosecutor "had a duty to learn of any favorable evidence

20  known to the others acting on the government's behalf, including the police."  514 U.S. at 437.

21  b.  Prosecutorial Misconduct for Presentation of False Evidence

22  A conviction obtained through the use of false evidence violates a defendant's due process

23  rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This is true whether the prosecutor knew the

24  evidence was false or should have known it was false. *United States v. Agurs*, 427 U.S. 97, 103

25  (1976).

26  The false evidence must have been material.  Evidence is not material if "the false testimony

27  could not in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S.

28  at 271; *Giglio*, 405 U.S. at 154; *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005); *Panah v.*

1   *Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (a petitioner proceeding on a *Napue* claim must

2   satisfy three elements, i.e. the testimony or evidence in question must have been false or

3   misleading, the State must have known or should have known that it was false or misleading, and

4   the testimony or evidence in question must be material).  A *Napue* claim fails if, absent the false

5   testimony or evidence, the petitioner still "received a fair trial, understood as a trial resulting in a

6   verdict worthy of confidence."  *Panah*, 935 F.3d at 664.

7            2.  Prosecutorial Misconduct Involving the Credibility of Witness Ryland Cade

8        Petitioner makes multiple allegations with respect to the trial testimony of Ryland Cade:  (a)

9   the prosecution suppressed evidence of Cade's mental health problems; (b) the prosecution

10   suppressed evidence that Cade requested, and received, more benefits than were revealed to

11   petitioner's trial counsel; (c) the prosecution suppressed evidence of Cade's prior crimes; (d) the

12   prosecution suppressed Cade's informant activity; and (e) the prosecution knew that Cade and

13   other witnesses coordinated their testimony and that it was false.

14                        a.  Cade's Testimony

15                        i.  Trial Testimony

16        Ryland Cade was the prosecution's "chief witness."  (EH RT (ECF No. 506) at 228

17   (testimony of attorney Urquhart).)  He was one of three inmate witnesses to testify that he saw

18   petitioner stab Gardner.  In addition, Cade testified that after trial petitioner confessed to him.

19   The following is a summary of Cade's trial testimony.

20        On the morning of the crime, Cade saw that petitioner had a prison knife, with something

21   white wrapped around the handle, tucked into his waistband inside his unfastened jacket.  (RT

22   2912:11 - 2913:14; 2995:5-6.)  As Cade walked downstairs to the first floor, he encountered

23   inmate Raybon Long on the stairs.  (RT 2901:1, 2902:27 - 2903:1.[14])  Long warned him someone

24   was about to be assaulted.  (RT 2903:3-23.)  Cade saw petitioner stab Charles Gardner.  (RT

_____

25   [14]  In Cade's trial testimony as well as that of the other inmate witnesses, many inmates

26   were referred to by their nicknames.  In this regard, petitioner's nickname was "Zoom."  Archie
     Menefield was "Racehorse."  Charles Gardner was "Little Charles."  Ryland Cade was "Terry."

27   David Calvin was "Lucky."  Raybon Long was "Butch."  Leslie Rooks was "Rider."  Robert
     Hayes was "Roberta."  Ruben Williams was "Big Rube."  (*E.g.*, RT 1996; 2032:13-14, 20-21;

28   2580 - 83; 2892:15-19; 2892:27 - 2893:3; 3039:27; 6501- 02.)

2917:1-7, 2919:9 - 2920:21.)  He saw inmate Archie Menefield grab Gardner by his clothes and pull him down.  (RT 2921:16 - 2923:9.)  Cade testified he saw petitioner drop the knife and run up the stairs, followed by Menefield.  (RT 2923:23 - 2924:24.)

Cade also testified that he later got into a fight and was placed in "the hole," a segregated unit, in a cell near petitioner's cell.  (RT 2943:24 - 2945:6.)  While there, petitioner told him that he killed Gardner and then ran to the third floor.  (RT 2945:27-28, 3008:18-26.)  Cade testified that he did not discuss the case with other inmate witnesses when he was housed at the California Institute for Men ("CIM") at Chino before petitioner's trial.  (RT 2953:18 - 2954:27.)  Cade was also housed at the Contra Costa County Jail with inmates David Calvin, Raybon Long, and Robert Hayes during petitioner's trial.  (RT 3036:7-15.)  He testified he did not discuss his testimony with the other inmate witnesses at that time either.  (RT 3036:16-20.)

Cade testified at trial that he asked prosecutor Charles Kirk and Department of Justice Investigator Norman Gard about an early parole date.  (RT 3033:16-28.)  He testified that he was told they "couldn't" do that.  (RT 3034:3-5.)  Cade denied that prosecutor Kirk helped make arrangements so that he could be married while in prison.  (RT 3035:13-28.)  Cade testified that, with regard to his federal imprisonment, the only thing prosecutor Kirk had done for him was write a letter on his behalf to the federal authorities.  (RT 3115:15 - 3116:1.)  This letter was admitted at petitioner's trial as Exhibit 46.  (RT 3115, 4032.)

Defense counsel questioned Cade about inconsistent prior statements he had made in three interviews with correctional officers and the prosecutor and during his testimony at petitioner's preliminary hearing.  Defense counsel pointed out that Cade testified at trial for the first time that he had seen inmate Long at the bottom of the stairs.  (RT 2946-47.)  Cade admitted he had lied at the preliminary hearing to protect Long.  (RT 2948:22-24.)  He also admitted lying about Long's whereabouts during his earlier interviews.  (RT 2956-57; 3053-54.)

Cade also testified that petitioner told him he had run to the third floor after stabbing Gardner. However, at the preliminary hearing, Cade testified he saw petitioner run to the third floor after the stabbing.  Cade testified on cross-examination that he could not have seen the third floor from where he stood, so he made a mistake in his preliminary hearing testimony.  (RT 3008-09.)

17

1   Defense counsel pointed out that Cade indicated in an interview with prosecutor Kirk that he had

2   intentionally gotten into a fight and ended up in "the hole" because he wanted to get some

3   "answers." (RT 3015:28 – 3016:18.)  At trial, Cade testified that he did not intend to go to the

4   hole. (RT 3015:21-23.)   Defense counsel also pointed out that Cade did not identify Menefield

5   in his initial interviews, but later told interviewers, and testified, that Menefield had held Gardner

6   while petitioner stabbed him.  (RT 3072-77.)

7                                       ii.  Cade's Reference Hearing Testimony

8          At the reference hearing ordered by the California Supreme Court, Cade testified he was

9   incarcerated in 1980 after being convicted of two murders.  (RH RT 804-05.)  Cade testified that

10  he did in fact talk with inmates Calvin, Long, Hayes, and Rooks about the case when they were

11  all housed in the Contra Costa County Jail during petitioner's trial.  (RH RT 1123:1 - 1124:1.)

12  Cade asserted his Fifth Amendment privilege and refused to answer questions about whether he

13  had been truthful in his trial testimony about the presence of Raybon Long at the crime scene.

14  (RH RT 1127:2-22.)  Cade also initially refused to answer questions about the crime.  (RH RT

15  1165-70.)  However, Cade later testified that he saw petitioner and then Archie Menefield run up

16  the stairs.  (RH RT 1223:10-26, 1224:10-18.)  He also testified he did not remember seeing

17  anyone else on the stairway.  (RH RT 1223:25-27.14)  Cade also testified later that he believed

18  Long was near the mail room when Charles Gardner was attacked.  (RH RT 1247:16-18.)  Cade

19  admitted that he had testified for the prosecution in a prior case.  (RH RT 1179:1-8.)  Cade

20  recalled asking prosecutor Kirk for an early release from prison.  (RH RT 1183:18 - 1184:7.)

21         Cade testified at the reference hearing that he has been under the care of a psychiatrist since

22  1976.  (RH RT 1227:18-20.)  At one point, he was sent to a mental hospital to be evaluated for

23  competency to stand trial.  (RH RT 805:15-20.)  He took medication on and off when he was at

24  CMF.  (RH RT 1227:21-22.)  When he was not taking his prescribed medication, he sometimes

25  heard voices.  (RH RT 1227:28 - 1228:1, 24.)  In the April 16, 1981 interview with prosecutor

26  Kirk, Cade stated, "All my life I've been on medicine and I woke up.  I've been off medication

27  for two weeks, and I feel like a brand new man, like I've been reborn in a lot of ways because it

28  made me feel good that I don't take medicine.  It should make me a normal person again."  (RH

18

1   RT 1238:18-25.)

2       Cade eventually testified at the reference hearing that he saw petitioner stab Charles Gardner.

3   (RH RT 1313:26 - 1314:1.)

4       The referee found Cade was not truthful in his testimony at petitioner's trial:

5               During Cade's interview of April 16, 1981, Cade told the
                investigator that if there were any problems to let him (Cade) know
6               and he would take care of it in court.

7               Prior to trial, Kirk gave Cade copies of Cade's previous
                interview, a list of questions Kirk expected to ask and a summary of
8               what Kirk expected to prove at trial.  Kirk also admonished Cade to
                tell the truth.
9
                Cade's general account of the stabbing itself remained
10              consistent although it varied from time to time regarding details of
                where Cade and other witnesses were located at the time of the
11              stabbing.

12              Cade's rap sheet contained the notation "INSANE," which
                was redacted from the copy of the rap sheet supplied to defense
13              counsel during the discovery process prior to trial.

14              Douglas Tucker, a psychiatrist, testified at the Reference
                hearing that a review of Cade's medical records indicated that Cade
15              displayed psychotic symptoms and was likely decompensating at the
                time of the stabbing.
16
                These psychiatric and medical records, which were supplied
17              for the first time at the Habeas Corpus Reference hearing, contained
                the notation on 11/14/80 that Cade witnessed the killing and is now
18              negotiating for testimony – that he "cooperates only when it is to his
                advantage, untruthful."  There was no indication that Cade did or did
19              not have illusionary hallucinations.  Dr. Tucker's opinion was that
                Cade's story was adjustable depending on what was to his advantage.
20              Dr. Tucker was also of the opinion that if Cade was given
                information during an interview, it would likely alter what he
21              actually perceived.

22              Prior to the stabbing, Cade often hallucinated.  Dr. Tucker
                could not draw any conclusion at the Reference hearing, twenty years
23              after the fact, as to Cade's ability to perceive, recall or relate at the
                time of the stabbing or time of the trial.  Any finding by the Referee
24              as to Cade's mental condition at the time of the event or at the time
                of trial would at best be idle speculation.
25
                Cade's testimony at the Reference hearing was evasive and
26              often at variance with prior testimony.

27              This Court previously indicated that Cade's trial testimony
                was thoroughly impeached.  2 Cal. 4th 271, 302 (1992).
28

1

> From the above, the Referee finds that Cade's trial testimony
> was not truthful and varied from what he actually heard or saw.
> However, the Referee does not find that the false testimony was
> knowingly induced by Kirk or the investigators.

(Referee's Findings, Ex. 74 to Answer, at 7-8.)

                b.  <u>Claim that Prosecution Suppressed Evidence of Cade's Mental Health</u>

                      i.  <u>Evidence Presented re Cade's Mental Health Problems</u>

The following evidence appeared in Cade's Department of Corrections ("CDC") file prior to trial:  (1) a summary of the probation officer's report regarding Cade's Los Angeles County murder case which describes the court's finding of his mental incompetence; (2) a CMF psychiatric intake report dated February 2, 1978 indicating Cade had received psychiatric treatment in Louisiana, had a history of alcohol abuse, had suffered a severe head injury at age 16, and had received a diagnosis of "organic brain syndrome;" (3) a CDC intake report dated January 31, 1978 reflecting that Cade had a history of blackouts, and alcohol and drug abuse; (4) a March 8, 1978 report of a transfer from Chino to CMF because Cade was psychotic; (5) an April 1, 1980 psychiatric evaluation which gave a diagnosis of "borderline personality disorder;" (6) a November 13, 1980 report indicating that Cade had a "psychotic history" and was supposed to be taking the anti-psychotic drug Navane; (7) a document dated February 7, 1978, indicating Cade was then taking the anti-psychotic drug Stelazine; (8) a parole document from April of 1978 stating that Cade had a "serious mental disorder;" and (9) a January 1978 pre-sentence report which stated that Cade used cocaine daily, suffered from blackouts, and had been in a mental hospital in Louisiana; (RH Ex. GGG, filed under seal per March 28, 2012 order.[15])  It is undisputed that none of this evidence was provided to petitioner's defense team prior to trial.  In fact, petitioner states that he was not provided with any of this discovery until the reference hearing.

/////

---

[15]  While RH Ex. GGG has been filed with the court under seal to protect some privileged information, the details listed here appear in petitioner's publicly-filed Second Amended Petition (ECF No. 248 at 70-72).  Throughout this order, the court similarly has described only that information from sealed documents which has already been made public in other filings.

Prosecutor Kirk's files contained the following additional information regarding Cade's mental health, none of which was provided to the defense prior to petitioner's trial:

- A May 23, 1977 report of Psychiatrist Alfred Coodley regarding his court-ordered sanity evaluation of Cade in which Dr. Coodley concluded that Cade "is manifesting a schizo-affective disorder of psychotic proportions." Dr. Coodley opined that Cade was unable to understand the criminal proceedings because he had "continuing hallucinations in which he is told to do everything by 'Tony' and anticipates being killed by 'Tony.'" (EH Ex. 1.)

- A similar evaluation by Psychiatrist Harold Deering dated May 31, 1977 concluding that Cade was schizophrenic, but was "probably" "marginally competent to stand trial." (EH Ex. 2.)

- A third evaluation conducted by Psychiatrist Alvin Davis. In his June 16, 1977 report, he opined that Cade suffered from "Schizophrenia, schizo-affective and paranoid, with suicidal depressions, hallucinations, and delusions of persecution." (EH Ex. 3.)

- Cade's rap sheet that showed he had been committed to Patton State Hospital in June 1977 as "INSANE." (EH Ex. 7 at Bate-stamp p.AGO-5708.)

- A January 26, 1978 report from an examination by Chief Psychiatrist R.L. Flanagan diagnosing Cade as suffering with "Schizophrenia. Schizo-affective, depressed, with paranoid features." (EH Ex. 7 at 5712.)

- A March 27, 1979 "Psychological Evaluation for Community Release Board" of Cade conducted by Staff Psychiatrist Robert Brooks. (EH Ex. 7 at 5716-17.) Dr. Brooks noted that Cade had discontinued medication in July 1978. He opined that Cade was no longer mentally unstable and had at that time no signs of homicidal ideations, suicidal ideations, alcoholic amnesia, or psychosis.

- An April 1, 1980 report by Dr. Brooks in which he diagnosed Cade with "Borderline Personality Organization." (EH Ex. 7 at 5722.)

- Records showing that in June 1979, Cade was transferred to a federal correctional institution in South Carolina for an evaluation of his mental competence to stand trial

21

1    on federal murder and robbery charges.  (EH Ex. 6.)  It appears that Cade was found to

2    be competent and later plead guilty to second degree murder.

3                                              ii.  Discussion

4          There appears to be no question that petitioner's trial attorneys did not receive any of this

5    evidence and were unaware of Cade's mental health history.  (*See* EH RT (ECF No. 506) at 229-

6    34 (testimony of attorney Urquhart); Oct. 17, 2013 Depo. of Ronald Moe ("Moe Depo."), lodged

7    herein on March 19, 2014 (*see* ECF No. 511) at 17-23.)  Respondent concedes that "the more

8    prudent course of action" would have been for prosecutor Kirk to turn over the evidence of

9    Cade's mental health issues to the defense.[16]  (ECF No. 525 at 9.)  This court finds that not only

10   would it have been prudent, but that by failing to turn over this evidence to the defense the

11   prosecution violated petitioner's constitutional rights to a fair trial.

12         The first question under *Brady* is whether the prosecution knew or should have known of the

13   existence of the evidence.  That question is easily answered in this case.  Kirk testified at the

14   evidentiary hearing that he was "probably aware" of these doctors' reports.  (EH RT (ECF No.

15   506) at 214:9.)  Because those reports were gleaned from prosecutor Kirk's own files, he certainly

16   can be charged with knowledge of them.  In addition, there is no question that Kirk had access to

17   Cade's prison records and must be charged with constructive knowledge of them as well.  *See*

18   *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (the duty to disclose under *Brady* includes

19   the prison records of a witness with a long criminal record).

20   ───────────────
[16]  Respondent also points out that the defense did have some information that Cade had suffered
21   mental health problems.  It is true that the defense had a copy of the transcript of Cade's April 16,
     1981 interview with prosecutor Kirk and investigator Gard.  (EH Ex. P-3.)  During that interview,
22   Cade stated that, "All my life I've been on medicine and I woke up.  I've been off medication for
     two weeks and I feel like a brand new man.  Like I been reborn in a lot of ways, cause it make me
23   feel good that I don't take medicine.  It should make me a normal person again."  (*Id.* at 34.)
     Cade stated that he did not regularly take his medications and took none the week of Gardner's
24   murder.  He described his medications as "Benzedrine for my head" and "tefinere, it's an anti-
     depressant.  It keeps a person from being depressed, that's all it is."  The fact that Cade may have
25   been taking Benzedrine, which according to the on-line version of the Encyclopedia Britannica,
     was typically used as a stimulant, an appetite suppressant, or for attention deficit disorder, and an
26   anti-depressant hardly put the defense on notice that Cade had previously been found to be insane
     by a court or suffered from severe mental conditions such as schizophrenia, psychoses, and
27   hallucinations.  *See*  https://www.britannica.com/science/amphetamine#ref276381, last visited
     August 10, 2022.
28

                                                       22

1    Moreover, prosecutor Kirk not only knew about some of this evidence, but he indeed took

2    purposeful steps to prevent the defense from learning about it.  Kirk submitted the inmate

3    witnesses' rap sheets, including Cade's rap sheet, to the trial court for *in camera* review to

4    determine what, if anything, from the rap sheet the prosecution was required to reveal to the

5    defense.  (EH RT (ECF No. 506) at 163.)  However, the rap sheet provided to the trial court by

6    Kirk was not complete.  A line showing that in 1977, after an arrest for murder, Cade was

7    declared insane and committed to Patton State Hospital was redacted from the rap sheet provided

8    to the trial court.  (Ex. II to Mtn. for Evid. Hrg. (ECF No. 391-4).)  Prosecutor Kirk admitted

9    redacting that information from the rap sheet.  Specifically, he testified that he struck the words

10   "INSANE" and "CAHO PATTON" from Cade's rap sheet before showing it to the judge because

11   he felt those entries were not a part of the official rap sheet.  (EH RT (ECF No. 506) at 164.)

12   According to Kirk, the fact that rap sheet was printed by an "alphanumeric printer in black" and

13   the words "INSANE" and "CAHO PATTON" were not, meant that those words were not part of

14   the "official" rap sheet.  (*Id.* at 192.)  Kirk repeatedly stressed his "expertise" with rap sheets as

15   the basis for knowing what constituted an official rap sheet.  (*Id.* at 164, 193.)  However, an

16   examination of Cade's rap sheet does not in fact reveal any difference in typeface or print in

17   connection with the words Kirk chose to redact.  (EH Ex. 7 at Bate-stamp p. AGO-5708.)

18   Respondent argues that the psychiatrists' evaluations from Cade's 1977 criminal proceedings

19   and the docket from Cade's 1979 federal criminal proceedings (EH Ex.'s 1-3, & 6) were public

20   and could have been obtained by petitioner's counsel.  He argues that defense counsel had notice

21   that these records existed based on records counsel received of an interview in which Cade

22   mentioned his second degree murder conviction in Los Angeles, mentioned having been on anti-

23   depressant medication, and mentioned a federal murder conviction he suffered in South Carolina.

24   In advancing these arguments respondent ignores clearly established law that required a

25   prosecutor to provide this potential impeachment evidence to defense counsel, regardless of its

26   availability to the defense through their own investigation.  *Amado*, 758 F.3d at 1135 ("The

27   prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise

28   diligence with respect to suppressed evidence.")

1     The second inquiry in connection with this *Brady* claim is whether the evidence of Cade's

2   mental illness was material.  Again, that question can be easily answered.  At the time of

3   petitioner's trial, mental health evidence regarding a witness, particularly evidence of severe

4   mental illness such as psychoses, was admissible to impeach the witness.  *See People v. Reber*,

5   177 Cal. App. 3d 523, 530 (1986) ("Certain types of mental disorders are highly probative on the

6   issue of a witness' credibility.  For example, the veracity of one afflicted with a psychosis such as

7   paranoid schizophrenia may be impaired by distortions in his ability to perceive and recall events;

8   a schizophrenic who suffers delusions and hallucinations may have difficulty distinguishing fact

9   from fantasy.").[17]   It is well-established that mental health evidence is the sort of potentially

10  impeaching evidence that a prosecutor is required to provide the defense under *Brady*.  *See*

11  *Gonzalez v. Wong*, 667 F.3d 965, 983 (9th Cir. 2011) ("Courts have long recognized the

12  impeachment value of evidence that a government witness has a severe illness, such as

13  schizophrenia, that dramatically impaired [his] ability to perceive and tell the truth."); *see also*

14  *Wilson v. Beard*, 589 F.3d 651, 665 (3rd Cir. 2009); *East v. Johnson*, 123 F.3d 235, 238 (5th Cir.

15  1997); *cf., Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002) (*Brady* requires evidence of a

16  witness's drug use should have been revealed to defense because it was relevant to impeach the

17  witness's "ability to recollect or perceive the events.").  Even though a witness may be impeached

18  at trial with evidence of his criminal record and history as an informant, new evidence of the

19  same witness's mental illness would not be cumulative and could cause the fact finder to question

20  the witness's "competency to perceive and tell the truth."  *Gonzalez*, 667 F.3d at 984.

21     At the evidentiary hearing in this action, prosecutor Kirk testified that he felt he was not

22  required to disclose Cade's mental health issues because he did not feel they were "relevant"

23  under the law and he cited the decision in *People v. Manson*, 61 Cal. App. 3d 102 (1976).  (EH

24

---

25  [17]   The California Supreme Court subsequently disapproved the Court of Appeal decision in *Reber* with respect to the pre-trial disclosure of documents protected by the

26  psychotherapist/patient privilege.  *People v. Hammon*, 15 Cal. 4th 1117 (1997).  However, the California Supreme Court stressed that it was examining only a defendant's pre-trial rights to

27  information.  *Id.* at 1124.  The court specifically stated that it was not opining on the question of whether a defendant could use information subject to a state-law privilege to cross-examine a

28  witness at trial.  *Id.* at 1128.

1    RT (ECF No. 506) at 165.)  Kirk testified he felt "[t]here was absolutely no evidence whatsoever,

2    not a shred of evidence that any mental problem Mr. Cade had had in the past fit within the

3    *Manson* standard."  (*Id.*)  Kirk admitted, however, that his opinion in this regard was based solely

4    on his own evaluation of the evidence.  (*Id.* at 165-66.)  He did not give the trial court any of the

5    mental health information to allow a trial judge to determine its relevance.  (*Id.* at 213.)

6         The *Manson* decision does not support Mr. Kirk's opinion that Cade's mental health was

7    irrelevant impeachment.  In *Manson*, the issue was whether the defense could require a

8    psychiatric examination of a witness to determine her competency.  The witness testified to her

9    use of LSD and other hallucinogenic drugs.  61 Cal. App. 3d at 136.  The court found it

10   unnecessary to order a psychiatric exam because it did not find a sufficient basis to doubt the

11   witness's competency to perceive the events or to testify.  *Id.* at 137-38.  In making this finding,

12   the court noted that "the impeaching effect of [the witness's] use of hallucinogenics was properly

13   placed before the jury." *Id.* at 137.  The court rejected the need for impeachment testimony in the

14   form of psychiatric evidence because a "'psychiatrist's testimony on the credibility of a witness

15   may involve many dangers.'"  *Id.* (quoting *People v. Russel*, 69 Cal. 2d 187, 195 n.8 (1968)).

16   Petitioner does not allege here that he was entitled to present psychiatric testimony regarding

17   witness Cade, only that he was entitled to know of Cade's significant and recent mental health

18   history prior to his trial.  That factual information is just the sort of evidence that the California

19   Court of Appeal in *Manson* found to be "properly placed before the jury."

20        The final question under *Brady* is whether prosecutor Kirk's failure to provide the defense

21   with these records prejudiced petitioner.  This court is required to consider the cumulative effect

22   of trial errors.  *Kyles*, 514 U.S. at 433-34.  The cumulative effect of all guilt phase errors will be

23   addressed in detail below in the court's discussion of petitioner's claim 32.  However, when the

24   cumulative effect of merely the prosecutor's violation of *Brady* with respect to the potential

25   impeachment of Cade is considered, it is clear that petitioner's due process rights were violated.

26   That discussion of prejudice stemming from prosecutorial misconduct in the withholding of

27   impeachment information regarding Cade will be set out below.

28   /////

25

1                      c. Claim that Prosecution Suppressed Evidence of Benefits Requested by

2                         and Conferred on Cade

3          Petitioner has presented evidence showing that Cade made numerous demands of prosecutors

4   and threatened to withhold his testimony if those demands were not met.  While petitioner has

5   less evidence that Cade received most of these requested benefits, he argues that the requests

6   were relevant to show Cade's motivation for testifying.

7                              i. Background Facts

8          Cade made several requests for help in getting married while imprisoned and was offered

9   some assistance in this regard.  During his April 16, 1981 interview with prosecutor Kirk and

10  investigator Gard, which took place while Cade was in federal custody at the Metropolitan

11  Correctional Center in San Diego, Cade asked for their help to get married to a woman named

12  Zoey.  (EH Ex. 22 at 2-4.)  Cade makes clear that he was asking for help in getting married

13  without the prison knowing of it because he disclosed that he had attempted to make

14  arrangements to get married previously and the institution "told the girl about this incident and

15  they ran her off."  (*Id.* at 3.)  When prosecutor Kirk told Cade he would make an inquiry about

16  "doing it the straight way," Cade said "I don't want it done that way."  (*Id.* at 65.)  Specifically,

17  Cade told Kirk he did not want to have to go through marriage counseling again.  (*Id.* at 66.)  Kirk

18  replied, "Okay, how about if I look into that situation for you, and I'll get back to you and let you

19  know whether or not they will put that stuff aside, the marital counseling and all that kind of stuff.

20  That is up to them, I can't tell them to do anything, I can ask."  (*Id.*)  Kirk then confirmed that he

21  would "look into the bureaucratic thing" with the federal prison and get back to Cade.  (*Id.* at 67.)

22         At the same time Kirk was promising Cade he would look into helping him bypass the

23  counseling requirement at the federal institution where he was confined, Kirk and Gard were also

24  telling Cade that they might be able to work something out for him when he was "up testifying in

25  Solano County with us."  (*Id.* at 66.)  Kirk told Cade he could arrange for his fiancée to "visit you

26  and stuff like that while you're up there."  (*Id.* at 60.)  Cade asked whether he might be able to see

27  her in a hotel, and Kirk replied, "[s]ure, yeah that is not [a] problem," and told Cade he "would

28  see no reason why we might not be able to work out something like that."  (*Id.* at 60-61.)  Kirk

                                                26

1   continued by stating, "we could arrange it where we would let her know where you would be and

2   then arrange a visit, let's assume we put you in a hotel.  Let her know where you would be and

3   arrange to let you have some time together and visit and stuff at the hotel." (*Id.* at 62.)  When

4   Cade suggested he could get married at the hotel, Kirk agreed that if Cade arranged it, "it is fine

5   with me." (*Id.* at 64.)

6       At the evidentiary hearing before this court, Kirk testified that he did not understand Cade to

7   be asking for anything out of the ordinary and that he was simply trying not to make Cade angry.

8   (EH RT (ECF No. 505) at 20-25.)  Kirk also pointed out that the transcript of this April 1981

9   interview with Cade was provided to petitioner's trial attorneys.  Kirk testified that when he

10  received a letter from Cade about the wedding that made clear Cade was asking for help in

11  skirting the rules, Kirk wrote a letter to the warden to make clear that Cade should get no special

12  treatment.  (*Id.* at 23.)  Kirk testified he believed he also wrote a letter to Cade along the same

13  lines.  (*Id.* at 22-23.)  However, there is no record of either letter.  In fact, respondent has

14  stipulated that no copies of such letters were found in Kirk's files. (ECF No. 510 at 1-2.)

15      In a November 1999 declaration filed in petitioner's state court proceedings, prosecutor Kirk

16  insisted that Cade's request for help getting married was, as he recalled, "the only [incident] in

17  which Cade ever tried to obtain special treatment." (EH Ex. 19 at 12-13.)  However, this was

18  belied by a number of letters from Cade to DOJ investigators that were found in Kirk's own files.

19  In them, Cade requested:  (a) a loan of money, (b) a letter to the federal parole board, (c)

20  assignment to a witness protection program, (d) a name change, relocation to a place where "no

21  harm will come to me or my family," (e) that Gard arrange for Cade's marriage to a new woman

22  named Sabrina Nash who was then in jail, (f) that Gard tell Kirk that Cade wanted to speak with

23  him, (g) for "soap, cigarettes, coffee, and money to take care of my needs." (EH Ex.'s 9, 28 &

24  45;[18] Ex. 210 to Mtn. for Evid. Hrg. (ECF No. 372-4) at 44.)  Several times, Cade threatened to

25  withhold his testimony if benefits were not placed in writing.  (EH Ex. 9 at 1; EH Ex. 45.)

26      Significantly, Cade indicated that he had been told he would receive a reduced sentence for

27  testifying against petitioner.  In an October 14, 1981 letter to prosecutor Kirk, written around the

28  _____

[18]  A more legible copy of EH Ex. 45 appears in ECF No. 372-3 at 8-10.

27

time of petitioner's preliminary hearing, Cade asked,

> I Would Like To Know What Is Being Done About The Letter, You was Supposed To Be Writing In My Behalf Of Getting A Short Released Date.  Now You Said You Was A Man Of Your Word.  I Have Been Honest With You And It Looks Like I Am Getting Mess Around.

(EH Ex. 46.)  Kirk testified at the evidentiary hearing before this court that Cade was mistaken but that he did not believe he wrote Cade to clear up that misunderstanding.  (EH RT 42-43.)

As his November 1982 testimony at petitioner's trial approached, Cade continued to make requests of the prosecution team.  In an August 1982 letter to Mr. Gard, Cade asked Gard to get him into a work camp or to North Carolina.  (EH Ex. 10.)  Again, Cade threatened to withhold his testimony unless the requested benefit was granted.  He also complained about his lack of personal products and coffee.  He also signed that letter, "Your slave, Ryland Cade."  (*Id.*)  In a September 1982 letter to Gard, Cade again expressed his expectation that he was going to get a sentence reduction for testifying:

> I am writing to tell you to inform Mr. Kirk what I am saying. I have talked to Mr. Hardeman and [inmate witness Raybon] [L]ong have also. We have come to know that we are not gonna get out of prison. I have six more years Before my release date and Long have 4 more years to do. Well we feel no matter where you put us sooner or later they are gonna catch up with us, even in The Federal prison, They have B.G.F. there too. I know that for a fact. So we have decided if we are gonna die, we can do it with [illegible] honor. If y'all cannot do anything to help us. If y'all can't give us our freedom or assure us we will get out in 1 year time, we do not wish to testify for y'all. Because our Life will be in danger . . . . I need a new place to live on the street, a job, a new place to call my home, a new name, and funds. I have a lady now with a son and they need protection too . . . . So if you can't promise myself and [L]ong anything, well we do not wish to testify for you guys. I am sorry. We would like to help but we do not have no choice . . . . I told you I keep my word, but y'all did not.

(EH Ex. 33.)  In a letter he wrote a week earlier, Cade asked Gard for a variety of other favors, including taking care of some of his property and arranging for a phone call with his "lady."  (EH Ex. 31.)

At the evidentiary hearing in this federal habeas proceeding, Kirk claimed he was unaware of Cade's correspondence with investigators.  He testified that he "tried to leave the investigators alone" and did not ask for copies of letters they received from the inmate witnesses.  (EH RT 37,

1    55, 60, 64.)  However, the parties in this case have stipulated that copies of the six letters from

2    Cade to investigator Gard, which are discussed above, were indeed found in Kirk's own trial files.

3    (ECF No. 510 at 2-3.)

4        Finally, petitioner points out that Cade did receive some benefits.  In a February 1982 letter to

5    prosecutor Kirk, Cade asked Kirk to "tell [Lieutenant] Hartman thank[s] for the gift."  (Ex. 209 to

6    Mtn. for Evid. Hrg. (ECF No. 372-3) at 6.)  During petitioner's trial, the prosecution arranged to

7    have one of Cade's tattoos obscured.  This was not revealed to the defense but was discovered by

8    defense counsel during the trial.  (*See* RT 6794-99.)  However, the trial court refused to allow the

9    evidence of the tattoo removal to be admitted.

10                                          ii.  <u>Discussion</u>

11        With respect to Cade's request for assistance in getting married, petitioner has failed to show

12   that a significant amount of such evidence was suppressed.  Petitioner concedes that his trial

13   attorneys were provided with the transcript of Kirk's first interview with Cade in which Cade

14   requested assistance in skirting the prison's rules to get married.  (ECF No. 518 at 58-59.)  In fact,

15   the issue was raised at petitioner's trial.  Attorney Urquhart asked Cade about a comment made in

16   that interview and Cade asked whether he was referring to getting married.  When Urquhart asked

17   if Kirk had arranged for a marriage, Cade replied, "[t]hat's between me and Mr. Kirk."  Kirk then

18   spoke up, "Go ahead, Mr. Cade, tell them whether or not I arranged for you to marry that girl."

19   Cade responded, "No, he did not."  (RT 3035.)

20        What defense counsel did not know, however, is that Cade made another request for

21   assistance getting married to another woman.  It is clear from Cade's correspondence that he

22   hoped to obtain the assistance of the prosecution team in both arranging a marriage and in giving

23   him contact with these women.  While the defense had access to the April 1981 interview, that

24   interview occurred over 18 months before Cade testified.  By demonstrating that Cade continued

25   to ask for help in marrying (September 1981 letter) and communicating with (September 1982

26   letter) women, the defense could have shown that Cade had a continuing expectation that the

27   prosecution team would facilitate these relationships for him.

28   /////

                                                        29

1    Respondent points out that Cade's requests for protection, including a name change, and for

2    spending money that he was unable to earn with a regular prison job due to his protected status,

3    were based on Cade's fear of reprisal for testifying.  It is true that this evidence would have

4    primarily shown the threats inmate witnesses felt as a result of agreeing to testify.  Petitioner had

5    nothing to gain by showing that Cade feared for his safety and decided to testify nonetheless.

6    The tattoo removal similarly showed that the prosecution, and Cade, were concerned about his

7    safety because he had agreed to testify.  Further, defense counsel discovered the tattoo removal on

8    its own accord.  Petitioner has not shown that, had the prosecution informed the defense about the

9    tattoo removal earlier, the defense would have been able to more persuasively argue in support of

10   the admissibility of that evidence.

11   However, one request that respondent characterizes as seeking protection would also have

12   ended up substantially benefiting Cade.  In August 1982, Cade wrote Gard to ask to be transferred

13   to a work camp or to North Carolina.  While Cade's letter is framed in terms of seeking

14   protection, in it he asked for a substantial benefit – a work camp would typically be a much better

15   placement than a prison.  (*See* Moe Depo. at 39.)

16   Other benefits Cade requested do not fit into the category of protective custody.  In fact,

17   respondent fails to discuss Cade's demand that he and Long be released within a year or they

18   would not testify.  That demand letter came just two months before petitioner's trial and the

19   defense was never made aware of it.  Defense counsel did question Cade regarding the request in

20   his April 1981 interview for a 1982 or 1983 parole date.  Cade responded he was told that

21   prosecutors could not do that.  (RT 3033-34.)  Those questions and responses involved the 1981

22   interview.  They did not address whether Cade later felt he might obtain an early release in

23   exchange for testifying.  Cade's September 1982 letter reflects just that.

24   The law required the prosecution to turn over evidence reflecting on Cade's motivations for

25   testifying.  All of Cade's requests were relevant.  The question is whether they were material.

26   Some courts have held simply that a witness's request for preferential treatment in exchange for

27   his assistance is "proper impeachment material and should have been disclosed."  *See Bell v. Bell*,

28   512 F.3d 223, 232-33 (6th Cir. 2008).  Other courts have held that every request for benefits made

30

1    by a witness need not be disclosed to the defense.  The test is whether those requests are material.

2    *See United States v. Bin Laden*, 397 F. Supp. 2d 465, 511-512 (S.D.N.Y. 2005) ("In light of the

3    significant benefits actually conferred, disclosure of [the witness's] additional requests would

4    have only slightly enhanced potential cross-examination . . . ."), *aff'd*, 552 F.3d 93 (2nd Cir.

5    2008).  In the present case, Cade's requests for protection, including a name change, were not

6    material for the reasons addressed above.  Similarly, Cade's requests for small amounts of money

7    or sundry items were not material.  Cade's remaining requests certainly were.  Cade was an

8    important witness who was portrayed by the prosecution as motivated by his religious faith to "do

9    the right thing" by testifying.  (*See* RT 7825-26 ("[T]he reason Cade finally came forward was

10    because he had been reading the bible and talking to his counselor.  It bothered his conscience.")

11    The defense obviously should have had the opportunity to demonstrate that Cade had clearly

12    expressed other, much less admirable, motives for testifying.  Particularly in light of Judge Taft's

13    determination after the reference hearing that Cade's trial testimony was not truthful and differed

14    from what he actually heard and saw, this court finds that a jury may have considered the

15    testimony of the prosecution's most important witness in a different light had they known he was

16    testifying, at least in part, out of self-interest.

17                 d.  Claim that Prosecution Suppressed Cade's Prior Crimes

18        During pretrial proceedings, the defense made numerous requests for the criminal histories of

19    the inmate witnesses.  The trial judge reviewed the witnesses' rap sheets in camera with the

20    prosecutor.  *(See* Supp. RTs of 10/21/82, 10/22/82 and 10/25/82 In Camera Proceedings.)  The

21    trial judge determined that only those convictions that might be used for impeachment, which at

22    that time were only convictions that related to truthfulness, needed to be disclosed to the defense.

23    (*Id.*)  The California Supreme Court held otherwise.  It ruled that the trial court abused its

24    discretion by failing to allow defense discovery of the witnesses' felony convictions.  *Roberts*, 2

25    Cal. 4th at 307-08.  "The [trial] court erred as a matter of state procedural law in failing to order

26    disclosure of all felony convictions to the defense."  *Id.* at 308.  That court further held, however,

27    that the error was harmless because "the inmate witnesses were thoroughly impeached by

28    evidence of state-provided benefits, prior inconsistent statements, and the like.  And the jury

31

1   knew they were incarcerated in prison for a felony." *Id.* at 308.  The California Supreme Court

2   specifically stated that it was not rendering any opinion about the admissibility of the prior

3   convictions as impeachment *per se*.  Rather, the argument petitioner made was that the defense

4   could have used the information regarding the witnesses' convictions and sentences to show how

5   important a letter to a parole board would have been for each witness.  The California Supreme

6   Court held that argument established good cause for discovery.  *Id.*

7      Respondent argues that the prosecutor cannot be charged with withholding Cade's criminal

8   history because any error was made by the trial court, not by the prosecutor.[19]  This court

9   disagrees.  A prosecutor cannot hide behind state court discovery rules to refuse to discharge his

10  obligations under *Brady.  See* 373 U.S. at 87.  The argument prosecutor Kirk made to the trial

11  judge during the in camera, *ex parte* consideration of the inmates' rap sheets was that only prior

12  crimes admissible at trial as impeachment under state law should be discoverable by the defense.

13  (*See* 10/22/82 Supp. RT 7-8; 10/25/82 Supp. RT 3.)  The prosecutor's obligation to provide the

14  defense with exculpatory materials arises under *Brady* and the U.S. Constitution, not under the

15  state discovery statute.

16     Petitioner argues that had his defense had access to information about Cade's felony

17  convictions, it would have known that in 1980, when the events here occurred, Cade was serving

18  a sentence of five years to life for murder.  In addition, Cade had a concurrent federal court

19  sentence of thirty years for a murder in South Carolina in 1974.  (EH Ex.'s. 5, 7.)  Petitioner also

20  claims that had his counsel been made aware of this conviction and sentence, he could have also

21  discovered that Cade agreed to testify against his co-defendant in order to avoid the death penalty

22  in that case.  This latter argument, that the prosecution failed to reveal the fact that Cade had

23  previously been an "informant" is discussed further in the following section of this order.

24

25  [19]  Respondent takes this argument a step further by claiming that had the prosecution revealed
    Cade's prior criminal history to the defense, it would have been in violation of the trial court's

26  order.  The question before the trial court was what the prosecutor was required to reveal, not
    what the prosecutor was required to protect.  The fact of the inmate witnesses' prior convictions

27  were matters of public record.  They were not confidential.  Should prosecutor Kirk have
    determined he had an obligation to turn over more than what the trial court had ordered, there is

28  nothing that indicates he would have been in violation of the trial court's order in doing so.

32

1    The weakness in petitioner's claim in this regard is that his trial attorney did, in fact, have

2    information about Cade's prior crimes and convictions.  Urquhart's files establish that he had a

3    copy of the transcript of Cade's April 1981 interview with prosecutor Kirk and investigator Gard.

4    (EH Ex. P-3.)  At numerous times during that interview, Cade mentions that he "took a life" and

5    had a "long term" sentence.  (*Id.* at 2,3.)  Cade even made it clear that he had received a state

6    sentence for a murder that he did commit and a 30-year-sentence from a federal court for a

7    murder in South Carolina that he claimed he did not commit.  (*Id.* at 36-37.)   It is also apparent

8    from the transcript that Cade was serving the federal sentence at the time of the interview.  Cade

9    told the interviewers that he entered a guilty plea for the federal crime because he was told he had

10   no defense and was facing the death penalty  (*Id.* at 38-39.)   The defense argument was, and is,

11   that information that Cade was serving a lengthy sentence could have been used to show that

12   Cade had more motivation than most to please the prosecution in order to get help with his release

13   on parole.  Nonetheless, petitioner's defense had sufficient information in their possession to

14   make that argument.  Accordingly, petitioner's *Brady* claim regarding Cade's prior crimes

15   ultimately lacks merit.  *See United States v. Brown*, 582 F.2d 197, 200 (2nd Cir. 1978) (finding

16   no *Brady* violation where the defense was "aware of the essential facts enabling him to take

17   advantage of any exculpatory evidence").

18                       e.  Claim that the Prosecution Suppressed Cade's Informant Activity

19   Petitioner has also presented evidence that shortly before the crimes at issue here, Cade

20   plead guilty in a South Carolina federal court to second degree murder charges and testified against his

21   co-defendants.  In that case, Cade's co-defendant Hardman was convicted.  (EH Ex. 8.)  In

22   January 1980, Cade was sentenced to thirty years in prison in that case.  (EH Ex. 6.)  Petitioner

23   characterizes Cade's sentence as "an extraordinarily favorable deal" based on his criminal history.

24   He also quotes Cade's statements to prosecutor Kirk in their first interview.  Cade told Kirk that

25   the federal prosecutors had told him he would face the death penalty if convicted so he felt that he

26   had no choice but to agree to the plea deal.  (EH Ex. 22 at 38.)   However, he also told Kirk he

27   felt that the federal prosecutor had treated him "with the uttermost kindness."

28   /////

1    Petitioner's defense counsel at trial had some information about Cade's federal sentence from

2    the interview transcript.  In fact, when arguing for access to Cade's rap sheet, attorney Urquhart

3    told the court that he knew Cade had some sort of a federal conviction and had made a request of

4    the prosecutor for help "with a public defender or get him an attorney to get him out earlier or

5    something."  (RT 1934:17-24.)  Prosecutor Kirk told the judge that no attempt or application had

6    been made for a reduction to Cade's sentence imposed in federal court.  (RT 1935:10-11.)  The

7    issue was then dropped.

8    Petitioner argues that Cade's decision to testify against his co-defendants was "informant

9    activity" that the prosecutor was required to reveal under *Brady*.  He cites cases establishing the

10   proposition that informant activity is indeed *Brady* material.  *See Maxwell v. Roe*, 628 F.3d 486,

11   511-12 (9th Cir. 2010); *Benn*, 283 F.3d at 1058; *In re Pratt*, 69 Cal. App. 4th 1294, 1310-11

12   (1999).  What petitioner does not establish, however, is that Cade's decision, made during the

13   course of his trial, to take a plea deal in his federal case in South Carolina and to testify against

14   his co-defendants in that case amounted to "informant" activity requiring disclosure by the

15   prosecution.  The cases cited by petitioner involved jailhouse informants, and one involved a

16   former police officer, who aided in investigations and/or testified based on information gained

17   from prison mates and associates.  In his reply brief, petitioner appears to concede this point and

18   instead argues that the prosecution was required to disclose the fact that Cade had been a

19   government witness.  Petitioner cites no authority for this proposition and simply has not shown

20   that Cade's agreement to plead guilty to second degree murder and testify against his co-

21   defendants in his federal case had any legally admissible relevance to his credibility.

22   Accordingly, petitioner has failed to establish a *Brady* violation in connection with the

23   prosecution's failure to turn over evidence to petitioner's defense that Cade had taken a plea deal

24   and testified against co-defendants in his federal case.

25                    f.  Claim that the Prosecution Knew Witnesses Coordinated to Give False

26                        Testimony

27   During petitioner's trial, the defense attempted to show that the inmate witnesses planned

28   their testimony with each other.  On cross-examination, Cade admitted that he was housed for a

1    week at the state prison at Chino before the preliminary hearing.  (RT 2953-54, 3036-37.)  While

2    there, he spent time with inmate witnesses Hayes, Long, and Calvin but he denied talking with

3    them about the case.  (RT 2953-54, 3057-58.)  Cade also testified that during petitioner's trial, he

4    was being housed with the same three inmates at the Contra Costa County Jail.  (RT 3036, 3057-

5    58.)  Inmates Rooks and Hayes also denied discussing their testimony with the other inmate

6    witnesses, even though Rooks and Calvin were cellmates for a period of time in 1981.  (RT 2105-

7    06, 2299.)

8         Petitioner claims that a letter which was not revealed to the defense showed that the inmate

9    witnesses were untruthful when they said they had not discussed the case with the others.  In his

10   September 1982 letter to investigator Gard, Cade stated that he and inmate Long would not testify

11   if they did not get assurances they would be released from prison within a year.  (EH Ex. 33.)

12   Petitioner also points to a letter dated June 1983 from prosecutor Kirk to the superintendent at

13   Soledad State Prison.  The purpose of the letter was to request that inmate Hayes be considered

14   for a sentence reduction based on "the exceptional assistance which he provided as [a]

15   prosecution witness" in petitioner's prosecution.  (EH Ex. 11.)  Therein, Kirk praised Hayes for

16   "placate[ing] the inmates held in the Contra Costa County Jail as prosecution witnesses during the

17   trial, allaying their fears and maintaining their morale."  (*Id.*)

18        Each inmate questioned at trial about whether he had discussed the case with the other

19   inmates flatly answered that he had not.  It is clear from the evidence petitioner presented the

20   inmates had, at least in some respects, discussed the case.  Indeed, the referee found that they had.

21   Therefore, petitioner is correct.  Their testimony was not truthful in this regard.  And, prosecutor

22   Kirk was aware, or should have been aware, that it was not truthful because, as discussed above,

23   he was in possession of a copy of Cade's November 1982 letter to Gard in which Cade stated that

24   he had talked with Long about the case.  In addition, as reflected in Kirk's letter on behalf of

25   Hayes, the prosecution team was certainly aware that Hayes had been in contact with the other

26   inmate witnesses when they were housed together during the time they were testifying  at trial.

27        The referee did not find that prosecutor Kirk induced the inmates' false testimony, and this

28   court will not so find, despite a good deal of damning evidence – the inmates were purposely

housed together before trial and Kirk knew that Cade had discussed the case with Long and therefore Cade and Long's testimony that they did not discuss the case was false. Nonetheless, this court does find that the evidence regarding Cade establishes that Kirk had constructive knowledge that at least some of Cade's trial testimony was false. The prosecutor has a duty to correct false testimony. *See Napue*, 360 U.S. at 269. Kirk did not carry out that duty. Thus, in addition to the misconduct involved in his failure to provide materials relevant to Cade's credibility to the defense, the court also finds that prosecutor Kirk should have known inmate Cade testified falsely at petitioner's trial.

g. Prejudice Stemming from Prosecutorial Misconduct re Cade's Credibility

Consideration of the cumulative effect of trial errors is necessary, particularly in a case such as this one in which the guilt phase of trial was rife with error.

> In cases where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir.1988)). In other words, "'[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.'" *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir.2001) (quoting *Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir.1984)), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n. 11 (9th Cir.2002) (*en banc*). "In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *Frederick*, 78 F.3d at 1381.

*Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002). That said, practically, this court must first consider the effect of each error individually to determine whether it, standing on its own, justifies a finding of prejudice. There are a number of reasons for making that determination separately. First, it will better allow a reviewing court to determine the effect of the errors found by this court, particularly if any reviewing court were to find that some of the claims identified as errors identified here do not rise to the level of error. Second, it is simply the most sensible way to examine the effect of errors. *See Kyles*, 514 U.S. at 437 n.10 ("We evaluate the tendency and force of the undisclosed evidence

36

1  item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality

2  separately and at the end of the discussion.")

3       It is also worth noting here that the cumulative effect of undisclosed information must be

4  considered by a prosecutor in determining materiality.  The materiality and prejudice standards

5  are intertwined – if undisclosed evidence was material, its nondisclosure was also prejudicial.

6  The Supreme Court in *Kyles* recognized that a prosecutor should not be relieved of the

7  responsibility of disclosing evidence simply because, on its own, that item of evidence did not

8  rise to the level of being material.

9            [T]he prosecution, which alone can know what is
        undisclosed, must be assigned the consequent responsibility to gauge
10       the likely net effect of all such evidence and make disclosure when
        the point of "reasonable probability" is reached.  This in turn means
11       that the individual prosecutor has a duty to learn of any favorable
        evidence known to the others acting on the government's behalf in
12       the case, including the police.  But whether the prosecutor succeeds
        or fails in meeting this obligation (whether, that is, a failure to
13       disclose is in good faith or bad faith), the prosecution's responsibility
        for failing to disclose known, favorable evidence rising to a material
14       level of importance is inescapable.

15  *Kyles*, 514 U.S. at 437-38 (internal citation omitted).

16       Here, this court examines the cumulative effect of the prosecutor's misconduct at the guilt

17  phase of petitioner's trial regarding witness Ryland Cade.  The first prosecutorial error was the

18  suppression of evidence of Cade's mental health history.  Had petitioner's trial attorneys been

19  provided access to that information, the jury would have heard that Cade was suffering from

20  psychosis, hallucinations, and other severe mental health problems just a few years before the

21  August 1980 crimes he testified that he had witnessed.  In May 1977, when Cade was evaluated

22  for competency to stand trial, a psychiatric report stated that Cade told an interviewer "he didn't

23  know if he was a man or a woman" and described a history of drinking, drug use, suicide

24  attempts, and hallucinations.  (EH Ex. 1 (Coodley Rpt.) at 2.)  Cade also described a voice called

25  "Tony" who "tries to make me hurt myself."  (*Id.*)  Dr. Coodley concluded that Cade was

26  "manifesting a schizo-affective disorder of psychotic proportions.  Despite the anti-psychotic and

27  anti-depressive medication, he is still suicidal and hallucinating."  (*Id.* at 3.)

28  /////

1    In his May 1977 evaluation of Cade, Dr. Deering came to similar conclusions.  He also noted

2    that Cade suffered auditory hallucinations and had difficulty thinking clearly.  Dr. Deering

3    concluded Cade was schizophrenic and "probably" "marginally competent" to stand trial.  (EH

4    Ex. 2 at 2-3.)  A third psychiatrist examined Cade in June 1977.  Dr. Davis also concluded Cade

5    was schizophrenic and "schizo-affective and paranoid, with suicidal depressions, hallucinations,

6    and delusions of persecution."  (EH Ex. 3 at 1.)

7        In January 1978, a psychiatrist noted that Cade "presents manifestations of a major mental

8    disorder which is psychotic in proportion.  There is a severe disturbance in thinking and he

9    complains of auditory hallucinations which direct him to do harmful things to himself."  (EH Ex.

10   7 (Flanagan Rpt.) at 5712.)  Dr. Flanagan diagnosed Cade with schizophrenia – "Schizo-affective,

11   depressed, with paranoid features."  (*Id.*)

12       In March 1979, a prison psychiatrist opined that Cade had "no delusions, or hallucinations"

13   and had "good reality testing functions."  (EH Ex. 7 (Brooks Rpt.) at 5717.)  Dr. Brooks felt Cade

14   was not at that time mentally unstable or psychotic.  (*Id.*)  Dr. Brooks reiterated those opinions in

15   April 1980.  He concluded the following about Cade at that time:

16              His current mental status does not include any evidence of a
            formal thought disorder.   His reality testing and cognitive
17          functioning remain well within the normal limits without medication.
            He is not clinically depressed or euphoric.  He shows no indication
18          of hallucinations or delusional thinking.  Excessive feelings of guilt,
            which were previously quite apparent, have been bound up through
19          a process of altruistic surrender and religious faith which appears to
            be serving him very well.   The presence of previous suicidal
20          behavior, continuing idealization of important objection relations,
            episodes of psychosis with severe depression, paranoid and obsessive
21          symptomology, all occurring in the context of a stable personality
            pattern without psychotic residuals support the diagnosis of
22          BORDERLINE PERSONALITY ORGANIZATION (301.83, DMS
            III) which is the new diagnostic impression.
23

24   (*Id.* at 5722.)

25       Respondent argues that petitioner has failed to show the state court would have permitted

26   Cade to be impeached with his mental health records.  However, as shown above, courts have

27   held this type of evidence relevant to a witness's credibility.  Respondent cites no case law to the

28   contrary.  Respondent has an arguably better argument that the evidence before this court of

                                          38

1   Cade's mental health issues does not show that Cade was suffering from an active mental disorder

2   at the time he witnessed the events in question or at the time he testified in petitioner's case.  That

3   is true.  However, that does not mean jurors at petitioner's trial should not have also been made

4   aware of Cade's relatively recent history of psychosis and hallucinations.  In adjudging Cade's

5   credibility, jurors should have been permitted to consider that Cade had a significant history of

6   serious mental illness, mental illness that could have affected his ability to perceive and

7   remember events accurately.

8        The second category of improperly suppressed evidence regarding Ryland Cade was the fact

9   that he made numerous requests for benefits from prosecutors.  Cade expressed an expectation

10  that the prosecution would help facilitate his relationships with women, he requested a transfer to

11  a work camp, and, most importantly, he conditioned his testimony upon satisfaction of his

12  demand that he be released from prison within a year. There is no question that the fact Cade was

13  actively angling to obtain significant benefits in exchange for his testimony, and was not simply

14  acting altruistically due to his conscience as the prosecution argued to the jury, would have been

15  critically important information for jurors to have in adjudging his credibility.

16       Ryland Cade was an extremely important witness for the prosecution.  In fact, prosecutor Kirk

17  identified him as the prosecution's most important witness.  (EH RT (ECF No. 505) at 16:11-13.)

18  Cade was one of only a few witnesses to testify that he saw petitioner stab Charles Gardner and,

19  moreover, he testified that petitioner confessed to him after the crimes.  The defense attempted to

20  attack Cade's credibility with evidence of his conflicting prior statements.  However, Cade's

21  response that he was cautious in talking with investigators due to concerns for his and others'

22  safety countered much of the impeaching value of his changing statements.  Further, even if his

23  changing statements did have some impeaching effect, additional impeaching evidence could

24  have made the difference between a jury which accepted Cade's and the other inmates' stories

25  and a jury that did not.

26       The United States Supreme Court has examined a similar situation when it determined

27  whether a petitioner was prejudiced by the prosecution's failure to disclose impeachment

28  evidence.  In *Wearry v. Cain,* 577 U.S. 385 (2016) the Supreme Court considered the habeas

1   corpus petition of a death row inmate.  The primary prosecution witness at petitioner Wearry's

2   trial was inmate Scott, who contacted authorities two years after the murder at issue to implicate

3   Wearry.  After giving various accounts of the crime, Scott testified at Wearry's trial that he was

4   with Wearry and others when the victim was killed.  Scott admitted on cross-examination that he

5   had changed his story several times.  577 U.S. at 387.  The prosecution also presented the

6   testimony of inmate Brown who also claimed he had been present that night and whose testimony

7   corroborated Scott's.  Brown had also given the police a different account previously but testified

8   that he had agreed to testify against petitioner "solely because his sister knew the victim's sister."

9   *Id.*

10       During Wearry's state post-conviction proceedings, evidence came to light that the

11   prosecution had withheld impeaching evidence regarding witnesses Scott and Brown.  First,

12   prosecutors had two important pieces of evidence about Scott's credibility.  Prosecutors knew that

13   Scott had told another inmate he had a grudge against petitioner Wearry and wanted to make sure

14   Wearry "gets the needle."  *Id.* at 389.  A third inmate originally claimed to have been present at

15   the scene of the crime as well.  But, the next day admitted that "'Scott had told him what to say.'"

16   *Id.*  This third inmate explained that Scott told him lying about the crime "'would help him get

17   out of jail.'"  *Id.* at 390.  Second, the prosecutor knew that the motivation for Brown's testimony

18   presented to the jury was not entirely true.  Despite Brown's and the prosecutor's protestations to

19   the contrary at trial, Brown had twice "sought a deal to reduce his existing sentence in exchange

20   for testifying against Wearry."  *Id.*  The Supreme Court concluded that these three items of

21   evidence undermined confidence in Wearry's conviction because the credibility of Scott and

22   Brown was so important to the prosecution's case.  The Court concluded, "[t]he State's trial

23   evidence resembles a house of cards, built on the jury crediting Scott's account rather than

24   Wearry's alibi."  *Id.* at 392-93.

25       In the present case, inmate Cade was, in everyone's accounting, the most important

26   prosecution witness against petitioner.  The evidence suppressed – of Cade's serious mental

27   health issues, which included hallucinations, of Cade's long prison sentence, and of Cade's

28   requests for significant benefits from the prosecution under threat of refusing to testify – would

1    have given the jury a very different picture of Cade than what was presented at petitioner's trial.

2    As in Wearry, the fact that some impeaching evidence was introduced at trial does not mean

3    further impeachment would not have made a difference.  Further, this court cannot ignore the fact

4    that, after hearing from Cade at the reference hearing, the referee concluded that Cade's "trial

5    testimony varied from what he saw and heard."  Besides the jurors, the referee was the only other

6    person to hear Cade's testimony and have the opportunity to judge his credibility on the stand as

7    well as consider the substantial impeaching evidence that was rendered unavailable to the jury by

8    the prosecution.  The referee's opinion that Cade was untruthful at petitioner's trial certainly

9    indicates that had jurors heard the suppressed evidence, they may very well have found Cade not

10    to be a credible witness.

11                    3.  Prosecutorial Misconduct Involving the Testimony of Witness Rick Yacotis

12        Petitioner next argues that inmate witness Yacotis's trial testimony was false.  Whether or not

13    the prosecution was aware of its falsity, petitioner claims his due process rights were violated as a

14    result.

15                        a.  Yacotis's Trial Testimony

16        Richard Yacotis was scheduled to testify on behalf of the defense at petitioner's trial.  (RT

17    6516:24 - 6517:6.)  Yacotis signed a statement or letter, dated August 12, 1982, in which he said

18    that he overheard inmates Long and David Calvin discuss both "lying for their freedom" in a

19    murder trial and sending "some other inmates to the gas chamber."  (Ex. 29 to State Pet., lodged

20    here as Ex. 28 to Answer; see ECF No. 263.)  On the day he was brought to court to testify, Mr.

21    Yacotis met with prosecutors.  (RT 6517:4-6.)  After that meeting, he refused to testify for the

22    defense and instead was called to testify by the prosecution in rebuttal.  In that testimony Yacotis

23    stated that after the crime, he overheard petitioner ask Archie Menefield why he didn't pick up

24    the knife.  (RT 6501:9-20.)  Menefield replied that he couldn't because he was running up the

25    stairs after petitioner.  (RT 6501:21-22.)   Menefield also told petitioner "'If push comes to

26    shove, I will take the rap.'"  (RT 6501:23-26.)

27        Yacotis was housed at Chino with the other inmate witnesses before petitioner's trial.  (RT

28    6519:2-15.)  He overheard some of the other inmates talk about the case.  (RT 6520:4 - 6521:5.)

Yacotis testified that prosecutor Kirk did not promise him anything for testifying at petitioner's trial. (RT 6629:17- 19.) Yacotis also testified at trial that he did not read the August 12, 1982 letter before he signed it because he "can't read too good." (RT 6604:21 - 6605:3.) He testified that petitioner's brother or cousin told him to sign it. (RT 6605:1-3.) However, he affirmed that he overheard inmates Long and Calvin talk about getting their stories straight and sending other inmates to the gas chamber. (RT 6522:9-12, 6602:11 - 6603:1, 6622:1-12.) He denied most of the remaining content of the August 12 letter bearing his signature. (RT 6622:16-21.)

b. Yacotis's 1995 Declaration

In a 1995 declaration which was submitted in support of petitioner's state habeas petition, Yacotis stated that he did not testify truthfully at petitioner's trial. (Ex. 30 to State Pet., ¶¶ 11- 12.) He declared therein as follows. What he had said in the August 1982 letter "was the truth." (*Id.* ¶ 12.) In addition, he had lied about being able to read and had earned a GED. (*Id.* ¶ 11.) After he was taken to the courthouse to testify for the defense, he met with prosecutor Kirk and Investigators Harman and Bennet. (*Id.* ¶ 13.) They told him they wanted him to be a prosecution witness. One of the investigators said, "we can make it easy for you or hard for you." (*Id.* ¶ 14.) Because he was young then and afraid that he could be transferred to a dangerous prison or killed, he agreed to testify for the state. (*Id.* ¶ 17.)

Yacotis said the prosecution team told him to testify that in 1981 he overheard petitioner ask Menefield, "Why didn't you pick up the knife?" (*Id.* ¶ 16.) He told them that statement was false, but "they did not care." (*Id.*)

Yacotis further declared that Mr. Long told him about benefits Long would receive from testifying regarding the 1980 incident at CMF. Specifically, Long told him he would be released from prison and would get $2,000, a new identity, and dental work. (*Id.* ¶ 5.) Yacotis stated that he saw Long after trial and Long told him prosecutors had given him new teeth, had moved his sister, and had cut his time in prison. (*Id.* ¶ 31.) Mr. Calvin told Yacotis he was receiving the same benefits as Long in exchange for his testimony and that Long had not witnessed the stabbing. (*Id.* ¶ 6.) Yacotis said he heard Long and Calvin discussing getting their stories straight. (*Id.* ¶ 7.) He stated he told an inmate named Ruben Howard what he had overheard.

42

1   (*Id.* ¶ 10.)  Howard was a close friend or relative of petitioner's.  (Id.)  Howard typed up Yacotis'

2   August 12, 1982 statement.  (*Id.*)  Yacotis read and signed it.  (*Id.*)

3                                c.  Yacotis's Reference Hearing Testimony

4        At the reference hearing, Mr. Yacotis stood by his 1995 declaration.  (RH RT 733:1-2.)  He

5   testified that he overheard inmate witnesses Long, Calvin, Hayes, and Cade talking about getting

6   their stories straight and if they testified "right," that they would receive benefits like their release

7   on parole.  (RH RT 734-35.)  Yacotis recalled that the inmate witnesses planned to lie on the

8   witness stand.  (RH RT 737:21-25.)  Long also told him after trial about receiving benefits,

9   including getting his teeth fixed, moving his sister, and receiving money for his testimony against

10  petitioner.  (RH RT 735:9-12.)  Yacotis testified that prosecutor Kirk and Lieutenant Hartman

11  told him to testify that he had overheard petitioner ask Menefield why he had not picked up the

12  knife.  (RH RT 754-55.)

13       Judge Taft found Yacotis's testimony at the reference hearing to be believable.  (Ex. 74 to

14  Answer, at 6.)  He found Yacotis did not overhear the conversation between petitioner and

15  Menefield to which he had testified at trial.  (*Id.*)  Specifically, the referee found:

16              At Petitioner's trial, Yacotis testified that he was housed in
17       the same segregation unit as Petitioner and Menefield, and overheard
         Petitioner ask Menefield why he hadn't picked up the knife.

18              In a declaration dated March 10, 1995 (Exhibit 29 to the
19       Petition) and at the Habeas Corpus Reference hearing Yacotis
         recanted the trial testimony by denying that he overheard any such
20       statement by Petitioner, and further denying that he was housed in
         the same segregation unit with Petitioner and Menefield.

21              Prison records were received which indicated that Yacotis
22       was in fact housed in the same segregation unit, within six cells of
         Petitioner and Menefield for a period of three days.

23              While Yacotis was housed at Chino, he overheard Hays [sic],
24       Calvin, Cade and Long discussing the case and the necessity of their
         testimony being consistent, and discussing the benefits they expected
25       to receive.  Yacotis related to another inmate, Ruben Howard, what
         he had overheard.  Later Howard presented Yacotis with the August
26       12, 1982 letter which Yacotis read and signed.

27              Two to three weeks later Yacotis was contacted by an
         investigator for the defense and again related what he overheard.
28       Yacotis was subsequently transported to the courthouse, in response
         to a defense subpoena, by the investigators for the prosecution.

                                                43

Yacotis claimed at the Habeas Corpus Reference hearing that the investigators and Long persuaded him prior to trial to be a prosecution witness with suggestions that if he did not, he could be removed from his segregated housing and be placed in the general prison population. He also testified that he in fact could read, in that he completed the eleventh grade, had received his GED, and knew the contents of the letter, which he said was true.

The Referee is aware that recantations should be viewed with suspicion. However, Yacotis had served his time and had been released. He believed that should he ever find himself back in prison, his recantation of the trial testimony would cause difficulty with the authorities. He appeared to the Referee to be sincere. He had nothing to gain by recanting the trial testimony.

Finally, evidence of his being housed five or six cells from Petitioner for three days is not sufficient impeachment to disregard his testimony.

The Referee finds the Habeas Corpus Reference testimony of Yacotis to be believable. The Referee believes Yacotis did not overhear the conversation between Petitioner and Menefield, and the Referee believes the truth of the claims made in the August 12, 1982 letter.

(*Id.* at 5-6.)

### d. Discussion of Presentation of Yacotis's False Testimony

Here, the prosecutor committed misconduct if he knew or should have known that Yacotis's trial testimony was false. *Napue*, 360 U.S. at 269. Of course, the false evidence must have been material. Evidence is not material if "the false testimony could not in any reasonable likelihood have affected the judgment of the jury." *Id.* at 271; *Giglio*, 405 U.S. at 154.

The first question is whether Yacotis's trial testimony was false. The referee found Yacotis testified falsely at trial. (Ex. 74 to Answer, at 6.) The California Supreme Court recognized that the referee's credibility finding was "entitled to great deference," but nonetheless concluded that it did not matter because Yacotis's testimony was not material. *In re Roberts*, 29 Cal. 4th at 743. Factual findings made by the state court after a hearing are presumed to be correct. 28 U.S.C. § 2254(d); *see also Tolbert v. Page,* 182 F.3d 677, 685 (9th Cir. 1999). Because no evidence before the court rebuts that presumption, this court finds Rick Yacotis's trial testimony was false.

The second question is whether the false testimony was material. The California Supreme Court held that because Yacotis was not an eyewitness, his testimony was less important. 29 Cal.

44

1  4th at 743.  "Had this evidence not been admitted, the jury still would have heard the testimony of

2  Long, Hayes, and Cade that they saw petitioner stab Gardner, and Cade's further testimony that

3  petitioner later confessed to the murder."  *Id.*  However, Yacotis's story that he overheard

4  petitioner and Menefield discuss the knife was essentially a confession.  As former California

5  Supreme Court Justice Kennard stated in dissent, Yacotis's testimony was "damning evidence of

6  petitioner's guilt," that "was an especially dramatic confession because it conformed exactly to

7  the prosecution's theory of the stabbing of Gardner."  *Id.* at 754.

8          This court agrees with former Justice Kennard.  The question posed is not whether petitioner

9  would have been found guilty without Yacotis's testimony.  Rather, the question is whether there

10  is any reasonable likelihood that Yacotis's testimony affected the judgment of the jury.  *See*

11  *Napue*, 360 U.S. at 271.  This court finds there was.  The jury had reason to doubt the testimony

12  of every inmate witness at petitioner's trial.  The jury knew each was receiving benefits for

13  testifying.  The strength of their testimony, as the California Supreme Court recognized, lay in the

14  number of witnesses testifying to a similar version of the events.  Because Yacotis testified that

15  petitioner essentially confessed to his participation in the crime just as it was described by other

16  witnesses, it was an important building block for the prosecution's case.  Further, as discussed

17  above regarding inmate witness Cade and as discussed below regarding inmate witnesses Hayes

18  and Rooks, jurors at petitioner's trial were deprived of important information that would likely

19  have  affected their consideration of the credibility of these important witnesses.  Moreover, as

20  also discussed below, this court finds inmate Long's testimony was unreliable as well.

21  Considered both on its own, and in combination with the other errors at the guilt phase of

22  petitioner's trial, Yacotis's testimony was material.

23          The final question is whether the prosecution knew or should have known that Yacotis

24  testified falsely.  The referee's findings in this regard are somewhat contradictory.  Judge Taft

25  found generally, apparently with respect to all witnesses, that "[t]here was no believable evidence

26  that there was an attempt by Kirk or the investigators to induce false testimony."  (Ex. 74 to

27  Answer, at 2.)  However, when he examined Yacotis's testimony specifically, Judge Taft found

28  that Yacotis's reference hearing testimony was believable.  (*Id.* at 6.)   Yacotis testified at the

1    reference hearing that the prosecution pressured him to testify falsely.  (RH RT 754-55.)

2        Petitioner raises an alternative ground for the granting of relief on his claims regarding

3    Yacotis's testimony.  Petitioner argues that even if prosecutor Kirk is not charged with actual or

4    constructive knowledge that Yacotis's testimony was false, a verdict obtained through the

5    presentation of false evidence is a stand-alone claim for habeas relief.  Respondent does not

6    address this argument.

7        The Court of Appeals for the Ninth Circuit has made clear that "[a] conviction based in part

8    on false evidence, even false evidence presented in good faith, hardly comports with fundamental

9    fairness." *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994).  *See also Maxwell*, 628

10   F.3d at 499-500 (9th Cir. 2010); *Hall v. Director of Corrections*, 343 F.3d 976, 985 (9th Cir.

11   2003); *Killian*, 282 F.3d at 1208 (the court assumes "the prosecutor neither knew nor should have

12   known of [the witness's] perjury" and considers only its effect on the verdict).  The question is

13   only whether the "State's reliance on that perjured testimony undermines confidence in the

14   verdict." *Maxwell*, 628 F.3d at 508.  Yacotis's false testimony along with the false testimony of

15   other inmate witnesses and the lack of important impeachment of many of them renders render

16   the guilty verdict in petitioner's case suspect.  Moreover, this court finds with respect to Yacotis's

17   trial testimony, as with Cade's, that the prosecution should have known it was false.

18                    4.  Prosecutorial Misconduct Involving the Credibility of Witness Robert Hayes

19       Petitioner argues the prosecution suppressed evidence of Hayes' prior convictions, of Hayes'

20   requests for favors from the prosecution, and of Hayes' status as an informant in other cases.

21                         a.  Hayes' Trial Testimony

22       Robert Hayes was one of the three inmate witnesses who testified at trial that he saw

23   petitioner stab Gardner.  (RT 2270:13-18.)  In October 1982, Hayes testified for the prosecution

24   as follows.  Early on the morning of the crime, Hayes was working at his job as a clerk in the

25   prison medical clinic.  (RT 2228:17-18, 2233:6 - 2234:3.)  Petitioner came by the clinic.  (RT

26   2234:12-20.)  Petitioner asked Hayes if alcohol could remove fingerprints and blood.  (RT

27   2245:14 - 2246:4.)  Hayes testified he saw petitioner attempting to wrap a prison-made knife with

28   an ace bandage.  (RT 2292:7 - 2293:20.)  Petitioner then asked for some paper tape.  (RT

46

1   2246:11-21.)  Paper tape is white.  (RT 2294:25-26.)  Petitioner went into a back room where the

2   paper tape is kept and Hayes saw him wrapping tape around the knife.  (RT 2248:14 - 2250:5.)

3   When Hayes questioned petitioner about the knife, petitioner told him he could not let Gardner

4   get away with disrespecting him.  (RT 2251:10-14.)  Hayes testified he looked into the hallway

5   from the window of the clinic and saw petitioner stab Charles Gardner.  (RT 2270:5 - 2272:7.)

6   Hayes claimed he did not discuss the case with other inmate witnesses when he was housed at

7   Chino or at the Contra Costa County Jail before petitioner's trial.  (RT 2299:22 - 2300:9.)

8       Hayes testified that he did not tell investigators what he knew when he was first interviewed

9   or when he testified at petitioner's preliminary hearing because he was just about to be paroled.

10  (RT 2273-77, 2280-81, 2335-36.)  Hayes was paroled in August 1981 and was back in prison in

11  October 1981.  (RT 2235:19-22.)  Hayes testified that in June 1982 he learned that his "life had

12  been placed in jeopardy" and he decided to contact Investigator Gard to tell him that he had some

13  information about the killing of Charles Gardner.  (RT 2336:1-9.)  Hayes did not testify, as other

14  inmate witnesses had, that he expected to receive a letter to the parole board in exchange for his

15  testimony.

16      Hayes' testimony at trial is his only sworn testimony.  He died before the reference hearing.

17  (Referee's Findings, Ex. 74 to Answer at 8; *see* ECF No. 263.)  The referee found "[p]etitioner

18  presented nothing that would indicate that [Robert] Hayes' trial testimony was false."  (*Id.*)

19                  b.  Evidence re Hayes that was not Disclosed to the Defense

20      Petitioner claims the prosecution purposely misled the defense by providing the date of

21  Hayes' conviction as January 1981, rather than the correct date of January 1982.  Further, the

22  prosecution did not provide the defense with all of Hayes' prior convictions.  Reference Hearing

23  Exhibit MM is the prosecution's list of Hayes' prior felony convictions which was provided to the

24  defense at petitioner's trial.  (ECF No. 392-3.)  That list reflected four burglary convictions and

25  one grand theft conviction.  The list omitted a felony forgery conviction which Hayes suffered in

26  Mississippi.  (Ex.'s 216 & 217 to Mtn. for Evid. Hrg. (ECF Nos. 373-5 & 374-1).)  It also omitted

27  a series of burglary convictions for crimes that were committed during the time Hayes was

28  released shortly after Gardner's killing. (Ex.'s 216 & 219 to Mtn. for Evid. Hrg. (ECF Nos. 373-5

47

1    & 374-3).)  Hayes' guilty pleas to these burglaries would appear to have been particularly

2    relevant to an assessment of his credibility by the jury because they involved his false

3    representation to elderly victims that he was a Social Services or Social Security employee.  (Ex.

4    219 to Mtn. for Evid. Hrg. (ECF No. 374-3).)

5        The defense was also unaware of Hayes' requests to prosecutors for a transfer to a different

6    prison and for a protective custody assignment and of prosecutor Kirk's apparent promise to

7    Hayes that he would write a letter on Hayes' behalf to the Board of Prison Terms.  Near the end

8    of the reference hearing, petitioner was for the first time provided with two letters Hayes wrote to

9    prosecutors.

10       The first, dated January 27, 1982, is directed to Department of Justice Investigator Norman

11   Gard.  (Ex. 220 to Mtn. for Evid. Hrg. (ECF No. 374-4).[20])  Therein, Hayes indicated that he had

12   prior conversations with Agent Gard in which they discussed Hayes' then upcoming sentencing

13   and arrangements that had been made to house him at Chino.  (*Id.*)  The second letter, dated

14   September 24, 1982, was addressed to prosecutor Kirk.  (*Id.*)  Therein, Hayes referred to a

15   meeting he had with Kirk in which they discussed witness protection programs.  (*Id.*)  Hayes also

16   mentioned in the second letter that Kirk said he would write a letter to the "Board of Prison Term

17   Committee" on Hayes' behalf.  (*Id.*)  Both of these letters, and the meetings between Hayes and

18   prosecutor Kirk and Agent Gard, were not revealed to the defense prior to petitioner's trial.

19       Petitioner also claims that Hayes had been an informant in other cases.  In the January 27,

20   1982 letter to Gard, Hayes discussed "bits of information which might be valuable in your

21   investigations."  (Ex. 220 to Mtn. for Evid. Hrg. (ECF No. 374-4).)  However, he then went on to

22   discuss various people who told him that word "had reached Folsom that Modestine (Hands) and

23   myself had testified against Baby Zoom (Roberts) and Race Horse (Menefield)."  Hayes then

24   described information from and about various people regarding possible "hits" to be carried out

25   on Modestine and himself.  The letter began and ended with Hayes expressing concern about

26   when he would be moved to Chino.  It is clear from the letter that Hayes was anxious to be moved

27   because he feared for his safety.  The letter does not, as petitioner claims, show that Hayes was

28   _____
     [20]  Both letters also appear in Exhibit 222, ECF No. 375-1.

1 offering the government information in the hope of obtaining a benefit.

2      Finally, in March 1983, after the conclusion of the guilt phase of petitioner's trial, Hayes also

3 sought and was provided a "birthday package" from Investigator Bennet.  (EH Ex. 13.)  Petitioner

4 points out that in his letter to Bennet accompanying his request, Hayes indicated the two had

5 discussed whether Bennet would provide Hayes a Christmas package or a birthday package.  (*Id.*)

6 Petitioner argues Bennet purposely delayed the delivery of the gift until after the guilt-phase

7 verdict had been rendered in petitioner's case.

8                          c.  Discussion of Suppression of Evidence re Hayes

9      As respondent points out, information that Hayes sought to be relocated was not impeaching.

10 Rather, it showed that Hayes feared for his safety because he had testified against BGF members

11 petitioner and Menefield.  This court finds that this evidence was not material and need not have

12 been revealed to the defense.  In addition, petitioner has not shown the prosecution suppressed

13 any information that Hayes was acting as an informant in other cases.  Nor has petitioner

14 established that prior to Hayes' October 1982 testimony, Bennet had promised Hayes a package

15 of either Christmas or birthday gifts.

16      Petitioner has shown that Hayes had prior convictions relevant to his credibility that were not

17 disclosed to the defense and, most importantly, that before Hayes testified, Kirk told Hayes that

18 he would write a letter to the Board of Prison Terms on Hayes' behalf.  The court notes that

19 neither petitioner nor respondent has pointed out a statement made in the September 1982 letter.[21]

20 The statement is clear, but is the only statement on that subject in a letter which dealt primarily

21 with Hayes' fears for his safety and concerns about being placed in a witness protection program.

22 Specifically, Hayes wrote to Kirk, "You stated that you would be sending a letter to the Board of

23 Prison Term Committee regarding me.  Will this be prior to the appearance in court?"  In the next

24 sentence, however, Hayes switched back to the letter's primary subject.  He asked whether the

25 necessary paperwork for the witness protection program would be completed before petitioner's

26 trial.  It does not appear that Hayes was drawing a connection between the Board of Prison Terms

27 _____

28 [21]  While they don't mention the statement regarding a letter to the Board of Prison Terms, both
parties discuss this September 1982 letter in their briefs.  (*See* ECF Nos.  518 at 35, 525 at 21.)

1   and the witness protection program and relocation.  And, it does not make sense that he would

2   have.  The Board of Prison Terms (now known as the Board of Parole Hearings) conducts parole

3   hearings and considers other matters related to the length of incarceration.  *See* Cal. Penal Code §

4   5075.1.  It does not manage prisoner transfers or witness protection programs.  The court takes

5   Hayes' statement at face value – he was inquiring about obtaining a letter regarding his

6   cooperation to the parole board.  It is not surprising that in a letter to prosecutor Kirk in which he

7   is asking about the status of things being done for him, Hayes might inquire about Kirk's

8   promised effort to reduce the length of Hayes' sentence.

9       Certainly, had petitioner's defense attorneys had the September 1982 letter before trial, they

10   could have used it to attempt to show that Hayes had an expectation of receiving a benefit from

11   testifying.  When considered with the prior crimes showing dishonesty, had such impeachment

12   evidence been disclosed to the defense the jury at petitioner's trial would have had more grounds

13   to disbelieve Hayes' testimony.

14       5.  <u>Prosecutorial Misconduct Involving the Credibility of Witness Leslie Rooks</u>

15   Petitioner alleges the prosecutor also suppressed evidence of inmate witness Leslie Rooks'

16   criminal history.

17       a.  <u>Rooks' Trial Testimony</u>

18       Leslie Rooks testified that the night before the stabbing of Gardner, petitioner asked him for a

19   knife because he wanted to kill Charles Gardner.  (RT 2037:22 – 2038:4.)  Rooks further testified

20   that he saw petitioner with a knife shortly before Gardner was killed. (RT 2040:11-12, 2042:6-7,

21   2064:7 - 2065:3.)  Rooks also testified that he saw petitioner on the third floor immediately after

22   the alarm sounded.  (RT 2043:5-27.)  Petitioner was dressed in his underwear. (*Id.*)  When Rooks

23   had seen him earlier, petitioner had been wearing a jacket and pants.  (RT 2043:28 - 2044:11.)  In

24   connection with his cooperation with authorities, Rooks testified that he had received a letter from

25   prosecutor Kirk to parole authorities, thirty dollars in his inmate trust account, placement in

26   protective custody, and help in transferring to a facility of his choice consistent with his security

27   considerations.  (RT 2054:8-21.)  He also testified that he had requested Kirk's help with a prison

28   disciplinary matter but that Kirk had sided with prison staff.  (RT 2054-55.)  That prison

50

1   disciplinary matter resulted in Rooks' transfer to a less desirable facility.  (RT 2055:10-14.)

2                       b.  <u>Rooks' 1995 Declaration</u>

3       In 1995, Rooks signed a declaration recanting much of his trial testimony.  In that declaration

4   Rooks stated that the moment the alarm sounded, he "was talking face to face with Larry Roberts

5   on the third floor.  He and I talked about the alarm as it was sounding and what it possibly

6   meant."  (Ex. 27 to State Pet., ¶ 6.)   Rooks also denied seeing petitioner with a knife on the

7   morning of the killing.  (*Id.* ¶ 8.)  However, he stated that the night before Gardner was stabbed,

8   petitioner "had asked me for a knife.  He told me that he had been threatened that day or night by

9   Little Charles (Gardner)."  (*Id.* ¶ 7.)

10                  c.  <u>Rooks' Reference Hearing Testimony</u>

11       In his reference hearing testimony, Rooks at first remembered little.  (RH RT 89, et. seq.)

12   Initially, Rooks remembered that on the morning Gardner was murdered petitioner had come by

13   Rook's cell to collect some 8-track tapes Rooks had borrowed.  (RH RT 90:26 – 91:7; 95:24-26.)

14   Petitioner forgot to take the tapes with him when he left so Rooks went after him to return the

15   tapes.  (RH RT 96:18-22.)  However, the lock-down was then in progress so Rooks was unable to

16   go to petitioner's wing and had to hand the tapes through "a little broken window" to someone in

17   that wing.  (RH RT 96:23-28.)  Eventually, Rooks testified that he recalled that petitioner had

18   been in Rooks' wing with him when the alarm went off.  (RH RT 101:1-9.)

19       Rooks testified that he agreed to testify at petitioner's trial because he was serving a life

20   sentence and wanted help getting paroled.  (RH RT 120:11-26.)  Rooks also re-affirmed his trial

21   testimony.  (RH RT 107:2-13, 324-25.)  The referee found that no "identifiable portion" of

22   Rooks' trial testimony "was fabricated" and that his trial testimony was "credible."  (Ex. 74 to

23   Answer at 3, 9.)   He also noted that, at the reference hearing, "Rooks remembered very little of

24   the event.  Playing tape recordings of the interviews or reading portions of the interview did not

25   sufficiently refresh his recollection."  (*Id.* at 9.)

26                d.  <u>Discussion of Suppression of Evidence re Rooks</u>

27       Petitioner argues the prosecutor suppressed evidence of Rooks' conviction.  As he had with

28   the other inmate witnesses' rap sheets, prosecutor Kirk discussed Rooks' rap sheet with the trial

judge *ex parte*. (EH RT (ECF No. 506) at 163; Supp. RTs of 10/21/82, 10/22/82 and 10/25/82 In

Camera Proceedings.) The trial judge determined that only those convictions that might be used

for impeachment purposes, which at that time were only convictions that related to truthfulness,

needed to be disclosed. (*Id.*) The trial judge determined that Rooks' had no convictions that

could be used as impeachment under California law. At the time (*Id.*) Prosecutor Kirk provided

the defense with a simple statement that Rooks had no convictions available for impeachment.

Rooks was serving a life sentence for murder. (EH Ex. 44 at 1-3.) The facts of that murder were

particularly gruesome. Rooks and another man murdered a 72-year-old nursing home resident by

beating him, stomping on him, forcing him to orally copulate them, pouring lighter fluid on him,

and setting him on fire. (*Id.* at 1-4.) Rooks confessed that he committed the crime because he

disliked white people. (*Id.*) Petitioner also points to a May 1983 report by parole authorities that

noted Rooks' "history of more than 40 disciplinary infractions with a propensity towards violence

and described his institutional adjustment as 'atrocious.'" (ECF No. 518 at 41 (citing EH Ex. 44

at 4).) Petitioner does not explain, however, how a May 1983 report would have been available

to the prosecution or to defense counsel prior to or during petitioner's trial that took place in

1981-82. While petitioner argues that prosecutor Kirk was obligated to provide the defense with

a copy of Rooks' prison records, he has presented no authority to support that assertion and does

not show what those records, if provided before trial, would have revealed. Moreover, on cross-

examination, Rooks did reveal that he had been charged with a number of disciplinary violations

during his time in prison, including one that involved attacking another inmate. (RT 2079-80,

2115-16.)

Rooks' prior crimes are, however, a different story. As described above, the test for

materiality under *Brady* is whether "there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473

U.S. at 682, *quoted in Kyles*, 514 U.S. at 433-34.

While Rooks' did not testify that he witnessed the attack on Gardner, his testimony was a

crucial link in the prosecution's case because it corroborated the testimony of other witnesses.

The California Supreme Court referred to Rooks as one of the prosecution's four "key witnesses."

1   *Roberts*, 2 Cal. 4th at 295. The fact that Rooks was facing many years in prison would have

2   given the jury a much better sense of his motivation to curry favor with the prosecution to help

3   him try to reduce that prison time. "'Impeachment evidence is especially likely to be material

4   when it impugns the testimony of a witness who is critical to the prosecution's case.'" *Price*, 566

5   F.3d at 914 (quoting *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005)).

6       When combined with all of the other evidence withheld by the prosecution, there is no

7   question that prosecutor Kirk's failure to provide the defense with Rooks' prior conviction and

8   the nature thereof affected the outcome of the guilt phase and thus was "material" under *Brady*.[22]

9             6. Prosecutorial Misconduct Involving the Credibility of Witness Raybon Long

10      These allegations regarding inmate Long set forth in support of petitioner's claim 1 were the

11   subject of the evidentiary hearing. They included both the allegation that the prosecutor knew or

12   should have known he was presenting false testimony at petitioner's trial and the related

13   allegation that petitioner's due process rights were violated because his conviction was based on

14   the false testimony of Long. In his post-hearing briefing, petitioner did not discuss the allegations

15   that the prosecution knew or should have known it was presenting the false testimony of inmate

16   witness Raybon Long. The court provided the parties an opportunity to brief the issue following

17   the evidentiary hearing. (ECF No. 536.) Petitioner's supplemental brief addresses only Long's

18   credibility. Petitioner did not address the prosecutorial misconduct aspect of this claim. (*See*

19   ECF No. 538.)

20               a. Long's Trial Testimony

21      Raybon Long was one of only three witnesses to testify at trial that he saw petitioner stab

22   Charles Gardner. He testified that on the day before the stabbing, he heard petitioner arguing

23   with BGF leader Ruben Williams. (RT 2592:2-3, 2594:4-13.) Long also heard petitioner tell

24   victim Gardner that if he took sides with Williams, he would die with him. (RT 2595:28 -

25

26   ―――――――――――――――
  [22] As he argued above with respect to Cade's prior crimes, petitioner argues the jury should have

27   been able to hear the gruesome facts underlying Rooks' crime. Petitioner has failed to show that
  evidence was, or should have been, admissible under state law. Therefore, this court will not

28   consider it when determining the prejudicial effect of the prosecutor's failure to turn over
  information about Rooks' prior conviction.

1   2596:9, 2598:17 - 2599:1.)  On the day of the stabbing, Long saw petitioner wake Archie

2   Menefield, give him a knife, and tell him Williams was on the first floor.  (RT 2601:7-22,

3   2628:25 - 2629:13, 2655:6-15, 2783:15-26.)  He also overheard petitioner ask a group of inmates

4   whether one of them would be willing to pick up the knives after the stabbing.  (RT 2602:1-28.)

5         Long testified he saw petitioner stab Gardner with a knife with "a white handle on it like

6   hospital kind of tape." (RT 2616:23 - 2619:2.)  He saw Menefield hold Gardner down during the

7   stabbing.  (RT 2621:4-28.)  Long did not see Menefield with a knife during the stabbing.  (RT

8   2622:5-10.)  He saw petitioner drop the knife and, followed by Menefield, run up to the third

9   floor.  (RT 2622:16 - 2623:11.)  He saw Menefield on the second floor throw a "white-handled

10  knife" out of a window.  (RT 2628:9 - 2629:23, 2782:27 - 2783:19.)  He saw Gardner pick up the

11  knife petitioner dropped and run up the stairs.  (RT 2631:12 - 2632:2.)  Long also testified that he

12  was housed at Chino along with inmate witnesses Calvin, Hayes, Cade, and Rooks after the

13  stabbing. (RT 2718:15-18.)  Finally, he testified that "we never discussed the case amongst one

14  another."  (RT 2718:20, 2846:3-4.)

15        During cross-examination, and to some extent on re-direct examination, at petitioner's trial,

16  Long admitted lying during his preliminary hearing testimony and during interviews conducted

17  by the prosecutors.[23]  (RT 2641:12-19, 2674:16 - 2675:13, 2677:22 - 2678:3, 2682:4-25, 2725:2-

18  24, 2772:2 - 2777:22, 2834:11-18.)  In particular, he admitted lying about his BGF membership

19  and testified that he never told interviewers, until shortly before he appeared as a witness at

20  petitioner's trial, that he had seen Archie Menefield with a knife and had seen Menefield grab

21  Charles Gardner.  (RT 2643:16 - 2644:20, 2778:1-6, 2848:5-28.)

22        At trial, Long testified that in exchange for his testimony, he had received placement in

23  protective custody, the opportunity to choose his placement "subject to his custodial status," a

24

25  [23]  The prosecution introduced transcripts or summaries of six interviews it conducted
    with Long.  Those transcripts were used at various times by both the prosecution and defense in
26  examining Long at trial.  According to the exhibit index in volume 1 of the Record of Transcript,
    the interviews were identified as exhibits 38 through 38E.  (1 RT xxxiv.)  "Interview D" is
27  identified as a summary of a March 12, 1981 interview, for which there was no transcript.  (RT
    2821-22.)  Petitioner included the transcripts or summaries of four interviews as Exhibits 4-7 to
28  his First Amended Petition.  (ECF No. 204.)

1    letter from prosecutor Kirk to his custodian regarding Long's cooperation,[24] thirty or forty dollars

2    to compensate for lost work, and, as described by prosecutor Kirk, "the possibility that we might

3    at some time look at . . . reduction [of] sentence."  (RT 2647:14 - 2649:26.)  Long denied ever

4    telling anyone that he testified in order to obtain an early release from prison.  (RT 2719:1-3.)  He

5    also denied that he knew he would be placed in a witness protection program and denied telling

6    anyone he was going to have dental work done as a result of testifying.  (RT 2719:4 - 2720:3.).

7                             b.  Long's 1995 Declaration

8         In 1995, Long signed a declaration in which he stated:  (1) he saw who assaulted Gardner but

9    did "not wish to state who was involved in the incident because I am concerned that there will be

10   retaliation against me;" (2) Cade and Hayes could not have seen the assault; (3) after the assault,

11   prison investigators threatened him if he did not cooperate with them; (4) his testimony that

12   petitioner killed Gardner was false; and (5) prosecutors encouraged him and the others housed at

13   Chino before trial to "get the story straight."  (Ex. A1 to Second Am. Pet. (ECF No. 249).)

14                           c.  Long's 1999 Declaration

15        In 1999, Long signed a second declaration in which he refuted important parts of his 1995

16   declaration.  (Ex. A5 to Second Am. Pet. (ECF No. 249).)  In his 1999 declaration Long recanted

17   his 1995 statement that the prosecution team coerced him to lie in his testimony at petitioner's

18   trial.  He concluded:  "What I said during the course of my testimony during the trial was the

19   truth.  Larry Roberts stabbed Charles Gardner."  (*Id.*)

20                         d.  Long at the Reference Hearing

21        At the reference hearing, Long testified:

22              Now, just to save a whole lot of people a lot of time, in order
             for me to stand up or sit here and deny or confirm what is said over
23           here and – or deny what's confirmed or said over there would mean
             beyond a shadow of a doubt that I am perjuring myself, regardless at
24           the bottom of each one of those statements it said at the bottom that
             I signed this under the penalty of perjury.
25
              So considering the two statements, I have already perjured
26           myself, so to keep myself from being perjured any further, look, as

27   _____
     [24]  At trial prosecutor Kirk showed Long People's Exhibit 37, which he identified as the letter to
28   the warden he wrote for Long.  (RT 2648:12-14.)  Kirk stated on the record at that time that he
     had given copies of that letter to defense counsel.  (RT 2648:7-8, 18-22.)

1    everybody knows, this happened a number of years ago, right?

2        What's today's date?

3    THE COURT: October 6th, 2000.

4    THE WITNESS: There you go. That's twenty years, four months and
     five, six days, something up in there. It's a long time ago. My
5    memory is not as good as it once was, okay? When I told the defense
     one thing and then told the District Attorney and them another, that's
6    what I thought at the time, okay?

7        Half the stuff that went on at that time, I don't even remember
     half of it now, so if anybody tries to stand up and ask me anything
8    about what's going on or what happened in the past, I'm telling you,
     half of it I won't even remember.

9
         Since I've been on the streets, I've used and experimented
10   with a number of drugs.  Half of it I won't remember what I said
     then.  We have to let it go then.  I can't change my past, can't change
11   what was said, good or bad, but I can't perjure myself any further;
     and asked any questions, that's what I would be doing.

12
         To deny what I told you is the truth or admit what I told you
13   is the truth is perjury.  Same thing over there; so if anybody can tell
     me how I cannot keep from doing that in this courtroom, I'm  with
14   it.

15   MR. BLOOM: Finished?

16   THE WITNESS: Sure.

17   THE COURT:  Well I've read Mr. Long's declarations and they do
     seem to be in conflict.
18
         Let me ask you this, Mr. Long: Do you want to talk to an
19   attorney?

20   THE WITNESS:  If I have to make any further statements in this
     courtroom, I definitely do.
21
     THE COURT:  All right. I guess the next question that we have is
22   whether the People want to grant Mr. Long immunity.

23   (Ms. Lee confers with colleague)

24   MS. LEE: We're not in a position to grant any immunity without
     knowing what the testimony will be, and we believe Mr. Long should
25   consult an attorney.

26   (RH RT 38:16 - 40:8.)

27       The court then stated that he would appoint the public defender to represent Long.  (RH RT

28   40:9-11.)  Later that day, Long's appointed attorney informed the court that Long wished to assert

56

1   his Fifth Amendment privilege against self-incrimination.  (RH RT 45:8-11.)  The prosecutor

2   refused to grant Long immunity.  (RH RT 9-20.)  Long did not testify any further at the reference

3   hearing.

4        While Long did not testify, his truthfulness and motivations for testifying were a subject of

5   the testimony of several other witnesses.  Inmate Yacotis testified about conversations he

6   overheard between Long and other inmates who testified at trial.  He testified that he overheard

7   inmate witnesses Long, Calvin, Hayes, and Cade talking about getting their stories straight and if

8   they testified right, that they would receive a benefit like parole.  (RH RT 734-35.)  Yacotis

9   recalled that those inmate witnesses planned to lie on the witness stand.  (RH RT 737:21-25.)  He

10  testified that Long was the "leader" of the group, telling the others what to do.  (RH RT 788:17-

11  21.)  Long also told Yacotis after trial about his receiving of benefits, including getting his teeth

12  fixed, moving his sister, and money, for his testimony against petitioner.  (RH RT 735:9-12.)

13       Inmate Ruben Howard testified at the reference hearing that he was housed at CIM-East with

14  Long.  (RH RT 1392-93.)  Long told him that "they was railroading [petitioner] and he didn't do

15  it."  (RH RT 1405:11-19.)  Inmate Arthur Givens testified at trial that he was an inmate with

16  Long at CIM-East.  (RT 5038-39.)  At the reference hearing, Givens testified that Long "and

17  some more guys was getting their story together to try to get out of prison," and that "[h]e was

18  scared that they was going to get caught; the jury was going to find out that they was lying."  (RH

19  RT 2886:17-24.)  Long also told Givens that he did not see the crime happen.  (RH RT 2890:14-.)

20  Givens testified that he overheard Long say that "the Department of Corrections had moved

21  everybody into the one place so they can discuss the case and get their story straight."  (RH RT

22  2891:21-28.)

23       The referee, Judge Taft, found that while Raybon Long invoked his rights under the Fifth

24  Amendment and did not testify, his "trial testimony should not be treated as believable."

25  Specifically, Judge Taft found:

26            On May 15, 1995, Inmate Raybon Long signed a declaration
           alleging that his trial testimony was false.  In the 1995 declaration,
27         he denied ever hearing Petitioner discussing Gardner's stabbing
           before it occurred.  His declaration also states that he did not see
28         Petitioner assault Gardner or run up the stairs.

Long bargained for favors (i.e., money, transfer to a camp in San Diego, reduction in his prison sentence). Long was housed with other inmate witnesses, and was heard discussing the testimony that was expected and the rewards to be realized.

Ruben Howard testified at the Reference hearing that he was housed at Chino with Long, Calvin and Rooks, that he overheard these three talking about the stabbing, and that he overheard one of the three state that Petitioner did not do the stabbing. Ruben Howard also testified that Long stated that petitioner did not have anything to do with the stabbing.

On November 3, 1999, Long was interviewed by investigators Norman Gard, Bill Bennett and Deputy Attorney General Susan Duncan Lee. This interview resulted in Long executing a second declaration recanting the previous 1995 declaration. Both declarations and the interview were received in evidence.

The November 3, 1999 interview reflects that Long, at that time, was as concerned with suggestions that Petitioner might get off Death Row as he was with the truth or falsity of the conflicting declarations.

At the Habeas Corpus Reference hearing, Long invoked his Fifth Amendment privilege, claiming that in view of the conflicting declarations, whatever he said would subject him to possible perjury charges. He offered no substantive testimony.

Your Referee finds that Long was given money and better prison housing, with representations that Kirk would appear at this parole hearing with favorable recommendations. Based on the conflicting 1995 and 1999 declarations and the aforementioned inducements, your Referee can only find that Long's trial testimony should not be treated as believable.

(Referee's Findings, Ex. 74 to Answer, at 4-5.)

The California Supreme Court rejected the referee's finding that Long's trial testimony should not be believed.

The referee found that Long's trial testimony that he saw petitioner stab Gardner "should not be treated as believable." The Attorney General excepts to this finding. This finding is not entitled to the "great weight" usually accorded to a referee's findings of fact, because Long invoked his privilege against self-incrimination and did not testify at the reference hearing. As noted above, " '[t]he deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying.' [Citations.]" (*In re Hitchings, supra*, 6 Cal.4th 97, 109.) The referee had little opportunity to observe Long's demeanor and manner of testifying. Rather, the referee's conclusion that Long's trial testimony should not be believed was based upon Long's conflicting declarations and the inducements provided by the

58

prosecution.[fn]  We are in as good a position as the referee to assess the effect of these factors, and we reach a different conclusion.

> [Fn] The dissent counters that although the referee did not hear Long testify, he did hear the testimony of inmates Howard, Givens, and Yacotis. (Dis. opn., post, at pp. 750-751.)  That is true, but the jury that found petitioner guilty also had heard the testimony of Givens and Yacotis.  Givens testified at trial, as he did at the reference hearing, that Long stated he was not present at the stabbing.  Yacotis testified at both the trial and the reference hearing that he overheard Long tell Calvin they had to "get their stories straight" so they could obtain their freedom by sending "some other inmates to the gas chamber."  Howard did not testify at trial, but his testimony at the reference hearing that he heard Long state that petitioner had nothing to do with the stabbing was cumulative to the testimony of Givens and Yacotis.

> It has long been recognized that "the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722 [114 Cal. Rptr. 429, 523 P.2d 229]; *see also People v. Minnick* (1989) 214 Cal.App.3d 1478, 1481 [263 Cal. Rptr. 316]; *People v. McGaughran* (1961) 197 Cal.App.2d 6, 17 [17 Cal. Rptr. 121] ["It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit ...."].)  It is true that Long's inconsistent statements lessen his credibility.  (People v. Smallwood (1986) 42 Cal.3d 415, 431, fn. 10 [228 Cal. Rptr. 913, 722 P.2d 197] ["Even if the recantation of the trial testimony was not reliable, these events cast some doubt on the credibility of Spencer as a witness."].)  Because Long has made inconsistent declarations, it is clear that he has lied at some point.  It is not clear, however, that it was Long's trial testimony that was false, rather than his initial recantation.  We will not disturb the jury's verdict based upon a recantation that must be viewed with suspicion and was subsequently disavowed by Long.

> As to the inducements provided by the prosecution upon which the referee relied, these matters were presented to the jury, which convicted petitioner nonetheless.

*In re Roberts*, 29 Cal. 4th at 742-43.

The California Supreme Court dissenting justices, Justice Kennard joined by Chief Justice George, would have adopted the referee's finding regarding Long's trial testimony:

> At petitioner's capital trial, inmate Long testified that the day before the stabbing he heard petitioner threaten to kill fellow inmate Gardner.  He also said that on the morning of the stabbing Long saw petitioner pull a prison-made knife from his clothes, stab Gardner, drop the knife, and run upstairs.  In 1995 Long recanted his trial testimony, then in 1999 he retracted his recantation.  The reference order directed the referee to determine whether Long heard petitioner

59

discuss the stabbing beforehand, saw petitioner stab Gardner, and then saw petitioner run upstairs. At the reference hearing, Long invoked his Fifth Amendment privilege not to incriminate himself.

The referee found that before petitioner's trial, while Long was housed at Chino prison with Leslie Rooks and David Calvin, these three prosecution witnesses were "overheard talking about the case, stating that they had to keep their [trial] testimony consistent." The referee found that Rooks and Calvin "did in fact discuss the case" but, "with the exception of Long," he did "not find any identifiable portion of their testimony to be fabricated."

At the reference hearing, inmate Ruben Howard testified that while incarcerated at Chino he overheard one of the Long/Rooks/Calvin trio say petitioner did not stab the victim. Howard also heard Long say that petitioner had nothing to do with the stabbing. The referee noted that in Long's 1995 recantation of his trial testimony against petitioner he specifically denied hearing petitioner discuss the stabbing of Gardner beforehand, seeing petitioner stab Gardner, or seeing petitioner flee up the stairs after the stabbing. Discounting Long's 1999 retraction of that recantation, the referee found that during the interview with prosecutors that led to the retraction, Long was as concerned that petitioner might get off death row so he would pose a risk to Long as he was concerned about the truth or falsity of his conflicting declarations. The fact that Long had received "money and better prison housing" as well as a promise that the prosecutor would make "favorable recommendations" at Long's parole hearing, coupled with Long's conflicting 1995 and 1999 declarations, led the referee to conclude that Long's trial testimony "should not be treated as believable."

The majority refuses to credit this finding by the referee because at the reference hearing Long exercised his Fifth Amendment privilege not to incriminate himself and consequently did not testify at the reference hearing other than to disclaim much memory of the crime. Thus, the majority reasons, the referee had no opportunity to assess Long's demeanor as a witness and hence Long's credibility.

This court's decisions have long applied the rule that "the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722 [114 Cal. Rptr. 429, 523 P.2d 229]; *accord, In re Hall* (1981) 30 Cal.3d 408, 418 [179 Cal. Rptr. 223, 637 P.2d 690] ["we routinely view recantations with suspicion"].) Although, as the majority points out, two Court of Appeal decisions have said that recantations are given "little credence" (maj. opn., *ante*, at pp. 742-743), this court has never adopted that standard. This court has never intimated that a recantation automatically is given "little credence." (See maj. opn., *ante*, at p. 743.) Here the referee viewed with suspicion Long's recantation of his trial testimony, but he found that Long had fabricated his trial testimony against petitioner. I would give that finding great weight because it is supported by ample credible evidence.

60

The majority dismisses Long's 1995 recantation of his trial testimony against petitioner and his 1999 retraction of that 1995 recantation with the cursory comment that "it is clear that he has lied at some point." (Maj. opn., *ante*, at p. 743.)  One cannot assume that either of Long's two versions was the truth.  He may well have lied in both. What is clear is that Long is a liar.  The referee found that because Long and the other inmates were "housed together" and because the investigators used leading and suggestive questions, "the inmate witnesses were able to learn the general theory of the prosecution's case."  The prosecution's theory was this:  Petitioner, armed with a knife, waited outside the first floor clinic with codefendant Menefield.  When fellow inmate Gardner approached, petitioner stabbed, while Menefield restrained, Gardner.  In the next two to three minutes, petitioner ran upstairs to his third floor cell.

Although Long did not testify at the reference hearing, and the referee thus was unable to observe his demeanor and evaluate his credibility, the referee did observe three witnesses testify about Long.  Inmate Howard, who was not a trial witness, testified at the reference hearing that at Chino prison he heard Long say petitioner had nothing to do with the stabbing of inmate Gardner.

Inmate Arthur Givens testified at trial that at Chino prison Long said he had not been present at the stabbing, and that he and other inmates were trying to align their trial testimony.   At the reference hearing, Givens expanded upon his trial testimony:  Long said he was reluctant to testify at petitioner's trial, fearing the jury would discover they were lying, but Long planned to testify in order to get out of prison.

At trial inmate Yacotis testified that at Chino prison Long and Calvin were trying to tell consistent stories, but Yacotis denied overhearing lengthy coaching sessions between Long and Calvin, and denied saying he had overheard one of them say they were "lying for their freedom."  At the reference hearing, Yacotis testified that Long said he and the other testifying inmates would do "anything" to get out of prison and that Long, as the leader of the inmates who testified for the prosecution, was insistent they get their stories straight before trial.

Thus, although the referee had no opportunity to assess whether inmate Long's reference hearing testimony was credible, the referee did have an opportunity to hear and assess the credibility of three other inmate witnesses who testified that before petitioner's trial Long said he intended to testify falsely that petitioner had committed the stabbing, which Long acknowledged he had not seen.  Moreover, the testimony of Yacotis and Givens at the reference hearing focused on Long's motive to give false trial testimony, namely, Long's stated belief that he would be released from prison in exchange for testifying against petitioner.  Unlike the referee, neither the jury nor this court has had the opportunity to hear this testimony of these three witnesses.

Ample evidence presented at the reference hearing supports the referee's finding that Long's pretrial conduct and statements were

at odds with his trial testimony.  That evidence was bolstered by Long's 1995 recantation of his trial testimony, which he retracted in 1999 when he feared petitioner might be released from death row. (*See People v. Smallwood* (1986) 42 Cal.3d 415, 431, fn. 10 [228 Cal. Rptr. 913, 722 P.2d 197] [retraction of recanted trial testimony "cast[s] some doubt on the credibility" of the witness].)  Because the referee had an opportunity to assess the credibility of three witnesses to Long's pretrial statements, and there is substantial evidence to support the referee's finding that Long's trial testimony against petitioner was false, I would adopt that finding.

*Id.* at 748-51 (Kennard, J., dissenting).

### e.  Evidence re Long Uncovered after Trial

With his motion for an evidentiary hearing, petitioner presented the following new evidence (evidence that was not available to the defense at trial) of the benefits received by Long in for his trial testimony:

- In 1984, he received $432 to relocate from San Diego to Las Vegas.  (Ex. 212 to Mtn. for Evid. Hrg. (ECF No. 373-2).)

- A 1982 note indicated Long was to be transferred to CIM-E (Chino) after he testified. (Ex. 214 to Mtn. for Evid. Hrg. (ECF No. 373-3).)

- In 1983, Long was transferred to the Sierra Conservation Center.  (Ex. 213 to Mtn. for Evid. Hrg. (ECF No. 423-3), filed under seal per March 28, 2012 order.)

- On April 24, 1981, prior to petitioner's trial, prosecutor Kirk wrote a CDC official asking that Long be transferred to a CDC camp near San Diego. (Ex. 215 to Mtn. for Evid. Hrg. (ECF No. 373-4); ECF No. 392-5 (redacted version of letter introduced at reference hearing as Ex. VV).)

- On June 30, 1983, shortly after the conclusion of the penalty phase of petitioner's trial, Kirk wrote the superintendent of the Sierra Conservation Center asking that Long be considered for sentence reduction based on his cooperation in this case. (Ex. 215 to Mtn. for Evid. Hrg. (ECF No. 373-4).)

- Long's statements to a prison psychiatrist. (Ex. 213 (ECF No. 423-3).)

- Richard Yacotis testified at the reference hearing that Long told him years later that he had received dental care, cash, and assistance for his sister as the result of his

62

1   testimony in petitioner's case. (RH RT 735.)

2   • In his 1995 declaration, Long stated that he was given "preferential treatment" at the

3   prisons and at the Contra Costa County jail during trial, had spending money after he

4   testified at petitioner's preliminary hearing, received contact visits while he was held

5   at the county jail, was promised early release from prison on parole, and received $400

6   after he was paroled. (Ex. A1 to Second Am. Pet. (ECF No. 249), ¶¶ 33-35.)

7   In his motion for an evidentiary hearing, petitioner also sets out the following evidence in

8   support of his argument that Long's trial testimony was coached:

9   • A series of interviews conducted by officers and the prosecution reflects that,

10   according to petitioner, Long's testimony was coached. (*See* ECF No. 248 at 35-36.)

11   • Long declared that officers coached him. (Ex. A-1 to Second Am. Pet. (ECF No.

12   249), ¶¶ 20, 21, 23, 24.)

13   • Long declared that officers interviewed him on August 19, 1980 and threatened him if

14   he did not cooperate. (ECF No. 248 at 132-133; Ex. A-1 to Second Am. Pet. (ECF

15   No. 249), ¶¶ 17-19.) That interview apparently was not tape-recorded. (ECF No. 248

16   at 35:6-13.)

17   • Richard Yacotis testified that he overheard Long conspire with others to testify falsely

18   against petitioner. (Ex. 30 to State Pet.; RH RT 734:8 - 735:4.)

19   • Prosecutor Kirk had Long housed at Chino and then at the Contra Costa County Jail

20   with the other testifying inmates so they could coordinate their trial testimony.

21   At the evidentiary hearing, prosecutor Kirk testified that he felt Long was being truthful at the

22   time of petitioner's trial. (EH RT (ECF No. 505) at 77:22-23.) Kirk felt Long changed his story

23   after trial because Kirk "refused to intervene in a burglary arrest that he had gotten in San Diego.

24   And he wanted me to bail him out. I refused to do so." (*Id.* at 77:25 – 78:2.)

25   With respect to Long being transferred to another prison after trial, Kirk testified that it was

26   done for Long's safety. (*Id.* at 117.) Kirk said he was unaware of Cade's letter asking Mr. Gard

27   for a different placement for himself and for Long. (*Id.* at 117-18.)

28   /////

1    Kirk also testified that he was aware that some of Long's trial testimony was not true.  (*Id.* at

2    120:14-16.)  However, he qualified that statement by explaining that Long felt he was being

3    truthful.  Long had been told things by BGF members so that he would "take the fall" for the

4    attack on Gardner.  (*Id.* at 121:19 – 122:1.)  It appears the portions of Long's testimony that Kirk

5    felt were not true were his statements that he was a member of the BGF and that he "was part of

6    their plot to hide the weapon" after Gardner was stabbed.  (*Id.* at 122:2-5.)

7    In addition, Kirk was aware that Long had not been completely truthful in his testimony at the

8    preliminary hearing.  (*Id.* at 130-31.)  Kirk could not recall whether he had informed the defense

9    at trial that Long had previously been untruthful.  (*Id.*)  He learned from inmate Rooks about the

10   BGF "duping" of Long and an investigative report of one of the interviews with Rooks should

11   have revealed that information.  (*Id.* at 132.)  However, Kirk was not sure if it had.

12   f. Discussion of Presentation of Long's False Testimony

13   The referee found generally, apparently with respect to all witnesses, that "[t]here was no

14   believable evidence that there was an attempt by Kirk or the investigators to induce false

15   testimony."  (Ex. 74 to Answer, at 2.)   In his petition, petitioner asserts that Long was threatened

16   with death by correctional officers if he did not cooperate.  (Second Am. Pet. at 132-33.)  This

17   contention is based on Long's 1995 declaration.  Long recanted that statement in his 1999

18   declaration.  Petitioner's argument that Kirk induced false testimony does not necessarily have a

19   firm basis.

20   However, as discussed above with respect to inmate Cade's testimony, evidence supports a

21   finding that Kirk should have known many of the inmate witnesses, and Long in particular,

22   testified falsely at petitioner's trial in important respects.  Kirk had the letter from Cade in which

23   Cade stated that he and Long had discussed the case and would withhold their testimony if they

24   did not get a promise that their prison sentences would be reduced.  And, the simple fact that the

25   prosecution housed Long with the other important prosecution witnesses shows that Kirk should

26   have had every reason to believe they would try to coordinate their testimony.

27   Even if Kirk is not charged with constructive knowledge that Long's testimony was false, this

28   court finds it should not be believed.  *See Maxwell*, 628 F.3d at 508 (The question is only whether

64

1    the "State's reliance on that perjured testimony undermines confidence in the verdict."); *Hall*, 343

2    F.3d at 984-85; *Killian*, 282 F.3d at 1208 (the court assumes "the prosecutor neither knew nor

3    should have known of [the witness's] perjury" and considers only its effect on the verdict).[25]

4        The parties submitted additional briefing regarding Long's credibility.  (ECF Nos. 538, 539 &

5    540.)  Petitioner does little besides recount Long's various statements, the testimony at the

6    reference hearing, and the referee's finding that Long's trial testimony should not be believed.

7    Respondent argues that a "recanted recantation can only be viewed with extreme skepticism."

8    (ECF No. 539 at 10 (quoting *United States v. Gallego*, 191 F.3d 156, 165 (2nd Cir. 1999)).)  He

9    points to the transcript of the prosecution's 1999 interview with Long in which Long indicated

10   that in 1995 when he was visited by the defense attorneys, he understood that petitioner was no

11   longer on death row and was fearful for his own safety.  (*See* Ex. V to Return to State Pet. (ECF

12   No. 539-3).)  However, as the referee noted, in that 1999 interview, Long still appeared far more

13   concerned with whether petitioner was on death row than he did with the truth or falsity of his

14   statements.  Further, the referee heard and adjudged the credibility of three other inmates who

15   undermined the claim that Long's trial testimony was truthful.  This testimony was not available

16   to the jury who convicted petitioner.  The referee heard new evidence and had the opportunity to

17   determine witness credibility – his finding that important underpinnings to the prosecution's case

18   were false, and that Long's trial testimony should not be believed, is entitled to deference.  *See* 28

19   U.S.C. § 2254(d) (state court factual findings are entitled to a presumption of correctness).

20            7. <u>Prosecutorial Misconduct Involving Victim Gardner's History of Violence</u>

21       Petitioner agrees that the guilt phase aspects of this claim were mooted by the California

22   Supreme Court's reversal of petitioner's conviction for the murder of Officer Patch.  (*See* ECF

23   _____

24   [25]  In a footnote, respondent raises a weak challenge to these holdings.  According to respondent,
     "a fair reading of the facts in all those cases show[s] that, indeed, the prosecution either had

25   knowledge or should have had knowledge of the false testimony."  (ECF No. 539 at 8 n.8.)
     Respondent conveniently ignores the fact that the Ninth Circuit made a point in these cases of

26   finding that the presentation of perjured testimony violated due process regardless of the
     prosecutor's knowledge of the perjury, or lack thereof.  According to the Ninth Circuit, "'[a]

27   conviction based in part on false evidence, even false evidence presented in good faith, hardly
     comports with fundamental fairness.'"  *Maxwell*, 628 F.3d at 506 (quoting *Killian*, 282 F.3d at

28   1209).

1   No. 526 at 21 n.8.)  He raises the issue again in his penalty phase claims, which are not addressed
2   in this order.

3        B.  <u>Claim  7 – Ineffective Assistance of Counsel at the Guilt Phase</u>

4       In his claim 7, petitioner makes numerous allegations that attorney Urquhart performed
5   unreasonably at the guilt phase of his trial.  The court granted an evidentiary hearing on just two
6   aspects of petitioner's claim 7:  (1) counsel's failure to investigate and present the impeachment
7   evidence identified in claim 1, and (2) counsel's failure to present the testimony of a prison expert
8   regarding the value to prisoners of the benefits conferred on them.

9          1.  <u>Factual Background</u>
10       In June 1981, attorney Richard Urquhart was appointed to represent petitioner.  (July 22, 2010
11   Decl. of Richard Urquhart ("Urquhart Decl."), EH Ex. 38, ¶ 3.[26])  At that point, Mr. Urquhart had
12   been a lawyer for about 4 and ½ years.  (*Id.* ¶¶ 1, 2.)  He had been an assistant district attorney for
13   a year, but had never tried a felony case to a jury.  (*Id.*)  He had been in private practice since
14   then.  He had tried a "few non-homicide felony trials as well as a number of misdemeanor
15   criminal trials."  (*Id.*)  When he was appointed to represent petitioner, attorney Urquhart had no
16   capital case experience or training.  (*Id.* ¶¶ 2, 3.)  After his appointment, attorney Urquhart
17   attended a death penalty defense seminar and obtained a copy of the California Death Penalty
18   Defense manual.  (*Id.* ¶ 6.)

19       Ronald Moe was appointed to represent petitioner's co-defendant Archie Menefield.  (Moe
20   Depo. at 10.)  Attorneys Urquhart and Moe investigated and prepared for trial separately.
21   (Urquhart Decl., EH Ex. 38, ¶ 8.)

22       In June 1981, Urquhart hired investigator Danny Clark to work on petitioner's case.  (July 23,
23   2010 Decl. of Danny Lane Clark ("Clark Decl."), Ex. 104 to Mtn. for Evid. Hrg., ¶ 1.[27])

24   _____

25   [26]  The declarations of trial counsel were originally submitted to the court under seal.  (*See* ECF
     No. 435.)  They were unsealed during the evidentiary hearing.  (ECF No. 509.)

26   [27]  Mr. Clark's declaration was also originally submitted under seal.  (ECF No. 435.)  In May
27   2014, the court ordered Clark's declaration to be unsealed for purposes of final briefing.  (ECF
     No. 513.)  The obvious corollary to that May 2014 order is that Clark's declaration may also be
28   cited in this court's final order.

1    Attorney George Cotsirilos was appointed to represent petitioner in August 1982 to help

2    prepare the penalty phase defense.  (Aug. 2, 2010 Decl. of George Cotsirilos ("Cotsirilos Decl."),

3    EH Ex. 39, ¶ 2.)  At that point, nothing had yet been done by the defense to prepare for the

4    penalty phase.  (Second Am. Pet. at 294.)  Attorney Cotsirilos was also a fairly new attorney at

5    the time of his appointment.  He had some defense experience in homicide cases, but had "never

6    been directly involved in a capital case."  (EH Ex. 39, ¶ 2.)  Attorney Cotsirilos was involved

7    very little of the guilt phase defense preparation, with the exception of a pre-trial discovery

8    dispute.  (Id. ¶ 9.)  He and attorney Urquhart communicated little about the two phases of trial

9    and they did not attempt to coordinate the guilt and penalty phases.  (Id. ¶ 10.)  Attorney

10   Cotsirilos also noted that attorney Urquhart insisted on keeping control of the penalty phase, but

11   never communicated "his choice of penalty phase themes, witnesses, evidence or strategies."  (Id.

12   ¶ 14.)

13   Attorney Urquhart stated that the first year he was on petitioner's case was devoted primarily

14   to discovery disputes.  (Urquhart Decl., EH Ex. 38, ¶ 10.)  He felt that this focus impeded his

15   ability to prepare the case.  (Id.)  Urquhart continued to push for discovery of the prosecution

16   witnesses' criminal records.  He never received that discovery.  He did not instruct his

17   investigator to obtain them, largely because, according to him, it would have been "too

18   complicated and time-consuming."  (Id. ¶ 11.)

19   Attorney Urquhart's trial files showed that he had copies of the transcripts of the April 16,

20   1981 interview of Ryland Cade conducted by prosecutor Kirk and investigator Gard.  (EH RT

21   272-74; EH Ex. P3.)  In addition, Urquhart referred to the interview and questioned Cade at trial

22   about some information from that interview, so it is clear he was aware of the transcript at that

23   time.  (See RT 3015-17; 3032-35.)  While he did not recall Cade asking for help getting married,

24   he admitted that he must have had the transcript and must have been aware of Cade's request.

25   (EH RT 275:5 - 276:4.)  In fact, Cade, not Urquhart, brought up the marriage help request issue.

26   (RT 3035:13-14.)  Urquhart then asked Cade whether Kirk had arranged for Cade to get married.

27   (RT 3035:16-17.)  Cade responded that he did not.  (RT 3035:28.)  Urquhart never mentioned

28   Cade's request to see his fiancée at a hotel and Kirk's statement that he could probably work that

1  out.  Urquhart testified that his failure to cross-examine Cade about information contained in the

2  April 16, 1981 interview transcript was an oversight on his part, not a strategic decision.  (EH RT

3  284:9-23.)

4      Petitioner also presents the testimony of "correctional consultant and prison expert" James

5  Esten.  (Jan. 8, 2014 Depo. of James Esten ("Esten Depo."), lodged herein on March 19, 2014.)

6  With respect to the guilt phase, Mr. Esten testified to the appropriateness and the value of the

7  benefits the inmate witnesses received.  He testified that even very small sums of money, or just a

8  pack of cigarettes, are not trivial to prisoners.  (*Id.* at 56-58.)  In addition, Esten testified that

9  housing testifying inmates together is not "common practice" because of the dangers of collusion

10  posed by that practice.  (*Id.* at 79.)  Although, he admitted that there was nothing written

11  prohibiting it.  (*Id.* at 80:22.)  He described institutions where all inmate witnesses could have

12  been housed separately so they could not have interacted.  (*Id.* at 80.)

13          2. Legal Standards

14      "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the effective

15  assistance of counsel.'"  *Summerlin*, 427 F.3d at 629 (*en banc*) (quoting *McMann v. Richardson*,

16  397 U.S. 759, 771 n.14 (1970)).  The Sixth Amendment standard for analyzing an ineffective

17  assistance of counsel claim is well established.  In order to prevail on a claim of ineffective

18  assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an

19  objective standard of reasonableness" and that "there is a reasonable probability that, but for

20  counsel's unprofessional errors, the result of the proceeding would have been different."

21  *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *Carter v. Davis*, 946 F.3d 489, 502–

22  03 (9th Cir. 2019) (under *Strickland*, a petition must show counsel's deficient performance under

23  prevailing professional norms and resulting prejudice).

24          a. Deficient Performance

25      Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

26  failed to meet an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Wiggins v.*

27  *Smith*, 539 U.S. 510, 521 (2003).  There is "a 'strong presumption' that counsel's representation

28  was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, 562

68

U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689.)  A petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of sound trial strategy.  *Strickland*, 466 U.S. at 688-89.  Judicial scrutiny of counsel's performance is highly deferential, and thus the court must evaluate counsel's conduct from his perspective at the time it occurred, without the benefit of hindsight.  *Id.* at 689.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688).  However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate."  *Summerlin*, 427 F.3d at 629.  For instance, "strategic choices made after thorough investigation of [the relevant] law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  However, the Supreme Court has explained,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances.

*Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91); *see also Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).  Similarly, a decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to making an informed decision.  *Wiggins*, 539 U.S. at 522-23; *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (defense counsel's decision not to call a witness can only be considered tactical if counsel had "sufficient information with which to make an informed decision"); *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a strategy.  It is, in fact, no strategy at all."); *Reynoso*

1   *v. Giurbino*, 462 F.3d 1099, 1112–15 (9th Cir. 2006) (counsel's failure to cross-examine a

2   witnesses about the witness's knowledge of reward money cannot be considered strategic where

3   counsel did not investigate that avenue of impeachment); *Stankewitz v. Woodford*, 365 F.3d 706,

4   719 (9th Cir. 2004) ("[T]here is no record evidence that [counsel] ever hired an investigator or

5   interviewed Stankewitz's teachers, foster parents, psychiatrists, psychologists or anyone else who

6   may have examined or spent significant time with him during his childhood and youth.");

7   *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of presenting an

8   alibi defense and rejecting a mental health defense was not a reasonable strategy where counsel

9   failed to investigate the possible mental defenses).

10       "[P]retrial investigation and preparation are the keys to effective representation of counsel."

11   *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Daniels v. Woodford*, 428

12   F.3d 1181, 1203 (9th Cir. 2005) ("We have found counsel 'ineffective where he neither

13   conducted a reasonable investigation nor made a showing of strategic reasons for failing to do

14   so.'") (quoting *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992)).  This duty on the part

15   of defense counsel to investigate begins prior to trial.  It is well-recognized that competent

16   strategy decisions cannot be made regarding presentation of guilt phase or penalty phase evidence

17   without a foundation of knowledge based upon a thorough defense investigation that was

18   completed long before jury selection begins.  *Williams v. Taylor*, 529 U.S. 362, 395 (2000)

19   (holding that the petitioner received ineffective assistance in connection with the penalty phase of

20   his trial and noting the record established "that counsel did not begin to prepare for that phase of

21   the proceeding until a week before the trial"); *Earp v. Ornoski*, 431 F.3d 1158, 1175 (9th Cir.

22   2005) ("The Supreme Court has conveyed a clear, and repeated, message about counsel's

23   sacrosanct duty to conduct a full and complete mitigation investigation before making tactical

24   decisions . . . [.]").

25               b.  Prejudice

26       Even where counsel's performance is found to be deficient, in order to prevail on such a

27   claim a petitioner is required to show that counsel's conduct prejudiced him.  *Strickland*, 466 U.S.

28   at 691-92.  To establish prejudice, a petitioner must demonstrate that there is "a reasonable

1   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

2   been different." *Id.* at 694.  A reasonable probability is one "'sufficient to undermine confidence

3   in the outcome'" but is "less than the preponderance more-likely-than-not standard." *Summerlin*,

4   427 F.3d at 640, 643 (quoting *Strickland*, 466 U.S. at 693-94).  Nonetheless, "[t]he likelihood of a

5   different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.  Prejudice is

6   established if "there is a reasonable probability that at least one juror" would have found the

7   defendant not guilty.  *Wiggins*, 539 U.S. at 537.

8                    3. <u>Discussion</u>

9              a. <u>Reasonableness of Counsel's Conduct</u>

10      First, as discussed in the section above addressing prosecutorial misconduct in connection

11   with petitioner's trial, attorney Urquhart had information in his files showing that Cade was

12   serving a lengthy prison sentence.  Petitioner argues Urquhart should have used this information

13   on cross-examination to show Cade had a particularly strong motive to curry favor with

14   prosecutors in the hope of reducing his time in prison.  It is clear from the letters Cade sent to

15   members of the prosecution team that he wanted, and expected, just such an agreement.

16      This court recognizes that California law at the time of petitioner's trial did not permit

17   introduction of evidence of a felony conviction for purposes of impeachment unless the

18   conviction involved the "character trait of truthfulness." *People v Woodard*, 23 Cal. 3d 329, 335

19   (1979), *superseded by statute/rule as stated in  People v Castro*, 38 Cal. 3d 301 (1985).

20   However, the defense intended to do more than simply introduce Cade's prior felony convictions

21   as impeachment.  Rather, as petitioner argued in state court, and argues again here, the prior

22   felony convictions would have been relevant to show Cade's motivation for testifying at

23   petitioner's trial.  At the time of petitioner's trial, California law recognized this distinction

24   between evidence of a prior felony conviction used simply to impeach a witness's character and

25   evidence of a felony conviction to show a motivation to testify. *See People v. Allen*, 77 Cal. App.

26   3d 924, 931-34 (1978) (evidence of pending charges against a witness is not appropriately used to

27   prove a witness's character trait, but is properly relied upon to show the witness's bias or

28   improper motive to fabricate testimony).

                                    71

1       Petitioner has also established that his trial counsel knew, or should have known, about

2   Cade's requests for help in getting married and to see his fiancée and failed to utilize this

3   information effectively at trial.  There was no reason for petitioner's counsel to fail to question

4   Cade about his request of the prosecution team to help him get married in more detail –

5   particularly when the transcript showed that prosecutor Kirk told Cade he would "look into"

6   helping Cade get married.  The only fact that petitioner's counsel elicited at trial was that Kirk did

7   not arrange for Cade's marriage.  Urquhart failed to question Cade at all about his request that the

8   prosecutor help him to see his fiancée at a hotel and Kirk's response that he saw "no reason why"

9   those arrangements could not be made.   Had Urquhart focused on Cade's expectations at the time

10  he gave his statement, and at the time he testified at the preliminary hearing, it is possible he

11  could have shown Cade was expecting help from the prosecution at those times.  Given Cade's

12  importance to the prosecution's case, which was recognized by the defense (EH RT 228), there

13  was no reason to refrain from pointing out the many other benefits Cade sought from the

14  prosecution team and was told he might very well get.

15      Petitioner has also established that there was much his trial counsel did not know.  However,

16  this court finds that little of that ignorance can be attributed to investigative failures of defense

17  counsel.  Petitioner has not shown that a reasonable attorney would have devoted investigative

18  resources to finding the criminal histories of the inmate witnesses.  As is clear from the discussion

19  of petitioner's claim 1, the prosecutor had an obligation to turn over that information to the

20  defense.  It is also clear that prosecutor Kirk stonewalled the defense and never turned over much

21  of the required discovery.  Just because Kirk did so, does not mean counsel should not have

22  expected the required discovery to be provided eventually.  Petitioner has failed to show that his

23  counsel should have re-directed his resources to locating the various inmate witnesses' criminal

24  histories.  Because those criminal histories would have given counsel clues to pursue other

25  avenues of investigation, such as Cade's mental health history, counsel cannot be faulted with

26  failing to find that as well.

27      Petitioner has also failed to show that a reasonable attorney in attorney Urquhart's shoes

28  would have hired a prison expert such as James Esten.  Counsel could easily have argued the

1   importance of the many benefits provided by the prosecution to the inmate witnesses. It did not

2   take an expert to make the significance of those benefits clear to the jury. Nor was an expert

3   necessary, as petitioner seems to argue, to show that the Department of Corrections had many

4   places to move the inmate witnesses pending their trial testimony. In fact, counsel stressed the

5   inmate witnesses' probable collusion based on their placement together at Chino before trial. The

6   fact that the prosecution was not required to house all of their inmate witnesses together was

7   fairly obvious.

8          The cases petitioner cites in support of his argument that a prison expert at the guilt phase was

9   reasonably necessary are not on point. In both, courts considered the sort of technical testimony

10  that counsel could not argue, or know, without consulting an expert. In *Duncan v. Ornoski*, 528

11  F.3d 1222, 1234-38 (9th Cir. 2008), the court considered whether petitioner Duncan's trial

12  attorney rendered ineffective assistance when he failed to consult a serology expert. The attorney

13  had a copy of the police serology report that indicated blood other than the victim's may have

14  been at the crime scene. That blood evidence was the only forensic evidence that the police had

15  not tied to Duncan. There was no reason for counsel to fail to investigate whether the blood

16  matched Duncan's. While other evidence tied Duncan to the crime scene, if the blood had a

17  different source, the defense could have argued Duncan was not the "actual and only killer."

18  Further, the court pointed out that "[i]t is especially important for counsel to seek the advice of an

19  expert when he has no knowledge or expertise about the field." 528 F.3d at 1235. Duncan's

20  counsel's cross-examination of the state's serology expert made clear that he not only did not

21  understand the expert's testimony but thought the expert dealt with hair evidence, not blood

22  evidence. *Id.* at 1236-39. By contrast, in the present case, counsel Urquhart did attempt to

23  impeach the inmate witnesses by showing the benefits they received from the prosecution and by

24  showing that they had the opportunity to coordinate their testimony.

25         In the second case petitioner cites, the court similarly considered scientific testimony that

26  required expert consideration and interpretation. In *Jennings*, 290 F.3d at 1013-16, the

27  petitioner's trial attorney was aware that Jennings was a long-term methamphetamine addict who

28  had used the drug on the night of the crime, that Jennings had attempted suicide, that Jennings'

1    wife told police he was "crazy" and had been diagnosed with schizophrenia, that he had a long

2    history of serious self-harm, and that he had been involuntarily committed for a psychiatric

3    evaluation.  290 F. 3d at 1-13-14.  Despite all of this information, Jennings' counsel did not

4    investigate Jennings' mental health to determine whether a mental health defense would have

5    been a better focus at the guilt phase than the weak alibi defense counsel chose.  *Id.* at 1014.

6    Unlike the present case, in which attorney Urquhart attempted in many ways to impeach the

7    inmate witnesses with information about the benefits they had received and their possible

8    collusion as to their testimony, counsel in Jennings did nothing to pursue a mental health defense.

9       Petitioner has shown attorney Urquhart acted unreasonably in failing to raise Cade's lengthy

10   prison sentence and Cade's requests for help in getting married and request to spend time with his

11   fiancée in a hotel.  However, petitioner has failed to show that his counsel was unreasonable in

12   failing to collect the inmate witnesses' criminal histories.  He has also failed to show that in 1981

13   or 1982 the failure to seek out an expert on prison life and the California prison system was

14   unreasonable.  While testimony such as Esten's may have been helpful to petitioner's defense at

15   trial, it does not necessarily follow that the failure to present it amounted to ineffective assistance

16   of counsel.

17                    b.   Prejudice

18      While Cade was the prosecution's star witness, the effect of Urquhart's failures to question

19   him about his sentence and about promises of help with his fiancée are insufficient, alone, to

20   amount to prejudice under *Strickland*.  Had Urquhart asked these questions, it is not reasonably

21   likely the result of the guilt phase would have been different.  This court does not find convincing

22   petitioner's argument that his counsel would have been able to question Cade about the facts

23   underlying his convictions.  While the court finds a trial court could have considered the fact that

24   Cade was serving a lengthy sentence as a motivating factor in agreeing to testify, the underlying

25   facts of Cade's crimes, going apparently to the likelihood of obtaining parole, are simply too

26   remotely connected to Cade's motivations to be an appropriate subject of cross-examination.

27   That said, the effect of Urquhart's errors contribute to this court's conclusion, reached below, that

28   the guilt phase of petitioner's trial was so laced with error that the verdict finding petitioner guilty

74

1 cannot stand.

2          C.  Claim 16 -  Prejudicial Courtroom Security

3      Petitioner alleges in claim 16 that courtroom security was prejudicially excessive and

4  unjustified.  In the order granting in part petitioner's motion for an evidentiary hearing, the

5  undersigned found that petitioner had failed to show that the security measures employed were

6  inherently prejudicial or that jurors saw petitioner shackled in a way that may have caused

7  prejudice to him.  (ECF No. 466 at 73-79.)   The court also found that petitioner had not shown

8  that prosecutor Kirk exaggerated or fabricated a factual basis for the prosecution's motion for

9  enhanced security at trial.  (*Id.* at 83-84.)  Nonetheless, this court did give petitioner the

10  opportunity to demonstrate he suffered actual prejudice as a result of the security measures

11  employed at his trial.  The undersigned found that petitioner made a "minimally colorable

12  showing of actual prejudice" and instructed the parties to address both the admissibility of juror

13  testimony on this issue and the standard for measuring actual prejudice due to the security

14  measures employed at trial.  (*Id.* at 79-81.)

15      In his supplemental brief, petitioner narrowed his claim of actual prejudice to the effect of the

16  security measures on one juror, Mark Galloway.  As explained below, this court finds petitioner

17  has failed to show the security employed at trial prejudiced juror Galloway against him.

18          1. Background Facts

19      While petitioner presents evidence regarding what others saw, he presents little evidence

20  regarding what Juror Galloway saw.  Mr. Galloway testified at the evidentiary hearing by way of

21  videotaped deposition.

22      Galloway was aware of the incident at the Marin County courthouse in the late 1970's when

23  Black Guerilla Family members tried to free others who were on trial and killed the judge

24  presiding over that trial.  (Oct. 3, 2013 Depo. of Mark Galloway ("Galloway Depo.") at 42-43,

25  lodged herein on March 19, 2014.)  That case made a "significant" impression on Galloway and

26  he was concerned about the "reoccurrence" of a "Marin County" type incident during petitioner's

27  trial.  (*Id.* at 14, 43.)  In particular, he was concerned that security at petitioner's trial was not

28  adequate.  (*Id.* at 14.)  Galloway recalled that jurors discussed their fears for their safety in a

75

1   written note to the trial judge.  (*Id.* at 44.)  He recalled the judge trying "to assure us that he felt

2   there was adequate safety."  (*Id.* at 45.)

3       Mr. Galloway was very certain that he had seen prosecutor Kirk with a gun in a holster twice

4   and saw the gun in a holster in Kirk's briefcase once.  (*Id.* at 48-49.)  Knowing that the prosecutor

5   was armed, however, was not surprising to him and did not affect how safe Galloway felt during

6   trial.  (*Id.* at 29, 51.)

7       Mr. Galloway recalled the security at trial as the following:  (1) a "normal bailiff that did all

8   the passing papers around;" (2) two more bailiffs or sheriffs on either side of the jury box; (3) two

9   more by the front door inside the courtroom; (4) one additional person standing at the doorway in

10  the hallway outside the courtroom.  (*Id.* at 37.)  All of these "bailiffs" were in uniform and were

11  armed.  (*Id.*)  Mr. Galloway did not recall a metal detector outside the courtroom.  (*Id.*)  He did

12  not see any armed personnel on the courthouse roof.  (*Id.*)  Mr. Galloway stated that the security

13  precautions increased his fears for his safety because they were limited to the courtroom.  (*Id.* at

14  38.)

15      Galloway did not recall ever seeing petitioner in shackles.  (*Id.* at 45.)

16      Galloway kept a shotgun by his bed at times.  (*Id.* at 39.)  However, he could not recall

17  whether he had done so during petitioner's trial.  (*Id.* at 40.)  In his June 17, 2009 declaration, Mr.

18  Galloway similarly stated that he "may have kept a shotgun near my bed for safety reasons during

19  the trial."  (Galloway Decl., Ex. 1 to Galloway Depo.)

20          2. Legal Standards

21      Excessive courtroom security may violate due process where it poses a threat to the

22  "fairness of the fact-finding process" by infringing upon the presumption of innocence.  *Holbrook*

23  *v. Flynn*, 475 U.S. 560, 567-68 (1986) (quoting *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976)).

24              Central to the right to a fair trial, guaranteed by the Sixth and
            Fourteenth Amendments, is the principle that "one accused of a
25          crime is entitled to have his guilt or innocence determined solely on
            the basis of the evidence introduced at trial, and not on grounds of
26          official suspicion, indictment, continued custody, or other
            circumstances not adduced as proof at trial."
27

28  *Id.* (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).

                                        76

1    The Supreme Court in *Holbrook* noted that the question to be asked in determining the

2    appropriateness of shackling of a defendant at trial is:  Is it justified by "an essential state

3    interest?" 475 U.S. at 568; *see also Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002)

4    ("[A] defendant has the right to be free of shackles and handcuffs in the presence of the jury,

5    unless shackling is justified by an essential state interest."); *Duckett v. Godinez*, 67 F.3d 734, 747

6    (9th Cir. 1995).  However, the Supreme Court declined to apply the standard governing the

7    shackling of a defendant at trial to the presence of security personnel in the courtroom.  Rather

8    than find such security presumptively prejudicial, the Court held that in reviewing the

9    constitutionality of a state court's use of courtroom security, the federal habeas court must

10
11
12

> [l]ook at the scene presented to jurors and determine whether
> what they saw was so inherently prejudicial as to pose an
> unacceptable threat to defendant's right to a fair trial; if the
> challenged practice is not found inherently prejudicial and if the
> defendant fails to show actual prejudice, the inquiry is over.

13    *Holbrook*, 475 U.S. at 572; *see also Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004).

14    As stated above, this court previously held that petitioner had failed to show courthouse security

15    during his trial was inherently prejudicial.  The evidentiary hearing was limited to determining

16    whether petitioner suffered actual prejudice as a result of the security.  Few cases define a test for

17    "actual prejudice."  In *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011), the Ninth Circuit looked to

18    the state court's consideration of the issue.  The state court considered whether jurors, who had

19    been questioned during voir dire, felt that security measure showed the "defendant might be

20    dangerous."  632 F.3d at 522.  Because the jurors did not express any such concerns, the court did

21    not need to consider whether the extent of that concern amounted to constitutionally unacceptable

22    prejudice.  *Id*.

23    Respondent cites a few additional cases in which courts considered, but failed to find, actual

24    prejudice.  None are particularly helpful in establishing the applicable standard.  In *Morgan v.

25    Aispuro*, 946 F.2d 1462 (9th Cir. 1991), the court briefly considered actual prejudice.  The

26    petitioner's only evidence to establish actual prejudice was the statement of one venireperson

27    during voir dire that courtroom security "reminded her of pictures she had seen during the trial of

28    Charles Manson."  946 F.2d at 1464 n.1.  The court held that the petitioner had failed to establish

1  actual prejudice because there was "no indication that this venireperson was a member of the petit

2  jury." *Id.*  The court did not then reach the question of whether a juror's comparison of the

3  petitioner's trial to the trial of Charles Manson amounted to an actual prejudice against the

4  petitioner.  *See Williams,* 384 F.3d at 588 (no finding of actual prejudice based on statement of

5  alternate juror that she was aware that more than the usual number of deputies were used during

6  trial); *Brown v. Cain*, No. 09-924-D-M2, 2011 WL 7096615, *25 (M.D. La. Nov. 22, 2011) (no

7  actual prejudice because there was no evidence that the fact a security officer followed a juror

8  home one night caused that juror to think it was due to any danger posed by the defendant), *report*

9  *and recommendation adopted*, 2012 WL 243338 (M.D. La. Jan. 25, 2012); *Buchanan v. Beard*,

10  Civil No. 10-423 GPC (NLS), 2013 WL 2390435, *25 (S.D. Cal. May 29, 2013) (after jurors

11  reached a verdict, they expressed concern about the availability of their personal information to

12  the defendants and about their safety; court held that the petitioner had presented no "evidence of

13  that jurors were actually prejudiced as a result of seeing the security in the courtroom").

14      The final legal question involves the admissibility of juror testimony on the issue of prejudice.

15  Federal Rule of Evidence 606(b) describes the circumstances under which juror testimony or

16  evidence of a juror's statement may be considered when a verdict is challenged.[28]  That rule states

17  as follows:

18         (1) **Prohibited Testimony or Other Evidence**. During an inquiry
into the validity of a verdict or indictment, a juror may not testify
19  about any statement made or incident that occurred during the jury's
deliberations; the effect of anything on that juror's or another juror's
20  vote; or any juror's mental processes concerning the verdict or
indictment. The court may not receive a juror's affidavit or evidence
21  of a juror's statement on these matters.

22         (2) **Exceptions**. A juror may testify about whether:

23            (A) extraneous prejudicial information was improperly
brought to the jury's attention;
24            (B) an outside influence was improperly brought to bear on
any juror; or
25            (C) a mistake was made in entering the verdict on the verdict
form.

26

27  /////

28  _____
[28]  The Federal Rules of Evidence apply to these habeas proceedings.  Fed. R. Evid. 1101(e).

1    The Ninth Circuit has held that Rule 606 permits jurors to testify as to how extraneous

2    information made them feel, but not as to how such information affected their votes on the

3    verdict.

> [A] court can and should consider the "effect of extraneous
> information or improper contacts on a juror's state of mind," a juror's
> "general fear and anxiety following" such an incident, and any other
> thoughts a juror might have about the contacts or conduct at issue.
> Id.  In this regard, a juror's testimony concerning his fear that
> individuals would retaliate against him if he voted to acquit (or
> convict) would be admissible, although his statement that he actually
> cast his vote one way or the other because of that fear would not.
> Further, evidence regarding any influence that such improper
> conduct or contacts had on the jurors' abilities to fairly and
> impartially receive the evidence, listen to the testimony presented,
> and the judge's instructions is also admissible. Finally, the court may
> consider the likely consequence of actions that might cause jurors to
> feel intimidated regardless of whether the jurors admit such an effect.
> Thus, objective and subjective factors may both be considered.

12   *United States v. Rutherford*, 371 F.3d 634, 644-45 (9th Cir. 2004) (footnote omitted; internal

13   citations omitted); *see also Mitchell v. United States*, 958 F.3d 775, 787-88 (9th Cir. 2020) (the

14   Supreme Court's decision in *Peña-Rodriguez v. Colorado*, 580 U.S. 206 (2017), which

15   established an exception to Rule 606(b) in the face of evidence of racial bias, is not "clearly

16   irreconcilable" with Circuit precedent).  This court can consider courthouse security to be the sort

17   of extraneous factor about which a juror may testify.  However, the court cannot consider the

18   effect of the courthouse security on the juror's verdict.  Consideration is limited to whether the

19   juror's impression of the petitioner was affected by the security measures employed.

20                    3.  Discussion

21       Petitioner shows that Mr. Galloway did have some fears about his personal safety during

22   petitioner's trial.  However, nothing petitioner has presented demonstrates that Galloway's fears

23   were directly related to petitioner.  Rather, the subject of petitioner's trial, gang involvement in a

24   prison murder, appeared to be the basis for Galloway's fears because of his familiarity with the

25   Marin County incident.  Moreover, according to Galloway, his concerns were that the security

26   employed at trial was inadequate, not that it was so excessive that it caused him to fear for his

27   safety.  More security, not less, would have made Galloway feel more secure.  Because he has

28   failed to establish actual prejudice as the result of the security employed at trial, petitioner's claim

                                                        79

1    16 will be rejected.

2         D.   Claim 29 – Removal of a Juror During Deliberations

3         Petitioner argues the trial court's removal of Juror Conklin during jury deliberations violated

4    his rights to due process and an impartial jury.

5              1.   Background Facts from the Trial Record

6         The guilt phase argument at petitioner's trial concluded on Friday, February 18, 1983.  The

7    court adjourned and continued proceedings to the following Tuesday, February 22.  (RT 7830.)

8    When court reconvened on Tuesday the 22nd, the judge informed jurors that Juror Ferguson was

9    not present and had informed the court that he was ill.  (RT 7831.)  The judge announced that Mr.

10   Ferguson felt he could return to court the following day but "if he isn't able to come tomorrow,

11   [I] have to pick that alternate juror."  On Wednesday the 23rd, there was no indication that Mr.

12   Ferguson was not present and the judge proceeded with jury instructions.  (RT 7844.)  After

13   reading the instructions, the trial judge, Judge Randall, informed jurors that he would be out of

14   town for the remainder of the week and that Judge Ely would be available "if any problems come

15   up."  (RT 7898.)  Judge Randall announced that he would return on Monday, February 28.  Jurors

16   began deliberating the afternoon of Wednesday, February 23.  (RT 7899.)

17        On the morning of Monday, February 28, the fourth day of deliberations, prosecutor Kirk

18   reported that "we have had Juror Conklin contacted and she has been ill." (RT 7902:5-6.)  Kirk

19   stated that both he and the judge had talked with the juror in question, she "is in bed at the present

20   time under a doctor's care.  She does have an elevated blood pressure.  She has indicated that it's

21   a result of both her illness and she says the pressure of what she is doing right now."  (RT 7902:9-

22   13.)  Kirk explained that the juror asked to be allowed to remain at home and felt that she might

23   be able to come back on Thursday.  (RT 7902:18-20.)  The judge added that this was "a fair

24   account" of the conversations with juror Conklin.  (RT 7902:23.)

25        Kirk expressed his concern about a "three-day hiatus." which granting the juror's request

26   would necessitate. (RT 7902:24-28.)  He pointed out that there was no "real assurance at the end

27   of those three days gone by that she would be with us.  She hopes to be with us.  There is no

28   assurance of that.  It would be appropriate to replace her with an alternate."  (RT 7903:4-7.)  Kirk

1   represented that the bailiff had informed him that "the jury would like to continue their

2   deliberations, would like an alternate appointed." (RT 7903:1-2.)  Kirk then requested that juror

3   Conklin be replaced with an alternate juror.

4        Both defense attorneys asked for time to speak to their clients regarding the matter.  (RT

5   7903:17 - 7904:11.)  Attorney Urquhart added that the "impression I got on the phone, Mrs.

6   Conklin still wishes to deliberate.  She needs the time, would be here on Thursday and I'm

7   reluctant to excuse her at this point of time, after two and a half days of deliberation, four months

8   of trial." (RT 7904:1-5.)  He felt that they should wait until Thursday, and, if Conklin remained

9   unavailable, replace her with an alternate then.  (RT 7904:7-10.)

10       Prosecutor Kirk next suggested convening the jury, telling them Ms. Conklin was ill and

11  might not be back until late in the week, telling them that if an alternate was appointed they

12  would be required to start deliberations over again, sending the jury back to consider what to do,

13  and having the jury advise the court how it wished to proceed.  (RT 7905:2-9.)  Attorney

14  Urquhart stated he did not have a problem with this approach, but noted that he did not "want the

15  jury to think they are controlling whether an alternate is picked or not." (RT 7905:12-15.)  The

16  court agreed to prosecutor Kirk's proposed procedure in addressing the issue.  (RT 7905:16.)

17  Attorney Moe stated he had no objection.  (RT 7905:19.)  The court then presented the

18  circumstances to the jury and asked "what would you prefer to do?" (RT 7906:17-28.)  Shortly

19  thereafter,[29] the jury foreman informed the court that the jurors "have decided it would be better if

20  an alternate was called in." (RT 7907:6-7.)

21       It was at this point that attorney Urquhart raised an issue with the judge about notes received

22  from the jury the previous Friday when Judge Randall was out of town and Judge Ely was

23  managing deliberations.  (RT 7908:16-17; 7910:6.)  Counsel recounted that on that Friday

24  morning, the jury had sent out several  questions.[30]  (RT 7908:14-19.)  One of the questions was

25

26  [29]  The court reporter noted in the transcript that at this point in the proceedings the judge
    and all counsel left the courtroom "momentarily" while the jury discussed whether to request the
27  seating of an alternate juror.  (RT 7907:3-4.)

28  [30]  Copies of two jury notes can be found at ECF No. 418-1.

"whether, after having signed and dated the verdict form, a person could change their mind."  (RT 7908:17-19; *see also* ECF No. 418-1.)  Shortly after this jury question was submitted to the court, another question was posed by the jury asking: "whether the person had to support any doubts they had in front of the rest of the panel."  (RT 7908:21-23; *see also* ECF No. 418-1.)  According to counsel, Judge Ely advised the jury in response to their questions, "'Until the formal verdict is returned, you can change your mind.'"  (RT 7910:6-7.)  The second note also shows that the judge told the jurors to refer to certain jury instructions.  (ECF No. 418-1.)

When prosecutor Kirk questioned the relevance of attorney Urquhart's observation about the jury notes received the previous Friday, Urquhart stated: "If this is, perhaps, the one juror who had some reservations, or had some doubt in the case, perhaps the jury's only[31] decision is influenced by that as well.  I think the Court can consider that in making its decision to seat an alternate."  (RT 7909:1-5.)  Attorney Urquhart suggested that the court should consider that Juror Conklin may have been the one questioning juror in weighing the expressed desire of the other jurors to replace Juror Conklin with an alternate.  (RT 7911:1-5.)  Urquhart then posed a formal objection to the seating of an alternate juror.  (RT 7912:23 - 7913:12.)

Without commenting on Urquhart's objection and argument, the trial court informed the jury that an alternate would be seated in place of Juror Conklin.  (RT 7915:17-19.)  The court stated it was seating the alternate because of Juror Conklin's illness and the preference of the rest of the jurors to proceed with their deliberations with an alternate.

> In view of the illness of the Juror Conklin, which I have confirmed by her over the telephone, and having in mind her statement, she is under the care of a physician and unlikely she will be able to appear here for a couple of days, and after discussing it with counsel, it is my view that, and I find, first of all, Juror Conklin is ill and unable to proceed at this time and having discussed this with the jury to see what they preferred to do, why, it is the judgment of the Court that an alternate will be selected to substitute for Mrs. Conklin, and after discussing it with counsel, Mr. Ford will be sworn in as the alternate juror.

(RT 7917:8-22.)  Prosecutor Kirk added that he felt the record should reflect that Juror Conklin had "indicated that she would be unable to be here until Thursday morning."  (RT 7917:24-26.)

---

[31] The word "only" in this sentence appears to be a typographical error.

82

Petitioner's motion for a new trial included an argument that Juror Conklin was erroneously excused and replaced as a juror.  (CT 1811-13; 5/24/83 RT 11.)  Petitioner included a declaration from Juror Conklin that stated she was in fact the juror who had wished to change her mind after signing the verdict form.  (CT 1806.)  Juror Conklin also stated that she had insisted that the jury ask the trial judge whether she could do so.  (*Id.*)  When she spoke to the trial judge on Monday, February 28, the day she was ill, she told the judge she "would be available for deliberations on Thursday."  (CT 1807.)

In argument on petitioner's new trial motion, prosecutor Kirk described what had transpired on the day Conklin called in ill:

> I think the court will recall on that morning, after I think the Court had received one or two calls from Mrs. Conklin, or Pat, the Judge's secretary, had just talked with her, then the Judge invited the attorneys into chambers where the Court stated – placed a call to Mrs. Conklin and in talking to her in our presence and the[n] you asked if any of us wished to talk to her.  I talked with her briefly in the Court's presence and in the presence of Mr. Moe and Mr. Urquhart.  Mr. Urquhart and Mr. Moe were offered an opportunity to talk with Mrs. Conklin.  Both declined.  Then I stated, as we started on the record on page 2, I made a brief summary on Pages 2 and 3 of my conversation with her where the Court concurred insofar as accurately stating the situation at the time, namely, that she was sick; she had high blood pressure, was in a doctor's care.  She felt that it could be controlled under medication.  She was afraid to come out.  If the Court will recall, this was the big rainy season.  My recollection that we had a flood around the courthouse on Friday, the preceding Friday.  It was raining on that particular morning.  Mrs. Conklin was afraid to come out in the rain.  She was ill, in bed.  She couldn't come in, thought she could come in on Thursday.  I asked her several times.  She couched it in terms of "thought" and so we were faced with a situation where the juror was plainly not there, plainly sick, thought she could be in by Thursday, had no assurance of that.  Just no question in anybody's mind, . . .

(5/24/83 RT 15.)  Attorney Urquhart agreed, "she was sick."  He described the objection he had made to replacing Conklin as a request for the Court to consider the fact that she might be a holdout juror.  He wanted the court to wait until that Thursday to see if she showed up and, if she did not, to excuse her at that time.  (*Id.* at 16.)

The judge also recalled what had occurred on the day Conklin called in sick:

> I talked with her four times altogether, starting – I talked to her husband.  None of you talked to him.  She was concerned about coming down with pneumonia.  We all know, raining cats and dogs

all around here.  Obviously, this woman was in no condition to be up here on this jury.  You all saw, she was a little on the plump side. The first time I called, I got her husband.  He answered the phone, said that she was not well at all.  No need of going on.

(*Id.* at 17.)  The judge reaffirmed his prior decision and denied the motion:

I am convinced it was no error whatsoever in my decision to excuse her.  In my opinion, there was absolutely no error, no assurances, that she would be able to be back on Thursday, regardless of what she said, particularly confirming her illness with her husband, and confirming the fact from looking at her, a rather stout woman, that she didn't want to come back if she could possibly help it, and I got that impression from her when I called her and told her what we had decided to do, how sorry she was not able to come back, and accordingly, the motion for mistrial on the grounds of error in excusing the juror is denied.

(*Id.* at 25.)

### 2. Post-trial Evidence

#### a. Juror Conklin

In addition to her September 2013 testimony by videotaped deposition, Juror Conklin signed two declarations, one on May 19, 1983 and the second on May 20, 2009.[32]  In the May 1983 declaration, Ms. Conklin detailed the jury's voting on the charges against petitioner, her initial guilty votes, and her change of mind.  (EH Ex. 53; Ex. 3 to Conklin Depo.)  When she told the jury foreman that she wanted to change her vote, he told her she could not.  The following day, Juror Conklin insisted that the jury foreman send a note to the judge asking whether she could change her vote.  The judge responded that she could.  The other jurors then told Conklin that she "would have to convince them that they were wrong."  She asked that another note be sent out. The judge advised the jury that "a juror did not have to justify his opinion to the others."  She told the other jurors that she did not feel the jury was "hung" and that she would be willing to talk with and listen to the other jurors further.

Ms. Conklin further stated in her May 1983 declaration that she was ill on Monday, February 28, 1983.  She "told the judge that [she] would be available for deliberations on Thursday."  She

---

[32]  Ms. Conklin signed an original declaration earlier, on May 12, 1983.  (*See* Ex. 3 to Sept. 25, 2013 Depo. of Edwina Conklin ("Conklin Depo."), lodged herein on March 19, 2014.)  In her May 19 declaration, she stated that she intended it to replace the May 12 declaration.

wished to remain on the jury and was disappointed when she was excused.

In her May 2009 declaration, Ms. Conklin re-affirmed her May 1983 declaration.  (Ex. 1 to Conklin Depo., ¶ 9.)  Conklin focused on extrinsic evidence considered by the jury and the racial prejudices displayed by some jurors.  Conklin stated that other jurors became "extremely angry" with her during deliberations, "which caused my blood pressure to soar to a level it had not reached before, nor has it reached since."  (*Id.* ¶ 6.)  She felt that the other jurors "didn't want to deal with [her] observations and opinions.  They wanted me to agree with them and be done with it.  But I was not going to change my mind to guilty no matter what."  (*Id.* ¶ 8.)

In her deposition testimony, Ms. Conklin described the deliberations as follows:

> Well, when we first started deliberating there was about four or five people that was along with me.  They did not feel that Roberts was guilty, but that changed as the foreman, you know, when some of the others really got belligerent about it.
>
> . . .
>
> Well, basically, they told me I had to convince them why I thought that he was not guilty.  And I said, "That's not the understanding I have.  I have that we base our convictions on what we see in the trial and we don't have to convince anybody.  I can tell you what my feelings are, but I can't convince you of anything."

(Conklin Depo. at 20:4-8, 16-22.)  Conklin described the deliberations as "awful," "heated," and "uncomfortable."  (*Id.* at 20:11-12, 20:23 – 21:1.)  At one point, she was the lone holdout for a not guilty verdict.  (*Id.* at 25:25 – 26:1, 66:17-20.)  She stated that she did not recall ever voting that petitioner was guilty.  If she did, it must have been a mistake.  (*Id.* at 67:1-14.)

She recalled feeling sick one morning because she was coming down with a cold and her blood pressure was very elevated from the stress of the deliberations.  (*Id.* at 30:10, 30:25 – 31:4.)  She called the court that morning and, she believes, spoke to the judge's secretary.  (*Id.* at 31:23-24.)  She believed that the judge called her back.  (*Id.*)  The judge asked Conklin how she was feeling and whether she wanted to remain on the jury.  (*Id.* at 32:1-2.)  Conklin replied that she did.  She testified that the judge told her "he wanted to keep me on" the jury.  (*Id.* at 84:14-20.)  She did not recall talking with prosecutor Kirk at that time.  (*Id.* at 32:17-21.)  During the phone call, the judge asked her whether she could be back in a couple days, and she said told him she

85

1   "didn't see any reason" why that would not be enough time.  (*Id.* at 32:25 – 33:2.)

2       Ms. Conklin went to the emergency room for her illness.  (*Id.* at 36:14.)  She was prescribed

3   "beta blockers and some cough medicine."  When asked whether she told the judge or anyone

4   else at that time that she was concerned about contracting "pleurisy," she responded that she did

5   not think so, "[i]t's not something I don't think I would have said. . . .  I would have said 'a very

6   bad cold.'"  (*Id.* at 37:6-9.)

7                       b.  <u>Juror Galloway</u>

8       Juror Mark Galloway also signed a declaration in 2009.  (Ex. 1 to Galloway Depo.)  Therein,

9   Mr. Galloway described the replacement of Juror Conklin,

10                  There was a female juror who could not be persuaded to agree
                    with the rest of the jury.  When she called in sick and the judge asked
11                  the rest of us to decide whether to keep her or not, it was not a
                    difficult decision.  We would not have come to a unanimous decision
12                  had this woman stayed on as a juror.

13   (*Id.* ¶ 7.)

14       Mr. Galloway also testified by videotaped deposition.  He described the forceful pressure the

15   jury foreman put on other jurors "to go his way."  (Galloway Depo. at 19-20.)  Galloway felt that

16   the foreman may have "pushed [Juror Conklin] out a little bit."  (*Id.* at 20:19-20.)  He recalled

17   that Conklin did not find the inmate witnesses credible.  (*Id.* at 20:24 – 21:9.)  Galloway

18   remembered that after Conklin had missed two or three days of deliberations, the judge asked the

19   remaining jurors:  "'Well you guys have a choice, either we can bring in an alternate and you

20   guys can start your negotiations all over again or you can – we can wait a few more days for this

21   juror to come back.'"  (*Id.* at 21:15-18.)  Galloway felt that the jury "would never come to a

22   conclusion" if Conklin stayed on as a juror.  (*Id.* at 22:6-7, 23:16-17.)  He did agree that it was

23   possible the judge asked the jurors to decide on the first day of Conklin's absence based on the

24   understanding that she would be out for two or three days.  (*Id.* at 23:7-10.)

25       On cross-examination, Galloway agreed that Conklin was "removed because she was ill."

26   (*Id.* at 54:11-13.)  Galloway also recalled that the stress of the deliberation was hard on Conklin.

27   (*Id.* at 55:6-9.)  He recalled she cried.  (*Id.* at 55:10-11.)

28   /////

                                                  86

1    Galloway recollected that the judge allowed the jury to make the choice about whether or not

2    Conklin stayed.  (*Id.* at 21-22.)   He testified that the judge told the jury, "You guys have a

3    decision to make."  (*Id.* at 55:23-24.)  Galloway felt "the decision was the jury's."  (*Id.* at 56:4-5.)

4    However, he also agreed that the judge did not specifically tell jurors it was their decision to

5    make.  "[H]e asked what our preference was."  (*Id.* at 56:14.)

6                            c.  Juror Edwards

7           Jury foreperson Charles Edwards signed a 2009 declaration and testified by videotaped

8    deposition.  In his declaration, Mr. Edwards described one female juror who did not believe the

9    prosecution's inmate witnesses and thought the defendants were innocent.  (Ex. 1 to Apr. 13,

10   2011 Depo. of Charles Edwards ("Edwards Depo."), lodged herein on March 19, 2014, ¶ 5.)  Mr.

11   Edwards was very clear in his declaration that he did not feel this juror should remain on the jury:

12                    This juror was insistent in her beliefs, refused to stand up for
                  justice, and would not be swayed by our reasonable arguments.  I
13                recognized this as a big problem and was very concerned that if this
                  juror remained in deliberations, we would wind up with a hung jury.
14                I didn't want that.  I believe in the process and I wanted it to work
                  correctly.  So as the foreman, I took control of the situation and
15                alerted the female bailiff.  I pointed out the female juror to the female
                  bailiff and told her that juror refused to believe any of the prosecution
16                witnesses and that we were going to have to get rid of her to avoid a
                  hung jury.  The bailiff said she would relay this information to the
17                judge.

18   (*Id.* ¶ 6.)  Mr. Edwards also appeared to feel that it was his duty as the jury foreman to try to have

19   the holdout juror removed so the jury could come to a unanimous verdict.  When the opportunity

20   to have her removed presented itself, he and the other jurors asked the judge to remove her.

21                    I remember that this female juror had some health issues
                  during the trial and called in sick at one time.  But her illness, or any
22                delay in the proceedings caused by her illness, had nothing to do with
                  my belief that she should be removed from the jury.  I remember at
23                some point after I had spoken to the bailiff about that female juror,
                  the judge brought us into the courtroom and asked the jury what we
24                wanted to do about that holdout female juror.  We discussed it
                  amongst ourselves and I relayed our decision on behalf of the jury.  I
25                told the judge that we felt it was best for the case to have that juror
                  removed.
26
27                    I had served on two previous juries before the Roberts trial,
                  and I experienced a similar situation in one of the other cases.  It was
28                a D.U.I. case.  One of the jurors had been on [sic] a victim on a
                  previous D.U.I. case and, during deliberations, she expressed that she

                                         87

1

2

3

4

> didn't think the defendant was guilty.  I took it upon myself, being the foreman on that case, to report her and to ask to have her removed.  She was in fact removed and once she was replaced, the defendant ended up taking a plea.  The other case I was involved in, we actually did have a hung jury.  I think if a jury hangs, that jury has failed.

5     (*Id.* ¶¶ 7,8.)

6        At his deposition, Edwards affirmed the statements he made in his declaration.  (Edwards

7     Depo. at 10:5-11.)  He described in more detail the DUI case in which a holdout juror was "just

8     adamant about not proceeding with the deliberations." (*Id.* at 11-12.)  In that case, he contacted

9     the bailiff and ended up telling the judge that the juror was unwilling to discuss the case during

10    deliberations.  He reiterated his feeling that for the process to work, the jury needed to reach a

11    unanimous verdict.  (*Id.* at 14:10-12.)  However, he also testified that he did not feel it was the

12    foreman's job to get the rest of the jurors to agree on a verdict. (*Id.* at 18:6-8.)

13       Edwards testified that Conklin "did her job of sitting and listening to the case but refused to

14    discuss the outcome of the different witnesses, trying to piece them together." (*Id.* at 21:1-4.)  He

15    and the other jurors talked about the problems posed by Conklin and a majority of them agreed

16    that he should speak to the bailiff about getting rid of her.  (*Id.* at 21:12-23.)  He did not recall

17    that Conklin had originally voted for conviction and then changed her mind.  (*Id.* at 23:20-23.)

18       Edwards remembered somewhat being told that Conklin was ill and being asked whether the

19    jury wanted to proceed without her.  (*Id.* at 28-30.)  He felt that she should be removed because

20    she was not participating in deliberations appropriately.  (*Id.* at 30:9-12.)  Her illness was not the

21    reason he wanted her removed.  (*Id.* at 30:23-25.)  He testified that when the jurors discussed the

22    judge's question about retaining her, "[h]er illness was not discussed." (*Id.* at 32:5-8.)  Nor did

23    they discuss how long she might be absent because of her illness.  Rather, "[i]t was a unanimous

24    decision by the other twelve jurors, including myself, that she is not helping.  She's hurting." (*Id.*

25    at 32:14-16.)

26       Edwards felt his communication to the bailiff that Conklin should be removed was the

27    motivating factor behind the judge's question to the jury about proceeding without her.  (*Id.* at

28    38:22 – 39:2.)  Edwards felt Conklin should be removed because she was not participating in

1    deliberations, not because of her feelings that petitioner was not guilty.  (*Id.* at 40:2-16.)  He

2    characterized Conklin's participation as being a refusal to "believe in the system, apparently,

3    because she did not believe anybody."  (*Id.* at 46:24 – 47:1.)

4                    3.  Legal Standards

5                        a.  Standards for Dismissing a Juror

6        It should go without saying that a trial judge may not dismiss a juror because that juror is a

7    "holdout" who disagrees with his or her fellow jurors as to what their verdict should be.

8    "Removal of a holdout  juror is the ultimate form of coercion."  *Sanders v. Lamarque*, 357 F.3d

9    943, 944 (9th Cir. 2004).  Thus, "'a court may not dismiss a juror during deliberations if the

10   request for discharge stems from doubts the juror harbors about the sufficiency of the

11   government's evidence.'"  *Id.* at 944-45 (quoting *United States v. Symington*, 195 F.3d 1080, 1085

12   (9th Cir. 1999)); *see also United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987) ("[I]f the

13   record evidence discloses any possibility that the request to discharge [the juror] stems from the

14   juror's view of the sufficiency of the government's evidence, the court must deny the request.").

15   Further, "if the record evidence discloses any reasonable possibility that the impetus for a juror's

16   dismissal stems from the juror's views on the merits of the case, the court must not dismiss the

17   juror."  *Symington*, 195 F.3d at 1087.   "The reason for this prohibition is clear:  'To remove a

18   juror because he is unpersuaded by the Government's case is to deny the defendant his right to a

19   unanimous verdict.'"  *Sanders*, 357 F.3d at 944.

20       The Ninth Circuit has considered a trial court's dismissal of a juror who was known to be the

21   lone holdout but who "expressed an intention to disregard the law."  The Court in that context

22   held,

23                    [I]n deciding whether to discharge a juror mid-deliberation,
                     the  critical  Sixth  Amendment  questions  are  whether,  after  an
24                   appropriately  limited  inquiry,  it  can  be  said  that  there  is  no
                     reasonable possibility that the juror's discharge stems from his views
25                   of the merits, and whether the grounds on which the trial court relied
                     are  valid  and  constitutional.   If  the  answer  to  either  question  is  no,
26                   the removal of the juror violates the Sixth Amendment.

27   *Williams v. Cavazos*, 646 F.3d 626, 644 (9th Cir. 2011), *reversed on other grounds, Johnson v.*

28   /////

                                              89

1    *Williams*, 568 U.S. 289  (2013).[33]  The Ninth Circuit in *Williams* concluded that under this

2    standard, the trial judge's dismissal of the juror violated the defendant's Sixth Amendment rights.

3    646 F.3d at 646.  In an alternative ruling, the court found the trial judge's findings regarding the

4    juror were not supported by the record and therefore the decision to replace the juror was

5    unsupported by good cause as required by the Sixth Amendment.  *Id.* at 647-52.  This court finds

6    particularly instructive that the Ninth Circuit in *Williams* found two, independent grounds for its

7    holding that the trial judge improperly dismissed the juror:  (1) there was a reasonable possibility

8    the juror's dismissal stemmed from her views on the merits of the case; and (2) the trial judge's

9    stated reasons for dismissing the juror were not supported by the state court record.  The court

10   held that either basis alone provided grounds for the granting of federal habeas relief.  *Id.* at 647.

11   Other courts have considered situations, like the present one, in which it appears the juror's

12   dismissal may have rested on more than one basis.  In *Perez v. Marshall*, 119 F.3d 1422, 1423

13   (9th Cir. 1997), the state trial judge had dismissed a lone holdout juror on the grounds that "she

14   was emotionally incapable of continuing to participate in the jury deliberation process."  *Id.*  After

15   holding a hearing, which include a lengthy interview with the holdout juror, the judge determined

16   the juror was "unwilling and unable to remain on the jury."  119 F.3d at 1423.  While recognizing

17   that the juror's holdout status was intertwined with her health problems, the Ninth Circuit held

18   that the trial judge properly removed the juror because her "emotional instability prevented her

19   from continuing to perform the essential functions of a juror in the same way that a hearing

20   impairment, a mental illness, or a poor health condition would have."  *Id.* at 1427.  The court

---

21   [33]  The Supreme Court reversed the Ninth Circuit based on error in determining that the state

22   court had not ruled on the merits of the federal constitutional claim and that, therefore, the
     AEDPA did not apply.  568 U.S. at 304-06.  In *Williams v. Johnson*, 824 F.3d 814  (9th Cir.

23   2016), *amended and superseded on denial of rehearing by Williams v. Johnson*, 840 F.3d 1006
     (9th Cir. 2016), the Ninth Circuit considered the case on remand.  Therein, applying the AEDPA,

24   the Court of Appeals held that the state court had not unreasonably applied federal law as
     determined by the Supreme Court.  824 F.3d at 817-18.  The Ninth Circuit noted, however, that

25   the rule announced in *Symington*, "that the dismissal of a juror violates the Sixth Amendment
     when it is 'reasonably possible that the impetus for [the juror's] dismissal came from her position

26   on the merits of the case,'" was "preferable" to what the trial court had done in the case.  *Id.* at
     819.  However, under the AEDPA, the state court was not bound by Ninth Circuit law.  *Id.*  As

27   noted earlier in this order, the AEDPA does not apply to the present case.  Therefore, this court is
     not reviewing the state court's decision and is bound by the law of this Circuit.

28

1  stated, "a trial court's findings regarding juror fitness are entitled to special deference." *Id.* at

2  1426.

3        The court in *Peek v. Kemp*, 784 F.2d 1479 (11th Cir. 1986) (*en banc*) also considered

4  dismissal of a juror who was both ill, and the holdout juror.  In *Peek*, the trial court had dismissed

5  a juror during deliberations based solely on its conversation with the jury foreperson in which it

6  was indicated that the juror in question was "definitely extremely nervous and almost at the

7  breaking point." 784 F.2d at 1482.  Later, it was determined that the dismissed juror was the lone

8  holdout and that neither the trial judge, nor the attorneys, were aware of that fact. *Id.*  The

9  Eleventh Circuit found that "the record supports a finding that [the juror] was too ill to continue

10  in the deliberations at the time he was dismissed." *Id.* at 1484.  The court found particularly

11  important testimony from the dismissed juror that he had asked to be dismissed because he felt

12  that he was too ill to continue. *Id.* at 1483-84.

13        Unlike the situation presented in *Peek*, in *Symington*, the juror's dismissal was motivated by

14  complaints from other jurors.  195 F.3d at 1083.  In *Symington*, jurors complained about a holdout

15  juror, juror Cotey, who according to the others "was unable to maintain focus on the topics of

16  discussion and she refused to discuss her views with the other jurors." 195 F.3d at 1083.  After

17  questioning the jurors individually, the trial judge dismissed juror Cotey on the ground that she

18  was "'either unwilling or unable to deliberate with her colleagues.'" *Id.* at 1084.  The Ninth

19  Circuit noted that "there may have been some reason to doubt [the juror]'s abilities as a juror,"

20  but "there was also considerable evidence to suggest that the other jurors' frustrations with her

21  derived primarily from the fact that she held a position opposite to theirs on the merits of the

22  case." *Id.* at 1088.  The court found the juror's dismissal violated the Sixth Amendment.  In

23  doing so, the Ninth Circuit employed the following legal standard - a court may not dismiss a

24  juror "if the record discloses any reasonable possibility that the impetus for a juror's dismissal

25  stems from the juror's views on the merits of the case." *Id.* at 1087.  It is instructive that the

26  Ninth Circuit in *Symington* focused on the jury's request for dismissal of the juror in question, not

27  merely on the trial court's decision to dismiss that juror:

28  /////

1

2

3

4

> It is undisputed that if this is true - if the other jurors did seek to remove Cotey because they disagreed with her views on the merits - then dismissal of Cotey was improper. "[W]hen a request for dismissal stems from the juror's view of the sufficiency of the evidence . . ., a judge may not discharge the juror:  the judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement."

5
*Id.* at 1085-86 (quoting *Brown*, 823 F.2d at 596).

6
b.  <u>Standards for Consideration of Juror Testimony</u>

7
Federal Rule of Evidence 606(b) prohibits testimony or other evidence "about any statement

8
made or incident that occurred during the jury's deliberations; the effect of anything on that

9
juror's or another juror's vote; or any juror's mental processes concerning the verdict or

10
indictment."  The rule lists three exceptions:  (i) evidence regarding "extraneous prejudicial

11
information" that was improperly brought to the jury's attention; (ii) an "outside influence"

12
improperly brought to bear on a juror; and (iii) a mistake made in entering the verdict.

13
The Ninth Circuit has held that Rule 606(b) "governs the admissibility of juror testimony in

14
federal habeas proceedings."  *Anderson v. Terhune*, 409 Fed. Appx. 175, 178 (9th Cir. 2011)[34]

15
(citing *McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997), *vacated in part on other*

16
*grounds*, 130 F.3d 833 (9th Cir. 1997), *overruling in part on other grounds recognized by United*

17
*States v. Haischer*, 780 F.3d 1277 (9th Cir. 2015)); *Fields v. Brown*, 503 F.3d 755, 778 (9th Cir.

18
2007); *Roybal v. Davis*, 148 F. Supp. 3d. 958, 1038 (S.D. Cal. 2015).  This rule can create an

19
unusual situation in which the state court considered juror testimony, but the federal habeas court

20
determines that it may not do so.  The Third Circuit has taken the position that Rule 606(b) does

21
not apply to evidence developed in state court.  *See Williams v. Price*, 343 F.3d 223, 230 n.3 (3rd

22
Cir. 2003), *abrogated in part by Peña-Rodriguez v. Colorado*, 580 U.S. 206 (2017).  Because this

23
court is bound by Ninth Circuit precedent, it concludes that Rule 606(b) applies to the juror

24
declarations which are part of the state court record in this proceeding, as well as to juror

25
testimony adduced in these federal proceedings.

26
/////

27

28
---

[34]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

92

1     The Supreme Court has clarified the strictures of Rule 606(b).  In *Warger v. Shauers*, 574

2     U.S. 40, 49-50  (2014), the Court held that Rule 606(b) precludes consideration of a juror's

3     affidavit which related another juror's comments during deliberations.  The petitioner in *Warger*

4     had argued that those comments demonstrated the juror's dishonesty during voir dire.[35]  Because

5     the case came to the court as an "inquiry into the validity of [the] verdict," the Court held that

6     Rule 606(b), by its plain meaning, applied.  574 U.S. at 44-45.  The Court made clear that in any

7     proceeding challenging the verdict, the rule applies.  The fact that the error claimed may not have

8     had a direct effect on the jury's verdict is not determinative of the application of the rule.  *Id.* at

9     48-49.  In other words, Rule 606(b) "applies in any proceeding that involves an inquiry into 'the

10    validity of the verdict,' however that inquiry is framed by the litigants."  *United States v. Leung*,

11    796 F.3d 1032, 1036 (9th Cir. 2015) (citing *Warger* and *Tanner*).

12    The Supreme Court further held that the juror's affidavit did not fall within the exception to

13    Rule 606(b) for  "extraneous" information.  The Court defined "extraneous" information as

14    matters derived from a source external to the jury.  *Warger*, 574 U.S. at 51 (citing *Tanner v.*

15    *United States*, 483 U.S. 107, 117 (1987)).  "'External' matters include publicity and information

16    related specifically to the case the jurors are meant to decide."  *Id.*  External matters also include

17    attempts by an outside party to influence the juror's vote, *Remmer v. United States*, 347 U.S. 227

18    (1954), and a juror's application for a job with the district attorney, *Smith v. Phillips*, 455 U.S.

19    209 (1982).

20    In *Tanner* the Supreme Court examined a similar question of the admissibility of a juror's

21    affidavit about the conduct of other jurors during trial and deliberations.  The Court held that a

22    juror affidavit charging other jurors with the use of drugs and alcohol during trial was

23    inadmissible.  483 U.S. at 121-22.  The Ninth Circuit has refused to consider juror testimony that

24    jurors engaged in premature deliberations or made up their minds before deliberations began.

25    *Leung*, 796 F.3d at 1038.  The court in *Leung* noted that, after *Warger*, Rule 606(b) prohibits

26    consideration of even juror conduct "that does not reflect the solemn duty undertaken by jurors."

27    _____

28    [35]  The Court's decision abrogates the Ninth Circuit's holding to the contrary in *Hard v.*
      *Burlington Northern R.R.*, 812 F.2d 482, 485 (9th Cir. 1987).  *See Warger*, 574 U.S. at 44, 47.

1    *Id.* at 1036.  Thus, conduct about which jurors may not testify includes: insanity, inability to

2    understand English, hearing impairments, or deciding a case through a coin flip or dice roll.  *Id.*

3    (citing *Warger*, 574 U.S. at 45, 52).

4         Nonetheless, the applicable case law lacks clarity on one issue.  Rule 606(b) specifically bars

5    three categories of juror testimony: (1) "any statement made or incident that occurred during the

6    jury's deliberations;" (2) the "effect of anything on that juror's or another juror's vote," and (3)

7    "any juror's mental processes concerning the verdict."  Some courts have recognized that juror

8    testimony on other subjects is not, therefore, barred.  For example, in *Austin v. Davis*, 647 Fed.

9    Appx. 477 (5th Cir. 2016) the court considered the applicability of Rule 606(b) to a juror's

10   declaration that he had lied during voir dire.  Because that declaration did not deal with something

11   that occurred during deliberations, and did not otherwise fall within the barred categories, the

12   Fifth Circuit found it could consider the declaration. 647 Fed. Appx. at 493.  The court in *Austin*

13   noted that in *Warger*, the Supreme Court considered juror declarations describing statements

14   made by jurors during deliberations.  *See United States v. Farmer*, 717 F.3d 559, 565 (7th Cir.

15   2013) (Rule 606(b) does not bar testimony regarding comments made by jurors during trial

16   indicating that they had already decided the case because those communications occurred before

17   jury deliberations).

18        However, in *Tanner* the Supreme Court applied the Rule 606(b) bar broadly, noting that the

19   rule derived from "the near-universal and firmly established common-law rule in the United States

20   [that] flatly prohibited the admission of juror testimony to impeach a jury verdict."  483 U.S. at

21   117.  The Supreme Court refused to consider a juror's affidavit that other jurors had "consumed

22   alcohol during the lunch breaks at various times throughout the trial, causing them to sleep through

23   the afternoons."  *Id.* at 113, 127.  In *Leung*, the Ninth Circuit relied upon the decisions in *Tanner*

24   and *Warger* to hold, contrary to the Seventh Circuit's decision in *Farmer,* that "juror testimony that

25   other jurors engaged in premature deliberations or made up their minds about the case before

26   deliberations began is inadmissible to demonstrate that the jury engaged in flawed processing of

27   the evidence.  Such testimony improperly implicates the internal affairs of the jury during an inquiry

28   into the 'validity of the verdict.'"  796 F.3d at 1038 (quoting *Warger*, 574 U.S. at 48-50); *see also*

94

1  *Love v. Yates*, 586 F. Supp. 2d 1155, 1186-87 (N.D. Cal. 2008) (a juror's declaration explaining

2  that another juror had "prejudged the case," that the jurors "had decided to reach a verdict without

3  her," and that jurors "intimidated, bullied and ostracized her" was considered "plainly

4  inadmissible") (citing *United States v. Decoud*, 456 F.3d 996, 1019 n.11 (9th Cir. 2006)).

5      Petitioner points to the two cases this court cited previously in the order addressing his motion

6  for an evidentiary hearing.  While both are instructive, those cases are not ultimately persuasive

7  because neither addresses Rule 606(b) and both were decided before the Supreme Court's decisions

8  in *Tanner* and *Warger*.  In *Peek*, the Eleventh Circuit reviewed the state habeas court's findings

9  based on the testimony or affidavit of a dismissed juror.  784 F.2d at 1483.  The court accorded the

10  state court's findings a presumption of correctness.  In the second case cited by petitioner, the court

11  remanded for factual development on the question of whether the excused juror was in fact ill, the

12  reason she apparently gave for wanting to be dismissed from the jury during its deliberations.

13  *Green v. Zant*, 715 F.2d 551, 557 (11th Cir. 1983).

14          4. <u>Discussion of Removal of Juror During Deliberations</u>

15      Respondent contends the California Supreme Court made an implicit factual finding that the

16  trial court excused Juror Conklin based solely on her illness.  In rejecting petitioner's claim based

17  on the dismissal of Juror Conklin, the California Supreme Court held:

18              A juror may be replaced if ill. . . .  The language of the statute
         then in effect, as  well as that of section 1089 today, makes clear that
19         the decision to replace an ill juror with an alternate is discretionary.
         The court's discretion is not unbounded:  it must determine whether
20         good cause exists to discharge the juror, and its reasons for discharge
         must appear in the record as a demonstrable reality.  Here the court
21         did its duty by telephoning the ill juror, discussing the matter on the
         record with counsel, and stating its reasons.  Hence there was no
22         abuse of discretion in its ruling that good cause existed to discharge
         the ill juror.   For that reason, we are unable to find  error.
23         Nevertheless, we caution that trial courts must not permit jurors to
         exercise any control over the composition of the jury.  That function
24         is reserved exclusively for the trial court.

25  *Roberts*, 2 Cal. 4th at 324-25 (internal citations omitted).  According to respondent, the fact that

26  the California Supreme Court did not "chide" the trial judge for allowing the jury to vote on

27  whether to proceed with an alternate indicates that the Supreme Court implicitly found that the

28  trial judge's decision to excuse Conklin was based "solely" on her illness.  Respondent claims

95

1    this court must presume this "factual finding" to be correct under 28 U.S.C. § 2254(d).  This court

2    is not convinced that the California Supreme Court so found.  Nothing about the California

3    Supreme Court's decision addresses the fact the trial judge stated two reasons for dismissing

4    Juror Conklin when he did:  because she was ill and because the remaining jurors wanted to

5    proceed without her.  Further, when it considered petitioner's appeal, the California Supreme

6    Court did not have the evidence now before this court from the 2009 declarations of Conklin,

7    Edwards, and Galloway.  This court will not presume the California Supreme Court made a

8    factual finding that the trial court reached the decision to dismiss Juror Conklin based solely on

9    her illness.

10        The stumbling point for petitioner's claim is whether this court may consider the testimony

11   presented by the three jurors.  The only definitive evidence that Juror Conklin was the holdout or

12   that the remaining jurors voted to replace her based solely on her status as a holdout is contained

13   in that testimony.  Rule 606(b), as strictly construed by the Supreme Court in *Tanner* and

14   *Warger*, allows for the consideration of juror testimony regarding deliberations in only the listed

15   situations:  extraneous evidence or influence or a mistake on the verdict form.[36]  None of those

16   exceptions apply here.  Based on a simple reading of the rule, this court may not consider the

17   jurors' testimony and petitioner's claim must fail because its underlying and necessary premise,

18   that Juror Conklin was dismissed because she was a holdout, cannot be established.

19        Nonetheless, this court hesitates to apply Rule 606(b) so simply for several reasons.  First, in

20   *Warger* and *Tanner*, the Court's rationale for applying Rule 606(b) strictly was that the legal

21   system provided other avenues for the information to come to light.  "[T]he defendant's right to

22   an unimpaired jury was sufficiently protected by voir dire, the observations of court and counsel

23   during trial, and the potential use of 'nonjuror evidence' of misconduct."  *Warger*, 574 U.S. at 51

24

---

25   [36]  It could be argued that the jurors' testimony involved the other jurors' vote to proceed without
     Conklin, rather than the deliberations.  However, the Ninth Circuit has held that Rule 606(b)

26   barred consideration of a juror's testimony that she asked the judge to dismiss her not due to her
     stated reason, that her religious values prevented her from judging another person, but because of

27   the stress caused by being the holdout juror.  *Decoud*, 456 F.3d at 1003, 1019 n.11.  Further, there
     is no way around the fact that the jurors' testimony regarding their vote was inextricably

28   intertwined with Conklin's holdout status, information derived from the jury's deliberations.

(citing *Tanner*, 483 U.S. at 127).  The problem in the present case is that these potential sources of evidence were unavailable.  There was no way to question jurors during voir dire about what they might do if presented with an opportunity to rid themselves of a juror who disagreed with them.  The observations of the court and counsel were limited to the following:  (1) at least one juror had changed his or her mind about a verdict on the third day of deliberations; (2) this appeared to cause dissension among the other jurors because they next asked whether the juror who had done so had to "support any doubts" he or she had "in front of the rest of the jury;" (3) the following court day, the court was informed that a juror was ill, in part because of the stress of the case; (4) before being asked, the jurors who were present requested that the court replace the ill juror with an alternate; and (5) when told that they would be required to start deliberations anew with an alternate if the absent juror was replaced, the jurors who were present quickly voted to replace the juror in question.  All of this certainly should have caused the trial judge to inquire further about the basis for the other jurors' "decision" to proceed without juror Conklin, or at the very least, to decide he would either not consider or not follow the other jurors' expressed desire to replace Conklin with an alternate.  That is obviously not what the trial judge did.  His ruling at the time makes clear that he considered both Conklin's illness and the remaining jurors' wishes.  Further, as petitioner points out, it seems highly likely that had the remaining jurors' expressed a desire to wait for Conklin to return, the judge would have decided to wait as well.

There is no question that the trial court should not have permitted the jurors to weigh in on whether to proceed with an alternate or wait for Juror Conklin's return.  Whether or not Juror Conklin was excused, deliberations were going to be delayed because the jury was required to re-start their deliberations with the alternate.  Simply put, the safeguards against dismissal of a holdout juror that should have been put in place by the trial court were not utilized.  Nonetheless, based on the Supreme Court's decision in *Warger* and despite the "Alice in Wonderland" quality of a discussion that must "ignore the most direct evidence of prejudice," this court finds it may not consider the declarations presented by petitioner in support of this claim.  *See Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008) (quoting *Sassounian v. Roe*, 230 F.3d 1097,1109 (9th Cir. 2000)).  Without that underpinning establishing that Conklin was the holdout juror,

1    petitioner's claim in this regard fails.

2    II.  <u>Non-Evidentiary Hearing Claims re the Guilt Phase</u>

3         Petitioner raised numerous additional claims which were not the subject of the evidentiary

4    hearing in this proceeding.

5         As noted above, he was granted an evidentiary hearing on two claims, claim 15 and 30, for

6    which he developed no evidence and agreed to submit briefing along with the non-evidentiary

7    hearing claims.[37]  The parties stipulated, and the court ordered, that the merits briefing on these

8    non-evidentiary hearing guilt phase claims would rest on the Second Amended Petition ("Second

9    Am. Pet.") (ECF Nos. 248, 249, 250), Answer (ECF Nos. 270, 271), and Traverse (ECF No. 284)

10   and supplemental briefing to the pleadings (ECF No. 519).  The parties filed that supplemental

11   briefing in late 2014.  (ECF Nos. 527, 528.)

12        Despite the fact the Second Amended Petition was filed eleven years earlier, petitioner

13   submitted additional briefing on only a few claims.  It is worth noting that this failure to update

14   the petition is not the only deficiency with petitioner's approach.  The other is a lack of

15   organization and focus.  The Second Amended Petition alleges many claims in a grab bag

16   fashion.  Specific sub-claims and allegations are not clearly identified.  No attempt was made to

17   consolidate and explain the basis for many of those claims.  In the Answer and its accompanying

18   Memorandum of Points and Authorities, respondent attempted to itemize petitioner's claims so

19   that they could be addressed in a more orderly manner.  The court is very appreciative of

20   respondent's organizational efforts in this regard.  Respondent's supplemental briefing mirrors

21   the organization set out in the answer.  The court follows it here.

22        A.  <u>Claim 1 – Prosecutorial Misconduct</u>

23        Petitioner was granted an evidentiary hearing on all aspects of claim 1 except the allegations

24   that (1) prosecutors suppressed evidence related to Alexander Vichi and William Acker, and (2)

25   prosecutors committed misconduct by delaying the investigation of petitioner's alibi and in

26   charging him.  In addition, there are a number of arguments contained in the petition that were not

27   raised in petitioner's motion for an evidentiary hearing and therefore were not the subject of

28   ─────────────────────
     [37]  In fact, petitioner submitted no additional briefing on these claims.  (*See* ECF No. 528.)

1    earlier briefing.  In this section, this court addresses all non-evidentiary hearing allegations of

2    prosecutorial misconduct.

3                    1.  Suppression of Petitioner's August 18, 1980 Interview Tape

4         Petitioner alleges that he was interviewed twice.  The first interview was conducted by Officer

5    Horton on August 18, 1980.  It was tape recorded.  Petitioner claims that the prosecution told the

6    defense it lost the recording.  At trial, Officer Horton testified about the interview based on his

7    notes.  Based on this testimony, prosecutor Kirk argued that petitioner provided inconsistent

8    statements in his two interviews.   Petitioner argues that his statements in the first interview were

9    not correctly reflected in Officer Horton's testimony.  (*See* Second Am. Pet. at 137.)

10        As respondent points out, petitioner has failed to support this allegation with any citations to

11   the record or other proof that these events occurred as alleged.  Accordingly, petitioner's claim

12   that the prosecution suppressed the tape recording of Officer Horton's August 18, 1980 interview

13   with petitioner is denied for lack of support.  *See* Rule 2(c)(1), Rules Governing § 2254 Cases

14   (petition must "specify the grounds for relief").

15                    2.  Abuse of Discretion in Charging as a Capital Case

16        While mentioned in petitioner's discussion of claim 1 (*see* Second Am. Pet. at 139-40), this

17   issue is the subject of petitioner's claim 2, discussed below.

18                    3.  Failure to Provide Non-exculpatory Witness Statements

19        Petitioner has failed to show a legal or factual basis for this claim.  (*See* Second Am Pet. at

20   146-48.)

21                    4.  Delay in Turning Over Menefield's Inculpatory Statements

22        On November 12, 1982, well after trial was underway, prosecutor Kirk provided the defense

23   for the first time with statements from co-defendant Menefield represented by notes made on a

24   blueprint diagram of the crime scene.  (CT 890-91.)   When he belatedly produced them Kirk told

25   defense counsel he had overlooked these notes.  Petitioner's counsel moved for a mistrial or

26   dismissal based on the belated disclosure of these notes.  (CT 897-98.)  He argued that the late

27   disclosure prevented him from adequately cross-examining two of the state's key witnesses, Cade

28   and Long.  He further argued that investigation based on the notes would have supported

                                            99

1   petitioner's motion for severance of his trial from Menefield's.  The trial judge heard argument.

2   (RT 3342-74.)  The judge mentioned that he felt the "good faith" of the prosecutor was the "key."

3   (RT 3372:27-28.)  Presumably based on a finding that Kirk acted in good faith, the judge denied

4   the motions.  (RT 3374.)  The following day, attorney Urquhart pointed out that Kirk had filed a

5   brief in August 1982 that showed he had "been spending some time on Mr. Menefield's

6   admissions and confession and that, as I indicated yesterday, we didn't receive the additional

7   statements until November 10th." (RT 3546.)  The judge noted the date and told attorney

8   Urquhart, "[y]ou have your record."  (RT 3546:8-9.)

9       Petitioner has failed to show here that the prosecutor violated *Brady* by not timely turning

10   over these notes because he has not established that the notes in question met the materiality

11   standard of *Brady*, 373 U.S. at 87.  To the extent petitioner argues that the prosecutor's delay in

12   turning over these notes violated the trial court's discovery orders, that is an issue of state law that

13   is not cognizable under 28 U.S.C. § 2254.  *See McGuire*, 502 U.S. at 67-68; *Weatherford v.*

14   *Bursey*, 429 U.S. 545, 559 (1977) (there is no constitutional right to discovery).  To the extent

15   petitioner argues that the delay in turning over these notes prejudiced his ability to seek a

16   severance, the severance issue will be addressed below in the discussion of petitioner's claim 22.

17           5.  Delay in Disclosure of Notes of Interviews with Several Prisoners and Officer

18               DuQuesnay

19       The day after the court considered the issue of the prosecution's delayed disclosure of the

20   Menefield interview notes, Kirk sent the defense another batch of "overlooked" evidence.  (CT

21   899-901.)  Kirk asserted that these documents were found in Lieutenant Hartman's personal file

22   and that he had been previously unaware of them.  The documents were notes taken by Hartman

23   during interviews with inmates Black, Hand, Samuels, Lewis, Turner, and Stephens and a

24   memorandum Hartman wrote following an interview with Correctional Officer DuQuesnay.  (CT

25   902-09.)  It does not appear that the defense sought redress from the court based on the delayed

26   production of these notes.  In fact, petitioner does not allege he suffered any prejudice as a result

27   of the delayed production.  As a result, this court cannot find any prejudicial prosecutorial

28   misconduct on that basis.  (Second Am. Pet. at 150-51.)

### 6. "Losing" Inmate Moore

Inmate Moore was apparently released on parole before petitioner's trial. He was later arrested in Denver, but "released in error." Petitioner insinuates, without any support, that the prosecution played some part in Moore's absence from petitioner's trial. (Second Am. Pet. at 153 & n.122.) However, petitioner has simply failed to show any misconduct on the part of the prosecutor in this regard.

### 7. Presentation of Evidence re the BGF

Petitioner asserts broadly that prosecutor Kirk's presentation of evidence regarding the Black Guerilla Family prison gang amounted to misconduct. (Second Am. Pet. at 154.) In claim 17, petitioner argues that evidence about the BGF was improperly admitted into evidence. Because this court finds below no constitutional error in its admission and that the evidence did not render petitioner's trial fundamentally unfair, prosecutor Kirk cannot be said to have committed prejudicial misconduct in this respect.

### 8. Failure to Provide Officer Stahl's Notes

Petitioner provides no support for his speculation that the original notes Officer Stahl took about his observations on the day of the crime differed from the typed report he relied upon at trial. (Second Am. Pet. at 155.) This claim is baseless.

### 9. Kirk's Comment re Inmate Witness's Location

Inmate Goodwin testified for the prosecution. Goodwin had been released from prison pursuant to a motion made under California Penal Code § 1170(d) for resentencing. (RT 2468.) Goodwin testified that prosecutor Kirk had promised to help Goodwin with this proceeding and did, in fact, write a letter on his behalf. (RT 2469-70.) Goodwin was released the day after he testified at petitioner's preliminary hearing. (RT 2470.)

Defense counsel Urquhart asked Goodwin questions about the letter Kirk wrote on his behalf. (RT 2489.) As Urquhart was showing Goodwin the letter, prosecutor Kirk interjected, "I would indicate to the witness, if I may, your Honor, for purposes of maintaining the witness – for the purpose of not disclosing the witness's location, the name and address of the person to whom these particular letters were written were omitted from the letters." Petitioner claims that Kirk's

101

1    explanation of the lack of identifying information for Goodwin on the letter would have shown

2    the jury that Kirk considered the defendants too dangerous to know the witness's location.

3         Petitioner points this out in his lengthy discourse addressing the prosecutor's conduct at trial

4    that makes up one section of the substance of petitioner's claim 1.  (*See* Second Am. Pet. at 155-

5    56.)  Petitioner does not attempt to pull together common threads of prosecutorial misconduct.

6    He fails to show that Kirk repeatedly tried to inform the jury that the defendants were dangerous.

7    Without more, petitioner's claim that Kirk's comment about the letter he wrote in support of

8    Goodwin's resentencing was prejudicial is neither adequately supported nor persuasive.

9                   10.  Misrepresentation of Inmate Calvin's Testimony

10        Petitioner identifies as a "particularly egregious instance of misconduct" prosecutor Kirk's

11   questioning of inmate Calvin.  (Second Am. Pet. at 156.)  Calvin testified that he saw Menefield

12   stab the victim but that he could not identify the second assailant.  Petitioner argues that Kirk

13   "twisted" Calvin's direct testimony that the second assailant was facing him.  According to

14   petitioner, Kirk described the second assailant as having his back to Calvin.  (*See* RT 2522:3-4.)

15   Petitioner ignores the fact that when Kirk first asked Calvin about the second assailant, Kirk said

16   nothing about the direction he was facing.  (RT 2517:28 ("Did you see any other inmates right in

17   the area?").)  Calvin responded, "Yes, there was somebody's back, but I couldn't see who it was."

18   (RT 2518:1-2.)  It was Calvin, not Kirk, who first mentioned that the second assailant's back was

19   turned to Calvin.  Petitioner's claim in this regard is therefore baseless.

20                   11.  Eliciting Prior Inconsistent Statement from Long

21        Petitioner alleges that during his direct examination of inmate Long, prosecutor Kirk elicited

22   prior inconsistent statements made by the witness.  (Second Am. Pet. at 156.)  He states that

23   attorney Urquhart objected, but that Kirk continued with his questioning.  However, the record

24   reflects that Urquhart objected only to the way in which Kirk was refreshing Long's recollection.

25   (RT 2810.)  He did not object to the fact Kirk was eliciting prior inconsistent statements.

26   Moreover, petitioner has failed to show that even if Urguhart was objecting to the eliciting of

27   prior inconsistent statements, the asking of those questions amounted to misconduct.

28   /////

1          12.  <u>Fabrication of Evidence re Interview with Officer Rudolph</u>

2          Petitioner claims that one of prosecutor Kirk's "most serious transgressions" occurred in his

3   handling of the testimony of Officer Rudolph regarding the east grille gate.  (Second Am. Pet. at

4   156-58.)  Officer Rudolph testified that he was on the third floor corridor the morning of the

5   crime and saw petitioner and Menefield talking.  (RT 3253.)  He further testified that the east

6   grille gate was normally left open but that he could not recall if it was open or closed that

7   morning.  (RT 3258, 3261.)  Rudolph also testified that when the alarm went off, he went through

8   the gate and down the stairs to the second floor.  (RT 3258.)  He could not recall whether or not

9   he locked the gate behind him.  (RT 3258-59.)  He also did not recall whether the gate was locked

10  when he went back to the third floor.  (RT 3275.)  Officer Rudolph recalled being interviewed by

11  prosecutor Kirk and that Kirk took notes during that interview.  (RT 3264-65.)

12         During cross-examination, attorney Urquhart had Rudolph review Kirk's notes from their

13  meeting.  He asked whether those notes refreshed Rudolph's recollection that he told Kirk he had

14  locked the east grille gate. (RT 3265.)  Rudolph testified that he did not tell Kirk he had locked

15  the gate.

16         During the defense case, Urquhart called Kirk as a witness.  (RT 5892.)  Urquhart gave Kirk

17  a copy of notes that Kirk described as being "part notes of [the Rudolph] interview and part

18  summaries of other information.  (RT 5893.)  The notes stated, "Right after came downstairs,

19  after locking east grille gate, sees Vasquez coming upstairs." (RT 5895-96.)  Kirk testified that

20  Rudolph did not tell him he had locked the east grille gate.  (RT 5896.)  Kirk explained that this

21  summary did not reflect only the interview with Rudolph.  He testified that he added the comment

22  that Rudolph locked the gate because he had been told by Officer DuQuesnay that Rudolph had

23  done so.  (RT 5897.)

24         Whether or not Kirk's behavior in this regard constituted misconduct, the jury heard his

25  testimony about his notes and had an opportunity to consider both his and Officer Rudolph's

26  credibility on the issue of the east grille gate.  Petitioner's has failed to prove that Kirk testified

27  untruthfully at petitioner's trial or that his behavior kept evidence from the jury.

28  /////

103

1    Petitioner raised a related issue regarding Kirk's use of the first person in his argument to the

2    jury. (Second Am. Pet. at 157.)  The California Supreme Court rejected these issues because they

3    were procedurally barred and, in the alternative, on the merits.  Whether or not a procedural bar

4    applies, this court finds, as the California Supreme Court did, that petitioner has failed to establish

5    that Kirk committed misconduct in the course of his argument to the jury, which required him to

6    use the first person because he had testified at trial at the behest of the defense.  Kirk's statements

7    reflected testimony at trial.  *See Roberts*, 2 Cal. 4th  at 309-10.

8                        13.   Fabrication of Evidence re Horton's Testimony

9    During a break in his testimony, Officer Horton told prosecutor Kirk that he had made a

10   mistake in identifying inmate Cade's location at the time of the crime.  On redirect examination,

11   Kirk questioned Horton to clear up the mistake. (RT 4185.)  It is entirely unclear from his

12   arguments presented to this court why this amounts to misconduct in petitioner's eyes.  Petitioner

13   cites no case law prohibiting an attorney from talking with a witness during a break in the

14   witness's testimony and he has not shown that Kirk or Officer Horton fabricated the corrected

15   testimony. (*See* Second Am. Pet. at 160.)

16                       14.   Inappropriate Questions to Defense Expert

17   The defense expert, Dr. Captane Thomson, testified about Gardner's propensity for

18   violence. (RT 5113-84.)  At the guilt phase of the trial, that issue was relevant to rebut the

19   prosecution's theory that Gardner was in a state of hypovolemic shock, and therefore was an

20   "unconscious agent of" petitioner, when he stabbed Officer Patch.  Because petitioner's

21   conviction for the murder of Officer Patch was reversed by the California Supreme Court, this

22   issue is no longer relevant to petitioner's guilt phase claims and will, therefore, not be considered

23   by this court.

24                       15.   Questioning of Inmate Stevens

25   Inmate Bill Stevens testified for the defense.  Petitioner contends prosecutor Kirk

26   attempted to frighten and intimidate Stevens into refusing to testify. (Second Am. Pet. at 161.)

27   Right before he was called to the stand, prosecutor Kirk made an *in camera* request that the court

28   advise Stevens of his *Miranda* rights. (RT 5485.)  Kirk told the court that,

                                              104

1

2

3

4

> [T]here is evidence in this case that Mr. Stevens provided Mr. Menefield with a knife used during the fatal assault of Charles Gardner . . . .   And that Mr. Stevens is a principal and a co-conspirator in the murder.  In addition, I have further evidence to indicate that Mr. Stevens has admitted his participation in the conspiracy.

5   (RT 5485:12-18.)  Neither of the defense attorneys objected to this advisement.  (RT 5486.)  The

6   judge gave Stevens his *Miranda* warnings outside the presence of the jury.  (RT 5487-89.)

7   Stevens told the judge he was nonetheless willing to testify.  (RT 5489-90.)  Petitioner has failed

8   to show how Kirk's actions in this regard amounted to prejudicial misconduct.

9        Petitioner also argues Kirk inappropriately asked Stevens whether he had refused to

10   provide a blood sample.  (Second Am. Pet. at 161; *see* RT 5526.)  Because Stevens testified that

11   he did not refuse, this court can discern no prejudice from Kirk's conduct.

12                   16. Questioning of Inmate Peterson

13        Inmate Peterson also testified for the defense.  Again, Kirk asked the judge to give Peterson

14   *Miranda* warnings.  (RT 5548-50.)  Again, defense counsel did not object.  Again, the witness

15   maintained that he wished to testify.  And, again, this court finds no prejudicial misconduct.

16        Petitioner also complains that Kirk violated a court order not to play a tape of an interview of

17   Peterson to refresh Peterson's recollection.  (Second Am. Pet. at 161.)  In fact, Kirk did not play

18   the tape – he merely attempted to.  Whether or not Kirk attempted to do something in violation of

19   a court order, petitioner has not shown it prejudiced him in any way.  (RT 5618-19.)

20                   17. Refusal to Grant Immunity to Inmate Foster

21        Inmate Foster was called to testify by the defense but asserted his rights under the Fifth

22   Amendment and refused to testify.  Foster had a pending criminal case and the fact that he had

23   suffered a prior conviction (which would have been obvious from his testimony in petitioner's

24   case) had some relevance to that pending case.  (RT 5632-36.)  In an offer of proof, attorney

25   Urquhart stated that Foster would testify that he witnessed the crime but could not identify the

26   two assailants as petitioner and Menefield.  (RT 5637-38.)   Counsel for both Foster and the

27   defense asked the prosecutor to extend immunity to Foster as to any admission he might make

28   that would be relevant to the pending criminal case.  (RT 5646.)  Prosecutor Kirk stated that he

1    could not do that.  Only the district attorney prosecuting the charges against Foster could.  (RT

2    5646-47.)  Urquhart then asked Kirk to contact the district attorney to request the granting of

3    immunity for Foster.  (RT 5656.)  Kirk declined.  He told defense counsel they could contact the

4    district attorney and make the request themselves.  (*Id.*)  He noted that he could not require the

5    district attorney to do anything.  (RT 5657.)

6        Petitioner presents no case law to establish that the prosecutor in this situation was required to

7    reach out to the district attorney to request immunity for a defense witness.  (*See* Second Am. Pet.

8    at 161-62.)  Petitioner has failed to establish that Kirk's actions as to this witness constituted

9    misconduct.

10                  18.  Failure to Provide Interview Report re Inmate Wilson

11       When the defense called inmate Harrit Wilson to the stand, attorney Urquhart noticed that

12   prosecutor Kirk appeared to be reviewing an interview report.  (RT 5907.)  When Urquhart asked

13   Kirk if he was looking through an interview report, Kirk replied, "[p]erhaps."  Urquhart requested

14   a copy.  Kirk stated that he did not believe he was required to give the defense interview reports

15   of people who were not percipient witnesses.  (RT 5907-5907A.)  He added that the judge had so

16   ordered.  (RT 5907A.)  Attorney Urquhart at that point did not pursue the matter.

17       Respondent argues that petitioner suffered no prejudice from the prosecution's failure to

18   produce the Wilson interview report in discovery because Wilson testified to its contents.  While

19   that may be true, this court is unable to make the comparison invited by respondent's argument

20   because neither party has pointed out where in the record, if at all, Wilson's interview report can

21   be found.  In any event, petitioner has not shown prejudice stemming from the prosecution's

22   withholding of the report because the record indicates that the information petitioner's counsel

23   received from Wilson was the same as the information contained in the interview report.  When

24   arguing that Kirk had failed to disclose multiple things to the defense, Urquhart pointed out the

25   Wilson report.  (RT 6142.)  Urquhart also noted that Wilson had told the defense the same thing

26   he told the prosecutor.  Petitioner's assertions that Kirk committed misconduct in failing to

27   provide the defense with Wilson's interview report does not entitle him to habeas relief as to that

28   claim.

                                          106

1          19.  Questioning Agent Bennett re Payments made to Inmate Witnesses

2        Agent Bennett testified about the payments made to the various inmate witnesses.  He stated

3    that Cade was paid $60, Long $50, Hayes $50, Green $40, Rooks $30, Calvin $10.  (RT 6392-

4    93.)  These payments were made to compensate the witnesses because they had been placed in

5    protective custody and were unable to earn money through their regular prison jobs.  (RT 6394.)

6    He explained that the $10 paid to Calvin was made while he was in prison.  When Calvin  was

7    released on parole, he went into a witness protection program.  (RT 6393.)  In conjunction with

8    that program, Calvin was paid a total of $639.15.  (RT 6393.)  Bennet explained that the

9    payments covered transportation, a motel, and food.  (RT 6394.)  When explaining the protective

10   custody, Bennet added, "They were there because of the death threats."  (RT 6394:20.)  Attorney

11   Urquhart's objection to this statement was sustained and the court stated, "it may go out."

12       Respondent frames this issue as an objection to the evidence that the witnesses were in

13   protective custody.  (Answer at 68.)  That does not appear to be the case.  Petitioner's description

14   of these questions and answers focuses on Bennett's revelation that the witnesses had received

15   death threats.  (Second Am. Pet. at 162-63.)  There is no question that this information would

16   have been highly prejudicial to both petitioner and Menefield.

17       Attorney Urquhart pointed out at trial that prosecutor  Kirk should have warned Bennett not to

18   mention the death threats.  (RT 6394.)  While that is certainly true, petitioner has not shown that

19   Kirk committed misconduct.  He asked Bennett why the inmate witnesses had received payments.

20   (RT 6394.)  Bennett could, and should, have limited his answer to the fact that they had been

21   placed in protective custody.  The fact that he did not cannot necessarily be imputed to Kirk.

22   However, particularly when combined with Rooks' testimony that petitioner threatened to kill

23   him, this testimony carried with it more prejudicial weight.[38]  Nonetheless, and, given the judge's

24   exclusion of the evidence from consideration, this court finds any error was not sufficiently

25   material to entitle petitioner to federal habeas relief as to this claim.

26   /////

27

28   [38]  Petitioner's claim regarding the admission of Rooks' testimony that petitioner threated to have
     him killed is addressed below in the court's discussion of petitioner's claim 19.

### 20. Questioning Rooks re an Order to have him "hit"

Rooks testified on rebuttal that petitioner had ordered to have him killed or "hit." (RT 6495.) The admissibility of this evidence is the subject of petitioner's claim 19, discussed below. Because this court finds the evidence was not improperly admitted, any misconduct on Kirk's part in this regard was not material.

### 21. Questioning Agent Gard

Kirk asked Agent Gard about his experience investigating prison homicides. (RT 6679-80.) Gard testified about investigating the July 1970 killing of an officer by a group referred to as the Soledad Seven. (RT 6680.) Gard added that "[u]ltimately . . . they were not convicted." Attorney Moe questioned the relevancy of this line of questioning. Nonetheless, the trial court allowed it. Petitioner claims Kirk then asked "irrelevant and inflammatory" questions about George Jackson, an inmate who was shot while at San Quentin and was apparently a "focal point" for the BGF since his death. (RT 6681.) Because petitioner does not explain the irrelevance of these questions and answers, this court cannot find that they amounted to prosecutorial misconduct. (See Second Am. Pet. at 163.)

Similarly, petitioner's complaint that Kirk continued to elicit hearsay testimony after objections to it were sustained by the trial judge is without substance. (*Id.*) After the judge considered defense counsel's hearsay objections *in camera* (RT 6690-94), Kirk agreed to eliminate seeking double hearsay testimony in some of his questions posed to witnesses (RT 6694). Defense counsel found that satisfactory. Kirk's questions that followed thereafter do not appear to have attempted to elicit double hearsay testimony and, most importantly perhaps, defense counsel did not object to them in any event.

### 22. Misconduct in Closing Argument

Petitioner claims a number of aspects of Kirk's closing argument to the jury at trial amounted to misconduct. First, he argues that Kirk improperly relied on BGF evidence. (*See* Second Am. Pet. at 164; RT 7496, 7521.) In his claim 17, petitioner argues that evidence about the BGF was improperly admitted at his trial. Because this court finds no constitutional error in the admission of this evidence, Kirk cannot be said to have engaged in prosecutorial misconduct in arguing to

1   the jury based upon that evidence which was admitted at trial.

2         Second, petitioner argues Kirk "attack[ed]" his character.  Petitioner cites to just two pages of

3   Kirk's closing argument – RT 7496 and 7506.  Apparently, petitioner is referring to Kirk's

4   reference to the BGF appearing on these pages of the reporter's transcript.  Petitioner does not

5   explain how those references in the prosecutor's closing argument amounted to attacks on

6   petitioner's character.

7         Third, petitioner complains about Kirk's frequent use of the first person.  He cites nineteen

8   places in Kirk's closing argument in which Kirk used phrases such as "I believe," or "I think," or

9   "I know."  Petitioner simply alleges that Kirk used those phrases to convey to the jury that he had

10  some "inside information that he wished he could share with the jury if it weren't for those pesky

11  rules that get in the way."  (Second Am. Pet. at 164.)  Petitioner does not, however, explain why

12  this is so.  In fact, as discussed above, in at least some of those statements, Kirk was referring to

13  his own trial testimony elicited by defense counsel.  Petitioner has failed to meet his burden of

14  showing that any of Kirk's uses of the first person in his closing argument amounted to

15  misconduct.

16        Finally, petitioner alleges Kirk erred in his closing argument by referring to statements made

17  by Menefield, but failing to point out that jurors could use those statements only against

18  Menefield and not against petitioner.  Respondent contends that, because this was argument, Kirk

19  had no obligation to remind the jury that these statements could be used only against Menefield.

20  According to respondent, that was the judge's job to so instruct at the time the evidence was

21  admitted and when instructing the jury.  Petitioner cites no authority to the contrary.

22        The rule petitioner claims Kirk violated was set out by the Supreme Court in *Bruton v. United*

23  *States*, 391 U.S. 123 (1968).  This court addresses the question of whether the out-of-court

24  statements of Menefield violated the rule of *Bruton* below in the discussion of petitioner's claim

25  22.  As described there, petitioner has either failed to show a *Bruton* violation took place or has

26  procedurally defaulted his claims in this regard because his counsel failed to object at trial.  The

27  lack of an objection at trial is particularly pertinent to petitioner's argument here.  Even if

28  prosecutor Kirk had some obligation to inform the jury during closing argument that Menefield's

1    statements could only be considered against Menefield, it is hard to imagine he was required to do

2    so if the trial court never so informed the jury because defense counsel had failed to object.  *See*

3    *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637

4    (1974)) (The relevant question is whether the prosecutors' comments "so infected the trial with

5    unfairness as to make the resulting conviction a denial of due process.")  Petitioner has failed to

6    establish Kirk's references to Menefield's statements amounted to misconduct.

                    23.  Misconduct Uncovered at State Reference Hearing

8            Petitioner devotes a substantial portion of his Second Amended Petition to a description of

9    the reference hearing and an itemization of evidence uncovered during the course of that hearing

10   that had not been provided to the defense prior to or at trial.  (Second Am. Pet. at 167-193.)

11   Much of this information is addressed in petitioner's claims of prosecutorial misconduct which

12   were the subject of the evidentiary hearing and has been discussed by the court above.  With

13   respect to non-evidentiary hearing issues, most have been addressed elsewhere.  The few

14   remaining issues raised by petitioner are addressed below.  None are found to have merit.

                           a.  Alexander Vichi Interview

16           Petitioner alleges that the prosecutor suppressed an interview of Alexander Vichi.  That

17   issue was raised previously in the pending petition (Second Am. Pet. at 142) and is addressed

18   below.

                          b.  Marcus Richardson Statement

20           Petitioner makes an extensive argument that inmate Marcus Richardson made an

21   exculpatory statement that was suppressed by the prosecution.  In 2006, during the course of

22   litigating petitioner's discovery motion, the undersigned held a limited evidentiary hearing

23   regarding petitioner's request that an accurate and complete transcript of an August 25, 1980

24   interview of inmate Marcus Richardson be produced in connection with these federal habeas

25   proceedings.  (ECF Nos. 326 & 327.)  Petitioner argued that both Judge Taft and petitioner

26   himself had seen such a transcript at the reference hearing.  (*Id.*)  This court found that petitioner

27   had not proven the existence of a different version of Richardson's interview statement that

28   allegedly exculpated petitioner.  (ECF No. 328.)   Thus, this court found these allegations

                                        110

1  advanced by petitioner to be baseless.  Petitioner has made no new showing to the contrary.  This

2  aspect of petitioner's claim 1 is therefore denied.

3  c. Fred Payne Declaration

4  Inmate Fred Payne testified at trial that he was on the second floor of the prison, heard a

5  commotion, looked into the corridor, and saw both Officer Patch and Gardner right after both

6  were stabbed.  Payne also testified that he saw inmate Rooks near Gardner on the second floor.

7  After he had been taken to the medical clinic, Gardner told Payne "a guy stabbed him" but he did

8  not identify the "guy."  (RT 3305.)  In 1995, inmate Payne signed a declaration in which he

9  reiterated the essential parts of his testimony.  (Ex. 42 to Ex. 28 to the Answer.)   In addition, he

10  stated that he felt Gardner could have survived if he had "been given reasonable care."  He felt

11  that Dr. Welch, who arrived about 10 to 15 minutes after Gardner was taken the clinic, was drunk.

12  According to Payne, Welch only worked on Officer Patch and did nothing to help Gardner.

13  Finally, Payne stated that Officer Horton, who interviewed him shortly after the incident,

14  encouraged him to lie and to say that he had seen petitioner run up the stairs that morning.

15  The veracity of Payne's trial testimony was one of the subjects of the reference hearing.  The

16  referee found that Payne lied at the reference hearing when he testified that he was induced to

17  testify falsely.  *See In re Roberts*, 29 Cal. 4th at 739-40.  Petitioner has failed to show that this

18  conclusion should be called into question.  Further, petitioner has failed to present any new

19  evidence to corroborate Payne's 1995 declaration regarding Dr. Welch's treatment of Gardner.[39]

20  Accordingly, petitioner's arguments that the prosecution withheld evidence about Dr. Welch or

21  that Payne testified falsely at trial are not supported by any credible evidence and must be

22  rejected.

23  d. Statements and Testimony by Kirk at Reference Hearing

24  Petitioner makes multiple allegations that prosecutor Kirk and other members of the

25

26  [39]  The issue of Gardner's medical treatment is addressed below in the discussion of petitioner's
claim 28.  There was some testimony at petitioner's trial that the medical care provided to

27  Gardner was substandard, but nothing was presented to support Payne's assertion that Dr. Welch
was drunk.  Further, Payne is not an expert so his testimony does not add anything to petitioner's

28  claims regarding Gardner's medical care.

1    prosecution team lied when they testified at the reference hearing.  (*See* Second Am. Pet. at 191-

2    93.)  These assertions of misconduct during a state court authorized proceeding do not, standing

3    alone and as argued by petitioner, make out a claim for federal habeas corpus relief.  *See*

4    *McGuire*, 502 U.S. at 67-68.

5                          24.  Evidentiary Hearing Issues

6         In his recitation of the issues presented in petitioner's claim 1 (*see* ECF No. 527 at 1-6),

7    respondent lists some issues that were the subject of the evidentiary hearing, which are addressed

8    by this court in the prior section of this order.  They are: prosecutorial misconduct regarding

9    inmate Long; presentation of perjured testimony; concealment of victim Gardner's C file; refusal

10   to turn over inmate witnesses' prior crimes; informant activity of inmates Rooks, Cade, and

11   Hayes; failure to disclose Cade's information regarding Cade's mental health; coercion of inmate

12   Yacotis; and failure to disclose the removal of Cade's tattoo.

13                          25.  Issues Addressed in Evidentiary Hearing Order

14        The court addressed, and rejected, the following claims of prosecutorial misconduct in the

15   order granting in part petitioner's motion for an evidentiary hearing:  failure to promptly

16   interview potentially exculpatory witnesses (ECF No. 466 at 51); deliberate delay in charging

17   petitioner (<u>id.</u>); and suppression of inmate Vichi's interview (*id*. at 35-36, 54).

18        B.  Claim 2 – Decision to Seek Death Penalty Based on Impermissible Considerations

19        Petitioner argues the decision to seek the death penalty was based on two impermissible

20   considerations.  First, he argues that because the killer of Officer Patch died and could not be

21   prosecuted, prosecutors creatively decided to pursue petitioner for the murder of Officer Patch.

22   Second, he argues that statistics show a pattern of seeking the death penalty against black

23   perpetrators, particularly when the victim, in this case Officer Patch, was white.  (Second Am.

24   Pet. at 194-95.)  Petitioner presents no factual basis in support of these assertions.

25        The Supreme Court has held that prosecutorial charging decisions are "particularly ill-suited

26   to judicial review."  *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also McCleskey v.*

27   *Kemp*, 481 U.S. 279, 296 (1987) (prosecutors have "wide discretion" in charging decisions);

28   *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("So long as the prosecutor has probable cause

112

to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").  To show an abuse of this discretion, petitioner would have to present "clear evidence" that prosecutors acted with an improper motive.  *See United States v. Armstrong*, 517 U.S. 456, 465-66 (1996).  Here, petitioner has not presented such evidence.

C.  Claim 3 – California's Death Penalty Statue Fails to Narrow the Eligible Class

Petitioner makes a brief allegation that the California death penalty scheme contains so many special circumstances that it fails to narrow the class of individuals eligible for the death penalty as required by *Furman v. Georgia*, 408 U.S. 238 (1972) and its progeny.  Because it lacks factual support, this claim is barred under controlling Ninth Circuit precedent.  *Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002).

D.  Claim 4 – Sufficiency of the Evidence for Lying in Wait

Petitioner claims the evidence presented at his trial was inadequate to prove either lying in wait as a theory of first degree murder or as a special circumstance.  Petitioner further claims that the lying in wait special circumstance fails to provide a meaningful basis for distinguishing the cases in which the death penalty is imposed from those in which it is not.

1.  Legal Standards

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution."  *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when

1   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

2   process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  The federal habeas

3   court determines sufficiency of the evidence in reference to the substantive elements of the

4   criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

5   However, the court looks to federal law to determine "the minimum amount of evidence that the

6   Due Process Clause requires."  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).

7       Petitioner's second argument, that the lying in wait special circumstance is arbitrary is based

8   on the Supreme Court's instruction in *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980), that death

9   penalty eligibility standards must provide "a meaningful basis for distinguishing the few cases in

10   which the penalty is imposed from the many cases in which it is not."

11                     2. <u>State Court Decision</u>

12       The California Supreme Court rejected this claim on direct appeal, stating as follows:

13           It was undisputed at trial that Gardner was killed as he walked
           a gauntlet of inmates lounging against the walls of a corridor. The
14         state did not present evidence that defendant concealed himself;
           according to its evidence he was standing in the hall waiting for
15         Gardner, and attacked him from behind as he passed by.  Evidence
           was also presented that defendant had been loitering in the hall for a
16         few minutes before the attack.

17           Defendant submitted a written motion for a "judgment of
           acquittal" on the lying-in-wait special-circumstance allegation on the
18         basis that no evidence of concealment had been introduced.
           Defendant also asked for a different instruction on lying in wait for
19         special circumstance purposes that would have told the jury the
           murder must have occurred during the lying in wait or that the lethal
20         acts flowed continuously from that time.  The court denied the
           motion and, after the parties agreed on the language of the
21         instruction, the court told the jury that "The term 'lying in wait' is
           defined as a waiting and watching for an opportune time to act,
22         together with a concealment by ambush or some other secret design
           to take the other person by surprise.  Concealment may manifest
23         itself either by ambush or by the creation of a situation where the
           victim is taken unawares even though he sees his murderer.  It is only
24         a concealment which puts the defendant in a position of advantage
           from which it can be inferred that lying in wait was part of the
25         defendant's plan to take his victim by surprise."  To find defendant
           guilty of first degree murder, the murder must be immediately
26         preceded by lying in wait.  "The lying in wait need not continue for
           any particular period of time provided that its duration is such as to
27         show a state of mind equivalent to premeditation or deliberation."
           As for the lying-in-wait special-circumstance, that allegation could
28         be found true only if "(1) ... the defendant intentionally killed the

                                 114

victim, and [¶] (2) ... the murder took place during the period of time that the defendants were lying in wait, or the lethal acts began and flowed continuously from the point in time the lying in wait ended. [¶] Lying in wait is defined elsewhere in these instructions."

The jury found defendant guilty of first degree murder for the killing of Gardner, and also that the special circumstance of lying in wait was true.

Defendant contends there was insufficient evidence to support the lying-in-wait instructions, the verdict finding him guilty of the first degree murder of Gardner, or the finding of the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)).  He also contends the lying-in-wait special-circumstance statute as applied is unconstitutional because the only difference between his case and one in which a prisoner walked to another inmate's cell and stabbed him to death would be locomotion; yet the hypothetical inmate would not be death-eligible on that basis.  This scheme, defendant contends, violates the federal Constitution's prohibition against cruel and unusual punishment, because it cannot be applied in a principled manner to distinguish cases meriting death from those that do not. (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427, 433 [64 L.Ed.2d 398, 409-410, 100 S. Ct. 1759].)

In *People v. Morales* (1989) 48 Cal.3d 527, 553- 556 [257 Cal. Rptr. 64, 770 P.2d 244], a majority held that a jury was properly instructed that to find a defendant guilty of first degree murder on a theory of lying in wait, physical concealment was not required; it was enough to take the victim unawares even though she saw her attackers.  (*Id*. at p. 555.)  With regard to the special circumstance finding, we concluded that section 190.2, subdivision (a)(15), was constitutionally sound because it meaningfully distinguished between other forms of premeditated murder as long as the murder was committed under circumstances that included "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage ...." (48 Cal.3d at p. 557.)  Again, no physical concealment is required.  (*Ibid.*)

Given the evidence of the events that preceded the killing of Gardner, the instruction, verdict, and finding met the statutory requirement of section 190.2, subdivision (a)(15), that the murder occurred "while lying in wait."  (*People v. Morales*, *supra*, 48 Cal.3d at p. 558.)  The holding in *Morales* also defeats defendant's constitutional argument.

*Roberts*, 2 Cal. 4th at 322-23.

3. Discussion

Petitioner argues the facts developed at trial do not establish lying in wait as either an

element of first degree murder under California law or as a special circumstance.  In addition,

115

1   petitioner argues the lying in wait special circumstance is so broad that its application fails to

2   narrow the class of murderers eligible for the death penalty as required by *Godfrey* and *Furman*.

3       Petitioner's argument is premised on his interpretation of California law.  According to

4   petitioner, at the time of the crimes in August 1980, the definition of lying in wait for both first

5   degree murder and for the special circumstance required physical concealment.  The primary case

6   he relies upon is *Richards v. Superior Court*, 146 Cal. App. 3d 306 (1983).  The California Court

7   of Appeal in *Richards* held that "some period of physical concealment must precede the murder

8   for it to be committed 'while lying in wait.'"  146 Cal. App. 3d at 315 (citing *People v. Tuthill*, 31

9   Cal. 2d 92, 101 (1947)).  What petitioner ignores is that in 1989 the California Supreme Court

10  disapproved of *Richards* on this very point.  In *People v. Morales*, 48 Cal. 3d 527, 557 (1989),

11  *disapproved on other grounds in People v. Williams*, 49 Cal. 4th 405 (2010), the court held that

12  "if a period of watchful waiting is shown immediately which immediately precedes the assault, a

13  concealment of purpose, coupled with a surprise attack from a position of advantage, will satisfy

14  the concealment element in lying-in-wait murder."  To the extent the California Court of Appeal

15  in *Richards* held otherwise, the California Supreme Court disapproved it.  48 Cal. 3d at 557.  To

16  the extent petitioner argues that the decision in *Richards* described the state of California law in

17  August 1980, when the crimes at issue in the present case occurred, it should be noted that the

18  crime at issue in *Morales* occurred just a few months later, in January 1981.  Based on California

19  law, then, petitioner's claim that there was insufficient evidence of lying in wait fails.

20      Petitioner's argument that application of the lying in wait special circumstance renders his

21  sentence arbitrary is similarly barred by controlling precedent.  In *Morales v. Woodford*, the Ninth

22  Circuit held that California's lying in wait special circumstance did not violate due process

23  because it is "not unconstitutionally vague as an eligibility factor."  388 F.3d 1159, 1174-75 (9th

24  Cir. 2003) (citing *Houston v. Roe*, 177 F.3d 901, 907-08 (9th Cir. 1999)).  The court went on to

25  hold in that case that California's lying in wait special circumstance also satisfied the Eighth

26  Amendment requirement that the eligibility factors "adequately narrow[] the class of murderers

27  subject to the death penalty."  *Id.* at 1175-78.  Petitioner has failed to establish any grounds for

28  the granting of federal habeas relief as to his claim 4.

1

2      E.  <u>Claim 5 – Reliance at the Guilt Phase on Prior Murder Conviction</u>

3          At the time of the present crimes, petitioner was serving a sentence of imprisonment on a

4      murder conviction.  In 1970, on his seventeenth birthday, petitioner shot and killed a security

5      guard.  Petitioner was tried as an adult and convicted, after waiving a jury trial.  (*See* Los Angeles

6      County court records re *People v. Roberts*, Superior Court # A167802, Ex. 303 to Mtn. for Evid.

7      Hrg. (ECF Nos. 439-3, 439-4, 439-5) redacted.)  He filed an appeal, which the California Court of

8      Appeal denied.  (ECF No. 439-4.)  In September 1982, shortly before the beginning of trial in the

9      present case, attorney Urquhart filed a habeas petition in the state superior court challenging

10     petitioner's 1970 murder conviction.  (EH Ex. L.)  Therein, petitioner raised claims that he did

11     not validly waive his right to a jury trial and that his trial attorney in the earlier case had rendered

12     ineffective assistance.  The superior court denied that 1982 habeas petition.  There is no

       indication that petitioner pursued further habeas relief from his 1970 murder conviction.

13         Petitioner now claims the 1970 murder conviction is unconstitutional because his trial

14     attorney rendered ineffective assistance of counsel.  (Second Am. Pet. at 203-06.)  Petitioner's

15     1970 conviction was the basis for the prior murder special circumstance charged in the present

16     case.  In addition, petitioner argues that had that conviction been challenged and declared invalid,

17     he could not have been charged with counts involving his status as a prisoner.[40]

18         The Supreme Court has held "that once a state conviction is no longer open to direct or

19     collateral attack in its own right because the defendant failed to pursue those remedies while they

20     were available (or because the defendant did so unsuccessfully), the conviction may be regarded

21     as conclusively valid."  *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394, 403 (2001).

22     The Supreme Court noted possible exceptions to this rule.  First, the rule might be inapplicable

23     "in a case where, 'after the time for direct or collateral review has expired, a defendant may

24     obtain compelling evidence that he is actually innocent of the crime for which he was convicted,

25     and which he could not have uncovered in a timely manner.'"  *West v. Ryan*, 652 F.3d 1071, 1081

26     (9th Cir. 2011) (quoting *Lackawanna*, 532 U.S. at 405).  Second, the rule might be inapplicable

27     _____

28     [40]  Petitioner was charged with, and convicted of, assault by a life prisoner resulting in death and
       possession of a weapon by a prisoner.  *Roberts*, 2 Cal. 4th at 294.

                                              117

1    "where there was a failure to appoint counsel in violation of the Sixth Amendment, as set forth in

2    *Gideon v. Wainwright*."  *Lackawanna*, 532 U.S. at 404.  In a companion case to *Lackawanna*, the

3    Court also suggested that another exception to this rule may be available in "rare cases in which

4    no channel of review was actually available to a defendant with respect to a prior conviction, due

5    to no fault of his own."  *Daniels v. United States*, 532 U.S. 374, 383 (2001).  Exceptions to

6    *Lackawanna* are seldom applied.  The federal circuit courts have applied *Lackawanna* in capital

7    cases to bar challenges, such as the one petitioner makes here, to a prior crime being used to

8    establish an essential element of his crime, *Hubbard v. Haley*, 317 F.3d 1245, 1254-57 (11th Cir.

9    2003), and to challenges to a prior conviction being used as an aggravating factor supporting a

10   death sentence, *Abdus-Samad v. Bell*, 420 F.3d 614, 629-31 (6th Cir. 2005).

11       In the present case, there is no indication that petitioner's 1970 murder conviction is open to

12   direct or collateral attack.  Petitioner's direct review concluded years ago when he did not seek

13   review after his judgment of conviction was affirmed on appeal.  Petitioner has likewise made no

14   attempt to show here that his 1970 conviction is still open to collateral attack.  While California

15   has no "express time window" in which a noncapital habeas petitioner must seek habeas corpus

16   relief, he generally must file "as promptly as the circumstances allow."  *In re Douglas*,  200 Cal.

17   App. 4th 236, 242 (2011) (citing *In re Clark*, 5 Cal. 4th 750, 765 n.5 (1993), *superseded by*

18   *statute as stated in In re Friend*, 11 Cal. 5th 720 (2021)).  Petitioner could only proceed with a

19   state habeas petition challenging the 1970 conviction after all this time by showing:  (1) absence

20   of substantial delay; (2) good cause for the delay; or (3) that the claim falls within an exception to

21   the state court's timeliness bar.  *See Walker v. Martin*, 562 U.S. 307, 312 (2011) (citing *In re*

22   *Robbins*, 18 Cal. 4th 770, 780 (1998), *superseded by statute as stated in In re Friend*, 11 Cal. 5th

23   720 (2021)).  Petitioner has not mentioned, much less established, any of these exceptions to the

24   state court's timeliness bar.  In federal court, of course, petitioner's claim would be barred by the

25   one-year statute of limitations.  *See* 28 U.S.C. § 2244(d)(1)(A) (1996).  Petitioner has not

26   attempted to show otherwise.

27       Therefore, the rule of *Lackawanna* bars this court's consideration of petitioner's challenges to

28   his 1970 conviction because it is "conclusively valid."  The exceptions mentioned by the Supreme

118

1    Court do not apply – petitioner has shown neither newly discovered compelling evidence of

2    actual innocence or that he was denied the appointment of counsel at trial.  Further, assuming,

3    without deciding, that there is an exception to the rule set forth in *Lackawanna* and *Daniels* for

4    "rare cases," this court concludes that the circumstances of this case do not justify the application

5    of such an exception.  *See Johnson v. United States*, 544 U.S. 295, 303-04 n.4 (2005) (stating that

6    the Court has recognized "only one exception" to the prohibition on federal collateral attacks on

7    prior state convictions and declining to explore the possible "rare" second exception).

8         The "rare" exception in question is at best only available to a criminal defendant who has no

9    available channel for review of his claims "due to no fault of his own" or where the state court

10   "without justification, refused to rule on a constitutional claim that was properly presented to it."

11   *Daniels*, 532 U.S. at 383.  Here, petitioner lost the opportunity to raise in state court the claims he

12   raises here because he abandoned further judicial review after his direct appeal and sole habeas

13   petition were rejected.  Stated in context, petitioner's failure to obtain review of his claims was

14   petitioner's "fault" because he chose not to take advantage of available "channels of review."   Put

15   another way, petitioner must bear the consequences of "failing to obtain timely review of a

16   constitutional claim."  *Lackawanna*, 532 U.S. at 405.

17        Accordingly, petitioner may not challenge his 1970 prior conviction in this federal habeas

18   corpus proceeding and relief as to his claim 5 will therefore be denied.

19            F.  Claim 6 – Prosecutorial Misconduct based on Delay in Bringing Charges

20            In claim 6, petitioner argues that the ten-month delay in bringing charges against him

21   irreparably damaged his opportunity to provide an adequate defense.  Petitioner also raised this

22   issue in his motion for an evidentiary hearing.  In the order addressing petitioner's motion for an

23   evidentiary hearing, the undersigned found that petitioner failed to make a "colorable showing of

24   success on his argument that prosecutor Kirk intentionally . . . delayed in charging petitioner to

25   petitioner's detriment."  (ECF No. 466 at 51.)   Petitioner has made no further argument in

26   support of this claim.  For the reasons stated previously, federal habeas relief as to petitioner's

27   claim 6 will be denied.

28   /////

119

1

2          G.   Claim 7 - Ineffective Assistance of Counsel at the Guilt Phase

3          Petitioner sought an evidentiary hearing on several aspects of his claim 7.  The court granted a

4   hearing on two: that petitioner's counsel failed to investigate and present the impeachment

5   evidence identified in petitioner's claim 1 and that counsel failed to present the testimony of a

6   prison expert at trial.  (ECF No. 466 at 133.)  Those issues are addressed above in the section

7   addressing petitioner's evidentiary hearing claims.

8          Petitioner also sought an evidentiary hearing on his claims that his counsel failed to further

9   question Officer DuQuesnay regarding the east grille gate and failed to present evidence at trial

10  that prison rules required the grille gate be locked or manned at all times.  The undersigned found

11  that petitioner had failed to make out a colorable constitutional claim with respect to these issues.

12  (*Id.* at 61-65.)  Petitioner does not make any new arguments regarding this aspect of claim 7.

13  Accordingly habeas relief will be denied as to this aspect of claim 7 for the reasons stated in the

14  court's prior ruling.

15         Petitioner has a long list of remaining arguments that his counsel was ineffective at the guilt

16  phase trial.  Several of the issues merit discussion and are discussed in the first section below.

17  Most of the issues raised by petitioner lack merit in the court's view and are addressed briefly in

18  the following section of this order.

19                   1.   Discussion of Unreasonable Conduct by Attorney Urquhart

20                        a.   Failure to Cross-examine Inmate Hayes re Benefits

21         Petitioner argues that attorney Urquhart erred by failing to cross-examine inmate Hayes

22  about whether he had received any benefits for testifying.  Most of the inmate witnesses testified

23  that prosecutor Kirk promised he would write a letter on their behalf to the parole board.  Hayes

24  did not.  No one asked Hayes whether he had received benefits in exchange for testifying.  In fact,

25  as demonstrated above in the section addressing petitioner's prosecutorial misconduct claims,

26  Hayes asked to be moved to a different prison and to be placed in protective custody.  More

27  importantly, the evidence shows that Kirk promised Hayes that he would write a letter on Hayes'

28  behalf to the Board of Prison Terms.  Urquhart's failure to at least attempt to question Hayes

120

1    about the benefits he received from the prosecution for testifying was unreasonable.  The court

2    can fathom no strategic reason to avoid asking such questions on cross-examination of Hayes.

3                         b.  Failure to Cross-examine Inmate Cade re August 25 Interview

4          Petitioner points to one specific failure in his counsel's examination of Cade.  He argues that

5    Urquhart failed to question Cade about the August 25 interview.  On August 25, 1980, Cade was

6    apparently interviewed for the first time by Officers Horton and Hartman.  What appears to be a

7    transcript of the tape recording of that interview was found in Urquhart's files.  (EH Ex. P-1.)

8    Petitioner states that during that interview Cade insisted he did not see the attack on Gardner until

9    he was threatened with being "put in it."  According to petitioner, Cade was then shown a picture

10   of petitioner and he identified petitioner as the assailant.

11         Petitioner has failed to prove Cade was shown a photograph of only petitioner, Menefield, and

12   Williams in order to coerce him to identify petitioner.  According to the transcript of the August

13   25 interview, in response to Cade's repeated insistence that he did not see the attack, officers told

14   him that others had placed Cade at the scene and further stated to him, "I don't think you want to

15   get caught up in this either."  And, "I don't think you want us to put you in it either do you?"

16   Cade replied he did not.  (*Id.* at 6.)  In the following interview question, the officer stepped back

17   from that statement.  Officer Horton stated next,

18                   So I was just thinking about it you're there.  I think you saw
                     more than you're telling us.  Maybe you don't want to tell us you
19                   know.  You got to live with it.  We've got you there.  We've got you
                     there, #55 [Cade's identifying number in the transcript].  Whether
20                   you were caught there by mistake, you know, we haven't got you
                     we'd be reading you your rights if we thought you were part of the
21                   incident.  We read some guys their rights.

22   (*Id.* at 7.)

23         Cade did testify at the preliminary hearing that he was shown photographs of only petitioner,

24   Menefield, and Ruben Williams during that interview.  (Preliminary Hearing ("PH") RT 371.)  A

25   review of the transcript of the August 25 interview indicates that he was not correct.  It is clear

26   early in the interview that Cade was being shown a picture or pictures of more than three inmates.

27   The officer told Cade that "we have innocent people locked up in the bucket, I know that, and you

28   know that.  We got some guilty ones, we also got some innocent ones."  (EH Ex. P-1 at 8.)  Cade

                                                    121

1  responds, "All these guys are locked up?"  The officer replies, "About half of them."  The other

2  officer continues, "The other half are not locked up.  You will be on there.  We got pictures of

3  you too."  Later in the interview, an officer points out at least nine inmates who were "in the

4  hole" as a result of the attack on Gardner.  (*Id.* at 16.)  It is also clear later in the interview that

5  Cade was being shown photos of many inmates because the officers asked him whether he saw

6  each one at the scene of the attack.  (*Id.* at 12-16.)

7      Petitioner's argument that attorney Urquhart should have cross-examined inmate Cade about

8  being shown only three photographs during his August 25 interview is not supported by the

9  evidence in the record before this court.

10                    c.  Failure to Use the Statement of Inmate Black

11      Petitioner argues Urquhart failed to take advantage of the fact inmate Robert Black told

12  officers he had seen Menefield and another man who was not petitioner run up the stairs followed

13  by Gardner after the attack.  (Second Am. Pet. at 213, ¶ 23.)  Inmate Black essentially refused to

14  testify at trial.  (RT 4277, et seq.)  The prosecutor moved to have Black's taped statement to

15  investigators played for the jury because Black described Gardner's appearance in a way that

16  supported the prosecution's theory that Gardner was in a state of shock and did not volitionally

17  kill Officer Patch.  After hearing argument on the issue, the trial court permitted the prosecutor to

18  play the tape recorded statement.  (RT 4324-25.)  In addition, a transcript of the tape recording

19  was introduced into evidence.[41]  (RT 6883-85.)   Black told officers he was walking down the

20  stairs from the second to first floors and saw "a scuffle" on the first floor.  (Ex. 3 to Pet., at 1.)

21  He then saw two men run past him followed by a man with blood on his shirt, who was holding a

22  knife.  (*Id.* at 1-2.)  When he was shown pictures, Black identified one man as Menefield and told

23  officers the second man looked like inmate Rooks.  (*Id.* at 16.)  From Black's description, the

24  second man was not petitioner.

25      Respondent concedes that Urquhart did not bring up in argument Black's description of the

26  likely second assailant and his tentative identification of Rooks as that assailant.  Indeed,

27  _____

28  [41]  The transcript was attached to petitioner's original federal petition ("Pet.") as exhibit 3.  It may
    be found elsewhere in the record, but neither party cites to a location for this document.

1    Urquhart did mention Black in his closing argument.  He first described the trial testimony of

2    William Marshall that right before the alarm went off he was in the stairwell between the second

3    and third floor and did not see anyone running ahead of him or anyone pass him on the stairs.

4    (RT 7640.)  Urquhart added that this testimony was consistent with the statement of Robert Black

5    "who never mentioned anybody running by him when he was standing by the stairs."  (RT

6    7640:15-17.)  While it's true that Black did not testify that he saw anyone run by him to the third

7    floor, Urquhart missed another important part of Black's statement.  Black stated that he was in

8    the stairwell between the first and second floors and that two men, followed by Gardner, ran past

9    him onto the second floor.  (Ex. 3 to Pet., at 1-2.)  Black's description of the second man and

10   identification of that man as looking like inmate Rooks was important evidence which supported

11   petitioner's defense.  This court can fathom no strategic reason for attorney Urquhart to have

12   failed to raise Black's statement in his closing argument to the jury.

13                  2.  Remaining Claims of Ineffective Assistance of Counsel at the Guilt Phase

14        The remaining laundry list of petitioner's guilt phase ineffective assistance of counsel claims

15   lack merit for the reasons identified below.

16                            a.  Errors During Jury Selection

17        These issues (see Second Am. Pet. at 209) are also raised in addressing petitioner's claim 15

18   and are discussed below.

19                     b.  Failure to Object to Prosecutor's Opening Statement

20        Petitioner has failed to identify which portions of the prosecutor's opening statement are

21   objectionable or to explain why they are so.  (See Second Am. Pet. at 210.)

22                          c.  Inadequate Guilt Phase Opening Statement

23        Petitioner's argument that attorney Urquhart erred when he "conceded that Gardner was

24   separating from the BGF" is unsupported by any showing of prejudice.  (See Second Am. Pet. at

25   210.)  His arguments that Urquhart failed to address attacks on petitioner's character and that his

26   opening statement was "meaningless" and "undirected" are insufficiently specific to merit the

27   court's consideration.  Petitioner also argues attorney Urquhart further erred by agreeing with the

28   prosecution about what occurred.  Petitioner takes Urquhart's statements in this regard out of

                                                 123

1  context.  Urquhart simply stated that he agreed with the basic facts – that Charles Gardner was

2  stabbed, ran to the second floor, and stabbed Officer Patch – and that he agreed that Gardner was

3  trying to get out of the BGF.  (RT 1773-74.)  Petitioner has failed to establish that Urquhart's

4  opening statement was unreasonable under the *Strickland* standard.  *See Garcia v. Burton*, 536 F.

5  Supp. 3d 560, 592–93 (N.D. Cal. 2021), *aff'd sub nom. Garcia v. Cisneros*, No. 21-16163, 2022

6  WL 2593517 (9th Cir. July 8, 2022) (citing *Strickland*, 466 U.S. at 690) (*Strickland* commands

7  that trial counsel be afforded a wide latitude in choosing trial strategy and tactics).

8                                  d.  Failure to Object to Officer Brown's and Officer Gloria's "Improper"

9                                   BGF Testimony and "Other Hearsay Evidence"

10      The admissibility of the BGF testimony is the subject of petitioner's claim 17 and, as

11  discussed below, was not admitted in error.  Accordingly, attorney Urquhart had no basis to

12  object to its admission and this aspect of claim 7 therefore lacks merit.  (*See* Second Am. Pet. at

13  210.)  Petitioner has failed to identify what "other hearsay evidence" he finds objectionable.

14                              e.  Stipulation to the Inapplicability of California's Proposition 8

15      Petitioner argues this stipulation was entered by his counsel in error because it prevented the

16  defense from cross-examining witnesses regarding their prior bad acts.  (Second Am. Pet. at 210.)

17  Petitioner has failed to show that attorney Urquhart would have succeeded on an argument that

18  Proposition 8 should apply had he advanced such an argument.  In fact, Proposition 8 was later

19  held to be inapplicable to crimes, such as the present one, occurring before June 9, 1982.  *See*

20  *People v. Smith*, 34 Cal. 3d 251, 258-63 (1983).

21                                  f.  Stipulation re Facts of Rooks' Offense

22      Petitioner argues that attorney Urquhart should not have agreed that he would not question

23  inmate Rooks about the gruesome facts of his offense of commitment.  (Second Am. Pet. at 210.)

24  Again, petitioner has failed to show that the information in question was properly admissible at

25  trial.

26                                   g.  Failure to Object to Questioning of Rooks

27      Petitioner fails to provide any specificity as to the nature of this contention with one

28  exception.  (Second Am. Pet. at 210, ¶ 11.)  In that regard, petitioner points to one "leading

1  question" posed to Rooks about having seen petitioner with a knife.  (RT 2041.)  Petitioner has

2  failed to explain, however, how an objection posed to that leading question would have ultimately

3  benefitted him in any significant or meaningful way.

4  h.  Failure to Question Rooks

5  Petitioner contends attorney Urquhart failed to ask inmate Rooks a number of pertinent

6  questions on cross-examination.  (Second Am. Pet. at 211, ¶¶ 12-14.)  Some of petitioner's

7  objections in this regard simply rely on false statements.  Attorney Urquhart did question Rooks

8  about the fact that prosecutor Kirk sent a letter on Rooks' behalf to the parole board.  (RT 2071.)

9  He also questioned Rooks about discrepancies between his preliminary hearing testimony and his

10  trial testimony.  (RT 2118-19.)  With respect to petitioner's allegation that his counsel should

11  have questioned Rooks about his prior informant activities, petitioner has failed to show what

12  those activities were.  As a result, the court cannot determine how his counsel's failure to inquire

13  in this area affected the jury's consideration of Rooks' testimony.  Petitioner's allegation that

14  Urquhart should have objected to Rooks' presence during a conference in chambers also fails

15  because petitioner has not made any showing how Rook's presence  prejudiced him.

16  i.  Failure to Object to Questioning of Hayes

17  Petitioner does not identify the questions he believes were objectionable.  (Second Am. Pet. at

18  211, ¶ 15.)  Therefore, relief will be denied as to this claim.

19  j.  Failure to Question Hayes

20  Petitioner argues that attorney Urquhart failed to cross-examine Hayes about his prior

21  convictions and the fact the knife recovered from Gardner was wrapped in brown leather, not

22  white tape as Hayes had testified.  (Second Am. Pet. at 211, ¶ 16.)  Reference Hearing Exhibit

23  MM is the prosecution's list of Hayes' prior felony convictions which was provided to the

24  defense at trial.  (ECF No. 392-3.)  That list shows four burglary and one grand theft conviction.

25  It does not appear that either attorney Urquhart or attorney Moe questioned Hayes about his prior

26  convictions.  However, defense counsel did question Hayes vigorously about inconsistencies in

27  his testimony.  The jury knew Hayes had been in prison previously and had returned to prison.

28  The court cannot conclude that petitioner's counsel acted unreasonably in not questioning Hayes

1    about his prior convictions.

2         Further, the evidence about the differences in the knives was apparent to the jury at trial.  A

3    photograph of both knives, and the knives themselves, were placed in evidence at trial.  (RT

4    4023, 4041, 4043.)  Rooks was shown the photograph.  He identified the knife in the bottom of

5    the photo as the knife he saw petitioner carrying.  He also testified that it was different than when

6    he saw petitioner carrying it.  According to Rooks, when petitioner had it, the handle was

7    "wrapped in rags."  (RT 2042:1-3.)  Officer Horton testified that he recovered a knife that was

8    "lying approximately two feet from Gardner" when he went to the second floor in response to the

9    alarm.  (RT 3713-14.)  He identified the knife appearing in the bottom of the photo as the one he

10   recovered.  (RT 3714:4-11.)   The knife appearing in the top of the photo was identified as the

11   knife recovered from the yard.  (RT 3664-65.)  According to Officer Tabbs, who recovered the

12   knife, it could be seen from a window on the second floor at the top of the stairs.  (RT 3663-64.)

13   Inmate Long testified he saw Menefield throw a knife out the second floor window as he was

14   running up the stairs behind petitioner.  The jury had a good deal of evidence about the knives

15   and, while some of that evidence may have been conflicting, it is not clear that attorney Urquhart

16   provided ineffective assistance by failing to point out the discrepancies or that petitioner was

17   prejudiced by any such failure.

18                     k.  Failure to Question Inmate Witnesses re Perjury Charges

19        Petitioner contends attorney Urquhart should have questioned the inmate witnesses who

20   admitted contradictory testimony at the preliminary hearing about whether they had been charged

21   with perjury.  (Second Am. Pet. at 211, ¶¶ 12, 16.)  Petitioner has failed to establish that a

22   reasonably competent attorney would have raised this issue.

23                     l.  Failure to Understand the Importance of Goodwin's Testimony

24        Petitioner does nothing more than cite to a portion of the trial transcript in which he contends

25   that attorney Urquhart asked questions "intended to undermine Goodwin's account."  (Second

26   Am. Pet. at 212, ¶ 17.)  The cited portion of the transcript, however, is prosecutor Kirk's, not

27   Urquhart's, questioning of Goodwin.  Petitioner fails to explain in what way attorney Urquhart

28   undermined Goodwin's testimony or, assuming he did, how that prejudiced petitioner.

                                                    126

m. Failures re Prosecution's Questioning of Calvin

Petitioner argues Urquhart should have objected to, or corrected, Kirk's misstatement of Calvin's testimony. (Second Am. Pet. at 212, ¶ 18.) As described above, prosecutor Kirk did not misrepresent Calvin's testimony. Accordingly, this aspect of petitioner's claim 7 lacks merit.

n. Failures re Testimony of Long

Petitioner's arguments that attorney Urquhart failed to object to hearsay and leading questions posed to Long and failed to adequately cross-examine Long lack specificity and any showing of prejudice. (See Second Am. Pet. at 212-13, ¶¶ 19-20.) Further, petitioner's complaints that his counsel failed to "explain or exploit the changing stories told by Long" are simply unsupported by the record in this case. In his closing argument, Urquhart focused on Long's changing stories in considerable detail. (RT 7602-14.) He concluded by telling the jury, "to make a long story short, what we have is an inmate who lies." (RT 7614:11-12.) Petitioner does point out one instance of hearsay in Long's testimony regarding a statement made by Menefield. Long described a conversation he had with Wilbur Peterson, Bill Stevens, and Menefield on the night before the attack on Gardner. He testified that the four of them "was all sitting up in there discussing what Zoom (petitioner) was thinking of contemplating doing the next morning." (RT 2599-2600.) The prosecutor then asked, "Did Mr. Menefield say anything about what he was going to do personally the next day?" (RT 2600.) Long replied, "Yes, well, Racehorse (Menefield), he – he was saying that he knew he would have to be there but Racehorse didn't want to be there." (*Id.*) At trial, the defense did not object to this testimony. The California Supreme Court held this issue was procedurally barred from review based on the defense failure to contemporaneously object. *Roberts*, 2 Cal. 4th at 303 n.4 ("There was no objection to Long's testimony, and any question of the propriety of that testimony was not preserved for appeal.") As described below in the discussion of petitioner's claim 22, admission of Menefield's non-testimonial out-of-court statements is not constitutionally objectionable. Accordingly, this court cannot find that petitioner's counsel acted unreasonably when he did not object to this question and its hearsay response. *See* fn. 59, below.

/////

127

1

o. <u>Failures re Testimony of Cade</u>

2 Petitioner again makes a non-specific, and accordingly baseless, argument that attorney

3 Urquhart failed to object to the prosecution's leading questions and questions calling for hearsay

4 testimony.  (Second Am. Pet. at 213, ¶ 21.)

5

p. <u>Failure to Object to Comment re Witness Payne</u>

6 Petitioner does not identify the comment regarding witness Payne  which he apparently

7 found to be objectionable.  (*See* Second Am. Pet. at 213, ¶ 22.)  He cites to page 3308 of the trial

8 transcript.  That page reflects that attorney Urquhart did, in fact, object to a question posed by

9 prosecutor Kirk to Payne.  (RT 3308:14-22.)  There is only one other question posed by Kirk to

10 Payne on that page:  "You said that you told him that Gardner had been talking down in the

11 hospital?"  Petitioner has failed to show that this question was in any way objectionable.

12

q. <u>Failure to "Mount any Claim" re the "Gross Medical Malfeasance" in</u>

13

<u>Gardner's Treatment</u>

14 Petitioner's one-sentence statement in his claim 7 that this failure on the part of his counsel

15 amounted to a Sixth Amendment violation is unexplained and unsupported by any evidence.

16 (Second Am. Pet. at 213, ¶ 22.)  Relief as to this claim will therefore be denied.

17

r. <u>Failure to Object to Testimony re Blood Sample</u>

18 Petitioner contends that attorney Urquhart erred when he failed to object to Officer Horton's

19 testimony that petitioner refused to submit a blood sample.  (Second Am. Pet. at 213, ¶ 22.)

20 Petitioner challenged the admission of this evidence in his claim 20.  As discussed below,

21 petitioner has failed to demonstrate that Officer Horton's testimony in this regard was improper.

22 Accordingly, counsel's failure to object to that testimony was not unreasonable.

23

s. <u>Failure to Request a Recess</u>

24 Petitioner argues counsel should have requested a recess when it was revealed that the defense

25 had not been given particular documents with which to cross-examine Lieutenant Hartman.

26 (Second Am. Pet. at 213, ¶ 22.)  Petitioner has failed to explain when this occurred or what

27 documents he is referring to.  Given that failure, petitioner is not entitled to habeas relief as to this

28 claim.

1

                      t.   <u>Stipulation that Petitioner had Spoken to Rooks</u>

2

        Petitioner contends counsel was unreasonable in stipulating that petitioner spoke to Rooks

3 on the morning of the attack, as Rooks testified. (Second Am. Pet. at 213, ¶ 22.) Without citation

4 to the record or any explanation, this court is unable to consider this issue.

5

                     u.   <u>Failure to Object to Evidence of the BGF Oath</u>

6

        Without citation to the record or any explanation by petitioner, this court is unable to

7 consider this issue. (*See* Second Am. Pet. at 213, ¶ 22.) In addition, as noted below in the

8 discussion of petitioner's claim 17, the court finds the admission of the BGF evidence at trial was

9 not in error. Therefore, counsel was not unreasonable for failing to object to it and relief as to this

10 claim will be denied.

11

                     v.   <u>Numerous Other Failures of Counsel</u>

12

       Petitioner's one-sentence statements regarding these alleged errors of his counsel are, for the

13 most part, unsupported by any citation to the record or any argument. (Second Am. Pet. at 213-

14 14, ¶¶ 24-27.) Without more, this court is unable to meaningfully consider them. Petitioner does

15 identify with a bit more specificity an error in the final paragraphs of his claim 7. He argues that

16 attorney Urquhart made a statement while the jurors were present that the defense would be

17 moving for an acquittal on the charges regarding Officer Patch. (RT 6000-01.) Petitioner

18 contends that when jurors understood that they needed to reach a verdict on those charges, they

19 would have known that the judge had rejected the motion. Because jurors would not have known

20 the grounds for any such motion, and because it was one isolated statement that occurred on

21 January 10, 1983, over a month before the conclusion of the guilt phase of the trial, this court

22 finds that any error on attorney Urquhart's part did not cause petitioner to suffer any prejudice.

23 Further, because petitioner's conviction in connection with Officer Patch's death was overturned

24 on appeal, any issues regarding the jurors' consideration of the charges related to his death have

25 been rendered moot.

26

        H.   <u>Claim 8 - Imbalance of Equities between Prosecution and Defense</u>

27

        Petitioner argues that the prosecutor had an unfair advantage at trial due to the access to

28 inmate witness files, the access to inmate witnesses themselves, the power to punish or reward

inmates, and the power to offer witnesses immunity for testifying. (Second Am. Pet. at 215-18.)
He also argues that he was unfairly saddled with an inexperienced attorney while the state was
represented by a seasoned veteran. Many of the arguments petitioner makes in his claim 8 were
raised in petitioner's prosecutorial misconduct claim and they are addressed above in the court's
discussion of his claim 1. With respect to the remaining issues, petitioner chose not to provide
points and authorities in support of his claim 8. In the Answer, respondent makes a supported
argument that the imbalance in this case is a "well-recognized and accepted fact of life" in the
American criminal justice system:

> The . . . contention, based on equalizing the powers of the
> prosecution and the defense, is entirely unpersuasive. A criminal
> prosecution, unlike a civil trial, is in no sense a symmetrical
> proceeding. The prosecution assumes substantial affirmative
> obligations and accepts numerous restrictions, neither of which are
> imposed on the defendant. The prosecution must prove the
> defendant's guilt beyond a reasonable doubt to the satisfaction of all
> the jurors; it may not obtain the defendant's testimony, suppress
> exculpatory evidence, nor retry the defendant after acquittal, even
> though errors prejudicial to the Government occurred. The
> defendant, by contrast, may prevail without offering any proof at all;
> he need not disclose whatever inculpatory evidence he discovers,
> may avoid conviction by persuading a single juror that reasonable
> doubt exists, and may challenge a conviction by direct appeal and
> subsequent collateral attack.
>
> The system of criminal law administration involves not only
> this procedural imbalance in favor of the defendant, but also
> important aspects of the Government's law enforcement power that
> are not available to the defendant. Subject to constitutional and
> statutory limits, the Government may arrest suspects, search private
> premises, wiretap telephones, and deploy the investigative resources
> of large public agencies. Few would seriously argue that the public
> interest would be well served either by extending all of these powers
> to those accused of crime or by equalizing the procedural burdens
> and restrictions of prosecution and defendant at trial. Viewed in
> isolation, there is a surface appeal to the equal availability of use
> immunity for prosecution and defense witnesses. But in the context
> of criminal investigation and criminal trials, where accuser and
> accused have inherently different roles, with entirely different
> powers and rights, equalization is not a sound principle on which to
> extend any particular procedural device. At a minimum, such a
> principle will not support a constitutional interpretation of Fifth
> Amendment fairness.

*United States v. Turkish*, 623 F.2d 769, 774-75 (2d Cir. 1980).

/////

130

1    This recognition of the imbalance of power and resources seems to arise most frequently in

2    the context of a defendant's claim that he was entitled to compel the government to grant a

3    witness use immunity for his testimony.  The Ninth Circuit has held that the government may not

4    be forced to confer use immunity on defense witnesses, unless "whatever power the government

5    possesses [is] exercised in a manner which denies the defendant the due process guaranteed by

6    the Fifth Amendment." *United States v. Alessio,* 528 F.2d 1079, 1081-82 (9th Cir. 1976).  In

7    1983, the Ninth Circuit, relying on a rule developed by the Third Circuit, held that due process

8    requires compelling the government to grant use immunity to a defense witness where "'the

9    government's decisions were made with the deliberate intention of distorting the judicial fact

10   finding process.'" *United States v. Lord*, 711 F.2d 887, 890-91 (9th Cir. 1983) (quoting *United*

11   *States v. Herman*, 589 F.2d 1191, 1204 (3rd Cir. 1978)).  Since that time, the test to determine

12   whether due process requires a court to compel use immunity has "evolved."  *United States v.*

13   *Straub*, 538 F.3d 1147, 1156 (9th Cir. 2008).  At the time of petitioner's trial, however, the law in

14   this circuit appeared to require use immunity only when the defense could demonstrate

15   prosecutorial misconduct.  As discussed above, this court finds petitioner has failed to establish

16   that the prosecution committed misconduct when it refused to offer inmate Foster use immunity

17   to testify at petitioner's trial.  Accordingly, petitioner's claim 8 fails.

18          I.  Claim 9 - Trial Court Rulings re Discovery and Disclosure

19   Petitioner argues the trial court erred when it ruled that the defense was not entitled to the

20   criminal histories of each of the inmate witnesses and when it denied a number of the defense

21   discovery requests.  The California Supreme Court held that the trial court's refusal to require the

22   government to turn over the witnesses' criminal histories violated state law.  *Roberts*, 2 Cal. 4th at

23   308.  That court further held that the error was harmless because the "inmate witnesses were

24   thoroughly impeached by evidence of state-provided benefits, prior inconsistent statements, and

25   the like." *Id.*  Further, the court observed that "the jury knew they were incarcerated in prison for

26   a felony." *Id.*

27   Of course, a state court determination that the trial court's rulings on the rap sheets violated

28   state law does not necessarily state a constitutional claim for relief.  *See McGuire*, 502 U.S. at 67-

131

1    68.  As respondent points out, there is no constitutional right to discovery in a criminal

2    proceeding.  *See Weatherford,* 429 U.S. at 559.  It is possible that petitioner could show a due

3    process violation based upon the trial court's actions if he established that the trial court's rulings

4    on the rap sheets rendered his trial fundamentally unfair.  However, petitioner has failed to show

5    trial court error rose to the level of a due process violation here.

6        Petitioner points out three aspects of the inmate witnesses' rap sheets that could have led his

7    counsel to uncover significant evidence.  First, he points to the "INSANE" finding that appears in

8    Cade's unredacted transcript.  As discussed above, however, the trial court cannot be charged

9    with any error regarding that notation on Cade's transcript.  The "INSANE" notation was

10   redacted by prosecutor Kirk before he presented the inmates' rap sheets to the trial judge for in

11   camera review.  The defense's failure to have that information, which would have been

12   enormously important impeachment of the prosecution's "most important" witness, is attributable

13   to prosecutorial misconduct, not trial court error.

14       Petitioner next argues that if the defense had had Cade's and Rooks' rap sheets, it would have

15   learned that both faced long prison sentences, giving them both a greater interest in pleasing the

16   prosecution in return for its helping them obtain an earlier parole date.  However, as described

17   above, the defense did have information about Cade's prior crimes and the length of his sentence

18   so any error by the trial court in this regard did not prejudice petitioner.  With respect to Rooks,

19   this court found above that prosecutor Kirk committed *Brady* error when he failed to provide the

20   defense with Rooks' criminal history.  To the extent there was any trial court error, that error does

21   not rise to the level of compelling a conclusion of a fundamentally unfair trial.  Further, to the

22   extent petitioner argues that the trial court error resulted in his failure to have information about

23   Rooks' prison disciplinary infractions, he does not point to a trial court ruling regarding Rooks'

24   prison record, only rulings regarding his prior criminal history.

25           J.   Claim 10 - Denial of Change of Venue

26       Petitioner contends the trial court violated his constitutional rights in numerous ways when it

27   denied his motion for a change of venue.  (Second Am. Pet. at 220.)  Petitioner makes no

28   argument in support of this claim in his petition or in the supplemental briefing.  Petitioner's only

1   argument in support of his claim 10 is contained in his pre-trial motion.  (CT 455-61, 466-67,

2   468-69.[42])   The trial court heard argument on April 30, 1982 in connection with that motion.

3   (9/81-5/82 RT 239-55.)  The trial judge denied the motion for change of venue based largely on

4   his determination that the publicity in this case was not unusual for a murder trial and had, at that

5   point, dissipated.  (*Id.* at 254-55.)

6              1.  Legal Standards

7          The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of

8   impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Green v. White*,

9   232 F.3d 671, 676 (9th Cir. 2000).  "[I]f prejudicial pretrial publicity makes it impossible

10  to obtain an impartial jury," then the trial judge must grant the defendant's motion for a change of

11  venue.  *Daniels*, 428 F.3d at 1210  (quoting *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir.),

12  *amended*, 152 F.3d 1223 (1998)); *Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997);

13  *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988).  However, jurors are not required to be

14  totally ignorant of the facts and issues involved in a case.  *Irvin*, 366 U.S. at 722; *see also Murphy*

15  *v. Florida*, 421 U.S. 794, 800 (1975); *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir.

16  1996).  It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict

17  based on the evidence presented in court.  *Holt v. United States*, 218 U.S. 245, 250-51 (1910);

18  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984) (the issue is whether jurors could impartially judge

19  the defendant, not whether they remembered the case).  Thus, pretrial publicity is so prejudicial

20  that it requires a change of venue where "the community where the trial was held was saturated

21  with prejudicial and inflammatory media publicity about the crime" or "voir dire reveals that the

22  jury pool harbors 'actual partiality or hostility [against the defendant] that [cannot] be laid

23  aside.'"  *Hayes*, 632 F.3d at 508  (quoting *Harris*, 885 F.2d at 1361, 1363).

24  /////

25

26  [42]  The attachments to attorney Moe's declaration in support of the motion for change of venue
    were not included in the original lodging of the record herein.  The court ordered respondent to
27  provide those attachments.  He has done so.  (*See* ECF No. 543.)  The attachments are copies of
    newspaper articles from three Solano County newspapers regarding the murders and the court
28  proceedings.

1       Prejudice from pretrial publicity may be presumed where the size of the community suggests

2   that impartial jurors may be hard to find, where the information is so "blatantly prejudicial" that

3   those exposed to it "could not reasonably be expected to shut [it] from sight," and where the

4   publicity occurs shortly before trial.  *Skilling v. United States*, 561 U.S. 358, 382-84 (2010).

5   Courts have presumed prejudice in very few cases.  The Supreme Court in *Rideau v. Louisiana*,

6   373 U.S. 723 (1963) considered television broadcasts replaying a filmed confession by defendant

7   Rideau.  Those broadcasts occurred three times and were seen by at least a third of the people in

8   the community.  The broadcasts occurred immediately after the crime, just two weeks before

9   Rideau's lawyers moved for a change of venue, and less than two months before Rideau's trial.

10  The Supreme Court held that a jury could not fairly be drawn from "a community so pervasively

11  exposed to such a spectacle."  373 U.S. at 726.

12      The Supreme Court has also found actual prejudice from pretrial publicity where there was

13  both a barrage of inflammatory publicity shortly before trial and a number of jurors who stated

14  that they had formed an opinion that the defendant was guilty prior to trial.  *See Irvin*, 366 U.S. at

15  728.  "This inquiry focuses on the nature and extent of the voir dire examination and prospective

16  jurors' responses to it."  *Hayes*, 632 F.3d at 510; *see also Irvin*, 366 U.S. at 728 (actual prejudice

17  found where eight of the twelve empaneled jurors had already formed the opinion that the

18  defendant was guilty, and 268 of the 430 potential jurors were excused for cause because they

19  indicated some degree of belief in the defendant's guilt).  Actual prejudice may also be found

20  where the degree of adverse pretrial publicity has created a community-wide sentiment against

21  the defendant, such that the jurors' claims that they can be impartial should not be believed.  *Id.*;

22  *Patton*, 467 U.S. at 1031.

23      Negative publicity is not presumptively prejudicial.  *See Harris*, 885 F.2d at 1362; *see*

24  *also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) ("pretrial publicity even pervasive,

25  adverse publicity does not inevitably lead to an unfair trial").  As noted by the United States

26  Supreme Court, "[w]e must distinguish between mere familiarity with petitioner or his past and

27  an actual predisposition against him, just as we have in the past distinguished largely factual

28  publicity from that which is invidious or inflammatory."  *Murphy*, 421 U.S. at 801 n.4

134

1    The duty of a federal court reviewing such a claim in a habeas corpus proceeding is to "make an

2    independent review of the record to determine whether there was such a degree of prejudice

3    against the petitioner that a fair trial was impossible."  *Harris*, 885 F.2d at 1360 (quoting *Bashor*

4    *v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984)).  To this end, a "reviewing court must

5    independently examine the news reports for volume, content and timing."  *Id.* at 1360.  A court

6    must also consider whether the jurors had such fixed opinions they could not impartially judge the

7    guilt of the defendant.  *Patton*, 467 U.S. at 1035; *see also Mackey v. Asuncion*, No. 15-CV-

8    03165-HSG, 2018 WL 4680190, at *27 (N.D. Cal. Sept. 28, 2018) (citing *Sheppard v.*

9    *Maxwell*, 384 U.S. 333, 362 (1966)) ("Due process requires that the accused receive a trial by

10   an impartial jury free from outside influences.").

11                    2.  Discussion

12       This court accepts petitioner's assertion that there was extensive media coverage of his case.[43]

13   Particularly in Vacaville, where the prison is located and where Officer Patch resided, there were

14   numerous articles appearing in the newspaper immediately after the crimes and during the

15   preliminary hearing.  (Ex. A to  Apr. 5, 1982 Decl. of Ronald Moe, lodged here on May 9, 2016

16   as Ex. 104A.)  After reviewing the state court record, the court finds that the nature of the news

17   coverage was primarily factual and not unduly inflammatory.

18       After reading the newspaper articles and other material submitted by petitioner, this court

19   concludes that the record does not reflect a "general atmosphere in the community or courtroom

20   [which was] sufficiently inflammatory and prejudicial to deny [petitioner his] right to a fair and

21   impartial jury at trial."  *See Harris*, 885 F.2d at 1363 (quoting *Murphy*, 421 U.S. at 802).  This

22   court also notes that petitioner did not allege any significant disruption of his trial proceedings by

23   ─────────────────────────

24   [43]  In his declaration in support of the motion for change of venue, attorney Moe stated that there
     had been over 25 articles about the case appearing in the Vacaville Reporter, over 15 articles in

25   the Vallejo Times-Herald, and over 25 articles in the Fairfield Daily Reporter.  (CT 466-467.)
     While attorney Moe attached copies of the newspaper articles from the Vacaville and Vallejo

26   newspapers, he stated that, "due to technical problems," he was attaching only 7 articles from the
     Fairfield Daily Reporter.  Moe said the balance would be submitted as a supplement.  However,

27   there is no indication in the record that any further articles were submitted.  Nonetheless, the
     court accepts the representation that there were more articles that appeared in the Fairfield paper

28   than the 7 attached to the defense motion.

                                    135

1    the news media, and he did not renew his motion for change of venue after the conclusion of jury

2    voir dire.  The news articles and media coverage of this case certainly did not rise to the level of

3    disruption that supported a presumption of prejudice in *Rideau*.

4         Further, most of the media coverage took place a year or two before jury selection

5    commenced.  The coverage was at its most intense the first few months after the crime occurred,

6    which was more than two years prior to trial.  There was renewed interest at the time of the

7    preliminary hearing in October 1981.  Petitioner has failed to show the trial court erred in

8    determining that coverage had dissipated by April 1982, which was still about six months before

9    the beginning of jury selection in October 1982.  "The Supreme Court has repeatedly recognized

10   that the passage of significant time between adverse press coverage and a defendant's trial can

11   have 'a profound effect on the community and, more important, on the jury, in softening or

12   effacing opinion.'"  *Hayes*, 632 F.3d at 509 (quoting *Yount*, 467 U.S. at 1033.)  The United States

13   Supreme Court noted in *Skilling* that "[w]hen pretrial publicity is at issue, 'primary reliance on

14   the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale

15   where the publicity is said to have had its effect' and may base her evaluation on her 'own

16   perception of the depth and extent of news stories that might influence a juror.'"  *Skilling,* 561

17   U.S. at 386  (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)).  Under these circumstances,

18   prejudice cannot be presumed.

19        This court also finds that no actual prejudice on the part of the jurors at petitioner's trial has

20   been established.  While there was extensive information about the case appearing in the local

21   media, the coverage was not nearly so prejudicial as that found in *Irvin*, which involved a

22   "barrage of newspaper headlines, articles, cartoons and pictures . . . unleashed against . . . [the

23   defendant] during the six or seven months preceding his trial."  *Irvin*, 366 U.S. at 725.  Petitioner

24   /////

25   /////

26   /////

27   /////

28   /////

1  has failed to show that the jurors themselves recalled the publicity or any details about the case

2  provided therein.[44]

3       For the reasons set forth above, the court concludes that petitioner has failed to show that

4  media coverage of his arrest and trial denied him the right to a fair trial in the venue in which it

5  was conducted.  Because petitioner suffered no presumed or actual prejudice as a result of pretrial

6  publicity, he is not entitled to federal habeas relief as to this claim

7       K.  Claim 11 – Denial of Marsden Motions

8       Pursuant to the decision in *People v. Marsden*, 2 Cal. 3d 118 (1970), when a criminal

9  defendant in California asserting inadequate representation seeks to discharge appointed counsel

10  and substitute another attorney, the trial court must permit him to explain the basis of his

11  contention and to relate specific instances of the attorney's inadequate performance.  Petitioner

12  argues he twice made *Marsden* motions and the trial court's denial of them without inquiry

13  violated his Sixth Amendment and due process rights.

14       1.  Background

15       On October 9, 1981, shortly after the preliminary hearing, petitioner asked for "reappointment

16  of attorney."  (10/9/81 & 11/3/81 RT 101-02.)  He told the judge he had concerns that, because

17  the death penalty was involved, he should be represented by a more experienced attorney.  He

18  said he had been in contact with an attorney, and had sent him papers to familiarize him with the

19  case.  Petitioner asked that this new attorney be appointed in attorney Urquhart's place.  The trial

20  judge denied petitioner's motion stating, "I don't think you have adequate showing that would

21  justify the Court making – entertaining your motion."  (*Id.* at 102.)

22       Petitioner then asked the judge to "inform me of the procedure to deal with those things that

23  the Court desires."  (*Id.*)  The judge responded, "[t]he ruling has been made today.  You are not

24  foreclosed in making further motions along the line as you go along."  (*Id.* at 102-03.)

25  _____

[44]  In his motion for an evidentiary hearing, petitioner also argued that his trial counsel was

26  ineffective for failing to question jurors about their exposure to pretrial publicity.  This court

27  previously found that petitioner failed to make out a colorable claim of ineffective assistance of counsel on these grounds.  (ECF No. 466 at 59-60.)  Petitioner has not argued the issue any further.  For the reasons stated by the court previously, any claim of ineffective assistance of

28  counsel for failing to question jurors regarding pretrial publicity is also denied.

In a letter dated December 1981, which was filed with the court on January 7, 1982, petitioner again asked for a new attorney.[45]  (CT 344-46.)   Therein, petitioner indicated he had a conflict with attorney Urquhart because Urquhart had been employed by the district attorney's office until a few years before he was appointed to represent petitioner.  In addition, petitioner complained that Urquhart had "little if any knowledge of some significant issues which the Attorney General's office clearly intend to make the foundation stone of its prosecution;" Urquhart was inexperienced; his counsel's investigation was "haphazard;" and Urquhart failed to question witnesses in a manner designed to obtain information helpful to the defense.

During the morning of a trial readiness conference on February 5, 1982, prosecutor Kirk mentioned petitioner's filing.  (9/81-5/82 RT 189.)  The judge told petitioner he had not yet reviewed the filing but that he would "take care of it before the day is out."  At the beginning of the afternoon session on February 5, the judge read the motion and then addressed petitioner, "Do you have anything you want to add to what's contained in your motion?"  (*Id.* at 205.)  Petitioner responded that he did not.  The judge then turned to attorney Urquhart.  Urquhart informed the judge that it appeared petitioner wanted to take a writ from the prior judge's denial of his request for new counsel.

Petitioner then spoke up,

> Well, I would like to say, in regards to Attorney Guynup who I requested in that particular letter is that up until this time, she have made statements and obligations which have not been carried out according to agreement between me and her.
>
> Now, I'm not totally satisfied with the appointment of her *per se* at this time, but in regards – I still stand behind my statements and request in the motion and perhaps that I have the opportunity to research for the possibility of another attorney under those circumstances.

(*Id.* at 206.)  The judge replied,

> Well, in a nutshell, I don't know that your research is going to be very productive.  To have an attorney relieved, at least my understanding of the law, you have to show good cause.

---

[45]  The court's copy of this letter is faint in places.  Where the court was unable to read the letter, the court accepts the parties' quotations from the letter as accurate.

138

1
        Now, in the Harris situation that you make reference to, and I don't purport to be familiar with the case.  But as I understand the case, the good cause there was the attorney had represented the Harrises in other matters, were very, very familiar with Los Angeles actions that had taken place in Los Angeles that were closely interwoven in the case, and I think this was in Alameda County . . .

2

3

4
        And that was the good cause that the Court found to relieve the Alameda County attorney and to substitute the same attorney who represented them in the other place.

5

6
        Other cases that I find, and you're entitled to a hearing on it, but the basic requirement puts on the Defendant to make a showing of good cause.  Good cause sometimes is well, I've got these witnesses that my attorney has not bothered to subpoena; I've got this; I've got that; specific items of failures on the part of the attorney.

7

8

9
        Now, I'm concerned with a situation where we've spent, what, an hour, hour and a half this morning arguing about your rights and your rights to discovery and so on, and your attorney actively participated in that, actively made efforts to protect your rights.  He seems to be well prepared on the subject, and his performance in representing you at this point in this court has certainly seemed adequate.  And you really don't spell out anything in your motion.

10

11

12

13
        His past association with the District Attorney's Office, he's got a past association in representing other people in connection with serious criminal charges.  He's defended other people.  He's not that recently out of the District Attorney's Office that he's closely associated with law enforcement people.

14

15

16
        Lack of confidence, I might find you an idiot that you had great confidence in.  And your lack of confidence, we're talking about seeing that you are represented by competent counsel. . . .

17

18
        So there has to be a showing of good cause.  Now, I think that you can do that at any stage of the proceedings.  I deny your motion.  That doesn't mean you can't come back in at a later time and say hey, now Judge, I've got good cause to discharge my attorney because of this.  And it's my obligation, not necessarily to see that you have the attorney of your choice, but to see that you have good representation in a matter this serious.

19

20

21

22
        So at this point, based upon what you have in your motion, it's denied.

23

24
(*Id.* at 206-08.)

25
        2.  Legal Standards

26
    The denial of a *Marsden* motion to substitute counsel can implicate a criminal defendant's

27
Sixth Amendment right to counsel and is properly considered in federal habeas corpus.  *Schell v.*

28
*Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (*en banc*).  On federal habeas review, the relevant

139

1    inquiry is whether the state trial court's disposition of the *Marsden* motion violated petitioner's

2    Sixth Amendment right to counsel because a conflict between petitioner and his attorney "had

3    become so great that it resulted in a total lack of communication or other significant impediment

4    that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth

5    Amendment." *Id.* at 1026.  As the Ninth Circuit has explained:

6            [T]he basic question is simply whether the conflict between
             Schell and his attorney prevented effective assistance of counsel . . .
7            . It may be the case, for example, that because the conflict was of
             Schell's own making, or arose over decisions that are committed to
8            the judgment of the attorney and not the client, in fact he actually
             received what the Sixth Amendment required in the case of an
9            indigent defendant . . . .

10   *Id.* (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)) (footnote omitted).

11       The Sixth Amendment does not guarantee a "meaningful relationship" between a client and

12   his attorney.  *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) (quoting *Morris*, 461 U.S. at

13   14).  Moreover, an indigent defendant does not have the right to counsel of his choice in a

14   criminal proceeding.  *United States v. Rewald*, 889 F.2d 836, 856 (9th Cir. 1989); *United States v.

15   Torres–Rodriguez*, 930 F.2d 1375, 1380 n.2 (9th Cir. 1991), *abrogated on other grounds by

16   Bailey v. United States*, 516 U.S. 137, (1995) ("A defendant who seeks to replace one appointed

17   counsel with another . . . will need to justify the replacement . . . .  An indigent defendant is

18   entitled to appointed counsel, but not necessarily to appointed counsel of his choice."); *see also

19   Bradley v. Henry*, 510 F.3d 1093, 1099-1100 (9th Cir. 2007) (concurring opinion), *amended*, 518

20   F.3d 657 (9th Cir. 2008).  "[I]n evaluating Sixth Amendment claims, the appropriate inquiry

21   focuses on the adversarial process, not on the accused's relationship with his lawyer as such."

22   *Wheat v. United States*, 486 U.S. 153, 159 (1988) (quoting *United States v. Cronic*, 466 U.S. 648,

23   657 n.21 (1984)).  Thus, "the essential aim of the [Sixth] Amendment is to guarantee an effective

24   advocate for each criminal defendant."  *Id.*

25       The United States Supreme Court has not specifically addressed the level of inquiry required

26   when a *Marsden* motion or other similar motion is made by a criminal defendant.  When

27   assessing a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus

28   proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an appropriate

                                            140

1    inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the

2    case goes forward." *Schell*, 218 F.3d at 1025; *see also Larson v. Palmateer*, 515 F.3d 1057,

3    1066-67 (9th Cir. 2008) ("Because Larson has not shown that he was entitled to a fourth set of

4    counsel under clearly established federal law, his Sixth Amendment claim fails."); *Plumlee v.*

5    *Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (*en banc*) ("Under our precedents, *see, e.g., Schell*,

6    218 F.3d at 1025-26, Judge Lane had a duty to inquire into the problems with counsel when they

7    were first raised, and he did so").

8                          3. <u>Discussion</u>

9        Petitioner has failed to establish a Sixth Amendment or due process violation.  In his first

10   request, petitioner simply stated his concerns about attorney Urquhart's inexperience and asked

11   for appointment of an attorney of his choosing.  Petitioner did not provide the judge grounds to

12   inquire further because there was no indication in the record of an "irreconcilable conflict" or a

13   "legitimate reason" that petitioner had lost trust in his attorney.  *See Daniels*, 428 F.3d at  1198.

14   In this regard, further inquiry by the trial court has been found to be necessary where an attorney

15   tells the court that "a conflict had arisen between herself and [the defendant] about how to prepare

16   his defense, and that [the defendant] wanted the court to relieve her and to appoint substitute

17   counsel," Schell, 218 F.3d at 1021, 1024-27.  Here, petitioner failed to show that any such

18   conflict had arisen between himself and his appointed counsel.

19       With respect to petitioner's second request, the judge did permit petitioner to further explain

20   why he felt the appointment of new counsel on his behalf was warranted.  Petitioner declined to

21   do so.  Because petitioner's complaints were largely that his appointed counsel was not

22   performing adequately, the judge considered attorney Urquhart's performance up to that point and

23   informed petitioner that he felt Urquhart was adequately representing petitioner.  To the extent

24   petitioner disagreed with counsel over strategic or tactical decisions, he simply failed or declined

25   to describe any that rose "to the level of a complete breakdown in communication."  *Stenson*, 504

26   F.3d at 886; *see also United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987)

27   ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the theory

28   of defense.").

                                    141

1      Petitioner argues that his claims of ineffective assistance of counsel validate his pre-trial

2  complaints.  It is true that this court has concluded in this order that petitioner's trial counsel did

3  not act reasonably nor provided adequate representation in some respects.  However, those

4  findings reflect actions by Urquhart that occurred after petitioner made his requests for new

5  counsel.  Petitioner has failed to show that in October 1981 and February 1982, the judge should

6  have been aware that Urquhart's actions had fallen short of the *Strickland* standards for

7  reasonably competent counsel.  Moreover, it's worth pointing out that petitioner has made claims

8  of ineffective assistance of counsel to address counsel's performance at  trial.  The issue here is

9  only whether the trial court erred when it denied petitioner's requests for new counsel well prior

10  to the commencement of trial.  Petitioner has failed to show the trial court denials amounted to a

11  violation of his constitutional rights.

12      L.  <u>Claim 12 – Failure to Dismiss Information</u>

13    In 1981, petitioner moved the state court to dismiss the information for violation of the

14  California's statutory speedy trial provisions.  (*See* CT 117-20.[46])  The motion was considered by

15  a magistrate of the Solano County Municipal Court, who determined that he did not have

16  jurisdiction to rule on the speedy trial issue raised by petitioner.  (*See* CT 120-24.)  In October

17  1981, petitioner's trial counsel challenged the magistrate's ruling and argued that the ten-month-

18  delay in bringing charges against petitioner resulted in a violation of his right to a speedy trial

19  under both state and federal constitutional law and pursuant to state statute.  (*Id.*)  The superior

20  court rejected that challenge.  (10/9/81 & 11/3/81 RT 124.)

21    In his claim 12, petitioner specifically states that he is challenging the municipal court's ruling

22  in this regard.  (Second Am. Pet. at 226.)  To the extent petitioner is arguing here that the state

23  court's determination that it lacked jurisdiction to consider petitioner's motion was incorrect, that

24  is an issue of state law which is not cognizable in this federal habeas proceeding.  *See McGuire*,

---

26  [46]  The record before this court does not appear to contain the summer 1981 proceedings held in
the Solano County Municipal Court.  Petitioner challenged the municipal court's ruling in filings

27  before the Solano County Superior Court in October 1981.  Those filings appear in the Clerk's
Transcript lodged herein and do describe the proceedings that took place before the municipal

28  court.

1   502 U.S. at 67-68.  To the extent petitioner is arguing that his right to a speedy trial was violated

2   denying him due process, he must demonstrate that he suffered actual prejudice and that the delay

3   offended "fundamental conceptions of justice."  *United States v. Sherlock*, 962 F.2d 1349, 1353-

4   54 (9th Cir. 1989).  Petitioner also argued that he was prejudiced by the delay in the charging

5   decision as part of his claim 6 (alleging prosecutorial misconduct by delayed charging).  As

6   discussed above, this court finds petitioner has failed to show he was prejudiced by any such

7   delay.  Further, petitioner has not established, either factually or legally, that the ten-month time

8   period between the commission of the crime and the filing of the information was so

9   unreasonable and extensive that it violated concepts of fairness and due process.

10          M.   Claim 13 – Multiple Murder Special Circumstance

11          Petitioner argues he should not have been held to answer for the murder of Officer Patch and

12   the multiple murder special circumstance.  To the extent petitioner contends he suffered prejudice

13   at the guilt phase in this regard, that contention has been rendered moot because the conviction

14   for Officer Patch's murder and the multiple murder special circumstance were overturned on

15   appeal.  *See Roberts*, 2 Cal. 4th at 322, 327.  Petitioner's remaining arguments involve prejudice

16   at the penalty phase of his trial.  (*See* ECF No. 528 at 3-6.)  The present order, however, addresses

17   only petitioner's guilt-phase claims and his penalty phase claims are not addressed herein.

18          N.   Claim 14 – Improper Denial of Continuance

19   Petitioner's trial was originally scheduled to commence on September 7, 1982.  On August 11,

20   1982, the defense moved for a continuance on the grounds that additional time was needed by the

21   defense to prepare for both the guilt phase and, particularly, the penalty phase of the trial.  (CT

22   630-38.)  The court heard the motion on August 24, 1982.  (*See* Trans. of Proc. on Aug. 24, 1982,

23   lodged herein on Jan. 20, 2004 as Ex. 84.)  During that hearing, attorney Urquhart told the judge

24   that he could be ready to proceed with the guilt phase of the trial by September 7, if necessary.

25   (*Id.* at 4.)  However, he was adamant that he could not be prepared for the penalty phase by

26   September 7.  (*Id.* at 4-7.)  The court then continued the trial for three weeks.  (*Id.* at 29.)

27          Three days later, on August 27, 1982, attorney Urquhart filed a renewed motion for a

28   continuance of the trial.  This time, he argued that additional time was necessary to prepare only

1    for the penalty phase.  (CT 659.)  The court denied that motion.  (CT 662.)

2         On September 24, 1982, the Friday before the first day of trial, the prosecutor informed the

3    court and the defense that he had additional information regarding percipient witnesses.  (9/24/82

4    RT 1-2.)  Attorney Urquhart requested a four-week continuance of the trial date.  (*Id.* at 81.)   The

5    court granted the motion in part and continued the trial for only one week.  (*Id.* at 83.)

6         In his claim 14, petitioner argues primarily that he suffered prejudice at the penalty phase of

7    his trial as a result of being denied adequate time to prepare.  (Second Am. Pet. at 241-43.)

8    Because this court is restricting its decision at this point to guilt phase issues raised in the pending

9    petition, the effect on the penalty phase of the trial court's denial of petitioner's requests for a

10   continuance of the trial will not be addressed in this order.  To the extent petitioner is making

11   some argument that he suffered prejudice at the guilt phase trial by the denial of his motion for a

12   continuance, he has failed to make any specific showing of actual prejudice.  *See Gallego*, 124

13   F.3d at 1072 (a petitioner must show actual prejudice resulting from the trial court's denial of a

14   continuance to prove a due process violation); *see also Bennett v. Scroggy*, 793 F.2d 772, 774

15   (6th Cir. 1986) (to form the basis of a habeas claim, a denial of a trial continuance "must have

16   been so arbitrary and fundamentally unfair that it violates constitutional principles of due

17   process").

18        O.  Claim 15 – Ineffective Assistance of Counsel during Jury Selection

19        In his claim 15, petitioner alleges his counsel was ineffective in three respects during jury

20   selection:  (1) failure to question prospective jurors regarding their potential racial bias; (2) failure

21   to conduct meaningful voir dire of the prospective jurors' attitudes about the death penalty; and

22   (3) failure to challenge the representativeness of the jury venire.  Petitioner also alleges in claim

23   15 that the trial court erred when it excused prospective jurors for cause based on their views of

24   the death penalty.

25        Petitioner raised these three ineffective assistance of counsel issues in his motion for an

26   evidentiary hearing.  This court found petitioner failed to make a colorable claim for relief as to

27   his arguments that his counsel failed to adequately question prospective jurors regarding their

28   views on the death penalty and failed to make a colorable claim that his counsel failed to

144

1   challenge the representativeness of the jury venire.  (ECF No. 466 at 55-56, 60-61.)  Petitioner

2   has not briefed these issues any further.  This court re-affirms its order in which it concluded that

3   these two aspects of claim 15 lack merit and that relief must be denied as to those aspects of the

4   claim.

5       This court did grant petitioner's request for an evidentiary hearing on his claim that his

6   counsel failed to adequately question potential jurors about racial bias.  (*See* ECF No. 466 at 57-

7   59.)  Although, it should be noted that the court was unsure whether petitioner had made a

8   sufficient showing of a colorable guilt phase claim.  (*Id.* at 59.)  Petitioner informed the court in

9   his post-evidentiary hearing briefing that he had not developed any evidence relevant to this claim

10  during the evidentiary hearing and that he would discuss the claim in the separate briefing

11  addressing his non-evidentiary hearing claims.  (ECF No. 518 at 1 n.3.)  However, petitioner

12  chose not to brief claim 15 any further thereafter.  (*See* ECF No. 528.)  Accordingly, this court is

13  limited to petitioner's briefing in the petition and in his motion for an evidentiary hearing.

14  Respondent did provide supplemental briefing addressing this aspect of petitioner's claim 15.

15  (*See* ECF No. 527 at 9-10.)   Petitioner's argument that his counsel was ineffective for failing to

16  question prospective jurors about racial bias will be discussed below.

17      Two of the twelve jurors at petitioner's trial were African-American.  (ECF No. 248 at 245:9-

18  10.)  Petitioner was an African-American prisoner and, the prosecution stressed at trial, a member

19  of the Black Guerilla Family prison gang.  He was charged with murdering not only another black

20  inmate, but a white correctional officer.  These circumstances provided obvious reasons for the

21  defense to be concerned about racial bias among the perspective jurors.  Nonetheless, according

22  to petitioner, attorney Urquhart asked no questions of the prospective jurors exploring their

23  possible racial bias.  In his declaration, attorney Urquhart conceded that he was aware that aspects

24  of the case "could play into the racial fears of white jurors."  (Urquhart Decl., EH Ex. 38, ¶ 20.)

25  Urquhart also admitted he made no attempt to question prospective jurors regarding possible

26  racial bias.  (*Id.*)

27      "The right to a jury free of biased persons is of constitutional magnitude."  *Johnson v.*

28  *Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) (citing *Smith v. Phillips*, 455 U.S. 209 (1982)).

1   When considering the possibility of prejudice to the petitioner from juror bias, the court must also

2   look to the cumulative effect of all errors.

3       Respondent argues that since this claim is based on alleged prejudice resulting from the

4   interracial crime and the conviction for the murder of Officer Patch was overturned, petitioner's

5   claim in this regard is moot.

6       Petitioner does not limit his claim to the interracial murder, although

7   that is obviously a focus of it.  He also argues racial prejudice based not merely on his race and

8   the race of victim Patch, but on his membership in a black prison gang.[47]

9       Petitioner's current habeas counsel did question juror Galloway at his deposition about

10  whether he felt any of the jurors had expressed racial prejudice.  Galloway testified that he felt

11  jury foreman Edwards' "inclination" was that the defendants were guilty because they were black

12  and in prison.  (Galloway Depo. at 18.)  However, Galloway also testified that he did not recall

13  anything specific Edwards said in that regard.  Rather, "these are just the feelings that I got."  (Id.

14  at 19.)   Juror Edwina Conklin stated in her declaration that she

15              [w]as upset that there was racial prejudice displayed by some
16          of the jurors.  They didn't come out and call anybody by racial
            epithets, but the way they verbalized their feelings towards the black
            defendants, and that the defendants were part of a gang, made it clear
17          to me that they had a racial bias against Larry Roberts and Archie
            Menefield.  And I am not someone who would label someone as a
18          racist without any basis.  I can recall specifically that the foreman
            came across as a racist by the comments he made and by his attitude
19          toward the defendants.

20  (Ex. 105 to Mtn. for Evid. Hrg. (ECF No. 370-2), ¶ 7.)

---

21  [47]  Respondent relies in part upon the decision in *Ristaino v. Ross*, 424 U.S. 589 (1976) in which
22  the Supreme Court noted that the fact a crime involves interracial violence does not by itself
    require a trial judge to question the prospective jurors about racial prejudice.  In so arguing,
23  respondent is conflating two different standards - the due process right to an impartial
    jury and the Sixth Amendment right to a reasonably competent attorney.  The fact that due
24  process may not require voir dire on racial prejudice in the prosecution of an interracial crime
    does not necessarily mean that a reasonable attorney would have failed to conduct such voir dire
25  questioning.  Moreover, the Supreme Court in *Turner v. Murray*, 476 U.S. 28, 33-34 (1986)
    distinguished *Ristaino* where the defendant faced a capital sentence.  There the Court held that
26  because there is a "range of discretion entrusted to a jury in a capital sentencing hearing, there is a
    unique opportunity for racial prejudice to operate but remain undetected."  *Id.* at 36-37.
27  Accordingly, "a capital defendant accused of an interracial crime is entitled to have prospective
    jurors informed of the race of the victim and questioned on the issue of racial bias."  *Id.*
28

146

1    Respondent argues that Federal Rule of Evidence 606(b) precludes this court's consideration

2    of Galloway's testimony or Conklin's declaration.  That is likely the case.  As discussed above, in

3    2014 the United States Supreme Court clarified Rule 606(b) in *Warger*, holding that Rule

4    606(b)'s ban on the consideration of juror testimony is clear.  574 U.S. at 49-50.  The court

5    concluded that the rule prohibits "the use of *any* evidence of juror deliberations, subject only to

6    the express exceptions for extraneous information and outside influences." *Id.* at 48.  The Ninth

7    Circuit had held in 2001 that testimony regarding racial bias may be exempt from Rule 606(b).

8    *See United States v. Henley,* 238 F.3d 1111, 1121 (9th Cir. 2001).  The Supreme Court

9    subsequently established an exception to the no impeachment rule of Rule 606(b) where "a juror

10   makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a

11   criminal defendant[.]" *Peña-Rodriguez v. Colorado*, 580 U.S. 206, ___, 137 S. Ct. 855, 869

12   (2017).  This court need not decide whether it may consider the jurors' testimony and declarations

13   because, even if the court can consider them, they are insufficient here to show that petitioner was

14   prejudiced by his counsel's failure to question perspective jurors about racial bias.  Both juror

15   Galloway and juror Conklin had a "feeling" that other jurors were influenced by the defendants'

16   race.  Petitioner was given the opportunity to prove more, but has failed to do so.  *Cf., Moore v.*

17   *Butler*, 819 F.2d 517, 520 (5th Cir. 1987) (local history of race discrimination combined with an

18   interracial crime did not make counsel's failure to question prospective jurors about race

19   necessarily prejudicial).  This is not a case in which a juror made a clear statement of racial bias

20   with respect to the defendant.  *See Bennett v. Stirling*, 170 F. Supp. 3d 851, 868-72

21   (D.S.C.), *aff'd,* 842 F.3d 319 (4th Cir. 2016) (granting a habeas claim based on evidence that

22   when a juror was asked after trial why he thought the petitioner was guilty, he stated it was

23   "[b]ecause he was just a dumb nigger.").

24   Whether or not attorney Urquhart acted reasonably in failing to question perspective jurors

25   about their racial biases, petitioner has failed to establish prejudice as required under the

26   *Strickland* standard.  Petitioner has not established a reasonable possibility that racial bias

27   contributed to the jury's guilt-phase verdict.  *See Clark v. Collins*, 19 F.3d 959, 965 (5th Cir.

28   1994) (a claim that counsel was ineffective for failing to question prospective jurors regarding

1    racial bias fails where the petitioner did not show that had his counsel done so, the verdict would

2    have been different).  Accordingly, petitioner is not entitled to federal habeas relief on his claim

3    of ineffective assistance of counsel during voir dire.

4            P.  <u>Claim 16 – Excessive Courtroom Security</u>

5        Petitioner alleges that courtroom and courthouse security measures were excessive and that

6    jurors saw him shackled during his transport.  (Second Am. Pet. at 254-56.)  Petitioner further

7    alleges that the requirement that the defendants be shackled during the jurors' visit to the prison

8    caused the defendants to waive their right to be present during the viewing.  This latter allegation

9    regarding petitioner's right to be present is also made in petitioner's claim 26 and the court

10   addresses it in that discussion below.  The court granted petitioner's request for an evidentiary

11   hearing on the first issue.  The excessive security aspect of petitioner's claim 16 has been

12   addressed, and denied, above.  Petitioner also sought an evidentiary hearing on his claims that the

13   trial jurors saw him shackled.  The court found that petitioner had failed to provide sufficient

14   factual support for his claim.  (ECF No. 466 at 78-79.)  At that time, petitioner had only the

15   declaration of Juror Conklin in which she stated, "I also remember there was a point when the

16   jurors were able to view the defendants in shackles."  (Ex. 105 to Mtn. for Evid. Hrg. (ECF No.

17   370-2), ¶ 4.)  In her testimony deposition, Juror Conklin again recalled seeing the defendants in

18   shackles, but was unsure about where or when that was.  (Conklin Depo. at 70.)  She seemed to

19   be fairly certain that it was not in the courtroom.  (*Id.*)  Petitioner has provided no further support

20   for this claim.  Accordingly, for the reasons stated in the court's order addressing petitioner's

21   motion for an evidentiary hearing, the non-evidentiary hearing aspects of claim 16 will be denied.

22           Q.  <u>Claim 17 – Improper Admission of BGF Membership</u>

23           Petitioner argues the trial court should have excluded evidence of the defendants' BGF

24   membership, expert testimony regarding the BGF generally, and evidence of BGF activity that

25   had no connection to petitioner or Menefield.  (Second Am. Pet. at 256-64.)  Petitioner also

26   challenges the trial court's refusal to grant the defense requests for the experts' background

27   information.

28   /////

148

1                 1. <u>Background</u>

2         On April 30, 1982, about four months before the September 7 trial date, prosecutor Kirk

3 provided the defense with a statement pursuant to Penal Code § 190.3 indicating the evidence the

4 prosecution intended to present at the penalty phase.  (9/81-5/82 RT 296.)  Attorney Urquhart

5 noted that the prosecution intended "to show Mr. Roberts' involvement in the Black Guerrilla

6 Family."  He added, "I thought that wasn't even going to be a part of this case according to Mr.

7 Kirk?"  (*Id.* at 270.)  Kirk replied, "It's the penalty phase, not the guilt phase."  (*Id.*)   A month

8 before trial, on August 9, 1982, the prosecution filed a witness list that included witnesses

9 indicating that it intended to introduce evidence at the guilt phase about the BGF.  (CT 613; *see*

10 CT 635.)  In his August 11 motion for a continuance of the trial date, attorney Urquhart noted that

11 the prosecutor's witness list included one or two guilt phase witnesses who might be called as

12 experts on prison gangs.  (CT 635.)  Urquhart argued that additional  time was required for the

13 defense to prepare for these witnesses because "the prosecution had previously indicated on the

14 record [that evidence regarding the BGF] would not be material to the guilt trial in this matter."

15 On August 12, attorney Moe filed a motion on behalf of both defendants opposing admission of

16 BGF evidence and requesting that the prosecutor be barred from mentioning anything regarding

17 the BGF in his opening statement, pending the court's decision on the admissibility of the

18 evidence.[48]

19         On August 27, the court heard argument on the motion and ordered additional briefing.[49]  (CT

20 662.)

21         By all accounts, the trial court never directly ruled on the admissibility of the BGF evidence.

22 *See Roberts*, 2 Cal. 4th at 297 ("Defendant concedes . . . that the court apparently never ruled

23 explicitly on the motion *in limine*, but noted only in passing during a hearing on another matter

24 that it thought such evidence was relevant to motive and identity.")  During a September 24, 1982

25 hearing on discovery issues, the trial court addressed a defense motion for information about

26 [48]  Petitioner does not cite to a location in the CT for this motion, which he describes in the
petition.  (Second Am. Pet. at 257, ¶ 5.)  The prosecution's opposition to the motion is, however,

27 contained in the lodged record at CT 654.

28 [49]  Again, the defense brief does not appear in the CT.  The prosecutor's brief is at CT 720.

1   witness testimony and evidence on the BGF.  (9/24/82 RT 44-59.)  The trial judge stated, "The

2   cases hold that identity and motive, that's why evidence is admissible about these organizations.

3   I'm thinking of that now and I don't see any problem here."  (*Id.* at 52.)

4               2.  <u>Legal Standards</u>

5        A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only

6   if it renders the state proceedings so fundamentally unfair as to violate due process.  *Drayden v.*

7   *White,* 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999);

8   *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  "A writ of habeas corpus will be

9   granted for an erroneous admission of evidence only where the 'testimony is almost entirely

10   unreliable and . . . the factfinder and the adversary system will not be competent to uncover,

11   recognize, and take due account of its shortcomings.'"  *Mancuso v. Olivarez*, 292 F.3d 939, 956

12   (9th Cir. 2002), *overruled on other grounds as recognized in United States v. Chandler*, 658 Fed.

13   Appx. 841 (9th Cir. 2016) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983), *superseded by*

14   *statute a stated in Slack v. McDonald*, 529 U.S. 473 (2000)).  Admission of evidence violates due

15   process only if "there are no permissible inferences the jury may draw from the evidence."

16   *Jammal*, 926 F.2d at 920.  "Even then, the evidence must 'be of such quality as necessarily

17   prevents a fair trial.'"  *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463 (9th Cir. 1986)).

18   In sum, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on

19   an evidentiary decision."  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *amended,* 421 F.3d

20   1154 (9th Cir. 2005).

21        Respondent argues that two aspects of this claim are procedurally barred because defense

22   counsel failed to object at trial.  The California Supreme Court held that petitioner was barred

23   from arguing that the trial court improperly admitted evidence that petitioner and Menefield were

24   /////

25   /////

26   /////

27   /////

28   /////

1  members of the BGF and that the prosecutor's witnesses on prison gangs were unqualified to

2  testify as experts.  *Roberts*, 2 Cal. 4th at 297-99.[50]

3       State courts may decline to review a claim based on a procedural default.  *Wainwright v.*

4  *Sykes*, 433 U.S. 72, 86-87 (1977).  As a general rule, a federal habeas court "'will not review a

5  question of federal law decided by a state court if the decision of that court rests on a state law

6  ground that is independent of the federal question and adequate to support the judgment.'"

7  *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting

8  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  The state rule is only "adequate" if it is

9  "firmly established and regularly followed."  *Id.*  (quoting *Ford v. Georgia*, 498 U.S. 411, 424

10  (1991)); *see also Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

11  adequate, the state law ground for decision must be well-established and consistently applied.")

12  The state rule must also be "independent" in that it is not "interwoven with the federal law."

13  *Park*, 202 F.3d at 1151-52 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).  Even if

14  the state rule is not independent and adequate, the claims may be heard if the petitioner can show:

15  (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or

16  (2) that failure to consider the claims will result in a fundamental miscarriage of justice.

17  *Coleman*, 501 U.S. at 749-50.

18                          3.  Discussion of Procedural Bar

19       Because the state court expressly held that the issues of the asserted erroneous admission of

20  evidence of the defendants' BGF membership and the lack of expert qualifications of witnesses

21  who testified about gangs were barred due to the failure of petitioner's counsel to object at trial,

22  the procedural default rule is applicable.  Further, respondent has met his burden of adequately

23  _____

24  [50]  The question of whether petitioner should be procedurally barred on the admission of the
   evidence of the defendants' BGF membership is complicated by the fact that a pre-trial motion

25  was made to exclude this evidence.  However, as the California Supreme Court pointed out, the
   trial court never explicitly ruled on that motion.  Rather, it "noted only in passing during a hearing

26  on another matter that it thought such evidence was relevant to motive and identity."  2 Cal. 4th at
   287.  Because the defense did not pursue and/or renew the objection to the evidence at trial, the

27  California Supreme Court considered it procedurally barred.  Because, as explained in the text,
   petitioner does not address in any way the procedural bar arguments, this court finds no basis

28  upon which to dispute the California Supreme Court's finding that further objection was required.

1    pleading an independent and adequate state procedural ground as an affirmative defense. *See*

2    *Bennett*, 322 F.3d at 585-86.

3        As far as this court can tell, petitioner has never challenged respondent's assertion of this

4    procedural bar, despite opportunities to do so in the traverse and/or in the briefing submitted

5    addressing the non-evidentiary hearing claims. Accordingly, petitioner has failed to meet his

6    burden of asserting specific factual allegations that demonstrate the inadequacy of California's

7    contemporaneous-objection rule as unclear, inconsistently applied or not well-established, either

8    as a general rule or as applied to him. *Bennett*, 322 F.3d at 586; *Melendez v. Pliler*, 288 F.3d

9    1120, 1124-26 (9th Cir. 2002). Petitioner's claims of erroneous admission of evidence of the

10   defendants' BGF membership and of the lack of expert qualifications of witnesses who testified

11   about gangs at petitioner's trial therefore appear to be procedurally barred. *See Coleman*, 501

12   U.S. at 747; *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Paulino v. Castro*, 371 F.3d 1083,

13   1092-93 (9th Cir. 2004). Petitioner does allege that his counsel was ineffective for failing to

14   object to the BGF evidence, which could potentially establish cause for his default. However,

15   petitioner has not established prejudice related to any failure to object because he has failed to

16   show an objection would have been successful. Examining the merits of this claim, petitioner has

17   simply failed to show the trial court erred in admitting this challenged evidence.

18       Petitioner has also not established that his membership in the BGF was not relevant to the

19   prosecution's case. Petitioner claims the prosecution concocted a theory that petitioner and

20   Menefield committed the crime as part of petitioner's "power play" to replace the head of the

21   BGF at California Medical Facility Vacaville in order to create a theory supporting the contention

22   that evidence about the BGF was relevant at trial. According to petitioner, the prosecution's only

23   theory that was supported by evidence was that petitioner killed Gardner because Gardner had

24   insulted him. Petitioner claims prosecutor Kirk admitted as much in his closing argument to the

25   jury.

26       Petitioner's view of the evidence and argument is too selective in the court's view. First, the

27   two prosecution theories for the murder were not necessarily in conflict. In his opening

28   statement, prosecutor Kirk told the jury that it needed to learn some background about the BGF to

152

1    understand the motives for the murder of Gardner, which he described as a "power play in the

2    BGF at Vacaville when Mr. Roberts over there decided that he wanted to run it." (RT 1747-52.)

3    Kirk then went on to tell a story that Ruben Williams had been the head of the BGF at Vacaville

4    and Charles Gardner was his lieutenant. After petitioner came to Vacaville, he started to feel that

5    Williams was not "taking care of business" and that he should take over as the head of

6    Vacaville's BGF. Then, the day before Gardner's murder, petitioner and Gardner were arguing in

7    the yard and during that argument Gardner referred to petitioner as "a punk motherfucker," a

8    serious insult. According to Kirk, that comment was the "straw that broke the camel's back."

9        Second, Kirk did not disavow the "power play" theory in his closing argument. Rather, he

10   recognized that the evidence presented made the precise motive for the murder unclear. (RT

11   7512-13.) Kirk then explained to the jury that he felt the evidence showed a dissension between

12   petitioner and Williams, leading to Gardner insulting petitioner, and petitioner's decision to kill

13   him. (RT 7513-15.) Petitioner has failed to show error in the admission of evidence that

14   petitioner and Menefield were BGF members or of evidence of the BGF's role and structure at

15   CMF Vacaville.

16       Petitioner's claim that the officers who testified about prison gangs were not qualified to do so

17   also fails on its merits. Petitioner simply states that the officers "were never formally qualified as

18   experts" without ever describing why they should have been so qualified or why, had the trial

19   court considered formally qualifying them as experts, they would have failed that test. Petitioner

20   has simply not shown how the trial court's decision to admit their trial testimony was in error.

21       The remaining aspects of petitioner's claim are not subject to procedural bar and merit further

22   analysis. They are: (a) that the trial court failed to order discovery of the materials relied upon

23   by the experts and, (b) that the trial court erred when it permitted evidence of BGF activities that

24   had no relevance to the case against petitioner and Menefield.

25                        4. Discussion of Denial of Discovery

26       Samuel Brown, who was an officer in the Special Services Unit of the Department of

27   Corrections, testified for the prosecution at trial that during his seven years in that position he

28   developed an expertise in the BGF. (RT 1795.) He described briefly the BGF's history and

                                       153

1    structure.  (RT 1797-1800.)  He then described the BGF "oath," read it to the jury, and explained

2    its meaning.  (RT 1804-07.)  The defense objected to Brown's testimony explaining the meaning

3    of the oath because it was based on Brown's discussions with BGF members and was thus

4    hearsay.  (RT 1805.)  The objection was overruled.  (RT 1806.)

5        Both defense attorneys cross-examined Brown regarding the sources of his information.

6    Attorney Urquhart then requested production of the intelligence reports Brown stated he had

7    relied upon.  (RT 1809.)  The court denied this request.

8        As discussed above, to succeed on a claim regarding the state court's denial of discovery,

9    petitioner must show the court's decision rendered his trial fundamentally unfair.  *Cf. McGuire*,

10   502 U.S. at 67-68 (violations of state law do not state a federal constitutional claim);

11   *Weatherford*, 429 U.S. at 559 (there is no constitutional right to discovery in a criminal

12   proceeding).  Here, petitioner has failed to do so.  Petitioner's argument is unsupported by any

13   showing that the defense examination of Officer Brown, or of any of the other witnesses who

14   testified about the BGF, would have been different had counsel had access to these reports.[51]

15   Petitioner's challenge to the trial court's denial of discovery of Officer Brown's background

16   materials will therefore be rejected.

17            5.  Discussion of Admission of BGF Evidence

18       Petitioner points to a number of places in the record where, he argues, the trial court permitted

19   the admission of evidence regarding prison gangs or the BGF that was unrelated to the case

20   against the defendants.  The court has reviewed each transcript reference cited by petitioner.

21   Most involved testimony that could be considered relevant to the proceedings.  (*See* RT 1797-99

22

23   [51]  Petitioner also makes a brief Confrontation Clause argument.  (Second Am. Pet. at 264, ¶ 46.)
     However, the Confrontation Clause is not implicated in discovery requests.  *See Pennsylvania v.*
24   *Ritchie*, 480 U.S. 39, 52-53 (1987).  The right to confrontation is a "trial right, designed to
     prevent improper restrictions on the types of questions that defense counsel may ask during cross-
25   examination."  *Id.* at 52 (citing *California v. Green*, 399 U.S. 149, 157 (1970)).  The denial of
     discovery is reviewed under the Due Process Clause.  *Id.* at 56.  To the extent petitioner is making
26   an argument that the officers' reliance on information obtained from unnamed sources also
     violated his Confrontation Clause rights, that argument is also unsupported.  *See id.* at 53-54 (the
27   right to confrontation is not implicated where the scope or nature of cross-examination is not
     limited) (citing *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985)).

28

1   (testimony regarding the hierarchical structure of the BGF governance relevant to prosecution's

2   power play theory); RT 2579, 2585-86, 2652, 2679-81, 2722, 2725 (testimony that the BGF

3   trained new members about vital points to stab someone relevant to intent to inflict lethal wounds

4   upon victim Gardner); RT 1804-07, 6430 (testimony regarding the BGF oath and rules relevant to

5   show why Menefield helped petitioner and to establish the existence of a conspiracy); RT 1912-

6   13 (testimony regarding the consequences of someone snitching on a BGF member relevant to the

7   prosecution argument that inmate witnesses originally gave false stories and that they testified

8   despite likelihood of serious reprisal by the BGF).)  Testimony regarding the defendants' gang

9   involvement and the structure of the gang was "'relevant to a fact of consequence' (i.e., the

10  motive of the defendant)."  *Windham v. Merkle*, 163 F.3d 1092, 1104 (9th Cir. 1998) (quoting

11  *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993)).  That evidence "did not 'lead only to

12  impermissible inferences about the defendant's character.'"  *Id.*  Testimony regarding gangs may

13  also be admissible on the issue of witness credibility.  *See United States v. Santiago*, 46 F.3d 885,

14  890 (9th Cir. 1995).

15      A few of petitioner's record citations point to testimony that could be considered irrelevant.

16  First, Officer Brown testified about the background of the BGF:

17          It's a prison gang that originated or began in '51.  Presently
            it's in every institution within the Department of Corrections.  They
18          are specialists in terrorism.  They started as a political organization.
            Outside now they are involved in prostitution and narcotics.
19          Recently, when several of the Generals had either been killed or died
            by one form or another, they had a power struggle, and several other
20          killings took place.

21  (RT 1797:4-11.)  Officer Brown also testified that a BGF "lieutenant" was usually the top person

22  in a prison.  (RT 1798:25.)  According to him, that lieutenant would have first pick of things like

23  narcotics and would be required to carry out orders from higher ups, "be it murder or otherwise."

24  (RT 1799:8-9.)  The lieutenant would also determine "if hits are to be made, hits or assaults on

25  other inmates or staff.  He determines about the narcotics, whatever the group is into at that

26  particular prison."  (RT 1799:21-24.)

27      Both Officers Brown and Gloria described ways BGF members who had been released from

28  prison communicated with those in prison, and described communications between prisoners.

1    (RT 1800-01, 1879-80.)  Both also testified that BGF leaders had issued "contracts" to kill people

2    who had testified for the prosecution or who live outside prison.  (RT 1803, 1881.)  The defense

3    objected to the relevance of this evidence.  (RT 1803:14-15, 1881:11-14.)  Officer Gloria

4    testified that BGF activity at CMF Vacaville involved controlling some of the narcotics traffic

5    and some of the homosexuals.  (RT 1826:11-12.)

6         Some of this evidence could be considered relevant to the prosecution's power play theory

7    and to the motivations of the inmate witnesses to talk with officials and to agree to testify at trial.

8    While petitioner insists these references were "constant," he has failed to point to more than

9    occasional references at trial to arguably irrelevant BGF evidence.  Petitioner has failed to

10   establish that the evidence was admitted in error or that, considered along with or separate from,

11   the other guilt phase errors, it rendered his trial fundamentally unfair.

12              R.  Claim 18 - Argument and Instruction re Petitioner's Flight from the Scene

13        Petitioner argues the trial court erred when, over a defense objection, it instructed the jury that

14   they could consider testimony regarding petitioner's flight from the crime scene as a

15   consideration in determining his guilt.[52]  (Second Am. Pet. at 265-66.)  Petitioner also argues the

16   prosecutor committed misconduct by referring to the evidence of petitioner's flight in his closing

17   argument.  According to petitioner, when identity is a contested issue, a flight instruction is

18   inappropriate.

19        The California Supreme Court rejected this claim on appeal:

20              Defendant contends the court erred in telling the jury it could
             infer consciousness of guilt from his flight if flight was proved.  We
21   _____

22   [52] The contested instruction stated:

23              The flight of a person immediately after the commission of a crime,
             or after he is accused of a crime, is not sufficient in itself to establish
24           his guilt, but is a fact which, if proved, may be considered by you in
             the light of all other proved facts in deciding the question of his guilt
25           or innocence.  The weight to which such circumstance is entitled is a
             matter for the jury to determine.

26              Whether or not evidence of flight shows a consciousness of guilt, and
             the significance to be attached to such a circumstance, are matters for
27           your determination.

28   (RT 7855.)

                                                    156

1

2

3

4

5

6

> recently rejected the overly broad dictum of the case on which he
> mainly relies, *People v. Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.
> Rptr. 669]. In *People v. Mason* (1991) 52 Cal.3d 909, 942-943 [277
> Cal. Rptr. 166, 802 P.2d 950], we instead construed section 1127c as
> mandating a rule that if there is evidence identifying the person who
> fled as the defendant, and if such evidence is relied on as tending to
> show guilt, then a flight instruction is proper.  In this case, the
> prosecution presented evidence that defendant fled up the stairs from
> the first to the third floor after stabbing Gardner.  The instruction
> therefore was correct.

7   *Roberts*, 2 Cal. 4th at 310.  Petitioner's only authority in support of this claim for federal habeas

8   relief is the California Court of Appeal's decision in *Anjell*, which the California Supreme Court

9   noted it had rejected.  Petitioner cites no federal authority in support of this claim.

10   Instructional error will not support a petition for federal habeas relief unless it is shown "not

11   merely that the instruction is undesirable, erroneous, or even 'universally condemned,'" but that

12   by itself the instruction "so infected the entire trial that the resulting conviction violates due

13   process."  *Karis*, 283 F.3d at 1132 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-147 (1973)).

14   The Ninth Circuit has rejected a petitioner's similar contention that a flight instruction "should

15   not have been given when the identification of the person fleeing was not established."  *McMillan*

16   *v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  Where there was sufficient evidence that the

17   petitioner was the person who left the scene, the Ninth Circuit has found the flight instruction was

18   appropriate, particularly were the jury was "expressly instructed that defendant's flight was

19   evidence of guilt only if defendant's flight were proved."  *Id.*; *see also Assoon v. Holt*, No. CV

20   19-4915 JFW (PVC), 2020 WL 5914553, at *11 (C.D. Cal. Aug. 28, 2020), *report and*

21   *recommendation adopted*, No. CV 19-4915 MCS (PVC), 2020 WL 5910413 (C.D. Cal. Oct. 5,

22   2020) (citing *People v. Ray*, 13 Cal. 4th 313, 345 (1996); Pen. Code § 1127(c)) (In general,

23   a flight instruction "is proper where the evidence shows that the defendant departed the crime

24   scene under circumstances suggesting that his movement was motivated by a consciousness of

25   guilt.").  Both of those factors are present in this case.  A number of witnesses testified to seeing

26   petitioner flee the scene and the jury was instructed that it could consider petitioner's flight only

27   "if proved."

28   /////

1    Petitioner has failed to show the challenged instruction rendered his trial fundamentally unfair

2    or otherwise violated his constitutional rights.  Further, his claim that the prosecutor committed

3    misconduct is supported only by a citation to a statement in which the prosecutor described the

4    evidence as showing that petitioner "runs up the stairs, from the People's evidence, goes through

5    the grille gate, gets caught upstairs."  (RT 7068.)  Since that was, in fact, the prosecution's theory

6    of the case, it is difficult to understand just what about this statement by the prosecutor petitioner

7    finds objectionable.  Relief as to petitioner's claim 18 will be denied.

8         S.  Claim 19 - Rooks' Testimony that Petitioner Ordered him Killed

9    During defense attorneys' cross-examination of Leslie Rooks, some of that questioning

10   focused on the fact that Rooks sought favors from the prosecution.  The defense brought up the

11   fact that it was not until shortly before he was to be considered for parole that Rooks told

12   authorities for the first time that he had seen petitioner with a knife.  (RT 2071-72.)  Attorney

13   Urquhart also asked Rooks why he was testifying.  Rooks first responded, "I don't, man, have to

14   tell you why I'm testifying, do I?"  (RT 2077:9.)  When Urquhart asked again, "You don't have

15   any reason for testifying?" Rooks replied, "It's personal."  (RT 2077:11.)  Urquhart then

16   reminded Rooks that when interviewed by authorities, he had asked "'If I do testify, what's in it

17   for me?"  (RT 2077:12-14.)

18   In the prosecution's rebuttal case, prosecutor Kirk asked Rooks why he decided to testify.

19   (RT 6495.)  Rooks responded that he "got tired of violence and different personality trips" in the

20   BGF.  Kirk then pressed Rooks about why he was motivated to testify against petitioner, asking

21   "is there anything particular in your relationship with Mr. Roberts that also motivated you to

22   come forward with evidence?"  Rooks responded that he "was supposed to get hit, he gave me the

23   order to have me hit."  (RT 6495:11-13.)  The defense immediately objected, moved for a

24   mistrial, and moved to have the testimony stricken.  The court heard argument in chambers and

25   denied both motions.  (RT 6495-98.)

26   Petitioner argues the trial court erred in permitting the testimony that petitioner had ordered

27   Rooks killed.  He claims that this testimony, in combination with an officer's testimony that the

28   /////

1   inmate witnesses were in protective custody due to a death threat, prejudiced him.[53]   (Second Am.

2   Pet. at 266-69.)

3        The California Supreme Court rejected this claim on the following grounds.

> Defendant contends the court erred in denying his motions to exclude Rooks's rebuttal testimony that he wanted to testify because defendant had given "the order to have me hit," and for a mistrial based on that statement.  Defendant also objected to a Department of Justice employee's statement that certain witnesses were placed in protective custody "because of the death threats," and contends that the employee's statement compounded the error even though it was stricken.  In an *in camera* discussion following Rooks's testimony, the prosecution contended the statement was admissible to show that Rooks's motive for testifying was not any inducement by the state but his dislike for defendant, based partly on defendant's alleged "order."

> Defendant objected to Rooks's statement because it was improper character evidence offered via prior acts of misconduct and because it was substantially more prejudicial than probative.  We examine the record to determine whether the court abused its discretion in admitting the statement.  (*See People v. Perez* (1981) 114 Cal.App.3d 470, 477- 478 [170 Cal. Rptr. 619]; *Allen v. Toledo* (1980) 109 Cal.App.3d 415, 419-421 [167 Cal. Rptr. 270].)

> We discern no such abuse.  First, the statement was not improper character evidence.  It tended to establish that Rooks's motive for testifying was resentment of defendant rather than any inducement the state had given him–and which defendant had emphasized to impeach Rooks's credibility.  Thus, the case is similar to *People v. Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal. Rptr. 1, 609 P.2d 468], in which we rejected a like contention.  As for defendant's contention that under Evidence Code section 352 and cases discussing the Federal Rules of Evidence the evidence was unduly prejudicial, we perceive the degree of prejudice as slight.  The jury had already properly heard evidence that defendant was a member of a prison gang with strict rules prohibiting testimony against other members.  Rooks's statement that defendant's death threat motivated him to testify was more of the same, but was also proper.

22   *Roberts*, 2 Cal. 4th at 305.

23        Rooks' testimony in this regard is troubling, particularly because the prosecutor pressed

24   Rooks to give it.  When compounded with the officer's revelation of death threats against the

---

25   [53]  Officer Bennett testified regarding payments made to inmate witnesses.  He explained that the

26   inmate witnesses were in "protective custody and unable to work . . . .  This was canteen money put to their funds for cigarettes, whatever they buy at the canteen.  They were there because of

27   death threats." (RT 6394:16-20.)  Attorney Urquhart's motion to strike that testimony was granted.  (RT 6394:22-23.)  Attorney Moe moved for a mistrial based on this testimony given by

28   Officer Bennett.  (RT 6400-401.)  The court denied the motion for a mistrial.  (RT 6402.)

1    inmate witnesses, there is no question that Rooks' testimony painted the defendants, and

2    particularly petitioner, as dangerous members of the BGF.  That said, petitioner can only succeed

3    on this claim by showing that the trial court erred when it refused to either give a limiting

4    instruction regarding Rooks' testimony or when it denied petitioner's motion for a mistrial.  The

5    standard with respect to this sort of evidentiary error is high – petitioner must show that

6    admission of the challenged evidence rendered his trial fundamentally unfair.  *See Reiger v.*

7    *Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986).  Moreover, the challenged evidence only

8    renders petitioner's trial fundamentally unfair if "there are no permissible inferences the jury may

9    draw from the evidence."  *Jammal*, 926 F.2d at 920.  Here, as the California Supreme Court

10   pointed out, the jury could have drawn a permissible inference that one of Rooks' motivations for

11   testifying was his anger at petitioner for ordering him killed.  On cross-examination, the defense

12   attempted to show that Rooks was testifying to receive favors from the prosecution.  The state

13   was entitled to rebut that testimony by showing that Rooks was motivated instead by anger.

14   Further, Rooks' testimony that petitioner had ordered him to be killed did not prove that

15   petitioner actually did so order, rather it merely went to prove that Rooks felt he had.

16        Even if it was error to admit this testimony, petitioner has failed to show prejudice when

17   Rooks' testimony is considered with the other trial testimony about both the "convict code" and

18   the BGF rules prohibiting inmates from testifying against another inmate or gang member.  The

19   fact that inmate witnesses, who jurors knew were in protective custody, were testifying out of fear

20   or due to anger directed at the defendants would not have come as much of a surprise to the jury.

21        T.  Claim 20 – Testimony that Petitioner Refused to Provide a Blood Sample

22        Officer Horton testified that petitioner refused to provide a blood sample.  (RT 3721:23.)

23   Attorney Urquhart questioned the relevancy of the testimony, but stated he had no objection to it.

24   (RT 3721-22.)  Over a defense objection, the trial court gave the following jury instruction:

25              Evidence that a defendant refused to give a blood sample
             when requested, may be considered by you as a circumstance tending
26           to show a consciousness of guilt.  However, such evidence is not
             sufficient in itself to prove guilt and its weight and significance, if
27           any, are matters for your consideration.

28   (RT 7851.)  Petitioner argues he had a Fourth Amendment right to refuse to give a blood sample

                                          160

1   and therefore the admission of evidence that he had done so, the resulting instruction, and the

2   prosecution's argument pointing to his refusal were all permitted in error.  (Second Am. Pet. at

3   269-71.)  The California Supreme Court rejected petitioner's claim of instructional error:

> At trial the prosecution introduced evidence that defendant had refused to take a blood test and that a court order had been obtained, after which defendant submitted to the test.  Defendant specifically stated he did not object to this testimony, even though the prosecution said it wanted to introduce the evidence to show an "admission of guilt by refusing to give physical evidence from his body ...."  The prosecution sought the instruction to which defendant now assigns error, and then defendant objected.  Another lawyer for the defense team noted that a person could refuse to give blood for fear of needles, but the prosecutor responded that defendant had given no reason for his refusal.

> Defendant asserts the instruction was improper because the demand to take the blood test violated both his Fourth and Fifth Amendment rights, and because his refusal to submit could not constitutionally be used against him.

> The Fifth Amendment claim is without merit, because the evidence was not testimonial but physical.  (*People v. Collie* (1981) 30 Cal.3d 43, 55, fn. 7 [177 Cal. Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)  The Fourth Amendment claim might require more scrutiny on a better record, but the record does not explain whether defendant refused to take the blood test for reasons within the scope of the Fourth Amendment. (*Cf., e.g., Tucker v. Dickey* (W.D. Wis. 1985) 613 F. Supp. 1124; *Storms v. Coughlin* (S.D.N.Y. 1984) 600 F. Supp. 1214*; see Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S. Ct. 1826].)  Defendant fails to establish that he exercised a protected right, and we must therefore reject his claim.

19   *Roberts,* 2 Cal. 4th at 310-11.

20   The United States Supreme Court has held the refusal to take a blood test, after it has been

21   requested properly under state law, is not a "coerced act" and is thus not protected by the

22   privilege against self-incrimination.  *South Dakota v. Neville*, 459 U.S. 553, 564 (1983).  The

23   Ninth Circuit considered the issue in *Newhouse v. Misterly*, 415 F.2d 514 (9th Cir. 1969).  There,

24   after the defendant's arrest, she refused to submit to a blood alcohol test.  At the time of her

25   arrest, California law required the defendant to submit to such a sobriety test.  415 F.2d at 517

26   (citing *People v. Duroncelay*, 48 Cal. 2d 766 (1957) and *People v. Conterno*, 170 Cal. App. 2d

27   Supp. 817 (1959)).  At defendant Newhouse's trial, evidence of her refusal was admitted and the

28   court instructed the jury that it could consider the refusal as consciousness of guilt.  *Id.*  The Ninth

161

1  Circuit held that the admission of the evidence and instruction did not violate Newhouse's

2  privilege against self-incrimination.  *Id.* at 518.

3       In the present case, petitioner has failed to establish that he had a Fourth Amendment right to

4  refuse to provide a blood sample.  As a prisoner, he lacked any "reasonable expectation of

5  privacy under the Fourth Amendment."  Hudson v. Palmer, 468 U.S. 517, 530 (1984).  Petitioner

6  has failed to show that he could not be compelled to provide blood or that the officer who

7  requested it did so without cause.  Had petitioner made such a showing, he may have had grounds

8  to argue that the evidence, argument, and instruction were inappropriate.  See United States v.

9  Prescott, 581 F.2d 1343, 1353 (9th Cir. 1978) (refusal to consent to warrantless search cannot be

10  used to show consciousness of guilt).  However, on the record before this court, petitioner's claim

11  fails.

12       U.  Claim 21 – Evidence of Gardner's Good Character

13       At trial, the prosecutor put on evidence that victim Charles Gardner had been a "model

14  prisoner" in the several years before he was killed.  When the defense objected, the prosecutor

15  argued the evidence was relevant to show that Gardner did not kill Officer Patch of his own

16  volition, but only because he was in a state of hypovolemic shock.  The trial court permitted the

17  evidence.  Petitioner argues in his claim 21 that the introduction of this evidence, and the trial

18  court's refusal to allow some of the defense rebuttal to it, violated his constitutional rights.

19  (Second Am. Pet. at 272-76.)  Respondent contends this issue is moot because the conviction for

20  Officer's Patch's death was reversed on appeal.  In additional briefing, petitioner notes that the

21  prejudicial effect of the evidence at the guilt phase may have been mooted by the reversal, but

22  that the evidence prejudiced petitioner at the penalty phase of his trial.  (ECF No. 528 at 7-9.)

23  Because the present order addresses only those claims affecting the guilt phase verdict, the court

24  will not consider petitioner's claim 21 as directed at the penalty phase at this time.

25       V.  Claim 22 – Denial of Motion to Sever and Admission of Menefield's Statements

26       Petitioner argues the trial court erred when it denied his motion to sever his trial from that of

27  Menefield.  He also challenges the testimony of inmate Rooks, inmate Long, and Officer Horton

28  recounting statements made by Menefield.  Finally, he challenges the admission of notes

162

1   Menefield wrote to inmate Moore which implicated petitioner.  (Second Am. Pet. at 276-287;

2   ECF No. 528 at 10-19.)

3              1.  Severance

4       A court may grant habeas relief based on a state court's decision to deny a motion for

5   severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.

6   *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a

7   constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth

8   Amendment right to a fair trial"); *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).

9   Petitioner bears the burden of proving that the denial of severance rendered his trial

10  "fundamentally unfair," *Grisby*, 130 F.3d at 370 (quoting *Hollins v. Iowa Department of

11  Corrections*, 969 F.2d 606, 608 (8th Cir. 1992)), and must establish that prejudice arising from

12  the failure to grant a severance was so "clear, manifest, and undue" that he was denied a fair trial,

13  *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v.

14  Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).  On habeas review, federal courts neither

15  depend on the state law governing severance, nor consider procedural rights to a severance

16  afforded to criminal defendants in the federal criminal justice system.  *Grisby*, 130 F.3d at 370

17  (citing *Hollins*, 969 F.2d at 608, and *Middleton*, 768 F.2d at 1085).  Rather, the relevant question

18  is "whether the state proceedings satisfied due process." *Id.* (quoting *Jammal*, 926 F.2d at 919-

19  20); *see also Walton v. California*, No. CIV S-09-2351 EFB P, 2011 WL 6102582, at *12 (E.D.

20  Cal. Dec. 8, 2011) (citing *Zafiro v. United States,* 506 U.S. 534, 538–39 (1993)) (a court may

21  grant habeas relief based on a state court's decision to deny a motion for severance only if the

22  joint trial was so prejudicial that it denied a petitioner his right to a fair trial.); *Cooper v.

23  McGrath*, 314 F. Supp. 2d 967, 983 (N.D. Cal. 2004) (same).

24      The only basis for petitioner's complaint about the denial of severance is the introduction of

25  Menefield's hearsay statements, discussed below.  That was the basis for petitioner's motion for a

26  severance before trial.  (CT 530-42, 555-56.)   A hearing was held on the motion.  (5/21/82 RT

27  272-77.)  During that hearing, attorney Urquhart agreed that redactions to Menefield's statements

28  that had been proposed by the prosecution should resolve most of the Confrontation Clause

1    problems.  (*Id.* at 272:9-10.)  The court determined that decisions regarding the remaining

2    Confrontation Clause issues should be made by the trial judge during the course of trial.  (*Id.* at

3    274-75.)  The defense did not object to that determination and the court denied the motion to

4    sever.  (RT 277.)

5        Petitioner's due process argument here is hampered by the fact that counsel at trial appeared

6    to agree with the procedure proposed by the judge.  In fact, petitioner did not raise any issue

7    involving the denial of his severance motion on appeal.  (AOB at 61-71.)  Based on defense

8    counsel's agreement to the procedures proposed by the trial court, this court cannot say the trial

9    court's denial of the severance motion violated petitioner's rights.[54]

10                    2.  Confrontation Clause Error

11                        a.  Legal Standards

12       The Sixth Amendment grants a criminal defendant the right "to be confronted with the

13   witnesses against him."  "The 'main and essential purpose of confrontation is *to secure for the*

14   *opponent the opportunity of cross-examination.*'"  *Fenenbock v. Director of Corrections for*

15   *California*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673,

16   678 (1986)) (emphasis in original).

17       In 2004, the United States Supreme Court held that the Confrontation Clause bars the state

18   from introducing into evidence out-of-court statements which are "testimonial" in nature unless

19   the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

20   regardless of whether such statements are deemed reliable.  *Crawford v. Washington*, 541 U.S. 36

21   (2004).  The *Crawford* rule applies only to hearsay statements that are "testimonial" in nature and

22   does not bar the admission of non-testimonial hearsay statements.  *Id.* at 42, 51, 68; *see also*

23   *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has no application

24   to" "out-of-court nontestimonial statements.")

25       Although the Court in *Crawford* declined to provide a comprehensive definition of the term

26   "testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations

27   _____
     [54]  Petitioner also argues that the trial court should have held pre-trial hearings to flesh out the
28   Menefield statements and finalize the redactions thereto.  He cites no constitutional basis for this
     argument.  Accordingly, petitioner is not entitled to relief in this regard.

1   are . . . testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52.  The court also

2   provided the following "formulations" of a "core class" of testimonial statements:  (1) "ex parte

3   in-court testimony or its functional equivalent – that is, material such as affidavits, custodial

4   examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial

5   statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial

6   statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior

7   testimony, or confessions;" and (3) "statements that were made under circumstances which would

8   lead an objective witness reasonably to believe that the statement would be available for use at a

9   later trial."  *Id.* at 51-52 (citations omitted).  The court in *Crawford* pointed out that the Sixth

10  Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes

11  other than establishing the truth of the matter asserted."  *Id.* at 59 n.9 (citing *Tennessee v. Street*,

12  471 U.S. 409, 414 (1985)).  However, "state evidence rules do not trump a defendant's

13  constitutional right to confrontation," and a reviewing court must ensure "that an out-of-court

14  statement was introduced for a '*legitimate*, nonhearsay purpose' before relying on the not-for-its-

15  truth rationale to dismiss the application of the Confrontation Clause."  *Williams v. Illinois*, 567

16  U.S. 50, __, 132 S. Ct. 2221, 2226 (2012) (citing *Street*, 471 U.S. at 417) (emphasis in original).

17      In *Bruton*, the Supreme Court held that a defendant is deprived of his Sixth Amendment right

18  of confrontation when a facially incriminating confession of a non-testifying co-defendant is

19  introduced at their joint trial, even if the jury is instructed to consider the confession only against

20  the co-defendant.  391 U.S. at 135-36.[55]

21      "[U]nder *Bruton* and its progeny 'the admission of a statement made by a non-testifying

22  codefendant violates the Confrontation Clause when that statement facially, expressly, or

23  powerfully implicates the defendant.'"  *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001

24  

---

25  [55]  In *People v. Aranda*, 63 Cal. 2d 518 (1965), the California Supreme Court held that at a joint trial, a co-defendant's extrajudicial statements inculpating another defendant must be excluded, even if the co-defendant testified at trial.  *Aranda* was abrogated in part in 1982 by an amendment

26  to the California Constitution.  *See People v. Boyd*, 222 Cal. App. 3d 541, 562 (1990) ("Thus, to

27  the extent *Aranda* required exclusion of inculpatory extrajudicial statements of co-defendants, even when the co-defendant testified and was available for cross-examination at trial, *Aranda* was

28  abrogated by Proposition 8.").

1   (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007)).  However,

2   after the *Crawford* decision, "[i]t is . . . necessary to view *Bruton* through the lens of *Crawford*,"

3   and "the threshold question in every case is whether the challenged statement is testimonial.  If it

4   is not, the Confrontation Clause 'has no application.'"  *United States v. Figueroa-Cartagena*, 612

5   F.3d 69, 85 (1st Cir. 2010) (citing *Bockting*, 549 U.S. at 420).

6       Accordingly, post-*Crawford*, the rule set forth in *Bruton*, which is premised on the

7   Confrontation Clause, does not apply to statements which are non-testimonial.  *See Lucero v.*

8   *Holland,* 902 F.3d 979, 987-88 (9th Cir. 2018) ("We agree [with every circuit court to consider

9   the issue] that only testimonial codefendant statements are subject to the federal Confrontation

10   Clause limits established in *Bruton*."), *cert. denied,* __U.S.__, 139 S. Ct. 1180 (2019)*; United*

11   *States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013); *United States v. Berrios*, 676 F.3d 118, 128

12   (3rd Cir. 2012); *United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010); *United States v.*

13   *Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Taylor*, 509 F.3d 839, 850 (7th Cir.

14   2007); *see also Smith v. Chavez*, 565 Fed. Appx. 653 (9th Cir 2014)[56] (explaining that *Bruton*

15   only applies "to statements that violate the Confrontation Clause" and are themselves

16   "testimonial" under *Crawford*), *cert. denied*, 574 U.S. 918 (2014); *Hundley v. Montgomery*, No.

17   2:12-cv-3051 JKS, 2014 WL 1839116, **11-13 (E.D. Cal. May 8, 2014) (the circuit courts which

18   have considered the issue "appear to have unanimously concluded that where a statement is non-

19   testimonial, neither *Crawford* or *Bruton* apply.").

20       Confrontation Clause violations are subject to harmless error analysis.  *Whelchel v.*

21   *Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).[57]  "In the context of habeas petitions, the

22   standard of review is whether a given error 'had substantial and injurious effect or influence in

23   determining the jury's verdict.'"  *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

24   *Brecht*, 507 U.S. at 637 ).  Factors to be considered when assessing the harmlessness of a

---

25   [56]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule

26   36–3(b).

27   [57]  The United States Supreme Court has specifically held that *Bruton* error is subject to harmless
error analysis.  *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999); *Harrington v. California*, 395 U.S.

28   250, 253-54 (1969).

1   Confrontation Clause violation include the importance of the testimony, whether the testimony

2   was cumulative, the presence or absence of evidence corroborating or contradicting the

3   testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's

4   case.  *Van Arsdall*, 475 U.S. at 684.[58]

5                                                   b.  Discussion

6         Petitioner first challenges Rooks' trial testimony that Menefield asked him for his "opinion as

7   to the incident in the regard to Little Charles, incident out in the yard that happened out in the

8   yard."  (RT 2038.)   Menefield then told Rooks that he was "[g]oing with him."  When asked to

9   whom "him" referred, Menefield responded, "Zoom."  (RT 2038-39.)  Defense counsel

10  strenuously objected to admission of this testimony before Rooks testified.  (RT 2010-20, 2027-

11  30.)  The trial court admitted it under a hearsay exception for statements made in furtherance of a

12  conspiracy.  (RT 2028-30.)  The California Supreme Court held that this evidentiary ruling was

13  erroneous and the admission of the testimony violated *Bruton*.  *Roberts*, 2 Cal. 4th at 303-04.

14  However, it further found the error to be harmless.  (*Id.*)

15        Petitioner also complains of Rooks' testimony that Menefield told him after the crime that "he

16  was down on the floor when the incident happened, but he couldn't say 'no,' because he couldn't

17  say 'no.'"  (RT 2053.)  At defense counsel's request, the court gave the jury an instruction

18  limiting their consideration of this last statement to their determination of Menefield's, not

19  petitioner's, guilt.  (*Id.*)

20        Petitioner argues this testimony was a clear violation of the rule of *Bruton*.  (ECF No. 528 at

21  14.)  However, in his briefing, petitioner does not mention the changes to the rule announced in

22  /////

23  /////

24  /////

25  /////

26  /////

---

27  [58]  Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is nothing in the
    opinion or logic of *Van Arsdall* that limits the use of these factors to direct review."  *Whelchel*,
28  232 F.3d at 1206.

1   *Bruton* wrought by the Supreme Court's decision in *Crawford*.[59]  After *Crawford*, the first

2   question is whether the statements in question were "testimonial" in nature.  Menefield did not

3   make these statements to Rooks "under circumstances which would lead an objective witness

4   reasonably to believe that the statement would be available for use at a later trial."  *Crawford*, 541

5   U.S. at 51-52.  These sort of "statements from one prisoner to another" are "clearly

6   nontestimonial."  *Davis v. Washington*, 547 U.S. 813, 825 (2006); *see also Berrios*, 676 F.3d at

7   128 (*Bruton* is inapplicable to a non-testimonial "prison yard conversation").  Petitioner's claim

8   of *Bruton* error in the admission of Rooks' statements at trial therefore lacks merit.

9   _____

10  [59]  The California Supreme Court's holding that the admission of Rooks' testimony here
    amounted to *Bruton* error preceded the United States Supreme Court's decision in *Crawford*.
    Although *Crawford* is not retroactive to collateral proceedings under the rule of *Teague v. Lane*,

11  489 U.S. 288 (1989), *see Whorton v. Bockting*, 549 U.S. 406, 421 (2007), petitioner has not
    demonstrated standing to raise *Teague* as a bar to the new rule of *Crawford*.  *See Lockhart v.*

12  *Fretwell*, 506 U.S. 364, 373 (1993) ("[T]he State will benefit from our *Teague* decision in some
    federal habeas cases, while the habeas petitioner will not."); *see also Desai v. Booker*, 538 F.3d

13  424, 429- (6th Cir. 2008) (extensively analyzing the retroactive application of *Crawford* whether
    or not it amounts to a "new rule" because the non-retroactivity rule of *Teague v. Lane* cannot be

14  invoked by a petitioner); *Free v. Peters*, 12 F.3d 700, 703 (7th Cir. 1993) ("The Supreme Court
    deems *Teague* a one-way street: designed as it is to protect the state's interest in the finality of

15  criminal convictions, it entitles the state, but not the petitioner, to object to the application of a
    new rule to an old case.") (citing *Fretwell*, 506 U.S. at 372-73); *Delgadillo v. Woodford*, 527 F.3d

16  919, 927-28 (9th Cir. 2008) (the court noting, in *dicta*, that a habeas petitioner "may not raise
    *Teague* to bar the application of a new rule").  Additionally, petitioner has not demonstrated that

17  *Bruton* and its progeny survive the decision in *Crawford* for purposes of the Confrontation
    Clause.  *See Giles v. California*, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are

18  excluded by the Confrontation Clause."); *Bockting*, 549 U.S. at 420 (Confrontation Clause has
    "no application" to non-testimonial statements); *Smith v. Chavez*, 565 Fed. Appx. 653 (9th Cir.

19  Mar. 4, 2014) (citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth
    Circuit Rule 36–3(b)) (*Bruton* is not violated by admission of non-testimonial out-of-court

20  statement made by nontestifying codefendant); *Parra v. Lizarraga*, No. CV 17-5946-VBF (KS),
    2018 WL 6835980, at *12 (C.D. Cal. Nov. 9, 2018), *report and recommendation adopted*, No.

21  LA CV 17-05946-VBF-KS, 2018 WL 6831532 (C.D. Cal. Dec. 27, 2018) (citing *Lucero*, 902
    F.3d at 988) (only testimonial codefendant statements are subject to the federal Confrontation

22  Clause limits established in *Bruton*); *Hundley v. Montgomery*, No. 2:12-CV-3051-JKS, 2014 WL
    1839116, at *10–11 (E.D. Cal. May 8, 2014) ("Although the Ninth Circuit has not expressly held

23  so, other circuits have concluded that *Bruton* must be viewed through the lens of *Crawford*, and
    that *Bruton* therefore does not apply to non-testimonial statements."); *Hurtado v. Long*, No. CV

24  14-8068 MWF (KS), 2017 WL 11647753, at *17 (C.D. Cal. Jan. 26, 2017), *report and*
    *recommendation adopted*, No. CV 14-8068-MWF (KS), 2017 WL 11647830 (C.D. Cal. Mar. 9,

25  2017) (it is not "clearly established" whether *Aranda/Bruton* still applies post-*Crawford*); *cf.*
    *Jensen v. Pliler*, 439 F.3d 1086, 1090 (9th Cir.2006) (declining to decide whether the firmly

26  rooted hearsay exception or particularized guarantees of trustworthiness test enunciated in *Ohio v.*
    *Roberts*, 448 U.S. 56, 65-66 (1980) (*abrogated by Crawford*, 541 U.S. at 68), is still applicable to

27  non-testimonial evidence under the Confrontation Clause); *Mayes v. Premo*, 766 F.3d 949, 963
    (9th Cir. 2014) (a *post-Crawford* application of the Confrontation Clause under *Roberts* in a case

28  governed by the AEDPA).

1    For the same reasons, petitioner's argument that the introduction of notes Menefield wrote to

2  inmate Moore violated *Bruton* also fails.  Further, the court observes that those notes were far less

3  prejudicial than the testimony discussed above.  They did not expressly or impliedly implicate

4  petitioner and the trial court instructed the jury that they were to be considered only against

5  Menefield.  (*See* Second Am. Pet. at 281-282.)

6    Petitioner next complains of Long's testimony about statements made by Menefield.  Long

7  described a conversation with Wilbur Peterson, Bill Stevens, and Menefield on the night before

8  the attack on Gardner.  As noted above, Long testified that the four of them "was all sitting up in

9  there discussing what Zoom (petitioner) was thinking of contemplating doing the next morning."

10  (RT 2599-2600.)  The prosecutor then asked, "Did Mr. Menefield say anything about what he

11  was going to do personally the next day?"  (RT 2600.)   Long replied, "Yes, well, Racehorse

12  (Menefield), he – he was saying that he knew he would have to be there but Racehorse didn't

13  want to be there."  (*Id.*)  At trial, the defense did not object to this testimony.  The California

14  Supreme Court held this issue was procedurally barred based on the failure to contemporaneously

15  object.  *Roberts*, 2 Cal. 4th at 303 n.4 ("There was no objection to Long's testimony, and any

16  question of the propriety of that testimony was not preserved for appeal.")  Respondent asserts

17  this procedural bar in the answer.  (ECF No. 271 at 156.)  Because respondent has adequately

18  plead the procedural bar, the burden shifts to petitioner to show that California's

19  contemporaneous objection rule is inadequate because it is unclear, has been inconsistently

20  applied, or is not well-established, or that the rule is not independent of federal review.   *See*

21  *Bennett*, 322 F.3d at 586; *Melendez*, 288 F.3d at 1124-26.  Petitioner does not attempt to make

22  such a showing.  Therefore, petitioner's claim is barred unless he can show cause for the default

23  and prejudice resulting therefrom.  Petitioner does raise the issue of ineffective assistance of

24  counsel in this regard.  In his claim 7, petitioner argues that his counsel acted unreasonably in

25  failing to object to the question asking Long what Menefield said.  As this court found above,

26  *Crawford* and *Bruton* are inapplicable to this nontestimonial statement.  Therefore, counsel

27  cannot be faulted with failing to object.  (*See* fn. 59, above.)  Moreover, petitioner did not suffer

28  prejudice from Menefield's response because Long had testified that he overheard a discussion

1  among the men about what petitioner was planning to do the following day.  Menefield's

2  statement indicating he would be involved implicated Menefield.  Petitioner had already been

3  implicated.

4        Petitioner's challenge to Officer Horton's testimony that Menefield made a similar comment

5  to him suffers the same procedural bar.  *See Roberts*, 2 Cal. 4th at 305 n.5 ("Defendant did not

6  object to a statement by Officer Robert Horton that Menefield told Horton that Menefield and

7  Ruben Williams had been present at the attack on Gardner 'for protection if anyone interfered.'

8  We therefore do not address his contention that it was error to admit this statement.").  Again,

9  petitioner has failed to challenge that procedural bar or establish cause and prejudice.  Moreover,

10  even if the claim were not procedurally barred, petitioner has failed to show it violated *Crawford*

11  and *Bruton*.  The statement Menefield gave to Horton could be considered "testimonial."

12  *Crawford*, 541 U.S. at 52.  However, the statement did not identify petitioner and did not

13  "facially, expressly, or powerfully implicate" petitioner.  *Hernandez-Orellana*, 539 F.3d at 1001

14  (citing Mitchell, 502 F.3d at 965); *see also United States v. Hernandez,* 608 F.2d 741, 749 (9th

15  Cir.1979) (explaining that "[w]here a statement does not allude to the defendant, or where all

16  references have been deleted, his right of confrontation is not abridged").  Accordingly, the

17  admission of the statement did not violate petitioner's Confrontation Clause rights under *Bruton*.

18  Petitioner has failed to establish constitutional error in the admission of Menefield's statements at

19  his trial.

20        W.  Claim 23 – Denial of Right to Confrontation of Inmates Black and Moore

21        Petitioner argues his Sixth Amendment confrontation rights were violated by the introduction

22  of a taped statement from inmate Robert Black and by the introduction into evidence of the notes

23  Menefield gave to inmate Moore.  Petitioner claims the statement from Black was prejudicial

24  because it was relevant to the prosecution's theory about Gardner's state of mind when he stabbed

25  Officer Patch.  (Second Am. Pet. at 288.)  Because the California Supreme Court reversed

26  petitioner's conviction for Patch's murder, this claim is now moot.

27        With respect to the notes passed from Menefield to Moore, the prosecutor at trial argued they

28  should be introduced through the testimony of Agent Gard because Moore was unavailable as a

1    witness.  (RT 3926.)  Petitioner argues that they should have been excluded because the defense

2    was unable to cross-examine Moore.  As discussed above, those notes do not expressly or

3    impliedly implicate petitioner and the jury was instructed to consider them only against

4    Menefield.  Petitioner has failed to establish any constitutional error in their admission.

5         X.  Claim 24 – Admission of Evidence of Timed Running Tests

6         In his claim 24, petitioner challenges the admission of Officer Ritz's testimony that he was

7    timed running from the site of the attack on Gardner to various locations on the third floor.  (RT

8    3173-80.)  The California Supreme Court summarized his testimony as "evidence that an agile

9    person could run from the first floor to certain key locations in seconds and walk briskly to

10   [petitioner's] cell in less than one minute, and that [petitioner] could have done so unseen."

11   *Roberts*, 2 Cal. 4th at 296.  According to petitioner, the admission of this evidence was unfair

12   because the defense was not provided with notice of the "testing" before trial and because the

13   evidence was unreliable.  (Second Am. Pet. at 158-59.)  Petitioner claims the "testing" failed to

14   take into account the impact of traffic in the corridors and on the stairs on the morning Gardner

15   was attacked.

16        The defense did not object to this testimony at trial.  However, there is no indication the

17   California Supreme Court refused to consider this claim on procedural grounds and respondent

18   does not assert a procedural default.  Accordingly, this court may consider the merits of the claim.

19   *Harris*, 489 U.S. at 261; *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005).  However,

20   petitioner has failed to cite any legal basis for his assertion that the prosecutor was required to

21   reveal the results of their timed running experiment before trial.  Except for a generalized

22   statement that the "testing" did not recreate the traffic on the day of the crime, petitioner fails to

23   show that it was somehow unreliable.  As respondent points out, the defense had the opportunity

24   to cross-examine Officer Ritz about how the "tests" were conducted.  Any failure to do so would

25   be an ineffective assistance of counsel claim, not a claim that admission of the "test" results

26   violated due process.  Accordingly, petitioner's argument that the admission of this evidence was

27   fundamentally unfair fails.

28   /////

171

1

Y.  Claim 25 – Admission of Yacotis's Testimony in Rebuttal

2     In the prosecution's rebuttal case, inmate Yacotis testified that he overheard petitioner ask

3 Menefield why Menefield had not picked up the knife.  (RT 6501:9-20.)   Petitioner argues that

4 this was inappropriate rebuttal testimony.  (Second Am. Pet. at 291-92.)   However, petitioner

5 cites no authority in support of this argument.  Petitioner has failed to show that the admission of

6 this testimony was erroneous or, assuming it was error, that it rendered his trial fundamentally

7 unfair.  The defense had ample opportunity to cross-examine Yacotis, and did so.  (*See* RT 6502-

8 22, 6600-09.)  Relief as to petitioner's claim 25 will therefore be denied.

9

Z.  Claim 26 – Denial of Right to be Present

10    Petitioner argues he was denied the constitutional right to be present at the jury's viewing of

11 the prison scene, at numerous *ex parte* conferences attended only by the prosecutor, and at

12 conferences attended by counsel that excluded the defendants.

13

1.  Legal Standards

14    Under the Due Process Clause, a criminal defendant has a right to be present at any stage of

15 the criminal proceeding that is critical to its outcome if his presence would contribute to the

16 fairness or reliability of the procedure.  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *United*

17 *States v. Gagnon*, 470 U.S. 522, 527 (1985).  A defendant must be allowed to be present "to the

18 extent that a fair and just hearing would be thwarted by his absence."  *Stincer*, 482 U.S. at 745

19 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934), *overruled in part on other grounds*

20 *by Malloy v. Hogan*, 378 U.S. 1 (1964)).  However, "th[e] privilege of presence is not guaranteed

21 'when presence would be useless, or the benefit but a shadow.'"  *Stincer*, 482 U.S. at 745

22 (quoting *Snyder*, 291 U.S. at 106-07); *see also Gagnon*, 470 U.S. at 527 (defendants' absence did

23 not violate the Due Process Clause where their presence was not needed to "ensure fundamental

24 fairness" and they could not have added to or gained from being present at the conference).  The

25 right to be present, like many other constitutional rights, may be waived.  *See Gagnon*, 470 U.S.

26 at 529; *Taylor v. United States*, 414 U.S. 17, 19-20 (1973).  The defendant must personally waive

27 his right to be present; waiver by counsel is insufficient.  *Turner v. Marshall*, 63 F.3d 807, 815

28 (9th Cir. 1995), *overruled on other grounds in Tolbert*, 182 F.3d at 685; *United States v. Kupau*,

172

1   781 F.2d 740, 743 (9th Cir. 1986); *see also Lugo v. Terhune*, 277 Fed. Appx. 714 (9th Cir.

2   2008).[60]

3       Under the Confrontation Clause, the question is "whether there has been any interference with

4   the defendant's opportunity for effective cross-examination." *Stincer*, 482 U.S. at 744 n.17.

5       A denial of the right to be present during all critical stages of the proceedings is subject to

6   harmless error analysis. *Rushen v. Spain*, 464 U.S. 114, 117 (1983); *Campbell v. Rice*, 408 F.3d

7   1166, 1172 (9th Cir. 2005).  However, in certain limited situations, the error may affect the

8   structure of the proceedings and harmless error analysis is, under such circumstances,

9   inapplicable. *Arizona v. Fulminante*, 499 U.S. 279 (1991).

10                    2.  Absence from Jury Viewing of Crime Scenes

11                        a.  Factual Background

12      At the close of the prosecution's guilt phase case, the jury was taken to the prison to view the

13  scene of the attacks on Gardner and Patch.  (*See* RT 4828-32.)  The defense was informed that the

14  defendants would be under heavy security, including shackles, if they chose to be present during

15  the viewing.  (*See* RT 4817:8-13.)  On that basis, during a conference on December 8, defense

16  counsel informed the court that the defendants waived their appearance at the viewing.  (RT

17  4817:12-13, 14-18.)  However, petitioner did express his reluctance to waive his appearance.  (RT

18  4818:6-14.)  The prosecutor offered to find out just what sort of security the prison would require.

19  (RT 4818:20-22.)  The judge agreed to wait for that information before questioning petitioner

20  directly about his waiver.  (RT 4818:24.)

21          There appears to be no transcript of the following day's proceedings in the record before

22  this court.  The Clerk's Transcript has minutes of proceedings on December 9.  (CT 1033.)  They

23  reflect that attorney Urquhart was ill and not present.  The court held a conference with counsel

24  for Menefield and the prosecutor "to discuss procedures required for touring" the prison.  The

25  next court day, December 13, attorney Urquhart indicated that he had learned about the proposed

26  security measures and had explained them to petitioner.  (RT 4824:19-22.)  Urquhart stated that

27  _____

28  [60]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
    36–3(b).

                                          173

1    petitioner would be willing to waive his appearance at the viewing, but that he wanted to address

2    the court.  (RT 4824:22-23.)  Petitioner expressed confusion about the basis for the security

3    restraints because he had not been restrained during "the last 18 months" at the prison.  (RT

4    4824:24 – 4825:2.)  The judge told petitioner that he had "nothing to say about the Department of

5    Corrections" or "the county jail."  (RT 4825:3-5.)  They had their rules and the judge told

6    petitioner he was "powerless to make any other rules."  (RT 4825:7-8.)  After more discussion

7    about the extent of the security measures to be taken, and objections from both attorney Urquhart

8    and petitioner to those measures, the judge repeated that he had "no alternative but to find that it

9    is necessary."  (RT 4826:14-15.)  When asked again whether he would waive his presence at the

10   viewing, petitioner responded, "Since I'm being forced to, I guess I have to."  (RT 4827:7.)

b. <u>Discussion</u>

12       Petitioner has failed to show that a jury's visit to a crime scene was a "critical stage" of

13   criminal proceedings.  In fact, the United States Supreme Court has held it is not.  *See Snyder*,

14   291 U.S. at 108-113.  Presence at a jury visit to the crime scene is not a right guaranteed by the

15   Constitution.  *Devin v. DeTella*, 101 F.3d 1206, 1207-08 (7th Cir. 1996) (citing *Snyder*, 291 U.S.

16   at 107.)  The Supreme Court in *Snyder* did leave room for a defendant to show that he was

17   prejudiced by his absence from the jury viewing of the scene.  *Snyder*, 291 U.S. at 107-08.

18   Petitioner has failed to make any such showing in this case.

19       Petitioner also complains about attorney Urquhart's absence from the December 9 conference.

20   However, again, he fails to make any showing that he was prejudiced by that absence.

3. <u>Absence from Ex Parte and In Camera Conferences</u>

22       Petitioner makes a generalized argument that the court conducted many *ex parte* proceedings,

23   most of which were held to permit prosecutor Kirk to argue that he should not be required to turn

24   over certain items to the defense in discovery.  (Second Am. Pet. at 296.)   The only specific issue

25   petitioner mentions here is the *ex parte* proceedings regarding the inmate witnesses' rap sheets.

26   That issue is discussed above.  Petitioner has failed to state this claim with sufficient specificity,

27   and has failed to provide legal support for his assertion that he had a right to be present at these *ex*

28   *parte* proceedings or at the attorneys' *in camera* and sidebar conferences with the court.  Again,

174

1    case law establishes that he had no such right, and that even if he did, he had waived it. *See*

2    *Egger v. United States*, 509 F.2d 745, 747-48 (9th Cir. 1975) (any greater right to be present than

3    the physical presence at trial was effectively waived by the petitioner's failure to request being

4    present at side-bar conferences); *Sherwood*, 98 F.3d at 407 (same).

5            AA.  <u>Claim 27 – Judicial Bias</u>

6        Petitioner points to his numerous complaints of judicial error, addressed elsewhere, and some

7    new complaints of error to argue that the trial judge was biased against the defendants at trial.

8        A criminal defendant is guaranteed the right to an impartial judge. "A judge's conduct

9    justifies a new trial if the record shows actual bias or leaves an abiding impression that the jury

10   perceived an appearance of advocacy or partiality." *United States v. Marks*, 530 F.3d 799, 806

11   (9th Cir. 2008). An appearance of bias rises to the level of a due process violation only where the

12   judge has a pecuniary or personal interest in the outcome of the proceedings, "becomes embroiled

13   in a running, bitter controversy with one of the litigants," or "acts as part of the accusatory

14   process." *Crater v. Galaza*, 491 F.3d 1119, 1130 (9th Cir. 2007) (citing cases). To sustain a

15   claim of actual judicial bias on habeas corpus, petitioner must "overcome a presumption of

16   honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47

17   (1975); *see also Sivak*, 658 F.3d at 924 (quoting *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir.

18   2010)). He must also show that the trial judge "prejudged, or reasonably appears to have

19   prejudged, an issue." *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992) (quoting

20   *Partington v. Gedan*, 880 F.2d 116, 135 (9th Cir. 1989) (Reinhardt, J. concurring and dissenting),

21   *certiorari granted, judgment vacated by Gedan v. Partington*, 497 U.S. 1020 (1990)). Bias can

22   "almost never" be demonstrated solely on the basis of a judicial ruling. *Liteky v. United States*,

23   510 U.S. 540, 555 (1994). A judge's remarks or opinions will not demonstrate bias unless they

24   "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*

25   On federal habeas review, the applicable standard is a stringent one: relief is warranted only if

26   "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due

27   process under the United States Constitution." *Duckett*, 67 F.3d at 740.

28   /////

1   Here, petitioner does not argue that the judge's actions created an appearance of bias and

2   there is no showing that the trial judge had a pecuniary or personal interest in the proceedings,

3   became embroiled in a controversy with one of the defendants, or acted as part of the

4   prosecutorial process.  Petitioner's argument is that the judge was, in fact, biased against the

5   defendants.  Petitioner's laundry list of judicial error evidences no actual bias on the part of the

6   trial judge.[61]  There is no evidence before this court that the trial judge's rulings were the result of

7   favoritism to the prosecution or antagonism towards petitioner, or that the judge had prejudged

8   any issue.  Aside from the rulings themselves, petitioner points to no evidence in the record

9   indicating that the trial judge harbored any bias against him.  Petitioner has failed to overcome the

10  presumption of honesty and integrity on the part of the trial judge.  Accordingly, petitioner is not

11  entitled to federal habeas relief with respect to this claim.

12       BB.  Claim 28 – Failure to Give Jury Instructions

13  Petitioner complains that the trial judge failed to give jury instructions or modified jury

14  instructions addressing three subjects:  (1)  the proximate cause of Charles Gardner's death, (2)

15  considerations in determining the credibility of witnesses, and (3) petitioner's decision not to

16  testify.  Instructional error will not support a petition for federal habeas relief unless it is shown

17  "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,'" but

18  that by itself the instruction "so infected the entire trial that the resulting conviction violates due

19  process."  *Karis*, 283 F.3d at 1132 (quoting *Naughten*, 414 U.S. at 146-147).

20       1.  Instruction re Proximate Cause of Gardner's Death

21  There was evidence, albeit minimal evidence, introduced at trial that Charles Gardner's

22  medical treatment following the stabbing was substandard.  Petitioner first points to evidence

23  from doctors and medically-trained inmates who treated Gardner shortly after the stabbing.  They

24  _____

25  [61]  Petitioner also raises a few issues that did not involve judicial rulings made during trial.  None
     of those issues demonstrates bias.  Petitioner's assertions that the judge slept during trial and that

26  he visited the prosecutor's office in the absence of defense counsel are unsupported, and, in any
     event, bear little relevance to the question of bias.  Petitioner's assertion that the judge stated that

27  juror Conklin would be replaced by "the colored fellow" was a one-time comment made outside
     the jury's presence. While the statement was highly inappropriate, petitioner makes no other

28  argument or showing that the trial judge harbored racial prejudice.

1    testified that he appeared to be stable when he first arrived in the prison's B-1 medical clinic.

2    (*See* Second Am. Pet. at 301.)  At the direction of Dr. Welch, who was attending to Officer Patch,

3    clinic workers gave Gardner CPR.  Defense witness Dr. Richard Lucas testified that CPR could

4    have been detrimental to Gardner because it squeezed blood out of his body.  (RT 5295.[62])

5         Prosecution expert Dr. Boyd Stephens testified that Gardner was "only being marginally

6    treated for his condition."[63]  (RT 4473:12-16.)   Prosecution witness Dr. Donald Trunkey testified

7    in a bit more detail about Gardner's treatment.  He stated that Gardner was "inadequately

8    resuscitated."  (RT 4636:5.)  On cross-examination, the defense asked Dr. Trunkey to expound on

9    that statement.  Trunkey testified that when Gardner arrived in the medical clinic, "he was still

10   salvagable [sic] and things weren't done to make him salvagable [sic]."  (RT 4680:11-13.)

11   Trunkey continued, "by the time he reached the clinic things were not done promptly, but I'm not

12   sure, in a prison situation, they could have done much better than they did."  (RT 4681:13-15.)

13   Trunkey testified that the cause of the cardiac arrest that killed Gardner was "[l]ack of treatment."

14   (RT 4718:1-3.)  Defense witness Dr. Robert Rabkin's testimony focused on the question of

15   whether or not Gardner was in hypovolemic shock at the time he stabbed Officer Patch.  During

16   the course of his cross-examination, he described the attempts made to resuscitate Gardner which,

17   according to Dr. Rabkin, brought him out of shock and, had his bleeding been stopped at that

18   point, Dr. Rabkin opined that Gardner "probably . . . would have survived."  (RT 5346:11-18.)

19   Dr. Rabkin did not, however, appear to be rendering an opinion on the adequacy of Gardner's

20   medical care.

21   /////

22

---

23   [62]  This page of the transcript is missing from the court's copy.  Respondent does not take issue
     with petitioner's description of Dr. Lucas's testimony in this regard.  Accordingly, for purposes of
24   this order, the court takes it as correct reflection of his testimony.

25   [63]  Petitioner also takes some of Dr. Boyd's testimony out of context.  For example, he asserts that
26   Dr. Boyd testified that a patient in Gardner's condition could have recovered had he been
     properly treated.  (Second Am. Pet. at 303, ¶11.)  However, Dr. Boyd testified more generally
27   that a person in the sort of profound shock he felt Gardner was in could have recovered from that
     shock.  (RT 4473-74.)  Dr. Boyd did not appear to be opining specifically on all of Gardner's
28   injuries.

1    The trial court gave the following jury instruction on the element of proximate cause in

2  relation to Gardner's killing:

3          To constitute murder there must be, in addition to the death
           of a human being, an unlawful act which was a proximate cause of
4          that death.

5           The word "proximate cause of a death" is a cause which, in
           natural and continuous sequence, produces the death, and without
6          which the death would not have occurred.

7          Where the original injury is a proximate cause of death, the
           fact that the immediate cause of death was the medical or surgical
8          treatment administered or that such treatment was a factor
           contributing to the cause of death will not relieve the person who
9          inflicted the original injury from responsibility.

10         Whre [sic], however, the original injury is not a proximate
           cause of the death and the death was proximately caused by such
11         medical or surgical treatment or some other cause, then the defendant
           is not guilty of an unlawful homicide.

12

13  (RT 7872:7-21.)  According to petitioner, the defense sought an additional instruction on

14  foreseeability and some changes to the pattern instructions.  (Second Am. Pet. at 304-05.)

15  Petitioner complains now that the absence of the foreseeability instruction prejudiced him.  That

16  proposed instruction was:

17         Therefore, if you find that Gardner was stabbed and then later
           suffered further injuries that contributed to his death, the stabbing
18         must be found to be the proximate cause of Gardner's death only if
           these further injuries were reasonably foreseeable results of the initial
19         stabbing.  Thus if Gardner's death resulted from injuries suffered
           during occurrences which were extraordinary and abnormal, and
20         these later injuries were not reasonably foreseeable results of the
           initial stabbing, then the stabbing cannot be deemed the proximate
21         cause of Gardner's death.

22  (CT 1312.)

23    Petitioner argues the jury should have been required to specifically find that the "medical

24  malfeasance" was "foreseeable."  Interestingly, petitioner does not extend his argument by

25  contending that had the jury been so instructed, it may very well have found that the stabbing of

26  Gardner was not the proximate cause of his death.

27    The California Supreme Court held that, under California law, only medical maltreatment that

28  is "grossly improper," and the "sole cause of death and hence an unforeseeable intervening cause"

178

1    will relieve a defendant of liability for the original injury.  *Roberts*, 2 Cal. 4th at 311-13.  Because

2    the evidence at trial did not establish that level of medical error, no foreseeability instruction was

3    required under state law.  Due process is an even greater hurdle and petitioner fails to clear it

4    here.  He has failed to show that due process required the giving of the foreseeability instruction

5    he proposed or, even if some sort of foreseeability instruction was required, that the jury would

6    have found in petitioner's favor had it been given.  Further, it is not at all clear the foreseeability

7    instruction proposed by the defense made sense in the context of petitioner's case.  It cannot

8    reasonably be said that Gardner's assailant could not foresee that the eleven stab wounds Gardner

9    suffered would cause serious, and likely fatal, injury.

10                2. Instruction re Witness Credibility

11          Petitioner next challenges the trial court's refusal to alter the standard pattern instruction

12   on witness credibility, CALJIC 2.20, as he proposed.  The court gave the following instruction,

13   while the changes proposed by petitioner appear in parentheses and are italicized:

14                     Every person who testifies under oath is a witness.  You are
15               the sole judge of the believability of a witness and the weight to be
                 given the testimony of each witness.

16                     In determining the believability of a witness you may
17               consider anything that has a tendancy [sic] in reason to prove or
                 disprove the truthfulness of the testimony of a witness, including but
18               not limited to any of the following:

19                     The extent of the opportunity or ability of the witness to see
                 or hear or otherwise become aware of any matter about which the
20               witness has testified;

21                     The ability of the witness to remember or to communicate
                 any matter about which the witness has testified;

22                     The character and quality of that testimony;

23                     The demeanor and manner of the witness while testifying;

24                     The existence or nonexistence of a bias, interest, or other
                 motive (*, including any payments of money, any change in conditions
25               of incarceration, or any consideration of aid given in the setting of
                 parole or release dates*);

26

27                     Evidence of the existence or nonexistence of any fact testified
                 to by the witness;

28   /////

                                              179

The attitude of the witness toward the action in which testimony has been given by the witness or toward the giving of testimony *(including any efforts on the part of two or more witnesses to discuss with one another and modify their testimony based upon such discussions)*;

A statement previously made by the witness that is consistent or inconsistent with the testimony of the witness; *(proposed replacement:   A statement previously made by him that is inconsistent with his testimony such as a statement made during the investigation of this case that is inconsistent with his testimony)*

The character of the witness for honesty or truthfulness or their opposites;

An admission by the witness of untruthfulness (*such as an admission that he made an untruthful statement during the investigation of the case*).

(RT 7852:25 – 7853:23.)

Petitioner has failed to show that due process required the insertion of facts specific to his case into these pattern instructions.  Nor has petitioner argued that the instructions, as given, did not encompass the credibility issues raised by the evidence in his case.  *See Duckett*, 67 F.3d at 743 (no error found in rejecting defendant's proposed instruction on his theory of the case "'if other instructions, in their entirety, adequately cover that defense theory'") (quoting *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990), *overruling in part on other grounds recognized by United States v. Tillisy*, 697 Fed. Appx. 910 (9th Cir. 2017)).  There is no showing that the credibility instruction given was not constitutionally adequate.

### 3.  Instruction re Petitioner's Decision not to Testify

The court gave the following standard pattern jury instruction:

It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify.  You must not draw any inference from the fact that he does not testify.  Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element.

180

1   (RT 7855:24 – 7856:7.)  The instruction proposed by petitioner kept the first sentence of the first

2   paragraph and the entire second paragraph of the standard instruction above.  Petitioner's

3   proposed instruction added a new paragraph:

> The decision as to whether to testify is often influenced by
> the defendant's attorney, who may instruct the defendant to rest on
> the state of the evidence rather than testify.  No inference may be
> drawn because there are many reasons that a defendant might be
> instructed not to testify even though entirely innocent of the charges
> against him.  Excessive timidity or nervousness when facing others
> might confuse and embarrass a defendant, causing his attorney to
> instruct him not to testify.

9   (CT 1243.)

10       In this final claim of instructional error at the guilt phase trial, petitioner does not even

11   attempt to show a constitutional violation.  Instead, he argues only that the trial judge violated

12   state law when he failed to give petitioner's proposed jury instruction regarding his decision not

13   to testify.  (Second Am. Pet. at 311, ¶ 46.)  Petitioner also argues briefly that the trial court erred

14   in giving any jury instruction on that issue – attorney Urquhart had asked that the trial court give

15   no instruction if it would not give the modified version proposed by the defense.  (RT 7075:7-11.)

16   What petitioner does not point out is that Menefield's counsel, attorney Moe, apparently wanted

17   the court to give the standard instruction.  (RT 7075:12-15.)  Thus, contrary to petitioner's

18   implication, the trial judge's ruling did not fly in the face of the expressed wishes of the defense.

19   Moreover, the Supreme Court has found no constitutional violation in this very situation.

20   *Lakeside v. Oregon*, 435 U.S. 333 (1978) (no violation of defendant's Fifth or Sixth Amendment

21   rights where trial judge gave instruction regarding a defendant's decision not to testify despite

22   defendant's objection thereto).

23       CC.  Claim 30 – Juror Misconduct

24       Petitioner argues here that the following conduct by jurors during the guilt phase of his trial

25   amounted to misconduct: (1) an alternate juror discussed the case with seated jurors and

26   expressed racially biased views; (2) Officer Patch's widow spoke to one of the jurors; (3) the

27   jurors discussed the case prior to deliberations and those discussions included inappropriate

28   considerations; (4) jurors were concerned about media taking photographs; (5) a juror was so

181

1    concerned about his personal security that he kept a loaded gun by his bedside; (6) jurors

2    considered Menefield's incriminating statements against petitioner, despite being instructed not to

3    do so; (7) one juror voted to remove juror Conklin because he "wanted to get another African-

4    American person on the jury;" and (8) jurors discussed petitioner's failure to testify.[64]  (Second

5    Am. Pet. at 315-16.)  Petitioner further alleges here that his trial and appellate counsel were

6    ineffective for failing to raise these claims of jury misconduct.  (*Id.* at 317-18.)

7        Petitioner raised these claims in his motion for an evidentiary hearing.  The court determined

8    that petitioner failed to state a colorable claim with respect to all except petitioner's argument that

9    some jurors expressed racial bias and that Juror Galloway was concerned about his security.  (*See*

10   Jan. 31, 2013 Order (ECF No. 466) at 106-10.)  The court addressed the racial bias concerns

11   above in its discussion of petitioner's claim 15 and the security concerns were addressed above in

12   the discussion of petitioner's claim 16.  Neither party has provided additional briefing addressing

13   petitioner's remaining allegations of jury misconduct.  For the reasons stated in the court's

14   January 31, 2013 order, these remaining allegations of jury misconduct are rejected.  Further, to

15   the extent petitioner asserts a claim of ineffective assistance of counsel here, his failure to show

16   juror misconduct means he cannot show prejudice from any failure of his counsel to raise these

17   claims either at trial or on appeal.  Accordingly, those ineffective assistance of counsel claims are

18   also denied.

19        DD.  Claim 31 – Failure to Maintain a Complete Trial Record

20        Petitioner argues the municipal and superior courts' failure to create and maintain complete

21   records of all significant proceedings in his case violated his constitutional rights.  (Second Am.

22   Pet. at 318-22.)  Specifically, petitioner points to:  (1) the lack of any record of the court's

23   responses to notes transmitted to the court from the jury during deliberations; (2) the lack of

24   transcripts of some *ex parte* conferences held in municipal court with the prosecutor; and (3)

25   redactions to transcripts of some of the *ex parte* conferences.

26   _____

27   [64]  Petitioner also alleges jurors felt "the penalty phase deliberations were conducted in an
     environment pervaded by intimidation and extreme psychological pressure."  (Second Am. Pet. at

28   316-17, ¶ 11.)  Because that issue addresses only the penalty phase of the trial, which the court is
     not addressing in this order, the court will not address it at this time.

1        1. Legal Standards

2        "Mere absence of a perfect transcript does not necessarily deny one due process of law."

3    *Mitchell v. Wyrick*, 698 F.2d 940, 941 (8th Cir. 1983).  The Ninth Circuit set forth the following

4    test for determining when the unavailability of a transcript of proceedings violates due process,

5    finding that a court assessing such a claim must measure two criteria:  "(1) the value of the

6    transcript to the defendant in connection with the appeal or trial for which it is sought; and (2) the

7    availability of alternative devices that would fulfill the same functions as a transcript."  *Madera v.*

8    *Risley*, 885 F.2d 646, 648 (9th Cir. 1989).  With respect to this first criteria, a petitioner is "not

9    required to make a showing of need tailored to the facts of the specific case," so long as he

10   identifies "a tenable theory as to what error might have been involved."  *Id.*; *see also Scott v. Elo*,

11   302 F.3d 598, 604 (6th Cir. 2002) ("petitioner must present something more than gross

12   speculation that the transcripts were requisite to a fair appeal") (quoting *Bransford v. Brown*, 806

13   F.2d 83, 86 (6th Cir.1986)); *cf., White v. Florida Dep't of Corrections*, 939 F.2d 912, 914 (11th

14   Cir. 1991) ("the absence of a perfect transcript does not violate due process absent a showing of

15   specific prejudice"); *Mitchell*, 698 F.2d at 941-42.  A habeas petitioner must establish prejudice

16   from lack of recordation to be entitled to habeas corpus relief.  *Holmes v. Nevada Dep't of Corr.*,

17   No. 3:21-cv-00364-MMD-CSD, 2022 WL 2819736, at *4 (D. Nev. July 15, 2022) (citing

18   *Madera*, 885 F.2d at 649).

19       2. Responses to Jury Notes

20       Petitioner states that the Solano County Superior Court case file shows that the jury sent a

21   dozen notes to the judge during the guilt phase deliberations.  (Second Am. Pet. at 319, ¶ 4.)  He

22   describes those notes as "asking for readbacks of testimony and for further instructions."  (*Id.*)

23       However, petitioner has provided copies of only two of these notes and describes in the

24   petition a third note.[65]  In a note dated February 25, 1983 at 10:20 a.m., the jury asked, "Once a

25   verdict form is signed and dated, can a person change their mind or is the verdict final?"  (ECF

26   _____

27   [65]  Petitioner did not identify the location of these notes in his discussion of this claim.  However,
     he successfully moved for expansion of the record to include, among other things, two jury notes.
28   (*See* ECF No. 418.)  Those notes can be found at ECF No. 418-1.  The court is unable to locate
     copies of any of the other guilt phase jury notes in the record lodged in this court.

No. 418-1.)  In different handwriting below the jury foreman's signature, someone wrote, "Until

formally presented to the judge in open court a juror may change his or her mind."  (*Id.*)  The jury

sent out another note five minutes later.  In one type of handwriting, it says, "If a person doubts

the evidence, must they support their doubt?"  Immediately after that, in different handwriting,

the note states "Or because they have found lies in testimony of witnesses can they totally

disregard their test."  Below the jury foreman's signature is a note in a third type of handwriting.

It states, "Please refer main packet of instructions CALJIC 2.21, 2.90 and 17.40."  In the pending

petition, petitioner describes a third note, dated February 24, 1983 at 4:11 p.m., which stated,

"Need to have the verdict form on 1st degree murder clarified concerning step 2."  (Second Am.

Pet. at 320, ¶ 7.)

   In 1988, according to petitioner, the California Supreme Court instructed the superior court to

attempt to settle the record with respect to the responses to the jury's requests.  (*Id.* ¶ 8.)  The

court was unable to reconstruct any of the responses to the notes received from the jury during the

guilt phase of the trial.  (*Id.*)

   With respect to the unidentified jury notes, petitioner has simply failed to state a cognizable

claim for federal habeas relief because he does not "state the facts supporting" these grounds as

required by Rule 2(c), Rules Governing § 2254 Cases, and has not presented any tenable claim of

constitutional error.  With respect to the February 25 notes, petitioner has failed to make out any

claim of prejudice.  He has not shown that the judge's apparent responses were in any way

erroneous or prejudicial, or that they were not provided to the jury.  In fact, when counsel

recounted to the trial judge what had occurred during his absence with respect to the possibility of

a holdout juror, they described that the judge who took the February 25 notes as telling the jury,

"'Until the formal verdict is returned, you can change your mind.'"  (RT 7910:6-7.)

   Further, petitioner has failed to show that he was constitutionally entitled to have the judge

provide the jury with a response to the inquiry at all.  Petitioner cites only California Penal Code

§ 1138's provision that "the jury has a 'right to have . . . further instructions given.'"  (Second

Am. Pet. at 320, ¶ 9.)  Federal habeas relief, of course, is not available for violations of state law.

*McGuire*, 502 U.S. at 67-68.  The February 24 jury note is the only one meriting some discussion

1  by this court.

2      The California Supreme Court considered this issue on appeal.  It held:

3          As relevant in this guilt phase discussion, the jury sent out a
       note stating that the jurors wanted to "have the verdict form on 1st
4      degree murder clarified concerning step 2."   Because the note
       referred to first degree murder, it is most likely that the jury was
5      wondering about the meaning of the following option on the verdict
       form, which it answered affirmatively:  "(2) The defendant has/has
6      not in this proceeding been convicted of more than one offense of
       murder in the first or second degree in violation of Penal Code
7      Section 190.2(a)(3)."   (Words stricken in original as returned by
       jury.)  There is no record of the response, if any, to this question.  It
8      is not even apparent that defense counsel saw the inquiry.

9          The   court   erred   under   state   law   by   not   having   the
       proceedings, if any, reported in open court in the parties' presence.
10     (Cal. Rules of  Court, rule 39.5(c); see also § 190.9 [operative July
       1, 1990].  If it failed to answer the inquiry in the presence of or after
11     notice to defendant's counsel or defendant himself, it also erred as a
       matter of state law.   (§ 1138.)   Any error under section 1138,
12     however, is subject to the prejudice standard of *People v. Watson,
       supra*, 46 Cal. 2d 818, 836, and we believe the same rule should
13     apply to the failure to have the proceedings reported.  In *People v.
       Chessman* (1950) 35 Cal. 2d 455, 462 a case analogous because the
14     reporter's notes were incomplete, we held that the defendant bore the
       burden of showing prejudice because of a consequential omission.
15     Here as there, "Examination of the record in light of defendant's
       claims discloses that it is adequate to permit us to ascertain whether
16     there has been any miscarriage of justice."  (*Ibid.*)  We find no such
       miscarriage.   We cannot agree that defendant has shown that the
17     lapse–if any occurred other than a failure to include the reporter in
       the discussion–resulted in a reasonable probability of a less favorable
18     outcome for him.  The jury completed the verdict form, and we must
       conclude the matter was resolved to its satisfaction.
19
       Defendant  also  raises  federal  due  process  and  Eighth
20     Amendment claims that the failure to record the proceedings
       deprived him of a right to a meaningful appeal.  We need not decide
21     the scope of those rights in this discussion, however, for defendant
       has cited no authority that would require reversal *per se*, and it is
22     plain that the court's failure to preserve the record of the discussion
       of and answer to the inquiry, if any, was harmless beyond a
23     reasonable doubt.  (*See People v. Moore* (1988) 201 Cal.App.3d 51,
       58.)   Nor do we perceive a defect of such a magnitude that
24     defendant's Eighth Amendment right to reliability in the fact-finding
       process was implicated.  The cases defendant cites do not persuade
25     us to the contrary.

26  *Roberts*, 2 Cal. 4th at 325-26 (some internal citations omitted).

27      Petitioner cites just two cases in support of his argument that the Due Process Clause and

28  Eighth Amendment provide a criminal defendant a "fundamental right to an adequate record from

185

1   which to appeal."  (Second Am. Pet. at 320, ¶ 11.)  Neither supports his implicit argument that the

2   constitution mandates a written record of every trial court proceeding.  In *Griffin v. Illinois*, 351

3   U.S. 12, 16-20 (1956), the Supreme Court held that indigent defendants are entitled to a transcript

4   of prior proceedings when the transcript is necessary to an effective defense or appeal.  In

5   *Entsminger v. Iowa*, 386 U.S. 748, 752 (1967), the Supreme Court simply held that the petitioner

6   in that case was precluded from obtaining "complete and effective appellate review" due to his

7   counsel's failure to provide the appellate court with the transcript of the trial proceedings.  The

8   Court later made clear that the state need only supply an indigent defendant with a transcript after

9   considering two factors to determine its necessity:  "(1) the value of the transcript to the

10   defendant in connection with the appeal or trial for which it is sought, and (2) the availability of

11   alternative devices that would fulfill the same functions as a transcript."  *Britt v. North Carolina*,

12   404 U.S. 226, 227 (1971).  In 1989 the Ninth Circuit applied the *Britt* standard to a state court's

13   failure to record portions of a criminal trial.  *Madera*, 885 F.2d at 648.

14      As the California Supreme Court described, it is most likely the jury's question was directed

15   to the verdict form found at CT 1521-22.  Petitioner offers no alternative to this assumption.  The

16   form specifies that the jury has found petitioner guilty of the first degree murder of Charles

17   Gardner and then goes on to the special circumstances, labelled paragraphs (1) and (2).  That

18   second paragraph read as follows:  "The defendant HAS/HAS NOT in this proceeding been

19   convicted of more than one offense of murder in the first or second degree in violation of Penal

20   Code Section 190.2(a)(3)."  The jury was instructed in a footnote to cross out the inapplicable

21   words.  They crossed out the "has not."  It is hard to imagine how any instruction from the court,

22   or lack thereof, would have confused the jury about the "legal standards they were required to

23   apply" as petitioner argues.  The jury specifically found petitioner guilty of the first degree

24   murders of Charles Gardner and Officer Patch.  (CT 1520, 1521.)  The special circumstance

25   finding in paragraph 2 of the verdict form simply recognized that they had already made those

26   findings.

27      Petitioner has failed to argue a tenable basis for federal habeas relief from any response, or

28   lack thereof, by the trial court to the jury's February 24 note.  Accordingly, his claim regarding

186

1   the trial court's failure to transcribe proceedings of court responses to the jury notes will be

2   denied.

3                          3.  Missing Municipal Court Transcripts

4       Petitioner simply points out that the municipal court's docket shows that on June 5, 1981 and

5   June 18, 1981, prosecutor Kirk and a municipal court judge had an *ex parte* conference. (Second

6   Am. Pet. at 321, ¶ 14.)  Petitioner states only that the lack of transcripts of those proceedings

7   means "he is unable to address whatever issues might be revealed by those missing transcripts."

8   (*Id.* ¶ 15.)  This is insufficient to state a "tenable" claim of constitutional error.

9                       4.  Deletions in Transcripts of Ex Parte Proceedings

10      Petitioner's final argument regarding the state courts' recordkeeping is that the defense was

11  provided with redacted transcripts of *ex parte* conferences between the prosecutor and superior

12  court judges.  (Second Am. Pet. at 321-22.)  Petitioner states that his appellate attorneys' request

13  for unredacted versions of those transcripts was denied by the California Supreme Court.

14  Petitioner raised this issue previously in his claim 9 challenging the trial court's discovery

15  determinations.  Petitioner argues here that the transcript redactions were unconstitutional *per se*.

16  As described above, there is no constitutional requirement that every trial court proceeding be

17  recorded.  *See Mitchell*, 698 F.2d at 941.  Petitioner's specific challenges to those redactions are

18  addressed in the court's discussion of his claim 9, above.

19  III.  Claim 32 - Prejudice from all Guilt Phase Errors

20      As described above, the guilt phase of petitioner's trial was rife with error.  As also discussed

21  above, the prosecutor committed significant misconduct when he failed to provide the defense

22  with information that was unquestionably material to the credibility of the most important inmate

23  witnesses.  And, it cannot be ignored that many actions of the prosecution team, while perhaps

24  not individually rising to the level of prosecutorial misconduct, affected the outcome of

25  petitioner's trial.  The delayed discovery of important documents and the housing of the important

26  inmate witnesses together before trial where they could confer about and rehearse their trial

27  testimony unfairly disadvantaged the defense.  Even if those actions were not misconduct, they

28  contribute to this court's finding that petitioner's guilt phase conviction rested on extremely shaky

                                            187

1    ground.  Those unfair prosecutorial actions aside, this court finds that the errors of constitutional

2    magnitude that took place in connection with petitioner's trial undoubtedly rendered his trial

3    fundamentally unfair and affected the jury's verdict.

4        "The Supreme Court has clearly established that the combined effect of multiple trial errors

5    may give rise to a due process violation if it renders a trial fundamentally unfair, even where each

6    error considered individually would not require reversal."  *Parle v. Runnels,* 505 F.3d 922, 928

7    (9th Cir. 2007) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974*)); see also United

8    States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (citing *United States v. Wallace,* 848 F.2d

9    1464, 1476 (9th Cir.1988)) ("Where, as here, there are a number of errors at trial, a balkanized,

10   issue-by-issue harmless error review is far less effective than analyzing the overall effect of all

11   the errors in the context of the evidence introduced at trial against the defendant.") (internal

12   quotes omitted); *Lucas v. Muniz*, No. 5:16-CV-02145-DDP-JC, 2020 WL 11039030, at *16 (C.D.

13   Cal. July 30, 2020) (citing *Parle*, 387 F3d. 1045) (same).  "[Courts] have granted habeas relief

14   under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless

15   errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra

16   v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle v. Runnels*, 505 F.3d 922, 933

17   (9th Cir. 2007)).

18       Even where individual errors looked at separately may not rise to the level of reversible error,

19   their cumulative effect may nevertheless be so prejudicial as to require reversal.  *United States v.

20   Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15, 1993);

21   *see also Alcala*, 334 F.3d at 883 ("[E]rrors that might not be so prejudicial as to amount to a

22   deprivation of due process when considered alone, may cumulatively produce a trial setting that is

23   fundamentally unfair."); *see also Taylor*, 436 U.S. at 487 n.15 (cumulative effect of the

24   potentially damaging circumstances of this case violated the due process guarantee of

25   fundamental fairness); *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir.

26   1995) (prejudice may result from the cumulative impact of multiple deficiencies); *United States v.

27   McLister*, 608 F.2d 785, 791 (9th Cir. 1979) (prejudicial effect of combined errors requires

28   reversal).

The cumulative effect of trial errors can be a basis for habeas relief where there is a "substantial and injurious effect or influence in determining the jury's verdict[.]"  *Brecht,* 507 U.S. at 637.  In reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors.  *Necoechea*, 986 F.2d at 1282.  Even if a particular error is cured by an instruction, the court should consider any "traces" of the error which may remain.  *Id.*

The prosecution's case against petitioner rested solely on the testimony of inmate witnesses. The prosecution put on three witnesses who testified that they saw petitioner stab Charles Gardner.  In addition, several other witnesses testified they either saw or heard something that significantly implicated petitioner.  The credibility of each of those witnesses was the key issue at trial because there was no physical evidence linking petitioner to the crime.  Petitioner has clearly established that the prosecutor withheld critical information that would have affected the jury's consideration of the testimony of most of these witnesses and has proved that other witnesses testified falsely at his trial.

When the cumulative prejudicial effect of errors of petitioner's trial attorney, undermining confidence in the trial verdict, are added to the mix, the case against petitioner crumbles and there can be no confidence in the guilty verdict rendered.  *See Gray v. Montgomery*, No. SA CV 15-313-VBF (GJS), 2018 WL 7889825, at **30-31 (C.D. Cal. Sept. 11, 2018) (citing *Pizzuto v. Arave*, 385 F.3d 1247, 1260 (9th Cir. 2004)), *report and recommendation adopted*, No. SA CV 17-15-00313-VBF-GJS, 2019 WL 1405549 (C.D. Cal. Mar. 26, 2019) (observing pre-AEDPA Ninth Circuit precedent supporting cumulating prejudice under *Strickland*); *Reinhardt v. Feller*, No. 1:08-cv-00329 LJO DLB HC, 2008 WL 5386802, at *12, n.4 (E.D. Cal. Dec. 24, 2008), *report and recommendation adopted*, No. 1:08-cv-00329 LJO DLB HC, 2009 WL 256378 (E.D. Cal. Feb. 3, 2009) (observing in the context of the claimed ineffective assistance of counsel, that the Ninth Circuit has recognized a claim of cumulative error to grant relief pursuant to a habeas corpus petition).

Inmate Ryland Cade was, by all accounts, the prosecution's most important witness.  Cade testified that he saw petitioner stab Gardner and that petitioner confessed to him afterwards.  In his closing argument, prosecutor Kirk lauded Cade's morality in coming forward to testify: "the

189

1   reason Cade finally came forward was because he had been reading the bible and talking to his

2   counselor.  It bothered his conscience." (RT 7825:28 – 7826:2.)  Prosecutor Kirk also asserted

3   that Cade had been "completely consistent throughout this case, once he decided to come

4   forward" and Kirk stressed again that Cade did so "because his conscience bothered him." (RT

5   7825:22-23.)  The defense was unable to cross-examine Cade with his prior inconsistent

6   statements made before he had his "crisis of conscience," about Cade's request for help from the

7   prosecution in getting married while imprisoned, and about the letter prosecutor Kirk wrote to the

8   federal authorities about Cade's cooperation.

9        The defense also was never allowed to know that Cade had been declared insane only three

10   years before he purportedly witnessed the attack on Gardner and that he had a history of suffering

11   from serious mental health issues.  The jury never heard the evidence that Cade suffered from

12   schizophrenia, psychoses, and paranoia or that he experienced hallucinations.  In addition to the

13   lack of this highly relevant evidence of Cade's abilities to perceive and remember the events

14   surrounding Gardner's killing, the defense also lacked information to seriously call into question

15   the prosecution's argument that Cade was motivated by morals to come forward.  The jury never

16   heard that Cade requested help in arranging a second prison marriage, requested money,

17   requested better placement in the federal prison system, and, most importantly, that Cade

18   expected to receive a reduced sentence for testifying and threatened not to testify at all if he did

19   not get those promises in writing.  Finally, due to defense counsel's error, the jury never heard

20   details about the prosecutor's offer of help with Cade's first marriage request and visit with his

21   fiancée at a hotel when he came to testify  at petitioner's trial.  The fact that Cade was facing two

22   long prison sentences would certainly have been important to point out during cross-examination.

23   The value of the one significant benefit each inmate witness testified he would receive – a letter

24   from the prosecutor to the parole board regarding his cooperation – depended on the sentence the

25   inmate was facing.  Had the defense known not only of the length of Cade's prison sentences, but

26   of his attempts to leverage his cooperation to shorten those sentences, the jury would have

27   understood that Cade had more than just his conscience motivating his agreement to testify for the

28   prosecution.

1     Inmate Robert Hayes was the second witness to testify that he witnessed petitioner stab

2  Gardner.  Again, the prosecutor withheld evidence from the defense that would have significantly

3  impacted Hayes' credibility.  As a result, the defense was unaware that the prosecutor had

4  promised Hayes he would write a letter to the parole board to help secure his release or that

5  Hayes had a number of prior convictions, including very recent convictions, involving dishonesty.

6  While the prosecutor certainly had an obligation to reveal that information, petitioner's trial

7  attorney can also be faulted for failing to ask Hayes on cross-examination whether he had

8  received any benefits for testifying.

9     The third witness to testify at trial that he saw petitioner stab Gardner was Raybon Long.

10  Following petitioner's trial, Long changed his story at least twice.  In addition, testimony at the

11  reference hearing, found to be credible by Judge Taft, showed that Long planned to testify falsely

12  at petitioner's trial.  It appears that every judicial officer who has considered Long's testimony in

13  this case has found him to be at least generally unbelievable.  In short, petitioner's conviction

14  cannot rest, even in part, on the testimony of such a known liar.

15     For the same reason, basing petitioner's conviction on the highly suspect testimony of

16  Richard Yacotis would be fundamentally unfair.  Yacotis testified that after the crimes he

17  overheard petitioner ask Menefield why Menefield had not picked up the knife.  However,

18  Yacotis testified at the reference hearing that, after agreeing to testify for the defense at trial, the

19  prosecution threatened him and told him to testify that he had overheard petitioner's statement to

20  Menefield.  Yacotis's testimony was an important piece of the prosecution's case against

21  petitioner.  Judge Taft found Yacotis' testimony at the reference hearing to be credible.

22     Inmate Leslie Rooks testified at trial that on the night before the killing, petitioner asked him

23  for a knife because he wanted to kill Gardner.  Rooks also testified he saw petitioner with a knife

24  on the morning of the killing.  Rooks testified that he had received some benefits for his

25  testimony:  a letter to parole authorities and help in transferring to a facility of his choice.

26  However, because the witnesses' prior crimes were not disclosed in discovery by the prosecutor,

27  the defense did not know that Rooks was in prison serving a long sentence and, therefore, had

28  particular reason to curry favor with the prosecution.

1    Finally, inmate Robert Black's tape-recorded statement was played for the jury.  Therein,

2    Black described two men running up the stairs followed by victim Gardner.  One of the men he

3    identified as Menefield.  The other he identified as possibly Leslie Rooks.  He did not identify

4    that second man he had seen as petitioner.  This was important eyewitness testimony that went

5    unused by defense counsel for no apparent reason.

6    Considered in total, the constitutional errors affecting the guilt phase of petitioner's trial

7    rendered it fundamentally unfair.  *See Alcala*, 334 F.3d at 883 (citing *Frederick*, 78 F.3d at 1381)

8    ("In those cases where the government's case is weak, a defendant is more likely to be prejudiced

9    by the effect of cumulative errors."); *Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992) ("We do

10   not need to decide whether these deficiencies alone meet the prejudice standard because other

11   significant errors occurred that, considered cumulatively, compel affirmance of the district court's

12   grant of habeas corpus as to the sentence of death.").

13   The jury did not have the opportunity to consider highly damning impeachment evidence and

14   did consider and rely on critical witness testimony that has since been found to be false.  As a

15   result, this court has absolutely no confidence that the guilty verdict returned against petitioner

16   was reliable or just.

17                        **CERTIFICATE OF APPEALABILITY**

18   Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has

19   considered whether to issue a certificate of appealability.  *See* Local Rule 191(j).  A successful

20   habeas petitioner may appeal only those claims for which a certificate of appealability is granted.

21   *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b); *Rios v. Garcia*, 390 F.3d 1082, 1088 (9th Cir.

22   2004); *see also Miller–El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Slack*, 529 U.S. at 483-84. .

23   A certificate of appealability may issue "only if the applicant has made a substantial

24   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

25   issue a certificate of appealability indicating which issues satisfy the required showing or state the

26   reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).

27   Where constitutional claims are denied on the merits, the petitioner must show that

28   reasonable jurists would find the district court's assessment of the constitutional claims debatable

1   or wrong.  *Slack*, 529 U.S. at 484.

2          Where the petition is dismissed on procedural grounds, a certificate of appealability

3   "should issue if the prisoner can show:  (1) 'that jurists of reason would find it debatable whether

4   the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it

5   debatable whether the petition states a valid claim of the denial of a constitutional right.'"  *Id.*

6   In the present case, the court finds that "reasonable jurists could debate" the denial of petitioner's

7   claim 29 regarding the removal of Juror Conklin during deliberations because petitioner has made

8   a "substantial showing of the denial of a constitutional right."  *Slack*, 529 U.S. at 483-84.  The

9   court finds that reasonable jurists would not find its denial of petitioner's other guilt phase claims

10  to be debatable, wrong, or deserving of encouragement to proceed further.

11                                  **CONCLUSION**

12         For the foregoing reasons, this court orders as follows:

13         1.  Petitioner's application for a writ of habeas corpus is conditionally GRANTED as to

14             his claims 1 and 7 (portions) on the grounds of prosecutorial misconduct, ineffective

15             assistance of counsel, and the presentation of false evidence at the guilt phase of

16             petitioner's trial in violation of his rights under the Fifth, Sixth, and Fourteenth

17             Amendments to the U.S. Constitution.

18         2.  Petitioner's guilty verdict shall be vacated unless the state commences a new trial

19             within a reasonable time.

20         3.  Petitioner's application for relief from the guilty verdict returned at the guilt phase of

21             his trial is denied in all other respects.

22         4.  The court does not at this time render any opinion on the claims of constitutional error

23             affecting the penalty phase of petitioner's trial.

24         5.  The court issues a certificate of appealability under 28 U.S.C. §2253(c) on claim 29.

25  /////

26  /////

27  /////

28  /////

6.   Petitioner's motion under Federal Rule of Civil Procedure 54(b) for final judgment on
claim 1 (ECF Nos. 559 & 560) is denied as having been rendered moot by this order.

IT IS SO ORDERED.

Dated:   __**October 28, 2022**__          _____

UNITED STATES DISTRICT JUDGE

194